IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDUARDO RAMIREZ          :        CIVIL ACTION
                         :
        v.                :
                         :
CITY OF PHILADELPHIA, et al.     :        NO.  24-3035

## <u>MEMORANDUM</u>

**Padova, J.**                                                           **June 30, 2025**

Plaintiff Eduardo Ramirez brings claims for violation of his rights under the United States Constitution and state law against the City of Philadelphia ("the City") and five Philadelphia police detectives arising out of his 1998 murder conviction, which was vacated in 2023 after he had been incarcerated for 27 years.  Four of the six Defendants have brought a Partial Motion to Dismiss, in which they ask the Court to dismiss three of the claims asserted against them in the Amended Complaint.  Specifically, the City seeks dismissal of Plaintiff's municipal liability claim, while Defendants John McDermott, Michael Gross, and Stephen Vivarina seek dismissal of Plaintiff's failure to intervene and Fourteenth Amendment malicious prosecution claims.  For the reasons that follow, we grant the Motion in part and deny it in part.

## I.    BACKGROUND

The Amended Complaint alleges the following facts.

A.  <u>The Murder and Robbery</u>

Early on the morning of February 20, 1995, Joyce Dennis was murdered at the laundromat where she worked in Philadelphia.  (Am. Compl. ¶ 16.)  Dennis was alone at the time of the killing, the last customer having departed by 12:45 a.m.  (<u>Id.</u> ¶¶ 18, 25-27.)  When Dennis failed to return home as expected, her husband notified police, who forced open the door to the laundromat's office and discovered Dennis dead on the floor.  (<u>Id.</u> ¶¶ 32-35.)

The investigation into Dennis's murder was originally assigned to Detective Walter Hoffner, who concluded that Dennis had been punched several times before being bludgeoned to death with a metal pipe.  (Id. ¶¶ 36, 213-14.)  An investigator for the Philadelphia Medical Examiner's Officer opined that the perpetrator's hands, face, and clothes would have been covered with blood, and Dennis had defensive wounds indicative of a struggle.  (Id. ¶¶ 38-39.)  The murder weapon, a three-foot metal pipe, was found near the body, along with a blood-smeared fleece vest.  (Id. ¶¶ 42-43.)  The perpetrator stole $800 in paper currency but left the laundry machine coin boxes undisturbed.  (Id. ¶ 49.)

B.  The First Phase of Investigation

Police learned from laundromat employee Jay Darnell, Sr., who lived nearby, that on the night of the murder, his children had been at home socializing with friends, including Plaintiff.  (Id. ¶¶ 51-52.)  Around 11:00 p.m. that night, Darnell's daughter, Mary Emanual, and Plaintiff left the house to pick up some items at a 7-Eleven before going to the laundromat for a particular kind of soda.  (Id. ¶¶ 54-55.)  They ran into a friend named Peter Gozzi and got a ride with him back from the 7-Eleven, but then realized that they had forgotten to pick up the soda.  (Id. ¶¶ 56-57.)  Plaintiff went across the street to the laundromat between 11:00 and 11:30 p.m., bought the soda, and exchanged phone numbers with another customer.  (Id. ¶ 58.)  At 1:00 a.m., the guests, including Plaintiff, Gozzi, and Billy Weihe, were asked to leave the Darnell house.  (Id. ¶ 71.)  Gozzi drove Plaintiff and Weihe to Weihe's house, where the two spent the night.  (Id. ¶ 72.)  Neither said anything to Gozzi about the murder and Gozzi did not notice anything suspicious.  (Id. ¶¶ 73-74.)  Sometime after 1:00 a.m., Plaintiff called the customer he had spoken with at the laundromat, and the two spoke for about twenty minutes.  (Id. ¶ 59.)

Emanual, then age 20, was interviewed by two different Detectives, who used "abusive and coercive tactics" in an effort to pressure her into implicating Plaintiff in Dennis's murder. (Id. ¶¶ 54, 60-61.) They questioned her for ten hours, handcuffed her to a chair, screamed at her, and threatened to "knock [her] right across this room" and send her to jail for "thirty years to life." (Id. ¶ 63.) They also repeatedly returned to Emanual's home, circling the block and threatening her family. (Id.) Despite all of this, Emanual steadfastly denied that Plaintiff was involved in the murder, even after police falsely claimed that Plaintiff and Weihe had confessed and implicated her. (Id. ¶¶ 64-65.) At one point during this interview, she was placed alone in a room with Weihe, who admitted "that he had succumbed to police coercion and falsely implicated" Plaintiff after investigators "threatened to charge him with murder and send him to jail for life." (Id. ¶¶ 66-67.) Defendants "concealed the coercive tactics employed against Ms. Emanual and the full circumstances of her interrogation." (Id. ¶ 68.)

Defendants Vivarina and Snell first interrogated 18-year-old Weihe on March 1, 1995. (Id. ¶¶ 54, 170.) Weihe initially claimed that on the morning after the killing, Plaintiff had shown him "a big knot of money" and admitted to robbing and hitting Dennis. (Id. ¶ 173.) Weihe then changed his story in response to police prompting, stating that Plaintiff had expressed his intention to rob the laundromat on the night of the murder. (Id. ¶¶ 174-75.) Before leaving the Homicide Unit, Weihe recanted his statement, which was noted in concealed police activity sheets but not on the statement itself. (Id. ¶¶ 182-83.) Police also concealed records indicating that they attempted to influence Weihe by setting up a confrontation between him and Emanual the next day (March 2). (Id. ¶¶ 236-37.)

Police also questioned Sarah Hurd, age 15, who had supposedly hosted a party where Plaintiff confessed to the murder. (Id. ¶¶ 75, 77.) On March 17, 1995, Defendants Vivarina and

Snell showed up at Hurd's home at 8:00 a.m. and she agreed to let them "drive her around the block to ask her a few questions," leaving her one-year-old in the care of neighbors. (Id. ¶¶ 78-80.) Instead, Defendants Vivarina and Snell drove her to the Homicide Unit and locked her in an interrogation room for hours without food, access to a bathroom, or a parent present. (Id. ¶¶ 81-83, 87.) The Detectives screamed at Hurd, threatening "to charge her with concealing evidence," to take her baby, and to arrest her mother. (Id. ¶ 86.) The Detectives also falsely told Hurd that Weihe and Plaintiff had confessed, and that they knew that both Plaintiff and Weihe had confessed to Hurd on the night of the crime. (Id. ¶¶ 84-85.) Despite this, Hurd insisted that Plaintiff had never confessed to her and that, in fact, she had spoken to Weihe and Plaintiff and both had denied any knowledge of the murder. (Id. ¶¶ 87-88.) After Hurd was released, her mother demanded that Hurd be allowed to make another statement with an attorney present. (Id. ¶¶ 89-90.) In her second statement, Hurd claimed that there had not been a party at her house on the night of the murder, that no one had confessed to the murder in her presence, and that Weihe and Plaintiff had denied any knowledge of the crime. (Id. ¶¶ 91-93.) Defendants concealed the coercive tactics they used in their first interrogation of Hurd and did not employ such tactics in the presence of Hurd's attorney. (Id. ¶¶ 94, 96.)

On March 17, 1995, police obtained a statement from Plaintiff and Weihe's friend Joseph Maio, then seventeen years old. (Id. ¶¶ 132.a, 137.) Maio stated that on the night of the crime he had been with Plaintiff, Weihe, and another friend, T.A. Dennis (no relation to the victim). (Id. ¶¶ 139, 200.) He insisted, however, that he knew nothing about the murder, that Plaintiff did not have extra money afterwards, and that he did not think Plaintiff was involved. (Id. ¶ 141.)

On the evening of March 20, 1995, Defendants Worrell and Gross showed up at the home of 15-year-old Luis Rivera, insisting that he come to the police station for questioning

unaccompanied by a parent or lawyer. (Id. ¶¶ 153, 155-57.) There, Defendants Worrell and Gross handcuffed Rivera to a table, screamed at him, threatened to charge him in connection with the murder, and threatened to "beat the shit out of [him]." (Id. ¶¶ 158-60.) "Defendant Worrell physically abused Mr. Rivera, striking him in the head several times while demanding a statement inculpating [Plaintiff]." (Id. ¶ 161.) Despite initially denying any knowledge of the crime, Rivera eventually succumbed to the abuse and agreed to falsely state that Plaintiff had confessed at Hurd's party. (Id. ¶¶ 158, 162-63.) Prosecutors later pressed him to testify accordingly at trial, threatening to charge him with perjury and coercing him to add additional false details to his story. (Id. ¶¶ 164-66.) Rivera suffered emotionally from this ordeal, and later recanted his statement and trial testimony. (Id. ¶ 167.) Defendants concealed Rivera's initial denial of any knowledge regarding the murder, their coercive tactics, and Defendant Worrell's history of misconduct. (Id. ¶¶ 168, 257-59.)

C. The Grand Jury

After several months of investigation, the Philadelphia District Attorney convened a Grand Jury, which heard testimony from Darnell, Emanual, one of Emanual's brothers, Gozzi and Detective Hoffner. (Id. ¶¶ 54, 210, 212.) None of the witnesses implicated Plaintiff, and the Grand Jury did not return an indictment. (Id. ¶¶ 211, 220.) Indeed, Hoffner came to believe that Plaintiff was not the culprit, since the statements implicating him referenced coins, which had not been stolen, and because the only evidence that there had been blood on Plaintiff's clothes on the night of the murder was a statement from Weihe that there had been a spot of blood on one of Plaintiff's shoes. (Id. ¶¶ 217, 221.) When the Homicide Unit first sought a warrant for Plaintiff's arrest, Hoffner voiced his concerns and the District Attorney refused to approve the warrant. (Id. ¶¶ 222-23.) Hoffner was later removed as lead investigator and replaced by Defendant McDermott. (Id.

¶ 224.)  Nonetheless, Hoffner remained so convinced of Plaintiff's innocence that, when a warrant ultimately did issue, he continued to lobby the assigned prosecutor to drop the charges.  (Id. ¶ 226.)

D.  The Second Phase of Investigation

On April 11, 1995, Weihe was interviewed a second time, this time by Defendants Worrell and Gross.  (Id. ¶ 186.)  He initially reaffirmed his first recanted statement implicating Plaintiff, before recanting a second time.  (Id. at 186-87.)  Weihe's second recantation was initially concealed, though it ultimately came out at trial.  (Id. ¶¶ 186-87.)  During this second interview, Defendant Worrell and others held Weihe for five hours and threatened him with criminal charges. (Id. ¶ 255.)  Police also made an effort to elicit information from Weihe through a confidential informant, which they concealed after obtaining nothing inculpatory.  (Id. ¶¶ 238-39, 327-28.)

On April 25, 1996, Defendant McDermott and another detective pressured incarcerated drug dealer Corey Wadkins to sign a statement implicating Plaintiff.  (Id. ¶¶ 128-29, 131.) Defendant McDermott left Wadkins handcuffed to a chair in the Homicide Unit interrogation room for hours until he agreed to sign a statement that Defendant McDermott had prepared.  (Id. ¶¶ 130-31.)  The statement, which Wadkins never read, falsely indicated that Maio had told Wadkins that Weihe claimed to have committed the crime, and that, a few days later, Weihe had tried to purchase PCP from Wadkins with a pocket full of change.  (Id. ¶¶ 132-33.)  Defendants later leveraged this false statement to elicit a confession from Weihe and concealed that the statement was coerced and fabricated.  (Id. ¶¶ 135-36.)

Investigators also repeatedly questioned Wadkins's girlfriend Melanie Foreman, a drug dealer and acquaintance of Hurd and Plaintiff, who persistently denied any knowledge of the murder.  (Id. ¶¶ 117-18, 129.)  On May 1, 1996, Defendants McDermott and Vivarina interviewed Foreman, who was the subject of three unrelated open criminal cases, and baselessly threatened to

charge her as a co-conspirator and accomplice in the murder and robbery.  (Id. ¶¶ 120, 122-23.)

Foreman agreed to give a statement falsely implicating Plaintiff.  (Id. ¶ 124.)  Ms. Forman's

statement combined details fed to her by the police and rumors she had heard on the street.  (Id.

¶ 125.)  Foreman stated, and later testified at trial, that Plaintiff had committed the crime with

Weihe and T.A. Dennis; that Plaintiff confessed to her at Hurd's party, claiming to have stolen

$250; and that Hurd bought PCP from her using dollar bills that Plaintiff had obtained from the

robbery.  (Id. ¶¶ 125-26.)  Defendants concealed Foreman's initial denials and the tactics they used

to elicit her subsequent inculpatory statement.  (Id. ¶¶ 119, 127.)  They also concealed that Forman

was cooperating with the Government when she made her inculpatory statement and that she was

on federal supervised release at the time of Plaintiff's trial.  (Id. ¶ 301.)

In June of 1996, police tricked an individual named David Wadsworth into accompanying

them to the Homicide Unit for questioning.  (Id. ¶ 206.)  There, Defendant McDermott threatened

Wadsworth with arrest and imprisonment if he refused to give a statement implicating Plaintiff.

(Id. ¶ 207.)  Wadsworth ultimately made a statement, which Defendants concealed, claiming that

he had heard that Plaintiff, Weihe, and T.A. Dennis were involved in the murder, but that both

Plaintiff and T.A. Dennis had denied any knowledge of the crime when he directly confronted

them.  (Id. ¶¶ 208-09.)

On June 19, 1996, police again questioned Maio, who had previously claimed that he was

with Plaintiff on the night in question and knew nothing of the crime.  (Id. ¶¶ 137, 139, 141.)

During this second interview, Detectives McDermott and Vivarina threatened to charge Maio with

an unrelated stabbing to coerce him into implicating Plaintiff and Weihe in the Dennis murder.

(Id. ¶ 143.)  Maio endorsed a fabricated statement claiming that Plaintiff's pockets had been loaded

with change at Hurd's party and that Plaintiff had confessed to committing the crime with Weihe

and T.A. Dennis. (Id. ¶ 144.) Maio later admitted to friends that he had signed the false statement under threat of prosecution for the unrelated stabbing. (Id. ¶¶ 150-51.) Police concealed both their coercion of Maio and the fact that Maio was a suspect in a stabbing. (Id. ¶ 152.) Also concealed were multiple statements and documentation from police interviews of T.A. Dennis contradicting Maio's second, inculpatory statement. (Id. ¶¶ 204-05, 252-53.)

On July 2, 1996, Defendants McDermott and Vivarina questioned 19-year-old Joseph McDevitt. (Id. ¶¶ 97-98.) McDevitt refused to cooperate until Defendants McDermott and Vivarina threatened to baselessly arrest him for an unrelated burglary. (Id. ¶¶ 100-01.) McDevitt denied any knowledge of the murder, and specifically denied being at Hurd's party, hearing Plaintiff confess, or even seeing Plaintiff on the night of the murder. (Id. ¶¶ 102, 104, 106-07.) Defendants McDermott and Vivarina pressed McDevitt to admit that Plaintiff had bought marijuana from him with loose change, but McDevitt insisted that although he did sell marijuana, he would never have accepted payment in coins. (Id. ¶ 104.) Defendants McDermott and Vivarina then threatened to charge McDevitt with the robbery and murder, falsely claiming that other witnesses had implicated him. (Id. ¶¶ 103, 108.) Hungry and scared after hours of interrogation, McDevitt signed a false statement, written by Defendants McDermott and Vivarina, saying that he had heard Plaintiff confess. (Id. ¶¶ 109-11.) Later, when prosecutors contacted McDevitt about testifying at Plaintiff's trial, he said he would be happy to talk to anyone about "how [his] police report was a lie and all the things that the cops did to [him] to sign the report." (Id. ¶¶ 113-14.) McDevitt was never called as a witness, and this encounter, as well as his initial statements and the coercive tactics employed against him, were all concealed. (Id. ¶¶ 114-16.)

On July 3, 1996, Defendants McDermott and Vivarina interrogated Weihe a third time. (Id. ¶ 188.) This time, they confronted him with the false statements implicating him and Plaintiff

that had been obtained from Rivera, Wadkins, Foreman, Maio, and McDevitt, and threatened Weihe with a death sentence or life imprisonment. (Id. ¶¶ 189-91.) They coerced Weihe to make a third statement incorporating new details from these other accounts, including that he and Plaintiff had gone to the party at Hurd's house, that Plaintiff had confessed to several partygoers, and that Plaintiff's pockets had been full of coins. (Id. ¶¶ 192-93.) Defendants concealed their role in coercing and fabricating Weihe's final statement. (Id. ¶ 196.)

To bolster their case against Plaintiff, Defendants suppressed additional exculpatory evidence. For example, "because multiple witnesses failed to identify blood on Mr. Ramirez when they saw him shortly after the murder," evidence of bloody nature of the crime was concealed. (Id. ¶¶ 228-32.) Defendants also concealed evidence that only paper currency had been stolen, which contradicted the trial testimony of two witnesses, Maio and Weihe, that Plaintiff's pockets were bulging with coins after the crime. (Id. ¶¶ 233-34.) Finally, Defendants suppressed evidence of alternative suspects, including several leads involving brothers John and Kenneth Oberholzer (id. ¶¶ 240-47) and two involving one of Darnell's sons, J.C. Darnell (id. ¶ 248-50).

E. Conviction and Post-Conviction

Plaintiff's trial commenced in December of 1997, with Weihe testifying to his and Plaintiff's purported roles in the crime and Maio, Foreman, and Rivera testifying to Plaintiff's supposed confession. (Id. ¶¶ 274-75.) In his defense, Plaintiff presented testimony from Hurd and her friend that the party where the confession supposedly took place never occurred. (Id. ¶¶ 310, 313, 315-16.) Plaintiff's father, a retired police officer, also testified that he had given Plaintiff permission to stay at the Darnell house on the night of the murder and that Plaintiff had returned the next morning wearing the same clothes he had left in, with no sign of blood. (Id. ¶¶ 317-19.) Following three days of deliberation, the jury acquitted Plaintiff of first-degree murder but

convicted him of second-degree murder, robbery, conspiracy, and possessing an instrument of crime.  (Id. ¶ 323.)  Plaintiff was sentenced to the mandatory minimum term of life imprisonment without parole.  (Id. ¶ 324.)

Plaintiff challenged his conviction, and in 2001, during state post-conviction proceedings, he learned that police had concealed the fact that Dennis's fingernails had been clipped but never tested for DNA.  (Id. ¶¶ 260-62.)  When the clippings were ultimately tested, they showed the presence of male DNA, likely deposited during Dennis's struggle with her assailant, which was not Plaintiff's.  (Id. ¶¶ 263-65.)  In 2019, several other items from the crime scene were tested for DNA, including the held end of the pipe believed to be the murder weapon, the bloody fleece vest, a wooden broom handle, and a folded scarf.  (Id. ¶¶ 266-69, 272, 273.)  DNA from a single, unidentified male was found on the pipe and fleece, and none of the recovered DNA was consistent with Plaintiff.  (Id. ¶¶ 270, 272-73.)

In 2023, the District Attorney's Office acknowledged that Plaintiff's rights had been violated and that Plaintiff had been denied a fair trial due to the suppression of evidence undermining the prosecution's case and implicating alternative suspects.  (Id. ¶¶ 355-57.)  This, in combination with the new DNA evidence, led the District Attorney to recommend that the Court of Common Pleas vacate Plaintiff's conviction.  (Id. ¶¶ 357-58.)  On November 2, 2023, the judgment against Plaintiff was vacated, and on November 30, 2023, the charges against Plaintiff were dismissed and Plaintiff was released.  (Id. ¶¶ 359-60.)

F.  Misconduct in Homicide Investigations

For years both before and after Plaintiff's arrest and conviction for the Dennis murder, the City and the Philadelphia Police Department ("PPD") utilized coercive techniques to obtain confessions, fabricated inculpatory evidence and witness statements, and withheld exculpatory

evidence from prosecutors and defense attorneys.  (Id. ¶¶ 361-65.)  At the time of Plaintiff's investigation and prosecution, these practices were known to the City due to newspaper investigations, governmental investigations, complaints from lawyers and civilians, and internal police investigations.  (Id. ¶ 366.)  Moreover, this misconduct was committed with the knowledge or encouragement of PPD supervisors.  (Id. ¶ 367.)  The Amended Complaint identifies several cases that demonstrate the pervasive nature of this misconduct:

- A 1988/1989 case in which police conducted a sham photo identification and threatened a witness with separate charges to obtain a false statement.  (Id. ¶ 373.)  The resulting conviction was ultimately vacated with the agreement of the Commonwealth.  (Id.)

- A 1989 case in which police suppressed an exculpatory eyewitness account, coerced vulnerable individuals to provide false identifications, pressured an informant facing significant jail time to endorse a fabricated statement, and threatened a suspect in the crime that he would be charged if he did not make a false identification.  (Id. ¶ 375.)  The defendant was convicted and served 31 years before exonerating evidence was discovered and the judgment vacated.  (Id.)

- A 1990 case in which police coerced a witness with threats and promises of financial support to obtain a false inculpatory statement, ignoring alternative suspects and discrepancies with other witness accounts.  (Id. ¶ 376.)  The defendant was initially convicted, but after the coerced witness recanted her statement, the conviction was vacated and the defendant acquitted on retrial.  (Id.)

- A 1991 case in which police held a witness for days, interrogating him without food, water, or bathroom access and hitting him several times, then held a suspect without food, water,

or bathroom access, handcuffed him to a chair, punched him in the face, and pressed a foot to his crotch until he signed a statement which was later proven to be false.  (Id. ¶ 369.)

- A 1991 case in which police obtained a conviction based on a fabricated, coerced confession and planted evidence, which was later contradicted by DNA evidence, resulting in the defendant's acquittal on retrial.  (Id. ¶ 378.)

- A 1991 case in which police coerced a witness by threatening to prosecute her and by falsely claiming that she had been implicated; coerced a statement from a witness with a long history of drug and mental health issues and criminal activity; and suppressed a tip specifically identifying an alternate suspect.  (Id. ¶ 379.)  Ultimately, both witnesses recanted and the Commonwealth conceded, based on the misconduct, that the defendant had been denied a fair trial.  (Id.)

- A 1991 case in which police coerced false identifications and concealed alibi evidence.  (Id. ¶ 380.)

- A 1992 case in which police, including Defendant Worrell, isolated a suspect, "smacked him around," and kicked his testicles until he falsely confessed.  (Id. ¶¶ 257, 372.)

- A 1992 case in which a suspect who had been awake for 36 hours was interrogated at length before eventually signing a false confession.  (Id. ¶ 374.)  Following his conviction, the Commonwealth conceded that he was denied a fair trial based on the suppression of exculpatory evidence.  (Id.)

- A 1993 case in which police were given a false name by a witness and coerced an unrelated individual by that name into making a false statement and identification.  (Id. ¶ 370.)  When the misconduct came to light, the detective responsible refused to testify and the pending charges in the case were dropped.  (Id.)

- A 1993 case in which a defendant was convicted despite a documented alibi. (<u>Id.</u> ¶ 377.) The Commonwealth ultimately agreed that police had concealed evidence implicating an alternative suspect. (<u>Id.</u>)

- A 1993 case in which police suppressed multiple contemporaneous eyewitness accounts implicating an alternative suspect, leading the court to order a new trial. (<u>Id.</u> ¶ 381.)

- A 1996 case in which police coerced an informant to falsely testify in exchange for leniency, interrogated a teenage witness without a parent or lawyer present, and suppressed impeachment evidence. (<u>Id.</u> ¶ 382.) The conviction in the case was ultimately overturned and the Commonwealth moved to dismiss the charges. (<u>Id.</u>)

- A 2000 case in which police coerced three witnesses into providing fabricated statements, interrogating one for eight hours and offering another leniency, and suppressed impeachment and alternate suspect evidence. (<u>Id.</u> ¶ 383.) The conviction in the case was ultimately overturned and the Commonwealth moved to dismiss the charges. (<u>Id.</u>)

- A case from an unknown year in which police employed verbal and physical abuse to coerce statements from four young witnesses. (<u>Id.</u> ¶ 371.)

The City and PPD failed to train, supervise, or discipline officers in response to this misconduct. (<u>Id.</u> ¶ 397.) Moreover, the disciplinary system in place was deficient due to arbitrariness, chronic delays, inconsistency, lack of progressive discipline, poor training and supervision of disciplinary personnel, and the inability to track repeat offenders. (<u>Id.</u> ¶ 398.)

Prior to January 1, 2014, the PPD did not have clear internal guidance or rules in place concerning the constitutional rights of those being questioned or interrogated. (<u>Id.</u> ¶ 386.) Specifically, there was no policy governing the length of detention, use of <u>Miranda</u> warnings, use of force, recording of interrogations, or disclosure of exculpatory evidence. (<u>Id.</u> ¶¶ 387-90.) On

January 1, 2014, the PPD began requiring the video recording of all Homicide Unit interrogations. (Id. ¶ 391.)  Directive 5.23 was issued that same day, prohibiting the use of force or threats to obtain information from witnesses or suspects, requiring Miranda warnings and notice of non-custodial questioning, and establishing procedures for detaining uncharged suspects, including a limit of 36 hours of detention.  (Id. ¶ 391-92.)  When the Directive went into effect, the clearance rate for homicide cases plunged, and detectives complained publicly about the impact of the limitations on their work.  (Id. ¶¶ 393-95.)

G.  Plaintiff's Damages and Claims

As a result of Defendants' conduct, Plaintiff was wrongfully incarcerated for 28 years and sustained personal, psychological, social, and economic harm.  (Id. ¶¶ 399-403.)  The Amended Complaint asserts the following claims pursuant to 42 U.S.C. § 1983 against the individual Defendants: malicious prosecution in violation of the Fourth and Fourteenth Amendments (Count I); deprivation of liberty without due process of law and denial of a fair trial by fabricating evidence, deliberately using coercion and suggestion to obtain inculpatory witness statements, and withholding material exculpatory and impeachment evidence (Count II); civil rights conspiracy (Count III); and failure to intervene (Count IV).  Additionally, it asserts the following claims against the individual Defendants under Pennsylvania law: malicious prosecution (Count VI), outrageous conduct causing severe emotional distress (Count VII), and civil conspiracy (Count VIII).  Finally, it asserts a § 1983 municipal liability, or Monell, claim against the City (Count V).

In the instant Motion, Defendants McDermott, Vivarina, and Gross seek dismissal of the Fourteenth Amendment malicious prosecution claim against them in Count I, as well as the failure to intervene claim against them in Count IV.  The City also seeks dismissal of the Monell claim against it in Count V.  Plaintiff opposes the Motion.

## II.    LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)). We "accept[] all well-pleaded allegations in the complaint as true and view[] them in the light most favorable to the plaintiff." Talley v. Pillai, 116 F.4th 200, 206 (3d Cir. 2024) (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)). However, "we need not 'accept as true a legal conclusion couched as a factual allegation.'" Host Int'l, Inc. v. Marketplace PHL, LLC, 32 F.4th 242, 248 (3d Cir. 2022) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (citation omitted).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," which "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (second alteration in original) (first quoting Fed. R. Civ. P. 8(a)(2); then quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The complaint must allege "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In the end, we will grant a motion to dismiss pursuant to Rule 12(b)(6) if the factual allegations in the complaint

are not sufficient "to raise a right to relief above the speculative level." Geness v. Admin. Off. of Pa. Cts., 974 F.3d 263, 269 (3d Cir. 2020) (quoting Twombly, 550 U.S. at 555).

## III.    DISCUSSION

Section 1983 "does not, by its own terms, create substantive rights," but rather, "provides remedies for deprivations of rights established in the Constitution." Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979)). To state a claim for relief pursuant to § 1983, a plaintiff must allege that "the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." Id. (citing Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)). It is incumbent on the plaintiff to "identify the exact contours of the underlying right said to have been violated." Berg v. Cnty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

### A.    Fourteenth Amendment Malicious Prosecution

Count I asserts a § 1983 claim against all individual Defendants for malicious prosecution in violation of the Fourth and Fourteenth Amendments. In the instant Motion, the moving Defendants do not contest the Fourth Amendment claim but contend that the Fourteenth Amendment claim is barred by qualified immunity.

"[Q]ualified immunity shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009). The qualified immunity inquiry is twofold: (1) whether the facts alleged in the complaint "make out a violation of a constitutional right," and (2) whether that right "was clearly established at the time of a defendant's alleged misconduct." Montanez v. Thompson, 603 F.3d

16

243, 250 (3d Cir. 2010) (quoting <u>Pearson</u>, 555 U.S. at 232).  To be clearly established, a right must be recognized by "controlling authority or a robust consensus of . . . persuasive authority" with sufficient clarity "that any reasonable official in the defendant's shoes would have understood that [he] was violating it."  <u>Weimer v. Cnty. of Fayette</u>, 972 F.3d 177, 190 (3d Cir. 2020) (first quoting <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 63 (2018), then quoting <u>Plumhoff v. Rickard</u>, 572 U.S. 765, 779 (2014)).  Courts have discretion to decide which prong of the qualified immunity analysis to consider first "in light of the circumstances in the particular case at hand."  <u>Montanez</u>, 603 F.3d at 250 (quoting <u>Pearson</u>, 555 U.S. at 236).  A defendant bears the burden of proving his entitlement to qualified immunity.  <u>Reedy v. Evanson</u>, 615 F.3d 197, 223 (3d Cir. 2010) (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 808 (1982)).

The moving Defendants argue that they are entitled to qualified immunity because there was no clearly established Fourteenth Amendment right against malicious prosecution in 1995-1997, when Plaintiff's investigation and prosecution transpired.  Indeed, just one year earlier in 1994, a plurality of the Supreme Court had concluded that because the Fourth Amendment offers specific protections against malicious prosecution, such claims are unavailable as a matter of substantive due process.  <u>See</u> <u>Albright v. Oliver</u>, 510 U.S. 266, 273-75 (1994).  Post-<u>Albright</u>, the United States Court of Appeals for the Third Circuit has acknowledged ambiguity in its own caselaw with respect to the viability of Fourteenth Amendment malicious prosecution claims.  <u>See</u> <u>Halsey v. Pfeiffer</u>, 750 F.3d 273, 290 n.14 (3d Cir. 2014) (comparing <u>Torres v. McLaughlin</u>, 163 F.3d 169, 173 (3d Cir. 1998), which left open the possibility that malicious prosecution claims might yet sound in *procedural* due process, and <u>Gallo v. City of Philadelphia</u>, 161 F.3d 217, 222 (3d Cir. 1998), which questioned the availability of any malicious prosecution claim outside of the Fourth Amendment).

Based on this authority, courts in this district have consistently concluded that there was not a clearly established right against malicious prosecution under the Fourteenth Amendment at the time of the PPD's investigation of the Dennis murder and the resulting prosecution of Plaintiff. See, e.g., Ogrod v. City of Philadelphia, 598 F. Supp. 3d 253, 266 (E.D. Pa. 2022) (concluding that there was no clearly established Fourteenth Amendment right against malicious prosecution between 1992 and 1996); Onyiah v. City of Philadelphia, 660 F. Supp. 3d 407, 420 (E.D. Pa. 2023) (same, between 2010 and 2013); see also Lewis v. City of Philadelphia, Civ. A. No. 19-2847, 2020 WL 1683451, at *8 (E.D. Pa. Apr. 6, 2020) (collecting cases); cf. Crosland v. City of Philadelphia, 676 F. Supp. 3d 364, 378 (E.D. Pa. 2023) (finding that a Fourteenth Amendment right against malicious prosecution was clearly established in this circuit *before* Albright was decided). Even Hicks, the only contrary case Plaintiff cites, merely declined to decide the issue at the motion to dismiss stage, despite acknowledging that it involves "murky, close questions," which "are the lifeblood of a qualified immunity defense." Hicks v. City of Philadelphia, Civ. A. No. 22-977, 2023 WL 5278713, at *8 (E.D. Pa. Aug. 16, 2023). Under these circumstances, we cannot conclude that a Fourteenth Amendment right against malicious prosecution was clearly established when the underlying events took place. Accordingly, we conclude that the moving Defendants have met their burden of establishing that qualified immunity shields them from Plaintiff's Fourteenth Amendment malicious prosecution claim, and we grant the Motion to Dismiss with respect to that claim.

B. Failure to Intervene

Count IV of the Amended Complaint asserts a § 1983 claim against all individual Defendants for failure to intervene to prevent Plaintiff's false arrest, malicious persecution, false imprisonment, and deprivation of due process. The moving Defendants contend that this claim is

barred by qualified immunity because there was no clearly established constitutional duty to intervene in this instance.

The Third Circuit has recognized a duty to intervene in the Eighth Amendment context, explaining that "a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior." Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  However, the Third Circuit has "concluded that our precedent does not establish, let alone clearly establish, a right to intervention in other contexts." Thomas v. City of Harrisburg, 88 F.4th 275, 285 (3d Cir. 2023) (citations omitted); see also Brackbill v. Ruff, No. 22-1628, 2023 WL 5447271, at *3 (3d Cir. Aug. 24, 2023) ("This Court has yet to determine whether a failure to intervene claim based on a false arrest is cognizable." (citing Lozano v. New Jersey, 9 F.4th 239, 246 n.4 (3d Cir. 2021))); cf. Weimer, 972 F.3d at 191 ("[W]e have not extended [the duty to intervene] to prosecutors who fail to intervene to prevent police from conducting unconstitutional investigations.").  We are aware of no legal authority on which we could base a conclusion that officials at the time in question had a clearly established duty to intervene to prevent a plaintiff's false arrest, malicious persecution, false imprisonment, or deprivation of due process, and Plaintiff does not identify any.  Cf. Ogrod 598 F. Supp. 3d at 273; Onyiah, 660 F. Supp. 3d at 416; Handy v. City of Philadelphia, Civ. A. No. 24-1905, 2024 WL 4309973, at *6 (E.D. Pa. Sept. 26, 2024) ("Courts in this district have consistently held that there is no clearly established stand-alone right to intervention by officers to prevent malicious prosecution or deprivation of liberty without due process[.]" (collecting cases)).  We therefore conclude that the moving Defendants have met their burden of demonstrating that qualified immunity bars the failure to intervene claim in Count IV.  Accordingly, we grant the Motion to Dismiss with respect to that claim.

C.  Municipal Liability

In Count V of the Amended Complaint, Plaintiff asserts a municipal liability claim against the City pursuant to § 1983 and Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  The Amended Complaint alleges that during Plaintiff's investigation and prosecution, the City maintained "a policy, practice, or custom of unconstitutional misconduct" including coercive questioning, fabrication of inculpatory evidence, and concealment of exculpatory and impeachment evidence.  (Am. Compl. ¶ 424.)  It further asserts that the City was "deliberately indifferent to the need to train, supervise, and discipline police officers" and employed an inadequate internal disciplinary mechanism.  (Id. ¶ 398.)

Under § 1983, a municipality is not vicariously liable for the constitutional violations of its employees simply by virtue of employing them.  Monell, 436 U.S. at 691.  Rather, municipal liability requires a plaintiff to demonstrate the municipality's culpability by showing: (1) "that an unconstitutional policy or custom of the municipality led to his or her injuries"; or (2) "that [the injuries] were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"  Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019) (citing and quoting Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019)).  Here, Plaintiff pursues both custom and failure-or-inadequacy theories of municipal liability, and the City contends that he does not adequately plead either.

1.  Custom

For purposes of a Monell claim, a municipal custom is a "course of conduct [which,] although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  Estate of Roman, 914 F.3d at 798 (quoting Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)) (citation omitted).  To plausibly allege a Monell claim based on

custom, a complaint must allege that a municipal custom was the "proximate cause" of the plaintiff's injury, in that there was an "affirmative link" between the custom and the constitutional violation.  Id. (first quoting Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996), then quoting Bielevicz, 915 F.2d at 850).

      i.   The Customs at Issue

The City argues that we should dismiss this aspect of Plaintiff's municipal liability claim because the Amended Complaint does not sufficiently identify the customs on which Plaintiff's claims are based, instead making only broad references to unconstitutional customs generally.[1] However, as Plaintiff stated at Oral Argument, and as is clear from reading the Amended Complaint as a whole, Plaintiff's claims are premised on three specific customs.  First, the Amended Complaint alleges that the City has a custom of police "withholding and hiding exculpatory and impeachment evidence from the prosecution and defense lawyers," including exculpatory statements and recantations, evidence undermining the prosecution's case, and their own role in coercing or fabricating statements.  (Am. Compl. ¶ 363.)  Second, it alleges that the City has a custom of police "coerce[ing] inculpatory statements" by holding witnesses for hours, physically abusing them, and making threats of baseless prosecution or promises of leniency.  (Id. ¶ 364.)  Finally, it alleges that the City has a custom of police taking steps to "make false statements appear true and reliable" by feeding information to witnesses or fabricating the statements outright, while concealing their involvement.  (Id. ¶ 365.)  The Amended Complaint further fleshes out these alleged customs by alleging numerous examples of misconduct from Plaintiff's case and

---

[1] At Oral Argument, Defendant also raised concerns about the temporal scope of Plaintiff's claims, arguing that Plaintiff could seek disproportionate discovery based on, e.g., allegations of 1970s newspaper investigations of police misconduct.  (See Am. Compl. ¶ 366.)  As we stated at the time, we decline to address hypothetical discovery issues in the context of this Motion to Dismiss.

others.  This is not the sort of generic pleading rejected as insufficient in the cases relied on by the City.  <u>See, e.g.</u>, <u>McTernan v. City of York</u>, 564 F.3d 636, 658 (3d Cir. 2009) (concluding that allegation that defendant "ignore[d] First Amendment right[s]" failed to provide sufficient notice of challenged conduct (second alteration in original) (internal quotation omitted)); <u>Argueta v. U.S. Immigr. & Customs Enf't</u>, 643 F.3d 60, 74 (3d Cir. 2011) (determining that broad allegation of "culture of lawlessness" should be accorded little weight because it is "conclusory in nature and merely provided, at best, a 'framework' for the otherwise appropriate factual allegations" (citing <u>Iqbal</u>, 556 U.S. at 668)).  On the contrary, at this stage, these allegations amply suffice to give the City "fair notice of what [Plaintiff's] claim is and the grounds upon which it rests."  <u>Twombly</u>, 550 U.S. at 555 (quotation omitted).  We therefore deny the Motion to Dismiss as to Count V on this ground.

      ii.  <u>Causation</u>

The City also argues that we should dismiss this portion of Plaintiff's municipal liability claim because the Amended Complaint fails to plausibly allege that the purported customs were the proximate cause of Plaintiff's injuries.  To show causation, Plaintiff must allege an affirmative link between the custom and the constitutional violation, which he can do by alleging that the City "had knowledge of 'similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to [his] injury.'"  <u>Estate of Roman</u>, 914 F.3d at 798 (alterations in original) (quoting <u>Bielevicz</u>, 915 F.2d at 851).

The Amended Complaint identifies numerous cases from the same time period as Plaintiff's and allegedly involving the same kinds of misconduct at issue here, including police coercing interviewees by abuse or threats (<u>see, e.g.</u>, Am. Compl. ¶¶ 257, 373, 375, 376, 369, 370, 372, 378, 379, 380, 374, 382, 383), concealing exculpatory or impeachment evidence (<u>see, e.g.</u>,

id. ¶¶ 373, 374, 375, 377, 379, 380, 381, 382, 383), and fabricating inculpatory statements (see, e.g., id. ¶¶ 375, 378, 383).  The Amended Complaint also alleges instances of misconduct throughout Plaintiff's own case, during both phases of the investigation, and under both lead investigators.  (see, e.g., id. ¶¶ 63, 82-87, 108-110, 127, 131, 143, 158-161, 168, 196, 203-05.) Finally, it alleges that the City was aware of this pervasive misconduct due to newspaper, government, and internal investigations, as well as attorney and civilian complaints.  (Id. ¶ 366.)

The City argues that the other misconduct alleged is too temporally remote to support Plaintiff's claim.  However, it relies upon cases involving gaps of five to six years between the prior misconduct and the incidents at issue, decided at the summary judgment stage.  See, e.g., Watson v. Abington Twp., 478 F.3d 144, 156 (3d Cir. 2007); Doe v. Allegheny Cnty., Civ. A. No. 10-1761, 2013 WL 1290686, at *2-3, 12 (W.D. Pa. Mar. 27, 2013); see also Freeman v. McGorry, Civ. A. No. 20-3354, 2022 WL 3030789, at *4 (E.D. Pa. Aug. 1, 2022) (granting summary judgment while noting that "[t]he Court provided Plaintiff with an opportunity to conduct discovery to develop her *Monell* claim by denying Defendants' motion for judgment on the pleadings" (citation omitted)).  Here, in contrast, the Amended Complaint alleges a consistent pattern of similar misconduct from 1988 through 1993, just two years prior to the beginning of the underlying investigation in early 1995.  (Am. Compl. ¶¶ 16, 274, 369-83.)  Moreover, the earlier procedural posture of this case is significant because "[m]unicipal liability under § 1983 'is generally not amenable to resolution at the pleading stage, as it requires a plaintiff to plead facts outside his or her personal knowledge.'"  Crosland, 676 F. Supp. 3d at 380 (quoting 3909 Realty LLC v. City of Phila., Civ. A. No. 21-30, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021)). Considering the allegations of persistent misconduct leading up to and throughout Plaintiff's prosecution, we conclude that the Amended Complaint plausibly alleges that the City was aware

of prior similar misconduct, yet failed to take appropriate precautions, causing Plaintiff's injuries. See Estate of Roman, 914 F.3d at 798 (quoting Bielevicz, 915 F.2d at 851). Accordingly, we deny the Motion to Dismiss as to Count V on this ground.

### 2. Failure to Train, Discipline, and Supervise

As we mentioned above, Plaintiff also bases his municipal liability claim on the City's alleged deliberate indifference "to the need to train, supervise, and discipline police officers" and use of an inadequate internal disciplinary mechanism. (Am. Compl. ¶ 398.) A failure to train, discipline, or supervise will only lead to municipal liability where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." Estate of Roman, 914 F.3d at 798 (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)); see also Forrest, 930 F.3d at 105 (citation omitted) (explaining that a municipality may be liable for failures related to supervision and discipline of police officers as well as training). The Amended Complaint alleges that at the time of the underlying investigation, the PPD had no rules or guidance with respect to how long individuals being questioned could be constitutionally detained or prohibiting the use of force or threats against them. (Am. Compl. ¶¶ 386-88 & n.7.) It also alleges that the PPD had no rules or guidance regarding disclosure of exculpatory or impeachment evidence and did not mandate the recording of interrogations, precluding supervisory review of officers' conduct. (Id. ¶¶ 389-90.) Indeed, the Amended Complaint alleges that PPD supervisors were aware of and encouraged the claimed misconduct. (Id. ¶ 367.) Moreover, the internal disciplinary mechanisms the PPD had in place were allegedly ineffective, as they were arbitrary and slow, favored officers, failed to impose progressive discipline or track repeat offenders, and were staffed by personnel who were themselves untrained and incompetent. (Id. ¶ 398.)

The City argues that we should dismiss the failure to train, supervise and discipline portion of Plaintiff's municipal liability claim because the Amended Complaint fails to allege deliberate indifference on the part of City policymakers. "A plaintiff sufficiently pleads deliberate indifference by showing that '(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" Estate of Roman, 914 F.3d at 798 (alterations in original) (quoting Doe v. Luzerne County, 660 F.3d 169, 180 (3d Cir. 2011)).

Here, the City doubtless "know[s] that [police] will confront" situations involving handling exculpatory evidence, questioning witnesses or suspects, and preparing statements. Estate of Roman, 914 F.3d at 798 (quotation omitted). Additionally, as discussed above in the context of Plaintiff's custom-based claim, the Amended Complaint alleges a "history of [police] mishandling" such situations by concealing exculpatory evidence, coercing individuals during questioning, and fabricating and supplementing statements. (Id. (quotation omitted).) Finally, there is little question that "wrong choices," such as those alleged in the Amended Complaint, will "frequently cause deprivation of constitutional rights." (Id. (quotation omitted).) We therefore conclude that the Amended Complaint adequately pleads deliberate indifference and we deny the Motion to Dismiss as to Count V on this ground.

      3.   <u>Municipal Liability for Rights Not Clearly Established</u>

Finally, the City argues that, even if we deny the Motion as to a portion of Plaintiff's <u>Monell</u> claim, we should dismiss Count V to the extent that it seeks to hold the City liable for violations of rights that were not clearly established at the time of Plaintiff's investigation and prosecution. As we concluded above, when the events at issue took place, there was: (1) no clearly

established Fourteenth Amendment right against malicious prosecution; and (2) no clearly established duty to intervene in the false arrest, malicious persecution, false imprisonment, or due process contexts.

While the Third Circuit has not addressed whether a <u>Monell</u> claim can be based on the violation of a constitutional right that was not clearly established, courts of appeals in other circuits have held that a municipality cannot be deliberately indifferent to a right that is not clearly established. See <u>Szabla v. City of Brooklyn Park</u>, 486 F.3d 385, 393 (8th Cir. 2007) (en banc) ("[A] municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." (citations omitted)); <u>Hagans v. Franklin Cnty. Sheriff's Off.</u>, 695 F.3d 505, 511 (6th Cir. 2012) (same) (quoting <u>Szabla</u>, 486 F.3d at 393); <u>Bustillos v. El Paso Cnty. Hosp. Dist.</u>, 891 F.3d 214, 222 (5th Cir. 2018) (same) (quoting <u>Hagans</u>, 695 F.3d at 511; <u>Arrington-Bey v. City of Bedford Heights</u>, 858 F.3d 988, 995 (6th Cir. 2017) ("The absence of a clearly established right spells the end of [a] <u>Monell</u> claim."); <u>Young v. Cnty. of Fulton</u>, 160 F.3d 899, 904 (2d Cir. 1998) (stating that a <u>Monell</u> claim based on "failure to train cannot be sustained unless the employees violated a clearly established federal constitutional right" (citation omitted)). We agree with these analyses.

Plaintiff acknowledges this authority but asks us to instead follow the analysis of this issue in the <u>Crosland</u> case, which rejected the City's argument "that a municipality can only be 'deliberately indifferent' to a constitutional violation if the underlying right was clearly established at the time." <u>Crosland</u>, 676 F. Supp. 3d at 381. The <u>Crosland</u> court rejected this argument as an improper "'conflation' of qualified immunity and municipal liability standards." <u>Id.</u> (citation omitted).

The Supreme Court has made it clear that "municipalities have no immunity from damages liability flowing from their constitutional violations." Owen v. City of Independence, 445 U.S. 622, 657 (1980). Nonetheless, municipalities may **only** be liable for constitutional violations they cause. Bryan Cnty., 520 U.S. at 415 ("As we recognized in Monell and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights."). Here, under both Plaintiff's custom and failure-or-inadequacy theories, the City's culpability is premised on allegations that it knew violations were occurring and either acquiesced in those violations or was deliberately indifferent to them. Thus, we conclude that the reasoning of Crosland does not apply in this case. We further conclude that the Amended Complaint fails to state a claim for municipal liability based upon malicious prosecution under the Fourteenth Amendment or a duty to intervene in the false arrest, malicious persecution, false imprisonment, or due process context, as these rights were not clearly established during the period in question. Accordingly, we grant the Motion to Dismiss as to Count V to the extent that Plaintiff's Monell claim is based on the violation of those non-clearly established rights. We deny the Motion to Dismiss as to Count V in all other respects.

## IV.    CONCLUSION

For the foregoing reasons, the Motion to Dismiss is granted with respect to Plaintiff's malicious prosecution claim under the Fourteenth Amendment in Count I; the failure to intervene claim in Count IV; and the Monell claim in Count V insofar as it is based on either of those dismissed claims. The Motion is denied in all other respects.[2] An Order follows.

---

[2] "If a civil-rights complaint fails to state a claim, a district court must grant leave to amend the complaint unless amendment would be futile or inequitable." Vorchheimer v. Philadelphian Owners Ass'n, 903 F.3d 100, 113 (3d Cir. 2018) (citing Mullin v. Balicki, 875 F.3d 140, 151 (3d Cir. 2017)). Amendment is futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000) (citing In

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.

---

re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)).  Plaintiff has amended his Complaint once already, and neither proposes nor requests further amendment.  Moreover, the basis for our dismissal, that the rights at issue were not clearly established, is a conclusion of law which could not be altered by further amendment.  Accordingly, we will not grant leave to further amend the Amended Complaint.