# Exhibit "A"

FILED
08/01/2023 10:50:31 AM
Post Trial Unit
By: K. JOH

# IN THE PHILADELPHIA COURT OF COMMON PLEAS

COMMONWEALTH
OF PENNSYLVANIA                    :


v.                                                   CP-51-CR-903912-1996 (PCRA)


EDDIE RAMIREZ                    :


## RESPONSE TO PETITIONS FOR POST-CONVICTION RELIEF


DAVID J. NAPIORSKI
Assistant District Attorney
NANCY WINKELMAN
Supervisor, Law Division
LARRY KRASNER
District Attorney of Philadelphia

Office of the District Attorney
3 South Penn Square
Philadelphia, PA 19107

*Counsel for the Commonwealth*

1

**TABLE OF CONTENTS**

I.   **INTRODUCTION** ................................................................................................ 1

II.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY** ................................ 4

   A.   The crime................................................................................................... 4

   B.   The investigation...................................................................................... 5

   C.   The trial..................................................................................................... 26

   D.   Conviction, Post-Conviction Proceedings, and Disclosures.................... 38

III. **DISCUSSION** .................................................................................................... 46

   A.   Ramirez's *Brady* claims are timely and thus properly before the Court. ................ 46

   B.   Ramirez is due relief on his claims that the prosecution violated *Brady v. Maryland* by failing to turn over a host of evidence in this matter.................................... 48

      1.   The police activity sheets, handwritten investigative notes, grand jury testimony, internal memoranda and police misconduct evidence is favorable and was suppressed. ........................................................................................ 49

         a.   *Suppression* ................................................................................. 52

         b.   *Favorability*.................................................................................. 56

      2.   Assessed cumulatively, the suppressed items were material.............................. 58

         a.   *Blood and injury evidence* .......................................................... 60

         b.   *Coins*........................................................................................... 62

         c.   *The timeline of events*................................................................. 64

         d.   *Witness credibility*....................................................................... 66

         e.   *Alternative suspect evidence* ...................................................... 70

   C.   In the alternative, the Commonwealth does not oppose a hearing on Ramirez's *Brady* claims................................................................................................ 73

IV.  **CONCLUSION**.................................................................................................. 74

## TABLE OF AUTHORITIES

Cases

*Banks  v. Dretke*,
  540 U.S. 668 (2004) ........................................................................................ 55, 72
*Berger v. United States*,
  295 U.S. 78 (1935) ................................................................................................. 7
*Brady v. Maryland*,
  373 U.S. 83 (1963) .............................................................................. 6, 44, 50, 55
*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*,
  561 U.S. 661 (2010) ............................................................................................. 58
*Commonwealth v. Cascardo*,
  981 A.2d 245 (Pa. Super. 2009) ......................................................................... 43
*Commonwealth v. Lang*,
  537 A.2d 1361 (Pa. 1988)............................................................................... 43, 56
*Commonwealth v. Natividad*,
  200 A.3d 11 (Pa. 2019)................................................................................... 49, 60
*Commonwealth v. Weiss*,
  81 A.3d 767 (Pa. 2013)........................................................................................ 66
*Connick v. Thompson*,
  563 U.S. 51 (2011) ................................................................................................. 7
*Dennis v. Secretary, Pa. Dept. of Corrs.*,
834 F.3d 263 (3d Cir. 2016) .........................................................................Passim
*Engle v. Isaac*,
  456 U.S. 107 (1982) ............................................................................................... 7
*Haskins v. Superintendent Greene SCI*,
  755 F. App'x 184 (3d Cir. 2018) ......................................................................... 74
*House v. Bell*,
  547 U.S. 518 (2006) ............................................................................................. 76
*Howell v. Superintendent Albion SCI*,
  978 F.3d 54 (3d Cir. 2020)............................................................................. 71, 73
*Kennedy v. Superintendent Dallas SCI*,
  50 F.4th 377 (3d Cir. 2022)................................................................................... 7
*Kyles v. Whitley*,
  514 U.S. 419 (1995) ......................................................................................Passim
*Lambert v. Beard*,
  633 F.3d 126 (3d Cir. 2011) ........................................................................... 66, 69

*Munchinski v. Wilson,*
   694 F.3d 308 (3d Cir. 2012)..................................................................................... 53
*Natividad v. Beard,*
   2021 WL 3737201 (E.D. Pa. Aug. 24, 2021) .......................................................... 60
*Strickland v. Washington,*
   466 U.S. 668 (1984) ................................................................................................ 75
*Strickler v. Greene,*
   527 U.S. 263 (1999) ..................................................................................... 53, 55, 60
*Tierney v. United States,*
   410 U.S. 914 (1973) ................................................................................................ 43
*United States v. Agurs,*
   427 U.S. 97 (1976) .................................................................................................. 55
*United States v. Bagley,*
   473 U.S. 667 (1985) ................................................................................................ 58
*Wearry v. Cain,*
   577 U.S. 385 (2016) ................................................................................................ 71
*Whitaker v. Superintendent Coal Twp,*
   721 Fed. App'x 196 (3d Cir. 2018)......................................................................... 25
*Wilson v. Beard,*
   589 F.3d 651 (3d Cir. 2009)..................................................................................... 76
*Wood v. Bartholomew,*
   516 U.S. 1 (1995) ............................................................................................... 56, 61

Statutes and Rules

42 Pa. C.S. § 9541, *et seq.* ...............................................................................Passim
Pa. R. Prof. Conduct 3.8............................................................................................ 7
Pa.R.Crim.P. 230...................................................................................................... 43

Other Authorities

Alair S. Burke, *Revisiting Prosecutorial Disclosure,*
   84 Ind. L. J. 481 (Spring 2009)................................................................................ 5

## I.    INTRODUCTION[1]

On February 20, 1995, someone robbed a Northeast Philadelphia laundromat of roughly $1,100 in paper currency. The robber viciously beat the only laundromat employee working, Joyce Dennis, to death with a metal pipe.

The prosecution's case against the petitioner, Edward Ramirez, who was 18 at the time, consisted of Ramirez's co-defendant and teenage witnesses, all but one of whom have since allegedly recanted their police statements and trial testimony. In the intervening years, the Commonwealth has disclosed evidence that calls the reliability of Ramirez's conviction into question: previously undisclosed police activity sheets, handwritten notes, police interviews, grand jury testimony, internal memoranda, and past police misconduct.

---

[1] The Commonwealth notes that two of its current ADAs, Paul George and Thomas Gaeta, were involved Ramirez's defense at various points. George, as part of a team from the Defender Association of Philadelphia, and Gaeta, as part of a team from the Federal Community Defender Office. Pursuant to its ethical obligations and the DAO's internal screening protocol, the Commonwealth has screened both George and Gaeta have from participating in this case. They have not aided the Commonwealth in any capacity.

Based on this suppressed evidence, Ramirez now claims (among other things) that the prosecution violated his constitutional rights by not disclosing this evidence prior to his trial. *See Brady v. Maryland*, 373 U.S. 83 (1963). Ramirez also puts forth new, compelling DNA evidence from the murder weapon that excludes him as a contributor.

After a careful review of the record and relevant precedent, the Commonwealth is constrained to concede that its suppression of the presented evidence violated *Brady* and to recommend that Ramirez be granted a new trial. The crux of Ramirez's claims is whether the suppressed evidence undermines confidence in the verdict—in *Brady* terms, whether it was material. The Commonwealth now believes that Ramirez's conviction is unworthy of confidence and can no longer defend it. If the jury had been told of additional evidence supporting Ramirez's arguments, from evidence of a bloody struggle (when there was no blood on Ramirez) to evidence of alternative suspects to evidence that would have impeached the credibility of key prosecution witnesses, there exists a reasonable probability that the result of the trial would have been different.

The Commonwealth does not arrive at this conclusion lightly. But the Commonwealth is mindful that "[p]rosecutors have a special duty to seek

justice." *Connick v. Thompson*, 563 U.S. 51, 65–66 (2011). A prosecutor's "interest 'in a criminal prosecution is not that he shall win a case, but that justice shall be done.'" *Dennis v. Secretary, Pa. Dept. of Corrs.*, 834 F.3d 263, 290 (3d Cir. 2016) (en banc) (internal alteration omitted) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *see also* Explanatory Comment 1, Pa. R. Prof. Conduct 3.8 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). The Commonwealth's position here is the product of a thorough review of the record, coupled with "careful consideration" in light of its "primary authority for defining and enforcing the criminal law." *Kennedy v. Superintendent Dallas SCI*, 50 F.4th 377, 382 (3d Cir. 2022) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)).

This response first reviews, in some detail, what happened during the investigation into the decedent's death and then Ramirez's trial, as well as the relevant appellate and post-conviction proceedings. Next, this response analyzes why, if the suppressed evidence had been disclosed to Ramirez prior to trial, when looked at collectively with all the other evidence in the case, there is a reasonable probability that the outcome of the trial would have been different.

The Commonwealth takes no position here on whether Ramirez is guilty or innocent of this heinous crime, only on the fairness of his trial pursuant to its constitutional obligations. After an exhaustive and careful review, and considering all the suppressed evidence in light of the record as a whole, including new DNA evidence and consistent allegations of police misconduct, the Commonwealth must conclude that the outcome of Ramirez's trial is unreliable and that justice requires he receive a new one.[2] In the alternative, if the court wishes to hear more, the Commonwealth does not oppose an evidentiary hearing on Ramirez's *Brady* claims.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The crime

In the early morning hours of February 20, 1995, Joyce Dennis, the decedent, was found brutally beaten to death in the back office of the laundromat where she worked. The rear door of the laundromat was propped open using that door's deadbolt lock. There was evidence of a bloody struggle

---

[2] In the interests of judicial economy, the Commonwealth addresses only the *Brady* claims Ramirez raised in the second and third amendments to his 2015 PCRA petition, filed in 2020 and 2022, respectively. Ramirez is entitled to complete relief on those claims, and the disposition of those claims will moot the remainder of Ramirez's petition and its amendments. Should the Court wish to hear from the Commonwealth regarding Ramirez's remaining claims, the Commonwealth respectfully requests the opportunity to supplement this response.

beginning in the washing-machine area and moving into the back office. The back office, where the decedent was found, is accessible only with a key. The decedent was found there lying in a pool of blood next to a bloody metal pipe typically kept in that back office.

Each employee of the laundromat also had a cashbox located in the back office. Each cashbox was accessible using only that employee's key. Roughly $300 of paper currency was taken from the decedent's cashbox, in addition to approximately $800 in paper currency taken from the laundromat's communal cash cup. No other employee's cashbox appeared to have been touched, nor were any washing machines, dryers, vending machines or change machines. Neither the proceeds from the robbery nor the decedent's keys were ever recovered and no physical evidence was tied to any particular suspect.

## B. The investigation

The police arrived quickly after the decedent's husband reported that she did not return home from work when her shift ended at 2am. Upon arriving, investigators noticed blood and spatter around the laundromat and in the back office, that the rear door was propped open and had blood on it, and a black men's jacket with a torn pocket was on the floor with spots

of blood on it. The police took photos, dusted for fingerprints, and con-

ducted a number of witness interviews in winter and spring of 1995. An

investigating grand jury was convened in the fall of 1995, which bore no

fruit. In spring of 1996, the case was reassigned from the initial lead as-

signed detective, Detective Walter Hoffner, to Detective John McDermott

to investigate the matter as a cold case.  Detective McDermott conducted

further witness interviews, ultimately leading to the arrest and charging of

Petitioner Edward Ramirez and his friend and co-defendant, Billy Weihe.

Ramirez was charged with first-degree murder and the Commonwealth in-

tended to seek the death penalty. Because the facts are so integral to the

*Brady* claims here, the relevant statements and investigative materials are

summarized in some detail below.

### 1.  Laundromat employees

Ernest Manger, the owner of the laundromat, told police that the de-

cedent typically locked the rear door of the laundromat at 8pm and the front

door at 12:30am, and that, between what she had on her person and in her

cashbox, she likely had access to around $1,000 when she was killed. *See*

Pet's App'x[3] at 21a (Ernest Manger 2/20/95 Statement). Mary Allen, another

---

[3] To avoid inundating the court with duplicates, documents that are in-
cluded in the appendix that Ramirez filed with his 2020 amendment will be
cited to as at "Pet's App'x." Documents included as exhibits attached to

laundromat employee, similarly told police that both doors are locked by 12:30am and no one is allowed in after that point unless they need to do wash. *See* Pet's App'x at 25a (Mary Allen 2/20/1995 Statement). Jay Darnell, Sr., who lived across the street from and worked at the laundromat, told police that Ramirez was in his (Darnell's) home the night of the murder and at about 11pm Darnell's daughter, Mary Emanuel, sent Ramirez to the laundromat to fetch a can of soda, which he did. *See* Pet's App'x at 28a–29a (Jay Darnell, Sr. 2/24/1995 Statement). Ernest Manger and Jay Darnell, Sr. testified at trial consistently with their statements. Mary Allen was not called to testify.

### 2. Girls from the laundromat

Wanda Vargas and Joanne Esquline, cousins and patrons of the laundromat, told police that they arrived at the laundromat at about 9:30pm and stayed until about 11:30pm on the night of the murder. Vargas said that she and Esquline were last to leave the laundromat at 11:30pm and that the decedent locked the front door behind them. *See* Pet's App'x at 38a (Wanda Vargas 2/22/1995 Statement). The girls also told the police that, before they

---

Ramirez's 2022 amendment will be cited to as at "Pet's Ex." Otherwise new exhibits or exhibits that do not appear to be part of a prior filing will be cited to as part of the Commonwealth's appendix, cited to as "DAO App'x," and filed with this response.

7

left, they saw Ramirez come into the laundromat to get a soda and flirt with Esquline. *Id*. at 39a; *see also id*. at 8a (Joanne Esquline 3/6/1995 Statement). Esquline also remembered giving Ramirez her phone number in the laundromat close to 11:30pm. *Id*. at 8a. Esquiline lastly said Ramirez called her that night, at around 12:30am, and they talked for about 20 minutes before she got tired and hung up. *Id*. at 9a. Neither girl was called to testify at trial.

### 3. Teenagers from the Darnell house

It is undisputed that Ramirez spent a few hours at his friends' Mary Emanuel and J.C. Darnell's house on the night of the murder. The house was across the street from the laundromat, where Emanuel and Darnell's father, Jay Darnell, Sr. worked. At the Darnell house that night were Ramirez, Billy Weihe, Mary Emanuel, J.C. Darnell, and Pete Gozzi. Their relevant statements are summarized as follows.

#### a. *Mary Emanuel*

Jay Darnell, Sr.'s daughter, Mary Emanuel, then 20, gave two statements to police and testified before a grand jury and at an earlier PCRA hearing in this case. In her statements, Emanuel told police that Ramirez went to the laundromat to get a soda around 11pm and was gone for roughly 10–15 minutes. Ramirez, his friend Billy Weihe, and another friend named Pete Gozzi all left Emanuel's house at about 1:30 or 2am. *See* Pet's App'x at 35a

(Mary Emanuel 2/24/1995 statement); DAO App'x at 19 (Mary Emanuel 2/28/1995 statement).

Emanuel was also called to testify before a grand jury in October 1995. There, she told the court that, after Weihe gave an initial statement to police in which he inculpated Ramirez and suggested Emanuel was also involved in the murder, police picked her up and told her they knew she was involved and were "screaming in [her] face and threatening" her. *See* IGJ N.T., 10/11/1995 at 19. She expressed the opinion that the police had scared Weihe into giving his statement since they tried to do the same to her. *Id*. at 20. She also told the grand jury that, after the police put her and Weihe together in the same room at the police station, Weihe admitted to her that his statement was a lie, that "Eddie really didn't do this," and that they threatened him with life in prison if he did not inculpate Ramirez. *Id*. at 20–21. These grand jury notes were not disclosed to defense counsel before trial and Emanuel was not called to testify at trial.

Nearly ten years later at a PCRA hearing in this matter, Emanuel reiterated Weihe's statement to her and the police's attempt to coerce her. *See* N.T., 1/5/2005 at 64 ("They told me if I didn't tell them that Edward Ramirez did this, I was going to do 30 years in jail. They had me in tears. They

9

screamed in my face. They threatened my family. They rode around the block. They tortured us.").

### b. J.C. Darnell

Mary's brother, J.C Darnell, age 17, was also interviewed by police. He told them that he remembered Ramirez leaving to get his father a soda from the laundromat sometime before 11:30pm and that everyone left his house at about 1am. *See* DAO App'x at 17 (J.C. Darnell 2/24/1995 Statement). He saw Ramirez the next day and Ramirez did not have any injuries on his hands. *Id*. at 18. Darnell was not called to testify at trial.

### c. Peter Gozzi

Gozzi, age 18, who met up with Emanuel and Ramirez around 11pm the night of the murder, went back to Emanuel's house with them. Though he did not remember the exact time he left the Darnell house with Ramirez and Weihe, his recitation of events would place that time around 1am. *See* DAO App'x at 25–26 (Peter Gozzi 3/1/1995 Statement). He testified consistently at trial with his statement and reiterated he could not recall the time.

## 4. Teenagers from Sara Hurd's house

The prosecution's theory of the case was that, after Ramirez and Weihe committed the crime sometime before 12:45am, they ran to a girl named Sara Hurd's house to party and do drugs until morning and again met up

10

at her house later in the week. In addition to Ramirez and Weihe, Joseph Maio, Luis Rivera, Sara Hurd, Thomas Dennis, and Joseph McDevitt were involved in the alleged goings-on at the Hurd house.

    *a. Joseph Maio*

Joseph Maio, then 17, gave two statements to police. In his first statement, issued in March 1995 and taken by Detective Worrell, he told police that Ramirez called him the night of the murder at around 2am from the Darnell house to complain about having to walk across town earlier because he did not have a bus pass. *See* Pet's App'x at 99a–100a (Joseph Maio 3/17/1995 Statement). He also told police that he didn't know anything about the murder, that Ramirez did not have any extra money after the date of the robbery, and that he did not think Ramirez was involved. *See id.* at 101a–102a.

Fifteen months later, in June 1996, Maio gave another statement to Detective McDermott in which he said that he overheard Ramirez and Weihe confess to the crime at a party at Sara Hurd's house on the night of the murder. He said Ramirez showed up to Hurd's "no later than 11:30pm" and that both of his pockets were "loaded with change" such that "you could hear all the change as he walked." *See* Pet's App'x at 115a–117a (Joseph

11

Maio 6/19/1996 Statement). According to Maio, Ramirez confessed to hitting the decedent a couple of times until she fell down and leaving with a bag of money while Weihe and another boy, T.A. or Thomas Dennis[4], watched or stood outside. *Id*.

Maio testified at trial consistently with his second statement. He has since allegedly recanted. According to affidavits signed by three women who purport to have known Maio, Maio confessed to them that his statements were a lie and the product of police threats. *See* Pet's App'x at 110a–112a (Billie Joe Blood Aff. ¶¶ 2–3; Maureen Suarez Aff. ¶ 2; Sabrina Suarez Aff. ¶ 2). Maio died in 2011.[5]

    b.  *Thomas Dennis (T.A.)*

T.A., or Thomas Dennis, told an investigator working for Ramirez's defense that he was with Joe Maio for the entirety of the night of the murder, that he never saw Ramirez or Weihe, and that he did not go to Sara

---

[4] Thomas Dennis has no relation to the decedent. To avoid confusion, the Commonwealth refers to Dennis by his nickname, T.A.

[5] The Commonwealth takes no position on the reliability or credibility of the recantations and/or allegations of police misconduct in this matter, as they do not bear on the disposition of Ramirez's *Brady* claims. To wit, though Billie Joe Blood's affidavit was not prepared until 2016, Ramirez's defense counsel knew of her existence at the time of trial and did not find her credible. *See* N.T., 1/3/2005 at 91.

Hurd's house. He also claimed to have given two written statements to police saying the same things. No such statements were disclosed, T.A. was not called at trial, and he was never charged with any crime connected to this case. However, during voluntary discovery completed in 2021, it was discovered that police conducted at least one interview with T.A. According to a handwritten summary, T.A. told police that he was not with Ramirez and/or Weihe on the night of the crime and spoke with both Weihe and Ramirez at about 1:30am that night about "how they got home," because they did not have bus passes. *See* Pet's Ex. 28 (Handwritten Investigative Notes).

    *c.   Sara Hurd and Luis Rivera*

Sara Hurd, then 15, was first interviewed by Detectives Vivarina and Snell in March 1995 without a lawyer or parent present. During this interview, she told police that she knew Eddie went to get a soda from the laundromat on the night of the murder but that was it. *See* Pet's App'x at 49a (Sara Hurd 3/17/1995 Statement).

In 2015, Hurd prepared an affidavit alleging that when the police initially approached her, they told her they wanted to drive her around the block to ask a few questions before driving "straight to [the police station]." Pet's App'x at 46a—47a (Hurd Aff. ¶ 2). Hurd alleges that the detectives

13

interviewing her "screamed" at her and threatened her with charges if she did not tell them that Ramirez had admitted to her that he committed the crime.  She refused to do so. *Id*. ¶ 3. When she returned home she told her mother what had happened and they called the Public Defender's Office, which assigned Jules Epstein to her case. The Commonwealth notes that Hurd's account of police coercion matches Mary Emanuel's almost exactly. *Compare* Emaunel PCRA N.T., 1/5/2005 at 64 ("They told me if I didn't tell them that Edward Ramirez did this, I was going to do 30 years in jail. They had me in tears. They screamed in my face. They threatened my family. They rode around the block. They tortured us.") *with* Hurd Aff. ¶¶ 2–3 ("They asked if they could drive me around the block for five minutes [before] …. The officer became really angry and started screaming at me that I was hiding evidence and he could give me charges for hiding evidence from them … [and that] if I didn't cooperate they would take my baby from me.").

The police then interviewed Luis Rivera, who was 15 and was interviewed by Detective Worrell without a parent or lawyer present. According to Rivera's statement, he overheard Ramirez confess the crime to Sara Hurd while at her house "the Thursday or Friday after" the murder. *See* Pet's App'x at 60a (Luis Rivera 3/20/1995 Statement). Rivera testified at Ramirez's

14

trial consistently with his statement. Rivera has since recanted his police statement and trial testimony, echoing Emanuel and Hurd's stories regarding coercion. *See* Pet's App'x at 55a (Rivera Aff. ¶ 2) ("One of the cops started yelling at me that I had to tell them the truth or they would beat the shit out of me"…"He threatened me with being charged as an accessory or conspirator for withholding the truth from them"…"Finally I wanted it to stop so badly I decided to tell the police what they wanted to hear even though it wasn't true . . . I never had a single conversation with Eddie.").[6]

After taking Rivera's statement, Detective Worrell re-interviewed Hurd with counsel (Epstein) present. At this time, no alleged coercion or misconduct occurred. There, Hurd reaffirmed that she never heard Eddie confess anything, and that Luis Rivera did not overhear anything in her house. *See* Pet's App'x at 67a (Sara Hurd 3/22/1995 Statement).

   d.  *Joseph McDevitt*

Police also interviewed Joseph McDevitt in the spring of 1996, who then said that he was at the party at Sara Hurd's house on the night of the crime and overheard Ramirez confess to the crime and talk about "getting paid."

---

[6] The Commonwealth has previously stipulated that the detective who took Ramirez's statement, Paul Worrell, engaged in a pattern and practice of eliciting false statements from witnesses dating back to at least 1992. *See Commonwealth v. Willie Veasy*, CP-51-CR-641521-1992, Joint Stipulations ¶¶ 46–57. The court there granted Veasy relief.

*See* Pet's App'x at 150a–151a (Joseph McDevitt 7/2/1996 Statement). McDevitt has since recanted that police statement, asserting that he was threatened with prosecution if he did not give an inculpatory statement and that the police tried to get him to say Ramirez purchased marijuana with loose change from him, but he refused. *See* Pet's App'x at 142a–143a (McDevitt Aff. ¶¶ 3–5). As part of his 2015 affidavit, McDevitt asserts that he called the DAO before Ramirez's trial and spoke with an unknown female ADA. During that conversation, McDevitt allegedly told the ADA that his statement was a lie and he was coerced. *Id*. ¶ 6. He was not called to testify at trial and no such conversation was relayed to the defense.

### 5. Butchy Oberholzer

The police interviewed John "Butchy" Oberholzer, a known criminal from the area, in March 1995 in relation to the murder. He told police that he did not know anything about it or any of the people allegedly involved, though he knew the laundromat and had done wash there before. *See* Pet's Ex. 21 (John Oberholzer 3/1/1995 Statement). Undisclosed police activity sheets and handwritten notes, discussed below, suggest Oberholzer may have been involved.

### 6. Investigating Grand Jury

In the fall 1995, an investigating grand jury was convened for the purpose of hearing evidence in this matter. At those hearings, Mary Emanuel, her brothers Samuel Emanuel and J.C. Darnell, and her friend Pete Gozzi all gave testimony. Additionally, the original lead detective investigating the matter, Detective Walter Hoffner, testified. None of these grand jury transcripts was disclosed to the defense pre-trial. While some of the grand jury notes were disclosed during the initial PCRA proceedings in this case, Detective Hoffner's testimony was not disclosed to the defense until voluntary discovery took place in 2021. The substance of Detective Hoffner's grand jury testimony is summarized as follows.

   *a. Detective Walter Hoffner (Pet's Ex. 11)*

At a grand jury hearing on September 19, 1995, Detective Hoffner first told the grand jury that the decedent's injuries were so severe that initial responding officers reported that she'd been shot in the head. IGJ N.T., 9/19/1995 at 8–9. The murder weapon appeared to be a four-foot-long metal pipe found in the laundromat's back office, two feet of which were "covered in blood." *Id*. at 10. Detective Hoffner told the grand jury that he believed the decedent was punched several times in the face before being beaten

17

with the pipe. *Id*. at 12. Detective Hoffner also reported that the decedent was "a big woman" who lifted weights and ran five miles per day. *Id*. at 13.

Detective Hoffner then told the jury that he recovered a black waist-length men's medium-sized winter jacket, made of cloth, laying out of place near the rear office with a torn pocket. The jacket "smelled like mildew and had water stains on it" and was something that "a street person" would wear. *Id*. at 14, 28.[7]

As to blood evidence, Detective Hoffner told the grand jury that there was blood on the door handle to the laundromat's office, blood on the inside of the rear door (which has to be pushed open from the inside), blood spatter on the floor and on some of the washing machines, blood spatter up to four feet high on the walls of the back office, a pool of blood around the decedent's head and blood in her hands. Detective Hoffner told the grand jury that his team believed the assailant may have had his own injuries.

As to the laundromat's operations, Detective Hoffner told the grand jury that the laundromat employees kept their small bills in locked cashboxes in the back office to make change for customers with bigger bills. Each em-

---

[7] The Commonwealth notes that none of the witnesses interviewed by police recognized this jacket and it was agreed at trial that the jacket was not Ramirez's.

18

ployee had their own cashbox with its own key. Detective Hoffner esti-mated that the decedent had about two or three-hundred dollars in small bills and about eight hundred dollars in large bills that were stolen. Lastly, in response to a question from a juror, Detective Hoffner told the jury that anyone who used the laundromat would know that "the attendant goes in the [office] with little bills and big bills and comes out with little bills," not-ing specifically that "it's not like they had change" there. *Id*. at 59.

As to the timeline of events, Detective Hoffner testified that the decedent did not let anybody start a wash after 11:30pm when she would customarily lock the front door and begin cleaning. She would lock the back door earlier in the evening so she only had one entryway to worry about. After 11:30, she would only let in people that had laundry or that she knew "for her own protection." *Id*. at 19–22. He believed that the decedent was opening the rear door for someone she knew when he pushed his way in. *Id*. at 54. The rear door's deadbolt opens and closes with a key and was found propped open.

Detective Hoffner also expressed his opinion that the decedent was killed "between 11:30pm and a quarter to 12" on the night of the murder. He based this opinion on knowing the decedent locked the front door be-hind two girls at 11:30pm and that it was customary that she would then

19

begin to clean. Detective Hoffner knew that it took about 30 minutes to clean the laundromat. When the police arrived at 3:05am, the place hadn't been fully cleaned yet, but a mop and cleaning supplies had been taken out and cleaning had begun.[8]

The investigating grand jury did not produce charges.

### 7.  Corey Watkins and Melanie Foreman

In April 1996, after the case had been cold for seven months, the police questioned Corey Watkins, a drug dealer who was in local custody, regarding the laundromat murder. According to a defense investigator who spoke with Watkins, police handcuffed Watkins to a chair and coerced him into signing a prepared statement. *See* Pet's App'x at 85a–87a (O'Leary Aff. ¶ 2). In that statement, Watkins told police that Joe Maio told him that Weihe confessed the crime to Maio. Pet's App'x at 155a (Corey Watkins

---

[8] The Commonwealth notes that in 2018, a defense investigator working for Ramirez spoke with Detective Hoffner at his retirement home in central Florida about this case. During that conversation, Detective Hoffner allegedly told the investigator that he believed Ramirez was innocent of the crime. As evidence, he noted that no coins were stolen, making the witnesses' testimony about coins noncredible, and that it was among the bloodiest crime scenes he'd ever seen, so the perpetrator would have been covered in blood. Hoffner also allegedly told the trial prosecutor about his reservations about Ramirez's guilt before trial but was ignored. *See* DAO App'x at 35 (12/12/2018 defense investigative memo). The Commonwealth notes that this memo was provided to them pursuant to a limited waiver of the work product privilege. The Commonwealth has so far been unsuccessful in contacting Detective Hoffner to corroborate this.

4/25/1996 statement). Watkins also reported in his statement that he saw Weihe try to buy drugs with a "pocketful of change." *Id*. at 156a. He told police that his friend, Melanie Forman, also had information.

Five days later, the police interviewed Forman, who was a drug dealer facing federal gun and drug charges. Forman told the police that she knew that Ramirez, Weihe, and T.A. did the crime. *See* Pet's App'x at 71a (Melanie Forman 5/1/1996 Statement). According to Forman, Ramirez confessed the crime to her at Sara Hurd's house while partying and told her that he got $250 in the robbery. *Id*. at 72a. She said that, on the night of the murder, Sara Hurd bought PCP off of her using $1 bills Ramirez had gotten from the robbery. *Id*. at 74a. According to Forman's statement, Ramirez committed the crime while Weihe retrieved a soda and T.A. waited outside.[9] Forman testified for the prosecution at Ramirez's trial and reiterated some of the contents of her statement. Watkins was not called to testify.

---

[9] It's suggested in Forman's statement that police had interviewed her previously and she denied having any knowledge of the crime. Forman Statement at 13. The Commonwealth has been unable to find any prior recorded statements from Forman or any notes regarding prior interviews in the file.

21

Both Watkins and Forman were interviewed by Detective McDermott and have since recanted their police statements and/or trial testimony, citing police pressure and threats of prosecution as motivating their statements. *See* Pet's App'x at 86a (O'Leary Aff. ¶¶ 2—3).[10]

### 8. Billy Weihe

The police interviewed Billy Weihe three times in this matter. In March 1995, Weihe first told the police that he and Ramirez slept in his basement on the night of the murder and that, when Ramirez woke up, he confessed the crime to him and showed him a wad of money. Weihe then announced to the police that he had lied and was going to tell them the truth, then telling them that he was at Mary Emanuel's house with Mary, her brother J.C. Darnell, Ramirez, and Peter Gozzi on the night of the murder and that, at some point during the night, Ramirez announced he was "going to get

---

[10] Forman also claimed the detectives who interviewed her were feeding her information and telling her what to say in addition to threatening her. The Commonwealth notes that Detectives McDermott and Vivarina, who interviewed Forman, do not have any known record of formal discipline. That said, in the interests of fulfilling its ethical obligations to the court, the Commonwealth acknowledges that both detectives have faced allegations of coercing and/or eliciting false statements from witnesses that at least one jury has believed. *See Commonwealth v. Whitaker*, CP-51-CR-0413791-2002, *on remand from grant of habeas relief in Whitaker v. Superintendent Coal Twp*, 721 Fed. App'x 196 (3d Cir. 2018) (non-precedential).

paid," and left the house to rob the laundromat. Weihe then said that nei-

ther he, nor Ramirez, nor Emanuel told anyone about what happened. He

surmised that Emanuel planned the robbery with Ramirez, because she

knew the layout of the laundromat due to her father's employment there.

Weihe guessed that Eddie left to rob the laundromat at midnight or 12:15am

and returned 30 minutes later with money and "full of energy." DAO App'x

at 03–15 (Billy Weihe 3/1/1995 Statement). Weihe said he did not see any

blood or cuts on Ramirez. According to previously undisclosed police ac-

tivity sheets, and Weihe's trial testimony, he then immediately recanted his

statement, saying he had made the whole thing up. *See* Pet's Ex. 5 (3/2/1995

Hoffner Activity Sheet); N.T., 12/16/1995 at 108.[11]

Weihe then issued a second statement on April 11, 1995 to Detectives

Worrell and Gross that reaffirmed his first, recanted statement. Pet's App'x

41a–43a (William Weihe 4/11/1995 Statement). He then recanted that second

---

[11] Weihe's testimony in this regard came as a surprise to Ramirez's defense counsel, who asked the trial prosecutor if there were any notations in the file either suggesting or confirming this recantation. The trial prosecutor, who the Commonwealth believes did not have the activity sheet, responded that there were not. *See* N.T., 12/16/1997 at 165 (**Q**: Do you have that nota-tion anywhere?; **A**: No, Mr. McMahon.). As discussed below, this notation exists on the recently disclosed March 2, 1995 police activity sheet.

statement, which was not disclosed pre-trial but was mentioned during trial. *See* N.T., 12/16/1997 at 176.

Thirteen months later, in July 1996, the police interviewed Weihe a third time. This time, interviewed by Detectives McDermott and Vivarina, Weihe implicated both himself and Ramirez. He told police that he was at the Darnell residence on the night of the murder with Ramirez, Mary Emanuel, J.C. Darnell, and T.A. Weihe said that at some point they left and went back to his house, after which Ramirez announced he wanted to rob the laundromat. *See* Pet's App'x at 166a–167a (Billy Weihe 7/3/1996 Statement). Weihe then agreed to be Ramirez's lookout and the two began walking back towards the laundromat.

Ramirez then allegedly walked in through the front door and Weihe sat on a table in the front of the laundromat. Weihe told police Ramirez asked for money three times, to which the decedent did not respond, before he saw Ramirez hit her with something, causing her to fall to her knees. *Id*. at 168a. Weihe then went outside, immediately followed by Ramirez who "already had the money." *Id*. at 169a. According to Weihe, Ramirez's pockets were so full of loose change that his pants were falling down. *Id*. at 177a. The two boys then ran down Pratt Street before running into T.A. Weihe told police that the three boys then went to Sara Hurd's house, where

24

Ramirez confessed the crime to attendees at her party, including Hurd, Maio, and T.A. Ramirez then left to purchase PCP from Melanie Forman with proceeds from the robbery. The group smoked PCP for the remainder of the night, with Ramirez leaving to buy PCP at least once more. *Id*. at 169a–172a. Later in the evening, Weihe allegedly saw a spot of blood on one of Ramirez's boots. *Id*. at 176a.

### 9.  David Wadsworth

Detective McDermott interviewed David Wadsworth in June 1996. Wadsworth told police that people were saying that Ramirez, Weihe, and T.A. were involved but that he asked Ramirez about it and Ramirez denied his involvement. *See* DAO App'x at 28–30 (David Wadsworth 6/24/1996 Statement). Wadsworth was not called to testify at trial and has since signed an affidavit alleging the police tried to coerce him into inculpating Ramirez, but he refused. *See* DAO App'x at 31 (Wadsworth Aff. ¶¶ 1–2) (alleging police tricked him into getting into their car and then took him to 8th and Race where they "threatened [him] with a warrant" and to throw him in jail if he did not inculpate Ramirez).

## C. The trial

After the renewed investigation in spring 1996, Ramirez was arrested and charged with first-degree murder, robbery, and conspiracy. The Commonwealth sought the death penalty. Ramirez retained Jack McMahon to represent him. The trial prosecutor was Mark Gilson, and the case was tried in front of a jury before the Honorable Paul Latrone.

At trial, the prosecution's theory was that, after leaving the Emanuel residence near midnight, Ramirez and Weihe went to Weihe's house where they ate food and decided to go to a party at Sara Hurd's house. On the way to Hurd's house, Ramirez robbed and murdered the decedent and then he and Weihe continued on to the party where they confessed the crime and used his proceeds to purchase PCP from Melanie Forman.

The defense theory was that Ramirez had nothing to do with the murder as he had no blood on him, the laundromat did not keep loose change in the back office, the prosecution's proposed timeline made little sense, and the prosecution's witnesses were unreliable.

The parties' main evidence is summarized as follows:

### 1. The prosecution's case

#### a. *Ernest Manger*

Ernest Manger, the owner of the laundromat, testified that each laundromat attendant has a locked cashbox in the back office used to make change for customers, *i.e.*, exchanging large bills for small bills to use in the change machines. N.T., 12/12/1997 at 22. He estimated that the decedent's cashbox would have had a couple hundred dollars in it, plus a cup with an accumulation of large bills from everyone's shifts with about $800 in it. Almost no money was kept on the attendant's person or in a bag. *Id*. at 50–51. Manger noted that it is possible a roll of dimes or pennies could be in a cashbox because they can't be used in any machines. *Id*. at 26.[12] He also testified that the front door is typically locked by 12:30am and the side/rear door is locked earlier in the evening, and that he'd never seen Ramirez in his store before. *Id*. at 35–37, 53.

#### b. *Joseph Maio*

Maio testified mostly consistently with his second police statement, *i.e.*, that he overheard Ramirez confess to the crime at Sara Hurd's party the

---

[12] Indeed, a roll of dimes was found in the decedent's cashbox left over from the robbery. N.T., 12/15/1997 at 50.

27

night of the murder while everyone, including Hurd's mother, was drink-

ing and doing drugs. N.T., 12/12/1997 at 81, 86. Maio could not remember

what time this happened but estimated sometime around midnight. *Id*. at

85. He testified that Ramirez confessed to robbing and killing the decedent

when he went to get a soda because Ramirez saw "change like bags or

something like pouches" and the decedent alone and decided to do the

crime. *Id*. at 88; *see also id*. at 137 (agreeing both of Ramirez's pockets were

"loaded with change"); 140 (Ramirez said he "took the bag with money in

it"). Specifically, Maio said Ramirez was loaded down with quarters and

had "a little bit of ones" in paper currency. *Id*. at 142–43. Lastly, he testified

that when Ramirez arrived to Hurd's party he looked the same as he did

earlier in the day, in the same clothes, and there was no blood on him. *Id*. at

145.

Maio testified that his first police statement was a lie he told to protect

his friends, but the second, inculpatory one was true. *Id*. at 100–02.[13] As

---

[13] The Commonwealth notes that Maio, a minor, was accompanied by his father when he issued his first statement claiming no knowledge, and was by himself and no longer a minor when he gave his second statement that inculpated Ramirez. *See* N.T., 12/12/1997 at 97, 101. His first interview was conducted by Detective Worrell and his second interview was conducted by Detectives McDermott and Vivarina.

noted above, Maio has allegedly recanted his second police statement and his trial testimony and is now deceased.

### c. Detective William Gross

Detective Gross testified that there was blood found on the floor and rear door of the laundromat as well as the handle to the office and the office's interior. He noted the decedent's cleaning supplies were out. He told the court there were no signs of blood in the main laundry area, the metal pipe had some blood on it, and a fleece jacket was smeared with blood. N.T., 12/15/1997 at 25, 55. He also reiterated that the laundromat's rear door requires a key to both get in and get out, the rear office was always locked, and that the decedent's keys were never recovered. *Id*. at 35, 38.

### d. Peter Gozzi

The prosecution also called Peter Gozzi who testified largely consistently with his statement. Gozzi told the court that he was at the Emanuel house on the night of the murder with Ramirez, Weihe, and others when Ramirez left for about fifteen minutes to get a soda. Gozzi could not remember what time Ramirez left or returned, or when they all left the house for the evening. N.T., 12/15/1997 at 69, 71, 80. Gozzi then drove Ramirez and Weihe to Weihe's house, neither one of them mentioning any nearby party. *Id*. at 81.

29

### e. Luis Rivera

Rivera, consistent with his statement, testified that he spoke with Ramirez the week of the murder and Ramirez confessed to the crime at Sara Hurd's house, but not at her party. N.T., 12/17/1995 at 8. He also claimed Ramirez appeared "glassy eyed" at the time like he was inebriated, though that is not in his police statement. *Id*. at 9.[14]

### f. Dr. Gregory McDonald

The assistant medical examiner, Dr. McDonald, testified that the decedent had sustained no fewer than nine blows to the left side, right side, and top of her head resulting in multiple fractures to the skull. N.T., 12/17/1995 at 41, 45–46. She also had facial injuries consistent with being punched with a fist as well as defensive injuries on her left hand. *Id*. at 42. Crucially, Dr. McDonald testified that the decedent was likely killed between 11:30pm and 2:30am and that her assailant would not necessarily be covered in blood. *Id*. at 51–52, 56, 60.

### g. Melanie Forman

Consistent with her statement, Melanie Forman testified that on the night of the murder, Sara Hurd purchased drugs from her using mostly $1

---

[14] As noted above, Rivera has since recanted this testimony claiming that it was the product of police pressure and coercion.

bills. N.T., 12/16/1995 at 7–8. Hurd allegedly bought drugs from Forman between nine and twelve times that night using money from the robbery. *Id*. at 8. The following day, after hearing about the murder, Forman went to Hurd's house where she smoked PCP with Hurd, Ramirez, and T.A. *Id*. at 24. Forman testified that, at this point, Ramirez confessed the crime to her and told her he did it with Weihe and T.A. *Id*. at 25–27, 30. This differed from her statement to police, in which she alleged this conversation happened later in the week. *Id*. at 43. Two weeks after she gave her police statement, two of her drug charges were dropped. *Id*. at 45.[15]

> ### h.  *Billy Weihe*

Weihe testified at trial consistently with his third police statement. He testified that he met up with Ramirez in the early evening of February 19, 1995, and hung out with him, Joe Maio, and T.A. N.T., 12/16/1995 at 79. After smoking marijuana, the four boys planned to catch the bus across Roosevelt Boulevard to the Emanuel house. *Id*. at 83. According to Weihe, only Maio and T.A. had bus passes, so he and Ramirez walked. *Id*. at 85. When they arrived at the Emanuel house, Mary Emanuel and her brother J.C. were there and their parents were upstairs. Maio and T.A. were not there. The group realized they needed rolling papers to smoke more marijuana, so

---

[15] As noted above, Forman has since recanted her statement and testimony.

31

Mary and Ramirez decamped to a nearby 7-Eleven to purchase some. Before the group left, Darnell, Sr. asked Mary to get him a soda while they were out. *Id*. at 89.

Emanuel and Ramirez came back 30 minutes later, at around 11pm, with another friend they'd run into at the 7-Eleven, Pete Gozzi. *Id*. at 91. When they returned, they realized they'd forgotten a soda for Mary's father, so Ramirez ran to the laundromat across the street to grab one from a vending machine. *Id*. at 92–93. Weihe did not know how long Ramirez was gone or what time it was, but when he returned, the group smoked more marijuana before Mary's parents asked the kids to leave. Again, Weihe was unsure of the time. *Id*. at 93. Gozzi then drove the two boys to Weihe's house and dropped them off.

According to Weihe, after eating some food, the boys decided to walk back towards J.C.'s house, a walk that would take roughly 15 minutes. On the way, Ramirez told Weihe he'd decided to rob the laundromat and asked Weihe to act as his lookout. *Id*. at 98. Ramirez allegedly walked in through the front door and asked for money, to which the decedent did not respond. Ramirez then allegedly "hit her with a black stick." *Id*. at 103. Weihe could not remember if the door was locked or how exactly Ramirez got in, or from where he got the stick but said that Ramirez wielded the stick with only one

32

hand. *Id.* at 211, 219. Weihe then went outside and did not hear or see anything else.

When Ramirez left the laudromat, he did not have anything with him but Weihe said he could hear all the loose change jingling in his pockets and Ramirez had one spot of blood on one of his boots. *Id*. at 226, 232. Weihe said that Ramirez was wearing a black jacket, Timberland boots and his father's black leather gloves at the time, but no hat. *Id*. at 107–08. The boys then ran from the scene and ran into their friend T.A. *Id*. at 113. They then all went to Sara Hurd's house. *Id*. at 118. Weihe said that Ramirez, not Hurd, then used the laundromat money to buy PCP from Melanie Forman. *Id*. at 120. When they returned to Sara Hurd's house, Ramirez allegedly confessed the crime to a group of people. *Id*. at 123.

During his testimony, Weihe mentioned that he had recanted his first two statements to detectives, recantations that were not disclosed prior to trial. *Id*. at 164, 167, 175–76. When defense counsel asked the trial prosecutor if there were any notations in the file reflecting these recantations, the prosecutor responded that there were not. *Id*. at 165; *see also id*. at 171 ("**McMahon**: That is a statement by {Weihe}. Do we have that?; **Gilson**: No."). The trial prosecutor was mistaken, as the Commonwealth believes

33

he simply did not have these notations. Weihe's recantation is reflected in recently disclosed activity sheets and grand jury testimony.

In exchange for his cooperation against Ramirez, Weihe was permitted to plead guilty to third-degree murder. He ultimately served 5 years in prison.[16]

### 2. The Defense's Case

#### a. *Brooke Williams*

Brooke Williams, a friend of Ramirez's, testified for the defense. She testified that on the night of the crime she was at Sara Hurd's house, there was no party, and she never saw Ramirez. N.T., 12/18/1997 at 4–7.

#### b. *Detective Stephen Vivarina*

Detective Vivarina was called to testify by the defense. He admitted that Weihe recanted his initial statement to him, and an activity sheet prepared by Detective Vivarina was then turned over during trial establishing the recantation. There is no record evidence that the more detailed activity sheet prepared by Detective Hoffner -- which specified that Weihe recanted his statement specifically as to Ramirez's involvement -- was disclosed. N.T., 12/18/1997 at 21–41.

---

[16] To the Commonwealth's knowledge, Weihe has not recanted any part of his trial testimony.

34

*c. Jay Darnell, Sr.*

Jay Darnell, Sr., Mary Emanuel and J.C. Darnell's father, testified that Ramirez and friends left his home at around 1am on the night of the murder, echoing J.C.'s statement to police. N.T., 12/18/1997 at 61–63. He also testified that it was customary to lock the front door to the laundromat by 12:30am, though the decedent would let people in after that if she knew them. *Id*. at 65–66. He lastly alleged that loose coins were not kept in the rear office at all. *Id*. at 68.

*d. Sara Hurd*

The defense called Sara Hurd, who testified that she was at home with her son and Brooke Williams on the night of the murder and did not have a party, though she did have one the night before. She never heard anyone confess to this crime in her home or her presence. N.T., 12/18/1997 at 96–102. She also testified on cross-examination that the police attempted to coerce her into issuing an inculpatory statement, but she refused. *Id*. at 104–07, 121–22. She has since reaffirmed this in a sworn affidavit. *See* Pet's App'x at 46a–47a (Hurd Aff. ¶¶ 1–3).

35

*e.  Eduardo Ramirez, Sr.*

Lastly, the defense called Ramirez's father, who was a former police officer then working as an investigator for the Defender Association of Philadelphia. He told the court that his son was at the Darnell/Emanuel house on the night of the murder and that he returned home the following morning wearing the same clothes. N.T., 12/19/1997 at 9–11. He had no blood on his clothes or boots and had no money. *Id*. at 11–13.

### 3.  Closing argument – defense

In closing, the defense argued that no physical evidence tied Ramirez to the crime, specifically noting that no bloody clothes, money, or keys were ever recovered and no fingerprints matched Ramirez. N.T., 12/29/1997 at 14–19, 29–30. Ramirez's counsel argued the import of the jacket recovered from the laundromat, presumably from the spot where the struggle with the decedent began, and that it did not belong to Ramirez. *Id*. at 21–22.

He also argued that the Commonwealth witnesses were unreliable. In so arguing, he stressed that there was no evidence any change was stolen from the laundromat, that the proposed timeline of events made little sense, and that the real assailant would have been covered in blood. *Id*. at 32–45, 50–58.

36

### 4. Closing argument – prosecution

Since the timeline of events was critical in this case, in his closing, the trial prosecutor first argued that Ramirez left the Darnell/Emanuel house "sometime after [midnight] but nowhere as late as 1am." N.T., 12/29/1997 at 77. By extension, he argued that the front door to the laundromat may not have been locked at that point, despite custom, though he conceded the decedent appeared to be in the middle of cleaning at the time of the attack. *Id*. at 81–83, 87. To bolster this argument, the trial prosecutor suggested to the jury that the defense called Darnell, Sr. about what time the boys left his home, knowledge he had only second-hand, rather than calling one of the kids themselves because the kids' testimony would have been unfavorable to the defense, *i.e.*, they would have said Ramirez left earlier. *Id*. at 78. The Commonwealth  notes that the trial prosecutor misspoke here, as all three kids either said or suggested in their statements to police that Ramirez left the Darnell house between 1 and 2am, which is favorable to the defense's argument. *See*  Pet's App'x at 46a (Mary Emanuel 2/28/1995 Statement); DAO App'x at 17 (J.C. Darnell 2/24/1995 Statement); DAO App'x at25 (Peter Gozzi 3/1/1995 Statement).

The prosecutor also argued that the "black stick" Weihe mentioned in his testimony, though not the murder weapon, may have referred to the

wooden broom in the laundromat and that may have been the instrument that began the assault. *Id*. at 86–87. He also argued that there was only a little bit of blood at the scene and that the idea that the assailant would have been covered in blood is "movie talk." *Id*. at 99–101. He suggested that no money was recovered because Ramirez spent most of it "that night buying drugs from Melanie Forman." *Id*. at 116. As to the change, the prosecutor argued that it was "flat wrong" that they don't keep loose change in the back office because a roll of dimes was found in the decedent's cashbox. *Id*. at 118–19. In so arguing, he relied on the testimony of Detective Gross. *Id*.; *see also id*. at 120 ("Use your common sense. Of course they have change there."). Lastly, he relied heavily on Weihe's guilty plea and the credibility of Forman, Rivera, and Maio in urging the jury to convict Ramirez. *See id*. at 125–43.

### D. Conviction, Post-Conviction Proceedings, and Disclosures

The jury deliberated for roughly two and a half days before finding Ramirez guilty of second-degree murder, robbery, and conspiracy. During the course of their deliberations, they asked for Maio's testimony to be read back to them, as well as for definitions of second and third-degree murder and accomplice liability. Ramirez was sentenced to a mandatory term of life imprisonment.

In 2000, the Pennsylvania Superior Court affirmed Ramirez's conviction and sentence on issues not presently before this Court. The Pennsylvania Supreme Court denied *allocatur*. *See Commonwealth v. Ramirez*, 1030 EDA 1998 (Pa. Super. June 5, 2020), *appeal denied*, 764 A.2d 1067 (Pa. 2000) (Table).

In 2001, Ramirez filed a timely *pro se* petition pursuant to Pennsylvania's Post-Conviction Relief Act, 42 Pa. C.S. § 9541–46. Ramirez's post-conviction counsel, Mark Scott-Sedley, then filed an amendment and an addendum to Ramirez's PCRA petition. As part of these PCRA proceedings, it became clear that the Medical Examiner's Office had in its possession fingernail clippings from the decedent that had neither been turned over nor tested. The PCRA court ordered the clippings be tested for DNA. Those tests found male DNA under the decedent's fingernails that did not belong to Ramirez.

As part of these proceedings, Ramirez alleged numerous instances of ineffective assistance of counsel, which led to a number of evidentiary hearings that took place in 2005 before the Honorable Peter F. Rogers. The relevant testimony from those hearings is summarized below:

1. **Defense counsel**

Jack McMahon, Ramirez's trial counsel, testified before Judge Rogers in January 2005. McMahon testified that he believed he had a strong case due

to of the lack of physical evidence and because the Commonwealth witnesses were "less than savory characters" who had lied in the past and had credibility problems. N.T., 1/3/2005 at 27–28. McMahon also said that he would not have chosen to pursue any specific alternative suspect due to of Weihe's guilty plea, including Butchy Oberholzer, because without some connection to Weihe or this crime, he did not feel it would be a good argument. *Id.* at 74, 84–85. To that end, McMahon noted that if he had any evidence that Oberholzer, or anyone else, had committed the crime, he would have used it but he "didn't have that," so he didn't. *Id.* at 89. He also noted that he felt Maio came off well in his testimony and that, if he'd had any additional evidence to impeach him with, he would have used it. *Id.* at 36, 39, 92.

### 2. Trial prosecutor

The trial prosecutor also testified as part of the 2005 PCRA hearings. Relevant to this action, he told the court that that all the discovery that was tendered pre-trial was reflected on the discovery letters. N.T., 4/22/2005 at 73. He specifically noted that he did not believe any grand jury notes were turned over to defense counsel in advance of trial.[17] N.T., 1/3/2005 at 108–

---

[17] The Commonwealth notes that grand jury notes favorable to a criminal defendant are generally discoverable pursuant to the government's constitutional obligations under *Brady*. *See Comment* to Pa.R.Crim.P. 230(B)(3);

09. He also testified that he had no information from Medical Examiner's Office Investigator Suplee available to him before trial. N.T., 4/22/2005 at 75–78.

\* \* \*

The PCRA court dismissed Ramirez's petition in 2006, finding that all of his claims were waived, previously litigated, or without merit. The Pennsylvania Superior Court remanded for an additional evidentiary hearing on an ineffective-assistance claim not relevant to this action. On remand, the PCRA court found the additional claim meritless and again dismissed. The Superior Court then affirmed the lower court's dismissal of all of Ramirez's claims and the Pennsylvania Supreme Court denied *allocatur*. *See Commonwealth v. Ramirez*, No. 1684 EDA 2010 (Pa. Super. Feb. 6, 2012), *appeal denied*, 51 A.3d 838 (Pa. 2012) (Table).

In 2015, Ramirez filed the instant PCRA petition raising the following claims:

---

*see also Commonwealth v. Lang*, 537 A.2d 1361, 1363 (Pa. 1988) ("The Commonwealth acknowledges its obligation to disclose exculpatory information to the defendant prior to trial, even if such evidence is produced by the investigating grand jury."); *Commonwealth v. Cascardo*, 981 A.2d 245, 260 (Pa. Super. 2009) (favorable grand jury transcripts subject to disclosure under *Brady*); *cf. Tierney v. United States*, 410 U.S. 914, 916 n.2 (1973) (noting that "grand jury testimony is regularly disclosed to criminal defendants without court order pursuant to *Brady*").

1) The Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence that police coerced or attempted to coerce the statements and testimony of Luis Rivera, Melanie Forman, Joseph Maio, Sara Hurd, Joseph McDevitt, Corey Watkins, Mary Emanuel and Billy Weihe[18];

2) Ramirez's trial counsel was ineffective for failing to "investigate, develop, and present" evidence of police misconduct and coercion in this case; and

3) Initial PCRA counsel was ineffective for failing to raise a due process claim rooted in Mary Emanuel's allegations of coercion and Maio's alleged recantation.

*See* 2015 PCRA Pet. ¶¶ 51–65.[19]

In 2016, Ramirez filed an amendment to his petition including signed affidavits from women named Billie Jo Blood,[20] Maureen Suarez, and Sabrina Suarez regarding Maio's alleged recantation and an affidavit from David Wadsworth, described above, who is now claiming the police tried to coerce him into inculpating Ramirez, which he did not do. Ramirez also

---

[18] In the alternative, Ramirez raises the same claim as an after-discovered evidence claim sounding in the PCRA and focused on the alleged recantations of Rivera, Forman, and Maio. *See* 2015 PCRA Pet. ¶¶ 60–62.

[19] Ramirez has also filed a habeas corpus action, raising the claims considered here and additional claims, that is currently stayed in federal court pending the disposition of this petition. *See generally Ramirez v. DiGuglielmo*, E.D. Pa. No. 12-5803.

[20] As noted above, though Blood's affidavit was not prepared until 2016, Ramirez's defense counsel knew of her existence at the time of trial and did not find her credible. N.T., 1/3/2005 at 91. The Suarez sisters were not mentioned prior to Ramirez's recent PCRA petitions.

filed a motion for new DNA testing. Specifically, Ramirez requested that the wooden broom, metal pipe, and fleece vest from the crime scene all be tested for male DNA. The Commonwealth ultimately agreed to the testing, which took place in 2019. The resultant DNA testing, using methods and technology that did not previously exist, found the same male DNA on both the metal pipe and the fleece vest. Ramirez was excluded as a source for that DNA.[21]

In 2020, Ramirez filed a second amendment to his pending petition raising an after-discovered evidence claim based on the new DNA testing results. The 2020 amendment also included an additional *Brady* claim that the Commonwealth failed to disclose the misconduct history of Detective Paul Worrell, who played a role in the Ramirez investigation and took statements from Luis Rivera, Sara Hurd, Joseph Maio, and Billy Weihe. Worrell's misconduct history had recently been made public by the 2019 exoneration of Willie Veasy. *See* 2020 PCRA Amendment ¶¶ 15–20; *see also Commonwealth v. Willie Veasy*, CP-51-CR-641521-1992, Joint Stipulations ¶¶ 1–80 (filed Oct. 1, 2019).

---

[21] No conclusive DNA was able to be pulled off the wooden broom.

43

In 2021, Ramirez and the Commonwealth engaged in voluntary discovery, including a review of the DAO's file for this case.[22] As a result of that discovery, Ramirez filed a third amendment to his petition in 2022 raising additional *Brady* claims based on the alleged suppression of the following 11 additional pieces of evidence found in the DAO's file:

(1) Six police activity sheets, materially summarized as follows:

- Activity sheet dated 2/21/1994, prepared by Detective Hoffner, writing that the assailant may have significant injuries and that detectives checked the area hospitals for trauma patients;

- Activity sheet dated 2/22/1995, prepared by Detective Hoffner, noting that decedent's husband's boss was posting a $2,500 reward for information on the homicide and that "arrangements would be made";

- Activity Sheet dated 2/23/1995, prepared by Detective Hoffner, noting that J.C. Darnell was a suspect in a previous burglary of the laundromat and that the decedent began cleaning up "about 11:30pm that night." The activity sheet also noted an interview with undisclosed witness, Betty Kiefer, who told the police she spoke with Darnell the morning after the murder and he was wearing boots with "dark brown stains on them" and that he appeared "real nervous";

- Activity sheet dated 3/1/1995, prepared by Detective Hoffner, which notes an interview with undisclosed witness Bert Calafell, who told police he had

---

[22] The police department's homicide file, as well as one box of the DAO's file, are currently missing. The Commonwealth has gone to great lengths to locate the missing materials, but has been unsuccessful.

heard that Butchy Oberholzer did the job with a white kid named Billy;

- Activity sheet dated 3/2/1995, prepared by Detective Hoffner, which notes that he spoke with Mary Emanuel, who denied overhearing Ramirez commit any crimes. Detective Hoffner notes that he spoke with OME investigator Suplee, who told Hoffner that the assailant "would not only have his clothes covered with blood but his face and hands" too. Detective Hoffner also noted a conversation with Dr. McDonald wherein the doctor relayed that the decedent appeared to have been punched with a fist three times and had a tooth knocked out as a result. Hoffner also heard Weihe recant his inculpatory statement and say that "he lied when implicating Ramirez."[23]

- Activity sheet dated 5/16/1995, prepared by Detective Hoffner, noting an interview with undisclosed witness Sean Maguire. Maguire told police he heard that Butchy Oberholzer committed the laundromat murder with a white male named Billy.

(2) handwritten investigative notes regarding similar evidence and specifically summarizing undisclosed interviews with witnesses T.A. and Nathaniel Rodriguez;

(3) form 75-328 noting profuse bleeding from decedent's head from OME Suplee;

(4) an ATF operational plan targeting Weihe for contact from a confidential informant;

---

[23] Another activity sheet, also dated 3/2/1995 but prepared by Detectives Vivarina and Snell, noted Weihe indicated he "made up his story and was afraid." This activity sheet was disclosed at trial during Detective Vivarina's testimony and is not at issue here.

45

(5) the grand jury testimony of Detective Hoffner, summarized in detail above; and

(6) an internal memo written by ADA Gail Fairman noting that the decedent engaged in a "struggle" with her assailant and complaining that it is difficult to get what they want out of juvenile witnesses when they "bring attorneys."

*See generally* 2022 PCRA Amendment.

The Commonwealth now responds. As noted above, the Commonwealth limits its response to the cumulative effect of Ramirez's *Brady* claims, as the Commonwealth believes those claims warrant relief in the form of a new trial which would moot the remainder of Ramirez's claims. As such, the Commonwealth currently takes no position on Ramirez's after-discovered DNA evidence claim or Ramirez's claims focused on various witnesses' recantations or police misconduct, outside of Detective Worrell. Similarly, the Commonwealth takes no position as to Ramirez's guilt or innocence, only the fairness of his trial and the reliability of its result.

## III.    DISCUSSION

### A. Ramirez's *Brady* claims are timely and thus properly before the Court.

A PCRA petition must be filed within one year of the date a petitioner's conviction becomes final. *See* 42 Pa.C.S. § 9545(b). Because Ramirez filed his 2015 PCRA petition nearly 15 year after his conviction became final, it is facially untimely. To that end, Ramirez alleges he satisfies the government

46

interference exception to the time bar. To meet this exception, Ramirez must show his failure to raise a claim earlier was the result of "interference by government officials." *Id*. § 9545(b)(1)(i).

It is well-settled that properly pleaded *Brady* claims meet this exception, as by virtue of the claim itself the petitioner has recently discovered evidence that was in control of the State. *Commonwealth v. Natividad*, 200 A.3d 11, 19 (Pa. 2019). Then, so long as the petitioner raises a *Brady* claim based on newly discovered evidence that was in the government's possession within one year of learning of said evidence, the petition is timely. 42 Pa. C.S. § 9545(b)(2).

Here, the Commonwealth agrees (1) that the evidence that forms the basis of Ramirez's *Brady* claims, *i.e.*, police activity sheets, handwritten investigative notes, grand jury testimony, misconduct history, internal memoranda, and police interviews were in the exclusive possession of the Commonwealth; and (2) that Ramirez's *Brady* claims were raised within one year of the Commonwealth's disclosure of this evidence. Because these claims were raised within one year of the date on which the facts underlying them became discoverable, they are timely. Further, because Ramirez could not have raised these claims in earlier proceedings, they are not waived. *See* 42

47

Pa. C.S. § 9544(b), § 9545(b)(1)(ii). As such, Ramirez's *Brady* claims are properly before the Court.

**B. Ramirez is due relief on his claims that the prosecution violated *Brady v. Maryland* by failing to turn over a host of evidence in this matter.**

The prosecution has an obligation to disclose to the defense information that is favorable to the guilt or punishment of the defendant, and the failure to do so may deprive a defendant of due process. *Brady*, 373 U.S. at 87. To prove a *Brady* violation, the evidence must have been (1) favorable to the accused, either exculpatory or impeaching, (2) suppressed by the state, either willfully or inadvertently, and (3) material enough that prejudice resulted from its suppression, meaning that there is a reasonable probability of a different result. *Dennis v. Sec'y, Penn. Dep't of Corrs.*, 834 F.3d 263, 284–85 (3d Cir. 2016) (en banc). Materiality of suppressed evidence must be "considered collectively, not item by item." *Id*. at 312 (citing *Kyles*, 514 U.S. at 441).

Below, the Commonwealth first assesses whether the evidence Ramirez presents was (1) suppressed by the prosecution and (2) favorable to Ramirez. The Commonwealth then evaluates whether when considered together the suppressed evidence is material, undermining confidence in the outcome of Ramirez's trial. The Commonwealth concludes that Ramirez

48

has satisfied all three *Brady* elements and recommends he be granted a new trial.

1. **The police activity sheets, handwritten investigative notes, grand jury testimony, Weihe recantations, internal memoranda and police misconduct evidence is favorable and was suppressed.**

As set out in detail above, Ramirez now presents the following 12 pieces of evidence in support of his *Brady* claims:

- Police activity sheet dated 2/21/1994 noting that the assailant may have significant injuries and that detectives checked the area hospitals for trauma patients (Pet's Ex. 9);

- Police activity sheet dated 2/22/1995 noting that decedent's husband's boss was posting a $2,500 reward for information on the homicide and that "arrangements would be made" (Pet's Ex. 37);

- Police activity sheet dated 2/23/1995 noting that J.C. Darnell was a suspect in a previous burglary of the laundromat and that the decedent began cleaning up "about 11:30pm that night." The activity sheet also noted an interview with undisclosed witness, Betty Kiefer, who told the police she spoke with Darnell the morning after the murder and he was wearing boots with "dark brown stains on them" and that he appeared "real nervous" (Pet's Ex. 31);

49

- Police activity sheet dated 3/1/1995, prepared by Detective Hoffner, notes an interview with undisclosed witness Bert Calafell, who told police he had heard that Butchy Oberholzer did the job with a white kid named Billy (Pet's Ex. 25);

- Police activity sheet dated 3/2/1995, notes that Detective Hoffner spoke with Mary Emanuel, who denied overhearing Ramirez commit any crimes. Detective Hoffner notes that he spoke with OME investigator Supplee, who told Hoffner that the assailant "would not only have his clothes covered with blood but his face and hands" too. Detective Hoffner also noted a conversation with Dr. McDonald wherein the doctor relayed that the decedent appeared to have been punched with a fist three times and had a tooth knocked out as a result. Hoffner also heard Weihe recant his inculpatory statement and say that "he lied when implicating Ramirez" (Pet's Ex. 5);

- Police activity sheet dated 5/16/1995 noting interview with undisclosed witness Sean Maguire. Maguire told police he heard that Butchy Oberholzer committed the laundromat murder with a white male named Billy (Pet's Ex. 26);

50

- Investigative notes from police interviews with witness T.A., who told police he was not at Sara Hurd's house on the night of the murder and did not see Ramirez at all that night, and Nathaniel Rodriguez, who told police he overheard Oberholzer complain about not getting much money from the job (Pet's Ex. 28);

- Form 75-328 noting profuse bleeding from decedent's head (Pet's Ex. 6);

- An ATF operational plan targeting Weihe for contact with a Confidential Informant (Pet's Ex. 20);

- The grand jury testimony of Detective Hoffner, summarized in detail above[24] (Pet's Ex. 11);

---

[24] Though it appears that other witnesses' grand jury testimony was disclosed during the 2005 PCRA litigation of this matter, the Commonwealth agrees and stipulates that Detective Hoffner's grand jury testimony was not among them. Indeed, the only record evidence available supports this. *See* DAO App'x at 33 (1/28/2003 Correspondence from PCRA counsel noting receipt of Mary Emanuel and J.C. Darnell's grand jury testimony); DAO App'x at 32 (Correspondence from FCDO attorney Andrew Childers confirming that the file they received from Ramirez's PCRA counsel contained only four grand jury transcripts: Mary Emanuel, J.C. Darnell, Peter Gozzi, and Samuel Emanuel). The Commonwealth nevertheless agrees that, regardless of whether Hoffner's grand jury testimony was disclosed in 2005 (which would make any discrete *Brady* claim based on that transcript now waived), if it was not disclosed pre-trial then it may be considered as part of the required cumulative materiality analysis on Ramirez's live *Brady* claims, which is meant to analyze all suppressed evidence in the context of the entire record. *See Munchinski v. Wilson*, 694 F.3d 308, 327 n.12 (3d Cir. 2012); *cf. Strickler v. Greene*, 527 U.S. 263, 286 (1999) (analyzing *Brady* and

51

- an internal memo written by ADA Gail Fairman noting that the decedent engaged in a "struggle" with her assailant and complaining that it is difficult to get what they want out of juvenile witnesses when they "bring attorneys" (Pet's Ex. at 10); and

- Police misconduct stipulations regarding Detective Paul Worrell regarding conduct dating back to 1992 (DAO App'x 36–74) (filings from *Commonwealth v. Willie Veasy*, CP-51-CR-641521-1992).

### a. *Suppression*

The first prong of a *Brady* analysis is whether a piece of evidence was suppressed by the government. It is well-settled that, to comply with *Brady*, prosecutors must "learn of any favorable evidence known to [them and to] others acting on the government's behalf, including the police," and pass that to the defense. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). There is no requirement that a failure to disclose evidence be done in bad faith or otherwise with intention. *Brady*, 373 U.S. at 87 (suppression of favorable evidence violates due process "irrespective of the good faith or bad faith of the prosecutor"). Indeed, "it is the character of the evidence, not the

---

holding, in the default context, that there is no duty to raise constitutional claims before sufficient evidence is discovered to fully support them).

character of the prosecutor," that makes out a *Brady* claim. *United States v. Agurs*, 427 U.S. 97, 110 (1976).

Further, defendants are entitled to rely on the government's affirmative duty to disclose evidence that is either exculpatory or impeaching, so there is no due diligence requirement under *Brady* and no duty to request such evidence. *Kyles*, 514 U.S. at 434; *see also Strickler v. Green*, 527 U.S. 263, 286–89 (1999); *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *cf. Dennis v. Sec'y, Penn. Dep't of Corrs.*, 834 F.3d 263, 279 (3d Cir. 2016) (en banc) (reversing state court's denial of relief on *Brady* claims as contrary to clearly established federal law, specifically noting the lack of a due diligence requirement after *Kyles*, and chastising lower courts for taking an "unreasonably narrow" view of *Brady*). A prosecutor's subjective assessment of the reliability or usefulness of any potentially favorable evidence goes to the weight of that evidence and is irrelevant to the affirmative duty to disclose. *Kyles*, 514 U.S. at 450–51; *cf.* ALAIR S. BURKE, *Revisiting Prosecutorial Disclosure*, 84 IND. L. J. 481, 494 (Spring 2009) (Because of "confirmation bias, selective information processing, and the resistance to cognitive dissonance…prosecutors err in applying *Brady*'s materiality standard [by] systematically underestimating, not overestimating, materiality"). Lastly, there is no requirement that evidence be admissible to be subject to disclosure. *Dennis*, 834 F.3d at 308–

53

09 (admissibility requirement is contrary to clearly established federal law) (analyzing *Wood v. Bartholomew*, 516 U.S. 1, 7 (1995)). A defendant need only show that an item was suppressed for purposes satisfying the PCRA by a preponderance of the evidence. *See* 42 Pa. C.S. § 9543(a).

Here, the Commonwealth agrees that there is no record evidence that the items presented here were passed to the defense pre-trial.[25] To be sure, there is also no record evidence that the trial prosecutor knowingly or intentionally failed to disclose the evidence. The trial prosecutor testified to a prior PCRA court during an evidentiary hearing that anything not listed on the discovery letters was not passed in pre-trial discovery, specifically noting that he did not believe any grand jury transcripts were passed.[26] N.T., 1/3/2005 at 108–09; N.T., 4/22/2005 at 73. He further testified that two additional items not included in the letters were passed during trial and

---

[25] As noted above, one box of the DAO's file is missing, as is the police department's homicide file. In addition, the undersigned has reviewed the state court record currently housed in the federal courthouse, and it is incomplete. That said, the Commonwealth is mindful that it cannot escape its constitutional obligations due to its own shoddy recordkeeping.

[26] As noted above, favorable grand jury testimony is subject to disclosure pursuant to the government's constitutional obligations under *Brady*. *See Lang*, 537 A.2d at 1363 ("The Commonwealth acknowledges its obligation to disclose exculpatory information to the defendant prior to trial, even if such evidence is produced by the investigating grand jury.").

"brought out on the record": results of a polygraph examination not at issue here, and one activity sheet reflecting a conversation between police and Weihe. N.T., 4/22/2007 at 74.

The Commonwealth's own review of its file aligns with the trial prosecutor's prior testimony. It does not appear that any of the evidence now presented by Ramirez was passed prior to the 2021 voluntary discovery in this case, save for Detective Worrell's misconduct history, made public in 2019, and the activity sheet regarding Detective Vivarina's conversation with Weihe, which was passed during the detective's trial testimony.[27] *See* Pet's Exs. 12, 13 (pre-trial discovery letters); N.T., 1/3/2005 at 108–09; N.T., 4/22/2005 at 73–74.

---

[27] The Commonwealth has reached out to the trial prosecutor and defense counsel regarding the suppressed evidence. Defense counsel did not recall receiving any of it, but did not have his old file to check. He asserted generally that, if he'd had any of this material, he would have used it. The trial prosecutor relayed that he did not believe he passed any of it with the possible exception of "Activity Sheets," as he "seem[ed] to recall" defense counsel "questioning some of the witnesses with information from the Activity Sheets." DAO App'x at 34 (5/23/23 correspondence from Mark Gilson). As noted above, only one activity sheet was brought out and used at trial to question a witness, Detective Vivarina. *See* N.T., 12/18/1997 at 29; N.T., 4/22/2005 at 74 (trial prosecutor noting one activity sheet was passed during trial and brought out on the record regarding Weihe's first police interview during Detective Vivarina's testimony).

The evidence in question here was all maintained in either the prosecution's files and/or the police department's homicide files. Thus, because the evidence was known to the government in advance of Ramirez's trial and there is no record evidence it was disclosed, and mindful of the fact that the standard to show suppression is merely a preponderance, given all of the above, the Commonwealth agrees and stipulates[28] that the above-described 12 items were suppressed for the purposes of a *Brady* analysis.

b. *Favorability*

The second prong of the three-pronged *Brady* analysis is favorability, *i.e.*, the suppressed evidence must be favorable to the guilt or punishment of the defendant. Evidence can be favorable either as exculpatory or impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 682 (1985). "[E]xculpatory evidence need not show a defendant's innocence conclusively" to be favorable under *Brady*. *Dennis*, 834 F.3d at 287. Indeed, suppressed evidence that "does not wholly undermine the prosecution's theory of guilt does not sap it of its exculpatory value." *Id*. In addition,

---

[28] Factual stipulations are "formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 677–78 (2010).

evidence that could have been used to impeach the testimony and credibility of key witnesses and/or call into question the good faith of the larger investigation is sufficient to establish favorability under *Brady*. *Kyles*, 514 U.S. at 445–51.

The Commonwealth agrees that the suppressed evidence presented here is favorable under *Brady* both for its exculpatory and impeachment value. The suppressed police activity sheets, investigatory notes, internal memoranda, and grand jury testimony, support all four prongs of Ramirez's trial defense: (1) the assailant would have been covered in blood;(2) there were no loose coins taken in the robbery; (3) the witnesses' testimony was unreliable; and (4) the likely timeline of events makes it unlikely that Ramirez was the killer. This evidence, taken together with the undisclosed witness interviews that are part of the handwritten investigative notes, could have also added an alternative suspect defense and allowed the defense to attack the reliability of the larger investigation.

The undisclosed ATF Operational Plan, in the context of Weihe's two pre-trial recantations, also would have been favorable in allowing reasonably competent defense counsel to argue to the jury that Weihe's testimony was colored by police pressure. Further, the undisclosed police interview with T.A. would have been favorable as both impeachment and

exculpation, and Detective Worrell's misconduct history would have been favorable in allowing reasonably competent defense counsel to attack the credibility of the witnesses he interviewed and the good faith of the larger investigation. *See Kyles*, 514 U.S. at 445 (*Brady* extends to information that could "attack . . . the thoroughness and even the good faith of the investigation").

## 2.  Assessed cumulatively, the suppressed items were material.

Suppressed evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. *Kyles*, 514 U.S. at 434. However, materiality is "not a sufficiency-of-the-evidence test," meaning that "a defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Commonwealth v. Natividad*, 200 A.3d 11, 26 (Pa. 2019)[29] (quoting *Kyles*, 514 U.S. at 434–35). To show a reasonable probability, a defendant need show only that the suppression undermines confidence in the outcome of the trial. *Id.*; *see also Strickler*, 527 U.S. at 298 (noting concern that use of the word "probability"

_____

[29] The Commonwealth notes that, though the *Natividad* court outlined the correct materiality standard, its application of that standard was contrary to clearly established federal law, leading to a reversal in federal court. *See Natividad v. Beard*, No. 08-449, 2021 WL 3737201 (E.D. Pa. Aug. 24, 2021).

may mislead lower courts, causing them to believe that the standard is "akin to the more demanding standard, 'more likely than not,'" when the materiality standard is a lower standard of proof closer to a "significant possibility") (Souter, J., concurring in part).

For example, suppressed evidence that would have bolstered a defendant's defense at trial may put the case in such a different light that *Brady* materiality is satisfied. *See Dennis*, 834 F.3d at 295 (citing *Kyles*, 514 U.S. at 435). Similarly, suppressed evidence that could have been used to impeach the credibility of a key witness "in a manner not duplicated" by other evidence, or to attack the reliability of the investigation, is sufficient to establish *Brady* materiality. *Id*. at 298, 308. Also, admissibility of evidence at trial is not relevant to a materiality analysis. *See Dennis*, 834 F.3d at 298 (rejecting state court opinion that inadmissible hearsay "cannot be the basis for a *Brady* violation" and cannot be used for impeachment purposes) (discussing *Kyles*, 514 U.S. at 433–34 & *Wood*, 516 U.S. at 7–8). Finally, materiality is to be considered collectively, not item by item. *Kyles*, 514 U.S. at 436. The "importance of cumulative prejudice cannot be overstated" in a materiality analysis as it "stems from the inherent power held by the prosecution, which motivated *Brady*." *Dennis*, 834 F.3d at 312 (citing *Kyles*, 514 U.S. at 437).

59

Here, after careful review and consideration of the trial record, the suppressed evidence, the case as a whole, and relevant precedent, the Commonwealth agrees that the evidence suppressed here, considered collectively, satisfies *Brady's* materiality test. Indeed, while individual pieces of the suppressed evidence would warrant *Brady* relief on their own, here "the cumulative effect of their suppression commands it." *Dennis*, 834 F.3d at 311.

**The suppressed evidence substantially calls into doubt the prosecution's case.**

The suppressed evidence, assessed cumulatively, calls into doubt substantial parts of the prosecution's theory of the case and supports all four key aspects of Ramirez's defense at trial as well as adds a potential fifth, an alternative suspect.

*a.   Blood and injury evidence*

First, the suppressed activity sheets and grand jury testimony would have bolstered Ramirez's argument at trial that the real assailant would have been covered in blood and had his own injuries. No witness told either police or the court that Ramirez had blood on him the night of or the day after the murder, or any apparent injuries, save for Weihe's testimony that he saw a spot of blood on one of Ramirez's boots. To support the prosecution's argument that the lack of blood or injuries on Ramirez was

60

not relevant, Assistant Medical Examiner Dr. Gregory McDonald testified that, in his opinion, the assailant would not necessarily have been covered in blood and the decedent was punched in the face once. N.T., 12/17/1995 at 41–42. Detective Gross also testified that the blood at the scene was limited. N.T., 12/15/1997 at 25, 55. The prosecutor then argued in his closing that "there was no evidence of a struggle." N.T., 12/29/1997 at 96.

Detective Hoffner's grand jury testimony and the suppressed activity sheets, by contrast, describe the bloody scene in detail and note that (1) it was so bloody the first officers on the scene thought the decedent had been shot in the head and (2) the assailant may have had injuries so significant that police were sent to area trauma hospitals looking for the assailant. *See* IGJ N.T., 9/19/1995 at 25–29; 2/21/1994 activity sheet; *see also* Pet's Ex. 10 (ADA Fairman memo) ("There was evidence that a struggle began in the washing machine area of the business"). Additionally, one of the undisclosed activity sheets relays a conversation between police and Office of the Medical Examiner Investigator Suplee, who was of the opinion after analyzing the scene himself that the assailant "would not only have his clothes covered in blood, but his face and hands" too. *See* Pet's Ex. 5 (3/2/1995 Hoffner activity sheet); *see also* Pet's Ex. 6 (Form 75-328) (noting "profuse bleeding" from the decedent). The same activity sheet notes that

61

Dr. McDonald relayed to police that the decedent appeared to have been punched in the face three times by a fist and had a tooth knocked out as a result. Pet's Ex. at 5. All of this would have been valuable impeachment evidence of Dr. McDonald and Detective Gross and bolstered the argument that the assailant would have been covered in blood and injured himself after a struggle. Had it been disclosed, it also would have allowed Ramirez to call either Detective Hoffner or Investigator Suplee as his own rebuttal witnesses, in addition to providing bases for further questioning of Dr. McDonald and Detective Gross.

The dearth of available, contrary evidence allowed the trial prosecutor to argue in his closing that the idea the assailant would have been covered in blood is "movie talk" that was not realistic and that there was no struggle. N.T., 12/29/1995 at 96, 99–101. This type of evidence—evidence that bolsters a defendant's trial defense that otherwise "had little objective reinforcement"—is the hallmark of *Brady* material and by itself would likely warrant a new trial. *Dennis*, 834 F.3d at 287.

   *b.  Coins*

The argument that only paper currency and not coins were stolen during the laundromat robbery was another pillar of Ramirez's defense at trial. Indeed, both Joseph Maio and Billy Weihe testified that they knew

Ramirez robbed the laundromat because his pockets were "loaded with change" and they could hear all the loose change jingling in his pockets. *See* N.T., 12/12/1997 at 88, 137, 142 (Maio); N.T., 12/16/1995 at 226 (Weihe).[30] In rebuttal, Ramirez called Jay Darnell, Sr., who worked at the laundromat, to testify that no loose coins were kept there. N.T., 12/18/1997 at 68. The trial prosecutor argued in his closing that Darnell was "flat wrong" because a roll of dimes was found in the decedent's cashbox and because "common sense" dictates that "of course they had change there." N.T., 12/29/1995 at 118–20.

The undisclosed 3/2/1995 activity sheet further suggests that only paper currency was stolen in denominations of $1s, $5s, $10s, and $20s. *See* Pet's Ex. 5. Indeed, the sheet does not mention coins at all. Additionally, and more critically, Detective Hoffner's grand jury testimony expresses the belief that "it's not like they had change" there. IGJ N.T., 9/19/1995 at 77. This activity sheet and testimony -- from the original lead investigator working the case -- would have been valuable impeachment evidence as to both Maio and Weihe's testimony regarding coins. Indeed, the only coin evidence presented to the jury was the recovery of a roll of dimes from the

---

[30] This evidence also appears to have been important to the jury, as it asked to have only Maio's testimony read back to them and requested to be reinstructed on felony murder.

decedent's cashbox. But neither Weihe nor Maio testified that Ramirez had rolls of change. Indeed, they testified that he had loose change in his pockets with Maio specifying that the loose change was quarters. N.T., 12/12/1997 at 142. Quarters, however, were only dispensed from the change machines, which were not hit. N.T., 12/11/1997 at 146; N.T., 12/12/1997 at 25–26.

The activity sheet and prior testimony could have presented the jury with some "reinforcement" of the defense theory and directly contradicted the trial prosecutor's assertion in his closing. *Compare* IGJ N.T., 9/19/1995 at 59 ("It's not like they had change" there) *with* N.T., 12/29/1995 at 170 ("Of course they had change there"). *See Commonwealth v. Weiss*, 81 A.3d 767, 788 (Pa. 2013) (suggesting undisclosed impeachment evidence is material under *Brady* if it supports the defense's theory at trial); *Lambert v. Beard*, 633 F.3d 126 (3d Cir. 2011) (reversing state court denial of relief where undisclosed activity sheet could have been used to impeach key witness's credibility).

c. *The timeline of events*

Another significant evidentiary dispute at Ramirez's trial was the timeline of events leading to the decedent's death. It was undisputed that Ramirez and Weihe were at the Darnell residence on the night of the murder and that Peter Gozzi drove them back to Weihe's house at some

64

point. But the time that Ramirez and Weihe left the Darnell residence was not just disputed, it was critical.

The evidence presented at trial established that the decedent locked up the laundromat at 12:30am, that she began cleaning soon after locking up, and that when she was found, it appeared her cleaning had been interrupted soon after starting. Wanda Vargas and Joanna Esquilin, by contrast, told police that they left the laundromat at 11:30pm and that the decedent locked the door behind them. Based on this, Detective Hoffner opined in his undisclosed grand jury testimony that the decedent was likely killed between 11:30 and 11:45pm. Putting all of this together, even crediting the later 12:30am lock-up time presented at trial, there is evidence the murder would have likely occurred before 12:45am.

Recognizing this, the trial prosecutor argued to the jury that Ramirez and Weihe left the Darnell residence close to midnight, giving them enough time to go to Weihe's house, eat food, and walk back towards the laundromat before 12:45am. N.T., 12/29/1995 at 77. He further argued that defense witness Jay Darnell, Sr., who testified that the kids left his house at 1am, was unreliable because this information had come to him second-hand. In so arguing, the trial prosecutor suggested to the jury that the defense did not call either witness who had first-hand knowledge, Mary

65

Emanuel and J.C. Darnell, because their testimony would have been unfavorable to the defense's theory. *Id*. at 78–79. As noted above, these suggestions were mistaken.

The newly disclosed grand jury testimony establishes that the initial lead investigator, Detective Hoffner, believed the decedent was killed within fifteen minutes of locking up and that she locked up at 11:30pm. This evidence is valuable both as exculpation and impeachment. The original assigned detective's opinion as to the circumstances surrounding the murder would have allowed reasonably competent counsel to further impeach Maio, who told police that Ramirez arrived at Sara Hurd's house after the murder "no later than 11:30pm," to call rebuttal witnesses, and to call the good faith of the larger investigation into question. *See Kyles*, 514 U.S. at 437; *see also* N.T., 1/3/2005 at 92 (defense counsel testifying that if he'd had further evidence to impeach Maio, he would have used it).

### d.  *Witness credibility*

The credibility of Commonwealth witnesses Forman, Rivera, Maio, and Weihe were paramount to the Commonwealth's case and to Ramirez's trial defense. Indeed, in a case where the only available physical evidence (a bloody scene and a recovered fingerprint) did not point to Ramirez, the witnesses' credibility was critical.

66

At trial, the prosecutor argued that Melanie Forman remembered the night of the murder because Sara Hurd had purchased her whole stash of PCP that night and that, the next morning, she went to Hurd's house where Ramirez confessed to her with T.A. present. 12/29/1997 at 125–26. The prosecutor further argued that Ramirez confessed to Forman because, as a drug dealer, she had a "right to know" where her money was coming from. *Id*. at 138. The trial prosecutor then argued that Weihe had no reason to lie because he was agreeing to have himself locked up. *Id*. at 133–36. Lastly the trial prosecutor argued that Maio was a credible witness both because he was friends with Ramirez and because the defense had nothing powerful to impeach him with. *Id*. at 142–43.

In addition to the above-described activity sheets, memoranda, notes and grand jury testimony regarding blood, coins, and timing that could have been used to impeach the witnesses and larger investigation, evidence of an undisclosed police interview with T.A. in which he reportedly contradicts nearly everything that was said about him and his involvement would have been powerful impeachment evidence of Maio, Forman, and Weihe. Indeed, all three witnesses intimated that T.A. was either with Ramirez and Weihe during the crime or with them at Sara Hurd's house afterwards. *See* N.T., 12/16/1997 at 112–18 (Weihe says that he and Ramirez

67

ran into T.A. after the crime); N.T., 12/12/1997 at 83 (Maio says that he saw T.A. arrive at Sara Hurd's house with Ramirez and Weihe); N.T., 12/16/1997 at 25–27 (Forman says Ramirez told her he did the crime with Weihe and T.A.). However, no police interviews with T.A. were disclosed pre-trial, he was not called at trial, and he was never charged with any crime. The previously undisclosed interview notes with T.A., found in 2021 during voluntary discovery, notes that the police interviewed T.A. around the same time they interviewed Mary Emanuel, and he told them he was not with Ramirez or Weihe that evening and that he called Weihe's house at 1:30am the night of the murder and spoke to both him and Ramirez on the phone about how they got home earlier since they did not have bus passes. *See* Pet's Ex. 28.

Additionally, specifically as to Weihe's credibility, Detective Hoffner's undisclosed note that Weihe immediately recanted his first police statement, specifically saying that he fabricated Ramirez's involvement, dovetails with Mary Emanuel's undisclosed grand jury testimony in which she says that Weihe told her "Eddie really didn't do this" and that the police threatened him with life in prison if he didn't inculpate Ramirez. *See* Pet's Ex. 5; IGJ N.T., 10/11/1995 at 20–21. Taken with the undisclosed ATF Operational Plan meant to target Weihe, dated May 26, 1996, Pet's Ex. 20,

68

reasonably competent defense counsel could have used all this to color the inculpatory police statement Weihe issued just five weeks later.

Lastly, Ramirez presents newly discovered evidence of Detective Worrell's history of eliciting false statements from witnesses dating back to 1990. If this had been known before Ramirez's trial, reasonably competent counsel could have presented it to the jury to further call the witnesses' credibility into question. Specifically, here, Worrell took (recanted) statements from both Weihe and Luis Rivera. In this case, where there exists a large number of misconduct allegations, any past police misconduct could have been useful not only to question and further impeach Rivera and Weihe, but to "call the thoroughness or even the good faith of the larger investigation into question." *Kyles*, 514 U.S. at 446.[31]

Such cumulative impeachment evidence, evidence that calls into question key witnesses' credibility and motives in a way not duplicated by other evidence, is quintessential material evidence under *Brady*. *See, e.g., Dennis*, 834 F.3d at 298–99; *Wearry v. Cain*, 577 U.S. 385, 393–94 (2016) (per

---

[31] Though not relevant to the disposition of the *Brady* claims addressed here, the Commonwealth notes that all the allegations of misconduct in this case, including recantations, appear consistent and that, in general, "multiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 61 (3d Cir. 2020).

curiam) (reversing denial of relief where suppressed evidence that damaged key witness's credibility was not disclosed and the state courts, in holding otherwise, "egregiously misapplied settled law"); *Banks v. Dretke*, 540 U.S. 668, 702 (2004) (suppressed impeachment evidence required reversal of conviction where evidence was not duplicative of other impeachment evidence).

e. *Alternative suspect evidence*

In addition to the above-described evidence supporting the arguments Ramirez made at trial that otherwise had little support, the recently disclosed activity sheets and police interview notes would have given reasonably competent defense counsel an additional defense to raise: an alternative suspect. Indeed, the recently disclosed March 1, 1995 activity sheet summarizes an interview with undisclosed witness Bert Calafell, who told police that he'd heard Oberholzer did the job with a white male named Billy. *See* Pet's Ex. 14. Similarly, the recently disclosed May 16, 1995 activity sheet summarizes an interview with undisclosed witness Sean Maguire, who echoed the sentiment that Oberholzer was involved along with a white male named Billy. *See* Pet's Ex. 26. Further, undisclosed interview notes with witness Nathaniel Rodriguez relay that Rodriguez claimed to have

70

heard Oberholzer complain about not getting much money from the job. *See* Pet's Ex. 28.

Similarly, the recently disclosed February 23, 1995 activity sheet notes that J.C. Darnell, Jay Darnell, Sr.'s son who lived across the street from the laundromat, was suspected of previously burglarizing the laundromat. The same activity sheet summarizes an interview with undisclosed witness Betty Kiefer, who told police that she spoke with J.C. Darnell the morning after the murder and that his boots had dark brown stains on them and he appeared "real nervous." *See* Pet's Ex. 31.

Reasonably competent defense counsel could have used this evidence to paint a picture of potential alterative suspects for the jury. Ramirez's defense counsel testified at an earlier PCRA proceeding that if he'd had access to a potential alternative suspect connected with either the crime or the players involved, he would have used it. N.T., 1/3/2005 at 74, 84–85, 89. He noted specifically he would have brought up Oberholzer if there had been any connection to Billy Weihe, but to his knowledge, there wasn't. *See id*. at 89. Reasonably competent counsel could have used this evidence to argue that the police took a "remarkably uncritical attitude" in accepting Ramirez as the killer here. *Kyles*, 514 U.S. at 420.

71

Generally, suppressed evidence suggesting that an alternate suspect may have committed the crime falls within *Brady*'s ambit, even if the police considered the leads fruitless. *Kyles*, 514 U.S. at 447; *Dennis*, 834 F.3d at 306 (noting that there is "no requirement that leads be fruitful to trigger disclosure under *Brady*" and reversing state court that held otherwise); *see also, e.g., Haskins v. Superintendent Greene SCI*, 755 F. App'x 184, 189 (3d Cir. 2018) (non-precedential) (holding that suppressed evidence pointing to an alternative suspect that would have given the jury a competing version of events is material under *Brady*).

\* \* \*

Assessed cumulatively, as is required, and in light of the record as a whole, including all evidence, the above-described 12 pieces of suppressed evidence satisfy *Brady's* materiality standard. The prosecution's case at trial already suffered from weaknesses from conflicting or shifting witness testimony and a lack of physical evidence connecting Ramirez to the crime. Suppressed evidence directly supporting Ramirez's trial defense, calling the witnesses' reliability into question, and suggesting alternative suspects undermines confidence in the jury's guilty verdict. If the evidence now before this Court had been disclosed, instead of hearing only four witnesses who offered inconsistent accounts, only one of whom claimed to witness

72

the event, the jury also could have heard from the original lead investigator on the case, the medical examiner's investigator, and additional witnesses to impeach or rebut the Commonwealth witnesses' testimony. The above-described evidence casts the case in a different light and establishes a reasonable probability of a different outcome. The new, compelling DNA evidence and consistent allegations of misconduct only further undermine that confidence.

As the jury already had reason to doubt the witnesses' testimony, and indeed did not find Ramirez guilty of first-degree murder as it was, it is reasonably probable that disclosure of the suppressed evidence would have built upon and reinforced those doubts in a way that changed the trial's outcome. Considering all of the suppressed evidence together and the trial record as a whole, the Commonwealth agrees that Ramirez has established *Brady* materiality and recommends he be granted a new trial. *Cf. Strickland v. Washington*, 466 U.S. 668, 696 (1984) ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

C. **In the alternative, the Commonwealth does not oppose a hearing on Ramirez's *Brady* claims.**

If the Court disagrees with the above or wishes to hear more, the Commonwealth does not oppose a hearing on Ramirez's *Brady* claims, limited

73

to the factual issue of suppression, as materiality is a question of law properly reserved for the court. *See Wilson v. Beard*, 589 F.3d 651, 657 n.1 (3d Cir. 2009) (noting that *Brady* materiality is "a legal question for [the court] to decide").

## IV.    CONCLUSION

Eddie Ramirez's second-degree murder conviction was based on less than overwhelming evidence, hinging on witnesses who offered shifting narratives and no physical evidence. We now know that the prosecution suppressed a large amount of material that would have been favorable to Ramirez's defense, undercutting the prosecution's case and calling into question the good faith of the larger investigation.

That the suppressed evidence does not conclusively exonerate Ramirez is of no moment. A jury that heard all the evidence, old and new, could still believe Weihe's testimony, which alone would be sufficient to sustain the conviction. But the existence of sufficient evidence does not defeat materiality. Indeed, even the actual-innocence gateway standard, which is much more demanding than *Brady's* materiality standard, was met in a case that was "not a case of conclusive exoneration." *House v. Bell*, 547 U.S. 518, 553–54 (2006). So, while the Commonwealth does not concede that Ramirez

74

has proven his innocence, he has shown more than enough to satisfy *Brady*

and therefore recommends that he be granted a new trial.



Respectfully submitted,


*/s/ David Napiorski*
DAVID J. NAPIORSKI
Assistant District Attorney
NANCY WINKELMAN
Supervisor, Law Division
LARRY KRASNER
District Attorney of Philadelphia

# Exhibit "B"

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| Eduardo Ramirez | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   24-3035 |
| City of Philadelphia, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                            Philadelphia District Attorney's Office: Tom
Gaeta

*(Name of person to whom this subpoena is directed)*

☑ *Testimony: David Napiorski, Assistant District Attorney, Philadelphia District Attorney's Office*

**YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.

| Place: City of Philadelphia Law Department | Date and Time: |
|---|---|
| 1515 Arch Street, 14th Floor, Philadelphia, PA 19102 | 11/4/2025 10:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        10/6/2025

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Daniel Cerone |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Defendant City of Philadelphia                                , who issues or requests this subpoena, are:

Daniel Cerone, City Law Dep't, 1515 Arch St., 14th Fl., Phila., PA 19102; 215-683-2964; daniel.cerone@phila.gov

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  24-01167

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____  on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit "C"

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| Eduardo Ramirez<br>*Plaintiff* | ) )<br>) ) |
| v. | ) Civil Action No. 24-3035 |
| City of Philadelphia, et al.<br>*Defendant* | ) )<br>) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Philadelphia District Attorney's Office: Shea Skinner,
Thomas Gaeta: Supervisor - Civil Litigation

*(Name of person to whom this subpoena is directed)*

☑ *Testimony: Katherine Ernst - Assistant District Attorney, Philadelphia District Attorney's Office*

**YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.

| Place: City of Philadelphia Law Department<br>1515 Arch Street, 14th Floor, Philadelphia, PA 19102 | Date and Time:<br>4/3/2026 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 2/27/2026

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Daniel Cerone |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Defendant City of Philadelphia , who issues or requests this subpoena, are:

Daniel Cerone, City Law Dep't, 1515 Arch St., 14th Fl., Phila., PA 19102; 215-683-2964; daniel.cerone@phila.gov

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  24-3035

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | | |
|---|---|---|
| Eduardo Ramirez | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  24-3035 |
| City of Philadelphia, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:              Philadelphia District Attorney's Office: Shea Skinner,
Thomas Gaeta: Supervisor - Civil Litigation

*(Name of person to whom this subpoena is directed)*

☑ *Testimony: Matthew Stiegler - Assistant District Attorney, Philadelphia District Attorney's Office*

**YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.

| Place: City of Philadelphia Law Department 1515 Arch Street, 14th Floor, Philadelphia, PA 19102 | Date and Time: 4/6/2026 10:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      2/27/2026

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| | | /s/ Daniel Cerone |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Defendant City of Philadelphia                                        , who issues or requests this subpoena, are:

Daniel Cerone, City Law Dep't, 1515 Arch St., 14th Fl., Phila., PA 19102; 215-683-2964; daniel.cerone@phila.gov

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  24-3035

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of Pennsylvania

| | | |
|---|---|---|
| Eduardo Ramirez | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  24-3035 |
| City of Philadelphia, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Philadelphia District Attorney's Office: Shea Skinner
and Thomas Gaeta: Supervisor - Civil Litigation

*(Name of person to whom this subpoena is directed)*

☑ *Testimony: Nancy Winkleman - Assistant District Attorney, Philadelphia District Attorney's Office*

**YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.

| Place: City of Philadelphia Law Department<br>1515 Arch Street, 14th Floor, Philadelphia, PA 19102 | Date and Time:<br><br>4/7/2026 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:          2/27/2026

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Daniel Cerone |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
<u>Defendant City of Philadelphia</u>                                  , who issues or requests this subpoena, are:

<u>Daniel Cerone, City Law Dep't, 1515 Arch St., 14th Fl., Phila., PA 19102; 215-683-2964; daniel.cerone@phila.gov</u>

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  24-3035

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit "D"

 Outlook

---

**RE: Edward Ramirez v. City of Philadelphia, et al. No. 24-3035 - Subpoena for ADA Julie Nelson**

---

**From** Brownlie, Joshua W. <JWBrownlie@MDWCG.com>

**Date** Tue 5/5/2026 1:56 PM

**To** Shea Skinner <Shea.Skinner@Phila.gov>; Gonzales, John P. <jpgonzales@mdwcg.com>; Clark, Oswald P. <OPClark@MDWCG.com>; Dorothy Hayes <Dorothy.Hayes@phila.gov>; Trey L Flynn <Trey.L.Flynn@phila.gov>; cioschi@wisemanschwartz.com <cioschi@wisemanschwartz.com>; atauber@atauberlaw.com <atauber@atauberlaw.com>; matthias@wisemanschwartz.com <matthias@wisemanschwartz.com>; wiseman@wisemanschwartz.com <wiseman@wisemanschwartz.com>

**Cc** Smith, Grant R. <GRSmith@MDWCG.com>; Battista, Taylor C. <TCBattista@MDWCG.com>

---

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

---

Certainly.  Jessi, please circulate a conference dial-in.

Thanks.



**Joshua W. Brownlie**

*Attorney at Law*

2000 Market Street, Suite 2300, Philadelphia, PA 19103

Direct: (215) 575-2816 | Main: (215) 575-2600 | Fax: (215) 575-0856

bio | e-mail | website

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to JWBrownlie@MDWCG.com, or by telephone at (215) 575-2816 and then delete the message and its attachments from your computer.

---

**From:** Shea Skinner <Shea.Skinner@Phila.gov>
**Sent:** Tuesday, May 5, 2026 1:55 PM
**To:** Brownlie, Joshua W. <JWBrownlie@MDWCG.com>; Gonzales, John P. <JPGonzales@MDWCG.com>; Clark, Oswald P. <OPClark@MDWCG.com>; Dorothy Hayes <Dorothy.Hayes@phila.gov>; Trey L Flynn <Trey.L.Flynn@phila.gov>; cioschi@wisemanschwartz.com; atauber@atauberlaw.com; matthias@wisemanschwartz.com; wiseman@wisemanschwartz.com
**Cc:** Smith, Grant R. <GRSmith@MDWCG.com>; Battista, Taylor C. <TCBattista@MDWCG.com>
**Subject:** Re: Edward Ramirez v. City of Philadelphia, et al. No. 24-3035 - Subpoena for ADA Julie Nelson

**WARNING: This email originated outside Marshall Dennehey. BE CAUTIOUS before clicking any link or attachment.**

Thank you, that works on our end. Can we plan to have a call at 10am?

Respectfully,

**Shea Skinner**

Assistant District Attorney
Appeals Unit / Civil Litigation Unit

Philadelphia District Attorney's Office

215-686-7644

*he/him*

---

**From:** Brownlie, Joshua W. <JWBrownlie@MDWCG.com>
**Sent:** Tuesday, May 5, 2026 12:49 PM
**To:** Shea Skinner <Shea.Skinner@Phila.gov>; Gonzales, John P. <jpgonzales@mdwcg.com>; Clark, Oswald P. <OPClark@MDWCG.com>; Dorothy Hayes <Dorothy.Hayes@phila.gov>; Trey L Flynn <Trey.L.Flynn@phila.gov>; cioschi@wisemanschwartz.com <cioschi@wisemanschwartz.com>; atauber@atauberlaw.com <atauber@atauberlaw.com>; matthias@wisemanschwartz.com <matthias@wisemanschwartz.com>; wiseman@wisemanschwartz.com <wiseman@wisemanschwartz.com>
**Cc:** Smith, Grant R. <GRSmith@MDWCG.com>; Battista, Taylor C. <TCBattista@MDWCG.com>
**Subject:** RE: Edward Ramirez v. City of Philadelphia, et al. No. 24-3035 - Subpoena for ADA Julie Nelson

> **External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

Mr. Skinner:

We are in receipt of your letter and are available tomorrow morning between 9 AM and 11 AM for the meet and confer.



**Joshua W. Brownlie**
*Attorney at Law*

2000 Market Street, Suite 2300, Philadelphia, PA 19103

Direct: (215) 575-2816 | Main: (215) 575-2600 | Fax: (215) 575-0856

bio | e-mail | website

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to JWBrownlie@MDWCG.com, or by telephone at (215) 575-2816 and then delete the message and its attachments from your computer.

---

**From:** Shea Skinner <Shea.Skinner@Phila.gov>
**Sent:** Tuesday, May 5, 2026 9:13 AM
**To:** Gonzales, John P. <JPGonzales@MDWCG.com>; Brownlie, Joshua W. <JWBrownlie@MDWCG.com>; Clark, Oswald P. <OPClark@MDWCG.com>; Dorothy Hayes <Dorothy.Hayes@phila.gov>; Trey L Flynn <Trey.L.Flynn@phila.gov>; cioschi@wisemanschwartz.com; atauber@atauberlaw.com; matthias@wisemanschwartz.com; wiseman@wisemanschwartz.com
**Cc:** Smith, Grant R. <GRSmith@MDWCG.com>; Battista, Taylor C. <TCBattista@MDWCG.com>
**Subject:** Re: Edward Ramirez v. City of Philadelphia, et al. No. 24-3035 - Subpoena for ADA Julie Nelson

WARNING: This email originated outside Marshall Dennehey. BE CAUTIOUS before clicking any link or attachment.

Good morning counsel,

Please see the attached courtesy copy of the DAO's written objections to Defendant Paul Worell's 4/30 subpoena for deposition testimony. Attorneys Gonzalez and Brownlie, kindly advise of your availability to confer pursuant to FRCP 26(c)(1).

Respectfully,


**Shea Skinner**

Assistant District Attorney
Appeals Unit / Civil Litigation Unit

Philadelphia District Attorney's Office

215-686-7644

*he/him*

---

**From:** Battista, Taylor C. <TCBattista@MDWCG.com>
**Sent:** Thursday, April 30, 2026 4:54 PM
**To:** cioschi@wisemanschwartz.com <cioschi@wisemanschwartz.com>; atauber@atauberlaw.com <atauber@atauberlaw.com>; matthias@wisemanschwartz.com <matthias@wisemanschwartz.com>; wiseman@wisemanschwartz.com <wiseman@wisemanschwartz.com>; Gonzales, John P. <jpgonzales@mdwcg.com>; Brownlie, Joshua W. <JWBrownlie@MDWCG.com>; Clark, Oswald P. <OPClark@MDWCG.com>; Raymond Escobar <Raymond.Escobar@phila.gov>; Dorothy Hayes <Dorothy.Hayes@phila.gov>; Shea Skinner <Shea.Skinner@Phila.gov>; Daniel Cerone <Daniel.Cerone@Phila.gov>
**Cc:** Smith, Grant R. <GRSmith@MDWCG.com>
**Subject:** Edward Ramirez v. City of Philadelphia, et al. No. 24-3035 - Subpoena for ADA Julie Nelson

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

---

Dear Counsel,

Attached, please find a Deposition Subpoena for ADA Julie Nelson.


Thank you,

Taylor



**Taylor C. Battista**

*Paralegal*

620 Freedom Business Center, Suite 405, King of Prussia, PA. 19406

Direct: (610) 354-8259 | Main: (610) 354-8250 | Fax: (610) 354-8299

e-mail | website

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to TCBattista@MDWCG.com, or by telephone at (610) 354-8259 and then delete the message and its attachments from your computer.

# Exhibit "E"

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| EDUARDO RAMIREZ, | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.   24-3035 |
| CITY OF PHILADELPHIA, et al., | ) |
| | ) |
| _Defendant_ | ) |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:

ADA Julie Nelson- 3 S. Penn Square, Philadelphia, PA 19107
c/o ADA Shea Skinner

_(Name of person to whom this subpoena is directed)_

✔ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  2000 Market Street, Suite 2300, Philadelphia, PA 19103 | Date and Time: <br> 05/08/2026 10:00 am |
|---|---|

The deposition will be recorded by this method:  The deposition will be recorded  by stenographic means

❑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    04/30/2026

| _CLERK OF COURT_ | |
|---|---|
| | OR |
| | /s/ John P. Gonzales |
| _Signature of Clerk or Deputy Clerk_ | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ ___defendant___
Detective Paul Worrell_____ , who issues or requests this subpoena, are:

John P. Gonzales, Esq./ 2000 Market Street, Suite 2300, Phila, PA 19103/ JPGonzales@MDWCG.com/ 215-575-2871

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  24-3035

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **EDUARDO RAMIREZ,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 24-3035** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date below, I served a copy of the foregoing Notice of

Deposition of Julie Nelson *via* email to:

Jon Cioschi cioschi@wisemanschwartz.com;
Alan Tauber atauber@atauberlaw.com;
Christina Matthias matthias@wisemanschwartz.com;
Michael Wiseman wiseman@wisemanschwartz.com;
John Gonzales jpgonzales@mdwcg.com;
Joshua Brownlie jwbrownlie@mdwcg.com;
Oswald Clark OPClark@Mdwcg.com;
Raymond Escobar Raymond.Escobar@phila.gov;
Dorothy Hayes Dorothy.Hayes@phila.gov;
Shea Skinner Shea.Skinner@Phila.gov
Daniel Cerone daniel.cerone@phila.gov

Date: April 30, 2026

/s/ Taylor Battista
Taylor Battista
MARSHALL DENNEHEY
2000 Market Street, Suite 2300,
Philadelphia, PA 19103
(215) 575-2600
tcbattista@mdwcg.com

# Exhibit "F"



**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
215-686-8000

May 5, 2026

**VIA E-MAIL AND CERTIFIED MAIL**

John P. Gonzales, Esq.
Marshall Dennehey Warner Coleman and Goggin, P.C.
2000 Market St., Suite 2300
Philadelphia, PA 19103
JPGonzalez@MDWCG.com

Joshua W. Brownlie, Esq.
JWBrownlie@MDWCG.com

      **Re: Objections to subpoena for deposition testimony in *Ramirez v. City of Philadelphia, et al.*, 24-cv-3035**

Dear Attorneys Gonzalez and Brownlie:

      I write in response to your subpoena served on the Philadelphia District Attorney's Office ("DAO") on April 30, 2026, seeking deposition testimony from non-party Assistant District Attorney Julie Nelson in connection with the above-captioned matter. Be advised that the DAO objects to your subpoena on the following grounds:

- The subpoena fails to allow reasonable time for compliance;

- The subpoena is not reasonably calculated to lead to the discovery of relevant, admissible evidence;

- Compliance with the subpoena would impose an undue burden and expense on a nonparty;

- The subpoena seeks disclosure of privileged information, including information protected by the deliberative process privilege and attorney work-product doctrine; and

- To the extent the subpoena seeks relevant, non-privileged information from ADA Nelson, the subpoena is unreasonably cumulative and/or seeks testimony that is duplicative of prior deposition testimony.

In light of the foregoing, the DAO is constrained to seek quashal of your subpoena and an appropriate protective order. Accordingly, kindly advise of your availability to confer pursuant to Rule 26(c)(1).

Respectfully,

/s/ *Shea Skinner*

Shea Skinner
Assistant District Attorney
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107-3499
(215) 686-7644
*Shea.Skinner@phila.gov*

cc (via email):

Jon Cioschi cioschi@wisemanschwartz.com;
Christina Matthias matthias@wisemanschwartz.com;
Michael Wiseman wiseman@wisemanschwartz.com;
Alan Tauber atauber@atauberlaw.com;
Dorothy Hayes Dorothy.Hayes@phila.gov;
Michael Lewis Flyn, III Trey.L.Flynn@phila.gov

# Exhibit "G"

David Napiorski
11/12/2025

Page 6

just ask that you answer the question before going on a break. It's not going to be very long. This will be an hour or two, so, either/or, if you need a break, feel free to take a break. Okay?

A    Understood.

MS. MATTHIAS: Should we just put on the record that Shea Skinner is here representing Mr. Napiorski.

MR. SKINNER: I am here on behalf of the witness.

BY MR. CERONE:

Q    Are you currently employed at the district attorney's office?

A    I am.

Q    Here in Philadelphia?

A    I am.

Q    What's your title?

A    I'm the assistant supervisor of the law division.

Q    Can you just explain to me what that entails, what that role entails?

A    Sure. Well, I'm still learning it. I assumed that role in July of this year, so a few months ago. The supervisor of the law division is a woman named Katherine Ernst now. I help her kind of

Page 7

run and manage the law division, which consists of four units within the district attorney's office: The federal litigation unit, the PCRA unit, the civil litigation unit and the appeals unit.

Q    So you had said you took on that role sometime in July?

A    July.

Q    What was your role prior to July of 2025?

A    I was the supervisor of the federal litigation unit.

Q    Can you tell me about your role as the supervisor of the federal litigation unit?

A    Sure. I was supervisor of fed lit for also, not that long, like, seven months or so. As leader of that unit, you handle all federal habeas matters that come through the district attorney's office.

You asked me what being the supervisor of litigation entails, which is what I was doing prior to July of this year. That entails overseeing a unit of about ten ADAs and three paralegals who handle all the federal litigation, federal habeas litigation that runs through the DA's office.

Q    You said you were doing that for about seven months?

Page 8

A    I honestly don't remember the date. It wasn't that long. Before that, I was the assistant supervisor for the federal litigation unit for a period of time, I don't remember, but most of my time in the DA's office, I have been a line ADA in the federal litigation unit.

Q    Great. When did you join the district attorney's office?

A    June 2019.

Q    Your role was a line ADA within the federal litigation unit?

A    Yeah.

Q    Now, were you a line attorney with the federal litigation unit in 2023?

A    Yes, I believe so.

Q    Was that when you were assigned to the case of Commonwealth versus Eddie Ramirez?

A    I don't remember the exact dates, but, I mean, it would have been sometime in 2022 or 2023, I guess.

Q    I guess I went through some of the dockets and I was trying to figure out how you came to be assigned. Can you explain to me how you became assigned the PCRA in Commonwealth versus Eddie Ramirez?

Page 9

A    Sure. I came to be assigned because the head of the law division at that time, Nancy Winkelman, asked me to take a look at it. It was a pending PCRA that seemed complicated and Nancy asked me to hop on it.

Q    Was there an ADA assigned to the case when Ms. Winkelman told you to hop on it?

A    No, there wasn't. Eventually, a PCRA ADA named Julie Nelson was also co-signed with me, but at that time, I was the first line ADA on the case, I think.

Q    On the PCRA?

A    On the PCRA.

Q    So it was not assigned before it being assigned to you?

A    I don't think so. It had been a federal habeas case that was stayed in order to exhaust, I think, some of the PCRA claims.

Q    Who was assigned to habeas?

A    It must have been me. I don't remember.

Q    You know Lori Williamson, correct?

A    I do.

Q    Was it your understanding that she had been assigned to the case for over a decade?

A    I knew she had worked on it previously,

David Napiorski
11/12/2025

Page 10

but I didn't know if she was continuously working on it. I knew she had worked on it in, like, 2005, maybe, or whenever the first PCRA was, I know that she worked on it.

Q   Do you have any reason why she wouldn't have been assigned to the PCRA since she had been on the case for so long?

A   I don't. I would have to guess, I don't know.

Q   Did you speak to Ms. Williamson during the time you were assigned to the Eddie Ramirez case?

A   Yes.

Q   About things she had done in the case, X, Y, Z, stuff like that?

A   Yes. I'm trying to remember. Yes, we definitely spoke about the case.

Q   So when you were a line ADA in federal litigation and you were assigned this case by the law division supervisor, Nancy Winkelman, who was the federal litigation chief?

A   Oh, man. I don't remember. It was either Matt Stiegler or Katherine Ernst. I don't remember what dates they switched. I don't know.

Q   Did either of them have any involvement in this case?

Page 11

A   Must have been Katie Ernst. I think Katie was the head of fed lit. She must have been the head of fed lit, because she reviewed the draft that we produced, as did Nancy.

Q   You spoke a little bit about Mr. Ramirez having a pending federal habeas?

A   He did, at the time.

Q   I had never been in federal habeas, I don't know how it works. Can you explain to me how it works when there is a pending PCRA and a federal habeas brought by a criminal defendant?

A   Sure.

MS. MATTHIAS: Objection to form. Go ahead.

THE WITNESS: I can answer?

BY MR. CERONE:

Q   Yes. There will be many -- obviously, there are many attorneys here. They will lodge objections for usually just form. You would be expected to answer every question unless your attorney, Mr. Skinner, instructs you not to answer. Okay?

A   I'm sorry. Can you repeat the question?

Q   I will try.

I don't have a good base of knowledge

Page 12

about federal habeas. Can you explain to me how it works when there is a pending PCRA and a pending habeas?

MS. MATTHIAS: Same objection. Go ahead.

THE WITNESS: Generally, if there is -- somebody files a federal habeas and a PCRA that raises the same claims, they will both be pending at the same time. It's common practice for the federal court to issue a stay in the federal habeas case to allow the petitioner to exhaust his new claims in state court first. Generally, the state courts are supposed to get the first crack at a new constitutional claim and the federal court will then weigh in once the state courts weigh in. That's generally how it's supposed to happen, federal courts will typically issue a stay in that scenario.

BY MR. CERONE:

Q   In this instance, the federal habeas was stayed and the PCRA was moving forward?

A   Yes, I think so.

Q   So you were assigned this case. Do you remember, ballpark, what month or what year you were assigned?

A   No, I don't. We can work backwards. I

Page 13

don't remember exactly when I filed this, but it would be about six months before I filed this --

Q   It's my understanding -- you are pointing to this. It's your filing?

A   The Commonwealth's response to Mr. Ramirez's position for post-conviction relief.

Q   I can represent to you that was filed sometime in August of 2023. Based on the math, you would have been assigned sometime in early 2023?

A   Now I remember. It was, like, December 2022, that's when I would have been assigned.

Q   When you were assigned in December of 2022, can you take me through your process; what do you do first on the case?

A   Generally, if I get -- I mean, when I was line ADA, any new case I got, I would review the file. I would review the petition first and then review any and all available transcripts. For a case with complicated Brady claims, I made sure I reviewed all the boxes that the district attorney's office had on the case and anything the police department had, just review everything I could really get my hands on.

Q   Understood. Let's do this. You pointed

Page 70

Q    As far as the 75-page document, do you dictate it, type it out yourself?  How is it prepared?

A    I draft it myself on a computer.

Q    So you are typing it out?

A    Yeah.  It goes through many different versions and drafts.  There are various editors, but the first draft is typed out by me.

Q    In these conviction -- this type of relief, you are asking for a new trial because of Brady evidence?

A    In this case, yes.

Q    When was the decision made that this individual was not going to be retried?

A    I don't recall.

Q    You said Mr. Krasner makes that decision, ultimately?

A    Yes.

Q    Do you remember attending any meetings between DiClaudio's decision and the nol pros, where it was discussed whether or not this case was going to be retried?

MR. SKINNER:  Objection, privilege, don't answer.

MS. MATTHIAS:  Objection to form.

David Napiorski
11/12/2025

Page 86

worked on, you didn't concede that relief would be appropriate?

A    No.

Q    In some instances where you conceded relief would be appropriate, do you know if the case then instead of -- you know, as an alternative of being tried again or nol prosed resulted in a guilty plea?

A    That I handled?

Q    Yes.

A    I don't know off the top of my head how many cases there were.

Q    Do you think that happened in at least one?

A    Yeah.  I mean, the number of cases I handled that resulted in an agreement to some kind of relief is probably closer to 15.  Of those 15, the majority of them would be cases that led to a plea, some kind of a plea agreement after relief was granted.

Q    So you mentioned that in your -- you put significant effort into locating the original homicide file in the PPD?

A    I looked for it, as did others.  ADA Julie Nelson, who also helped with the case, helped review

Page 87

files, looked for it, couldn't find it.  Lori Williamson, who we talked about, looked for it, couldn't find it.

Q    To be clear, I am talking about the Philadelphia Police Department's homicide file that they would have created at the time of the investigation, that's what you are talking about, too?

A    Yes.

Q    Your memory, I think you told us, was someone from the police department reported that there was some indication in their records that the H file had been turned over in the 2005 PCRA era?

A    I mean, that is what I remember.  I can't say 100 percent.  That is what my memory is telling me, that there was some notation suggesting that the file had been given to the district attorney's office during the prior PCRA.

Q    That wouldn't be totally unusual in your experience for that to happen?

A    No, that's not unusual.  Generally, we would return it, but, I mean, again, these paper files, sometimes things just get lost.

Q    In terms of your process for evaluating the suppression element of the Brady claims here, I

Page 88

want to talk about some of the things that you did.

A    Sure.

Q    That type of analysis you've done in other cases, too, right?

A    A suppression analysis?

Q    Yes.

A    Yes.

Q    Some of the things you'll typically do is look at the discovery letters; is that fair?

A    Yes, typically, trying to see if something was possibly suppressed -- I mean, you would look through the file to see if it's there, you look at the discovery letters to see if it's listed on a disclosure letter, you would look at the file markings for the trial binder to see if there's any markings on anything that was disclosed during trial, you would look through the trial file, you would talk to defense counsel, if he or she were alive and available, you would talk to the trial prosecutor, if he or she were alive and available, and come to a determination about whether -- at least under the PCRA, is has to be a preponderance of the evidence, that whether, by a preponderance of the evidence, we think the petitioners met their burden of showing this stuff wasn't turned over at

Page 89

the time of trial.

Q    When you said, look at the file to see if it's there, you are talking about the defense -- counsel files are available?

A    When I say the trial file, the prosecutor's file.  If something is in the prosecutor's file, it's more likely that it would have been disclosed at some point as opposed to something that's only in the police department's file.

Q    So, in some instances, you are able to separate out those two files and make a comparison, right?

A    Yes.

Q    But you weren't able to do that here?

A    I wasn't.  Everything was kind of mixed together.

Q    That's due to the sort of imperfect handling of the records and where they have been maintained over time, right?

A    Yes, imperfect record maintenance.

Q    Obviously, your review is guided by the claims that the petition brings.  So, in this case, Mr. Ramirez identified 11 pieces of evidence that they said were favorable to Mr. Ramirez and

# Exhibit "H"

Page 22

previously marked as Exhibit D-1.

MS. MATTHIAS: We have -- okay. I got this.

BY MR. FLYNN:

Q. (Indiscernible.)

A. So I just know that the first time I ever heard about the case was when Nancy had come to me and told me that the law division was handling this case and that she wanted to put somebody thorough and a good ADA on it. And so probably early 2023 based upon all this.

Q. In that conversation with Nancy, did you take that to mean that you were to be assigned the case or that you were to assign the case?

A. I think she -- honestly, the only two people in the federal -- well, really that I would -- certainly in, in the federal litigation unit at the time, is what I led, that I would say would have the experience and -- to handle this case would have been me or Dave, but I was, like, very underwater at the time and so assigned this case, but I don't remember if she asked me or she told me -- or we just discussed it. I don't know who made the decision.

Page 23

Q. At that point the case was in a PCRA posture though, correct?

A. Yes.

Q. Why was a PCRA case assigned to the federal litigation unit?

A. So the federal litigation attorneys handle a lot of PCRAs because there are just a lot of PCRAs that -- (indiscernible) people will also have a PCRAs. So federal litigation attorneys will handle many PCRAs if they're connected to one of our federal litigation cases, but sometimes they're just assigned PCRAs because PCRA is under water.

Q. Was Laurie Williamson the head of PCRA at the time that this conversation between you and Nancy occurred?

A. She was the assistant supervisor.

Q. Who was the supervisor?

A. Tracey Kavanagh.

Q. Were you aware that Laurie Williamson had had this very matter as a PCRA for over a decade?

MS. MATTHIAS: Objection to form.

THE WITNESS: I am now aware of

Page 24

that. I was not aware of that when the (indiscernible) division was talking about the case because I didn't know anything about that.

BY MR. FLYNN:

Q. Did you know the concession brief getting filed, did you become aware of that Ms. Williamson had previously had the case?

A. Yes.

Q. Did you speak to Ms. Williamson about the case?

A. Yes.

Q. What was your role precisely in preparing this, what's been shown to you as D-1?

A. I edited it, and I, you know, just talked with Dave about it. He is one of the best lawyers in our office. And so that's why I was very happy for him to take it because I can know that he had it then I didn't have to worry what level of diligence or level of legal expertise there was in the person handling it because he's very smart. And we had a number of meetings with other people as well in which we discussed the case, talked through it over and over, once --

Page 25

Q. When you say "edited," to what level of detail did you edit D-1?

A. I, I, you know, edited it for comprehensibility, for -- you know, make sure that the law is correct, but I -- so I, I edited it but I didn't, like, go through the underlying, like, documentation, like, confirmed that -- yeah, the facts of the present case.

Q. So you had a number of meetings. Who were those other individuals in these meetings and roughly where did they take place?

A. So --

MS. MATTHIAS: Sorry. Objection. Relevance.

Go ahead.

THE WITNESS: So Nancy wanted to hear from Dave because she wanted somebody to, you know, take a good thorough look at it, but then she also wanted to hear from Laurie because Laurie had worked on the case for over a decade as you mentioned. And then Laurie wanted a line ADA to also look into it from PCRA so, so that had many people looking at it. And so the meetings -- we had a

888-893-3767          Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com    Nevada Registration #116F. California Firm Registration #179

LEXITAS

Page 26

number of meetings with Nancy, me, Dave, Laurie, and then Julie Nelson is the ADA that Laurie brought in on the case as well.

And Julie and Dave jointly did -- you know, worked on investigating facts that we felt needed to be further investigated. Like, I specifically remember, for instance, Julie going down to the federal courthouse, I think it's where the, the quarter sessions file was being held at the time because we wanted to look in there to see if there was documentation of certain things. So we had a number of meetings to talk about what additional investigative steps needed to be done, you know, our thoughts of the claims, etc.

BY MR. FLYNN:

Q. And can you walk us through some of the investigative steps that took place under your leadership?

A. Trying to remember. I mean, said that we were getting court sessions. Dave was trying to talk to -- had attempted and -- it's been a long time. My cases, if I, I did the case myself

Page 27

I, like, remember everything, but if I, I supervise a case, I supervise staff on a case so I can't remember everything.

Q. So Mr. Napiorski was taking the lead on any investigation and --

MS. MATTHIAS: Yeah. Objection.

THE WITNESS: And I --

MR. FLYNN: Grounds?

MS. MATTHIAS: Form.

THE WITNESS: And I also didn't view myself as supervising this case in this -- in the way that I would if it were, you know, in a typical federal litigation case. I viewed myself -- I viewed it as Nancy was supervising the case and I was just kind of helping, which wasn't uncommon because especially in a difficult case it's common to pull in expert supervisors to get their take on things.

BY MR. FLYNN:

Q. So would it be your testimony that you were not the supervisor of this case?

A. I certainly wasn't the ultimate supervisor of the case.

Page 28

Q. When this case was now crossed on November 30th, did you identify yourself as the supervisor of this case?

A. I mean, I'm certain that David Napiorski supervised it.

MR. FLYNN: (Indiscernible) --

MS. MATTHIAS: This is Defendant 2nd?

MR. FLYNN: (Indiscernible) --

MS. MATTHIAS: (Indiscernible) --

MR. FLYNN: In page 30?

MS. MATTHIAS: Yeah.

BY MR. FLYNN:

Q. I'm going to read along starting from the very beginning of the proceeding. "Ms. Ernst: Good morning, Your Honor, my name is Katherine Ernst. I'm the supervisor of federal litigation. I supervise this case and (indiscernible.)" So did I read that correctly?

A. Yes. You did.

Q. So on November 30th you identified yourself on the record as the supervisor. Is that what you're saying?

MS. MATTHIAS: Objection.

Page 29

THE WITNESS: I did. Yes.

BY MR. FLYNN:

Q. So we've identified Nancy, Mr. Napiorski, Ms. Williamson, and Mrs. Nelson were involved in meetings to discuss this case, correct?

A. Yes.

Q. Did anyone have push back on granting relief?

MR. SKINNER: Objection. States for -- asking for privileged discussions.

MR. FLYNN: Which privilege?

MR. SKINNER: Attorney work product or deliberative process.

MR. FLYNN: (Indiscernible) --

BY MR. FLYNN:

Q. Did Ms. Williamson ever voice objections to granting relief?

MR. SKINNER: Objection. (Indiscernible.)

Go ahead.

BY MR. FLYNN:

Q. Did anyone mention then any of the issues raised were previously litigated in the

888-893-3767    Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

Page 34

on November 2, 2023 when this concession brief was heard or argued before Judge DiClaudio?

A.  Which date?

Q.  November 2nd, so prior to that one.

A.  Was that when there was the oral argument?

Q.  Yes.

A.  I was there.  Yeah.

Q.  Did you hear everything that Mr. Napiorski said on the record?

A.  Yeah.  Absent someone talking to me and I don't remember, yes.

Q.  But you were there in the capacity as a supervisor?

A.  Yes.

Q.  And do you stand by everything that Mr. Napiorski said to Judge DiClaudio for the record that day?

A.  I currently have no reason to believe anything he said was wrong.

Q.  I'm just going to show you -- that's the November 2nd transcript.  You can just look through that.  Let us know this 35 little pages; is that right -- 36 little pages?

Page 35

A.  Yes.  Do I read them all?

Q.  No, no, no.  And this looks like it's Mr. Napiorski presenting argument and the Innocence Project was represented by Mr. Sambi at the same time?

A.  Ms. Sambi, but yeah.

Q.  Sorry.  Was Mr. Weisman present on the given date?

A.  I don't remember him being there but I could just be not remembering.

Q.  But you're aware that he represented Mr. Ramirez at the time?

A.  No.  I don't know if I did know that.  I have a, a, a recollection of -- at this -- at, at this hearing, the, the November 30, 2023 hearing of, of Wiseman being there.  And I specifically remember it because he was speaking on his phone in court and the Judge yelled at him and I thought that was an insane thing to do.  Not the Judge yelling at him in the gallery speaking and so forth.  And, and I think that might have been the first time I even realized he had anything to do with the case.

Q.  So it's your testimony that you didn't

Page 36

know that Mr. Wiseman represented Mr. Ramirez until November 2, 2023?

MS. MATTHIAS:  Objection.
Asked and answered.
THE WITNESS:  No.  I did know because his name is on the petition.  I did know.  I, I think -- I think I had just forgotten and because Niwon Sambi (phonetic) had been the one primarily handling the case and so I had just forgotten and then that reminded me that he was on the case.

BY MR. FLYNN:

Q.  So after the November 2, 2023 hearing, the case was nolle prosequi, right?

A.  Yeah.

Q.  And the DAO was presented with the decision of whether to retry the case?

A.  Yes.  Well, we had to decide whether we retry it and then we nolle prosequi it.  You said it in the opposite order.

Q.  So it's your testimony that the nolle prosequi preceded a decision of whether to try it again?

A.  No.  I was saying the opposite.  I'm

Page 37

saying we had to decide first whether we wanted to reprosecute it and then when we decided that we wouldn't/couldn't, then we nolle prosequi.

Q.  You're right.  I'm sorry.  So relief was granted?

A.  Yes.

Q.  Then you had to decide whether you'll retry the case?

A.  Correct.

Q.  Can you describe that process?

A.  We had (indiscernible) in which we discussed the case and that decision was made.

Q.  Who was present for those meetings?

MR. SKINNER:  I think I'll object to that.  Delivering process privileged, asking prior communications in the presence of individuals.

BY MR. FLYNN:

Q.  You can answer who was that, if you would know.

A.  Yes.  So it was definitely, obviously the district attorney.  I think Nancy Winkelman was there, but I'm not certain of that.  I was there.  Judge Temin was there.  She was the first



would have to, you know, thoroughly review the case, which, of course, you read the petition and then you would read all the transcripts, and then you would look in the boxes to the extent it was necessary.  You would do legal research, you may do some level of actual investigation, speak to witnesses etc., and then you would come to some sort of conclusion as to what position we should take specifically as to each claim and, you know, are we asserting a procedural effect?  Are we making an argument on the merits, whatever.  And then you would take that to your supervisor, you talk it through, and then you agree eventually. And then you would write up a response.

Q.   So for purposes of a line ADA's responsibilities in the federal litigation unit, that does involve some level of investigation?

MS. MATTHIAS:  Objection.  Form.

THE WITNESS:  Yeah.  If it's necessary for the case.

BY MR. BROWNLIE:

Q.   So if Assistant District Attorney Napiorski testified that he would never have conducted an investigation into Eduardo Ramirez's

888-893-3767      Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179



conviction, that would've been falsehood?

A.   Well, we did do an investigation.

Q.   And when you say "we," you mean David Napiorski and yourself?

A.   No.  David Napiorski -- I used we, the world (indiscernible) we for the office all the time, and I should maybe not do that here, but no, David Napiorski and Julie Nelson, as I mentioned.

Q.   So David Napiorski did undertake an investigation into Eduardo Ramirez?

MS. MATTHIAS:  Objection to form.

If there's something you want to show her, then you're --

MR. BROWNLIE:  I'll show what I'm going to show.  What's your objections?

MS. MATTHIAS:  I'm objecting to form, and if you want to be a little more specific --

MR. BROWNLIE:  You can answer.

Excuse me.  Madam Court Reporter, can you read back the question, please?

THE REPORTER:  Give me one second to go back up to that.

So did David -- can't pronounce the

 

about the investigation and all this. And I know that she was, even after those meetings and after the brief has been written, asked to weigh in on whether she saw any facts that belong, and that she knows the case really well and we wanted to make sure we're getting it.

Q. And who asked her that?

A. Nancy.

Q. The results of Mr. Napiorski's investigation were reported to you?

MS. MATTHIAS: Objection to form.

THE WITNESS: Yeah. We had these meetings, and Dave and I are friends on top, top of working together. So I -- he would also just tell me things even if -- he told me about stuff that's totally unrelated to me.

BY MR. BROWNLIE:

Q. You're friendly with Mr. Napiorski?

A. Yeah.

Q. You have a relationship outside of the Philadelphia District Attorney's Office?

A. I mean, my husband and I and his wife and Dave will get together. We're friends.

888-893-3767       Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

Katherine Ernst

Page 74

Q.   How often do you get together with Mr. Napiorski?

A.   Maybe once a quarter.

Q.   And do you ever discuss work outside the Philadelphia District Attorney's Office during these off hours?

A.   Sure.

Q.   Are you still friends with Mr. Napiorski?

A.   Yeah.

Q.   And he would report -- or you would have meetings with Mr. Napiorski concerning the status of his reinvestigation, correct?

MS. MATTHIAS:  Objection to form. Asked and answered.

THE WITNESS:  His reinvestigation?

BY MR. BROWNLIE:

Q.   Well, his investigation, his findings.

A.   Right.  So he was investigating suppression on the Brady claims and those had never been raised before.

Q.   And he discussed those with you?

A.   (Indiscernible) I'm sure he would have is what I'm saying.

888-893-3767          Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

the exhibit numbers that are referenced in the

brief correspond to the exhibit numbers at the end

of Mr. Ramirez's second amended petition.  So Mr.

Napiorski, when he drafted the concession brief,

went in chronological order, so I'll do the same.

A.    Okay.

Q.    So the Hoffner activity sheet February

21st of 1995.  Do you have any evidence that

Detective Worrell ever possessed that?

A.    Is that December 21, 1994?

Q.    February 21st --

A.    Sorry.  February 21, 1994.  Okay.

Q.    Well, that's in --

A.    You would say '95, so I was just --

Q.    My opinion is that that's typo in your

in your brief.

A.    Oh, okay.

Q.    So it's really 1995.

A.    Okay.  I'm not looking at this.  I had

no information about your client at all.

Q.    Do you have information that Detective

Worrell possessed the February 22, 1995 activity

sheet by Detective Hoffner?

A.    No.



# Exhibit "I"

Page 42

But generally who attends those meetings?

MS. MATTHIAS: Objection to form.

A. The assigned ADA, and then there was something of a standing committee which would have been the head of homicide -- most of these cases are homicide cases -- the head of the Conviction Integrity Unit because that was an important position in the office, the head of the Law Division, Victim Services Coordinator, one of the first assistants. Maybe others but those are the people, the seats, the positions that I am remembering.

BY MS. HAYES:

Q. Okay. Is there anyone from the CIU there?

A. I -- yes.

Q. And apologies if I missed that in your list.

And you mentioned that the District Attorney would make the final call of what to do?

A. Yes.

MS. MATTHIAS: Objection; asked and answered.

Page 43

BY MS. HAYES:

Q. Okay. And do you have any reason to believe that something different happened in this case?

A. No.

Q. Do you remember at the SRC or otherwise any pushback to the decision to nolle pros this case?

MR. SKINNER: Objection.

Don't answer to the extent that it would be privileged, internal deliberations or work product about the decision.

MR. BROWNLIE: Madam Court Reporter, can you mark each of Mr. Skinner's objections, please?

MS. HAYES: Are you instructing her not to answer entirely or just to a degree?

MR. SKINNER: If you can answer without waiving privilege, you can go ahead. But don't answer to the extent that it would reveal the content of deliberations or work product about those deliberations.

A. Can you repeat the question?

Page 44

BY MS. HAYES:

Q. Sure. So at the SRC or otherwise do you remember anyone objecting, and I don't mean a formal objection, just objecting to the fact that this case was nolle prossed?

A. I don't think I can answer that question based on my attorney's instructions.

Q. Do you remember anyone suggesting to plead Mr. Ramirez out to time served?

MR. SKINNER: Same objection.

A. Same answer.

MR. SKINNER: Don't answer.

BY MS. HAYES:

Q. Were plea negotiations ever entered?

MR. SKINNER: Same objection. Don't answer.

BY MS. HAYES:

Q. Okay. Typically when the SRC meets is there any further investigation that they do to determine whether to nolle pros versus retry versus engage in plea negotiations?

MS. MATTHIAS: Objection to form.

A. I'm pausing because I don't know who the "they" is. The results of those meetings often

Page 45

would lead the assigned ADA to do more work, to do some more homework on it and typically because we have a DA who is very inquisitive and asks a lot of questions and often cases wouldn't be resolved in one meeting because there would be follow-up work that the DA or someone else on the committee would have asked of the assigned.

BY MS. HAYES:

Q. Do you remember examples of what type of work? Is that talking to witnesses, victims' families, et cetera? Can you give me some examples?

A. I think those are two categories. Certainly talking to victims' family, if that hadn't already been done that would be a follow-up that would have to be done. More factual investigation, take another look at certain documents, take another look at certain transcripts.

Q. Anything else that comes to mind just off the top of your head?

A. Not off the top of my head.

Q. Do you know whether this case was ever formally transferred to homicide to see if they

888-893-3767    Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

Page 58

asked and answered.

A.   Not personally.

BY MR. BROWNLIE:

Q.   How did you determine whether or not Mr. Napiorski's review of the record was exhaustive?

MS. MATTHIAS:  Objection to form; asked and answered.

A.   Because of my confidence in him and my prior working relationship with him I knew that he would do a thorough, exhaustive and careful review.

Q.   How did you determine that Mr. Napiorski's review of the record was careful?

MS. MATTHIAS:  Objection to form; asked and answered.

BY MR. BROWNLIE:

Q.   You can answer, ma'am.

A.   Because he had -- thank you.  Because I knew he was a careful lawyer, he is a careful lawyer.

Q.   And you endorsed the quality of his research and -- factual research and legal conclusions in his brief?

A.   Yes.

Page 59

MS. MATTHIAS:  Objection; asked and answered to the prior question.

THE WITNESS:  I'm sorry.

BY MR. BROWNLIE:

Q.   Have you ever been accused of being evasive, Ms. Winkelman?

MS. MATTHIAS:  Objection to form.

MR. SKINNER:  Objection.

BY MR. BROWNLIE:

Q.   You can answer.

A.   Not in a way that I could discuss here.

Q.   Why not?

MR. SKINNER:  Object.  And I'm going to instruct the witness not to answer.  There are certain matters that are under Court seal that the witness is not permitted to discuss.

MR. BROWNLIE:  Are you asserting privilege here?

MR. SKINNER:  It's an assertion of an objection to instruct the witness not to answer to preserve a limitation of a Court Order which is already in place under 30(b)(c).

Page 60

MR. BROWNLIE:  In this case?

MR. SKINNER:  No.

MR. BROWNLIE:  Did you move affirmatively for relief to limit the scope of my examination in this case?

MR. SKINNER:  No.  But if you continue with this line of questioning I would have to terminate the deposition to do that.

BY MR. BROWNLIE:

Q.   So is it my understanding, Ms. Winkelman, that you are refusing to answer any questions about whether or not you have been previously accused of being evasive?

MR. SKINNER:  Same objection.

A.   I'm instructed not to answer.

BY MR. BROWNLIE:

Q.   So you're familiar with the Wharton matter, correct?

MR. SKINNER:  Same objection.

BY MR. BROWNLIE:

Q.   You're familiar with Judge Goldberg's published opinion sanctioning you and Paul George for your conduct in that case?

Page 61

A.   Yes.

Q.   That opinion is not under seal?

A.   No.

Q.   Have you ever been accused of being evasive before?

MR. SKINNER:  Same objection.  Don't answer.

This is in bad faith just to harass her, you know, to embarrass this witness.  And we can also terminate the deposition for that reason.

BY MR. BROWNLIE:

Q.   What was the basis for the Court's finding, for the Court's sanction in Wharton?

MS. MATTHIAS:  Objection.

MR. SKINNER:  Objection.  If you're asking the opinion it speaks for itself.

MS. MATTHIAS:  Correct, it speaks for itself.

MR. BROWNLIE:  Are you going to do this the whole time?

MR. SKINNER:  If you're going to go down -- this is not even relevant.  And, you know, it's definitely in bad faith to

888-893-3767          Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com    Nevada Registration #116F. California Firm Registration #179

LEXITAS

Nancy Winkelman

Page 62

embarrass or annoy the witness.

BY MR. BROWNLIE:

Q. You have made a representation in this case that the District Attorney's Concession Brief was based on a careful and thorough review of the record, correct?

MS. MATTHIAS: Objection; asked and answered.

A. Yes.

BY MR. BROWNLIE:

Q. Did the sanctions litigation in Wharton concern representations by you that you conducted a careful review of the record in that case?

MR. SKINNER: Objection. Same objection.

Don't answer.

Even if the order is published the filings are still under seal.

MR. BROWNLIE: I'm not asking about the filings. I'm asking about the published opinion.

MR. SKINNER: Again, that speaks for itself.

MR. BROWNLIE: So I'm asking what

Page 63

her understanding of the opinion is.

MR. SKINNER: Objection; relevance.

BY MR. BROWNLIE:

Q. You can answer.

A. I'm sorry, I'm getting lost in this.

Q. This is the way --

MS. MATTHIAS: Maybe we should take a minute and just talk it out. Maybe we should go off the record for a second.

MR. BROWNLIE: No, we are going to stay on the record.

MS. MATTHIAS: Okay, we can stay on the record. Do you guys want to just talk about the scope of where you are going to cut this off?

MR. SKINNER: That's fine. Yeah, I think that's called for.

MR. BROWNLIE: All right.

MS. MATTHIAS: We'll go off the record.

MR. BROWNLIE: We'll go off the record.

(There was a discussion held off the record, followed by a brief recess.)

Page 64

BY MR. BROWNLIE:

Q. You have had time to confer with counsel, Ms. Winkelman?

A. Yes.

Q. Have you ever been accused of being evasive?

A. I'm -- I may have been, yes.

Q. By whom?

A. Eastern District of Pennsylvania Judge Mitch Goldberg may have included that in a Rule 11 opinion that involved me.

Q. And how did that Rule 11 opinion involve you?

A. It was in the matter of Robert Wharton and my colleague, Paul George, and I and the office were sanctioned by Judge Goldberg for not giving complete information to him and not having full conversations, communications with the victim's family in that case.

Q. In the Wharton matter, similar to Mr. Ramirez, the District Attorney's Office filed a concession; is that correct?

MS. MATTHIAS: Objection to form.

A. Yes, we filed a concession but it was

Page 65

very different than the concession that we filed in Mr. Ramirez's case.

BY MR. BROWNLIE:

Q. But your representations about the thoroughness of your review of the records in the respective cases were similar?

MS. MATTHIAS: Objection to form.

A. We used those words, yes, as I recall.

BY MR. BROWNLIE:

Q. What was the result of the sanctions hearing held before Judge Goldberg?

MS. MATTHIAS: Objection to form.

A. Mr. George and I and the office were sanctioned under Rule 11 of the Federal Rules of Civil Procedure.

BY MR. BROWNLIE:

Q. What information did you withhold from Judge Goldberg in that case?

MS. MATTHIAS: Objection to form.

A. We didn't tell him information that we didn't know and that wasn't anywhere in the existing record that involved an escape Mr. Wharton had attempted from a courtroom in City Hall some decades ago.

Page 66

BY MR. BROWNLIE:

Q. And your office in that litigation was in possession of that information at the time that you made the misrepresentation to Judge Goldberg, correct?

MS. MATTHIAS: Objection to form.

A. No, not correct.

BY MR. BROWNLIE:

Q. What is incorrect about that statement?

A. At the time that we made the concession before Judge Goldberg we were not aware of the escape.

Q. Did Judge Goldberg agree with that?

A. I'm pausing because it's a little complicated. Neither Mr. George nor I was aware of Mr. Wharton's escape. The complication comes because Judge Goldberg asked Mr. George was the office aware that this had happened and Mr. George answered yes, thinking that because we had prosecuted Mr. Wharton when he tried to escape we had constructive knowledge, even though neither of us at that time had personal knowledge of the attempted escape.

Q. And you appealed Judge Goldberg's

Page 67

sanctions order?

A. Yes.

Q. And what was the result of that appeal?

A. Judge Goldberg was affirmed.

Q. Meaning what?

A. The Third Circuit found that although Mr. George and I were "dedicated public servants," in quotes, we had made a mistake and that the "very mild sanction," again in quotes, that Judge Goldberg imposed sanctions were warranted. Those sanctions were not a monetary sanction or anything like that. It was that the DA write letters of apology to the family, which he did, and that in future concessions before Judge Goldberg we provide our full reasoning, along the lines I should say of what we did in the Eddie Ramirez case.

Q. And the Third Circuit said that you and Mr. George had made a mistake?

MS. MATTHIAS: Objection; asked and answered.

A. They said -- my memory of the opinion is that the court said they made a mistake.

Page 68

BY MR. BROWNLIE:

Q. Do you recall Judge Bibas writing for the Third Circuit that the District Court properly sanctioned appellants -- and that would be you and Mr. George, correct?

A. Yes.

Q. -- "for falsely claiming they had carefully reviewed the facts in the law." Do you recall that from the Third Circuit opinion?

A. I don't recall that sentence. But you seem to be reading from it so I'm not going to dispute that it's there.

Q. Do you recall the Third Circuit holding that the District Court, in this case Judge Goldberg, "properly sanctioned appellants for misleadingly claiming that the office had communicated with the victim's family"?

A. Again, I don't remember the words in the opinion. But if you're reading it to me, I don't dispute that it's there.

Q. And that the minor sanctions imposed were justified.

So Ms. Winkelman, you have a demonstrated history of withholding information

Page 69

from Courts in the post conviction context?

MS. MATTHIAS: Objection to form.

A. Absolutely not.

BY MR. BROWNLIE:

Q. Judge Goldberg's Order doesn't demonstrate the contrary?

A. That's one opinion. That's different than a demonstrated history.

Q. There is at least one instance in the post conviction context where you have withheld information from a Court during post conviction proceedings; is that correct?

A. I don't believe that I withheld information from Judge Goldberg. I agree with you that he found that we had not given him all the information. But I don't believe that he ever found that Nancy Winkelman personally withheld information that she knew and didn't tell the Court.

Q. Do you stand on that representation?

A. Yes.

Q. After affirmance -- excuse me. Let me walk that back.

Judge Goldberg referred his

888-893-3767    Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com    Nevada Registration #116F. California Firm Registration #179

LEXITAS

Nancy Winkelman

Page 74

interject.

MS. MATTHIAS: You really need to lower your voice.

MR. BROWNLIE: If you want to put something on the record --

MS. MATTHIAS: I'm going to --

MR. BROWNLIE: -- wait until we are done our conversation because this objection is with respect to the substance of my testimony, not yours.

MS. MATTHIAS: There was a pause and I'm going to put something on the record.

MR. BROWNLIE: You can put it on afterwards.

Mr. Skinner -- excuse me.

MS. MATTHIAS: Stop.

MR. BROWNLIE: Excuse me.

MS. MATTHIAS: No, no, you got to stop.

MR. BROWNLIE: I'm not going to stop.

MS. MATTHIAS: He made his objection. I'm going to put something on the record.

Page 75

(Court reporter asked for one at a time.)

MR. BROWNLIE: We are going to take five minutes.

MS. MATTHIAS: Before we go off the record. The DA will put their objection on the record. They stated the basis clearly. So if you guys want to litigate this we can litigate this but we not going to all scream at each other in this room.

MR. BROWNLIE: That's correct. So when I'm done conversing with him on the record concerning --

MS. MATTHIAS: Don't hover over me. That's not cool.

MR. BROWNLIE: I'm five feet from you.

MS. MATTHIAS: Just sit down.

MR. BROWNLIE: You're not a victim here.

MS. MATTHIAS: We are not doing this.

MR. BROWNLIE: Yes, we're not. So I'm going to finish my conversation with

Page 76

Mr. Skinner before you rudely interjected.

So I want to make sure I understand the substance of the objection, Mr. Skinner. It's not privileged; you would agree?

MR. SKINNER: Correct.

MR. BROWNLIE: With respect to a Court Ordered limitation, there is no Order in this case concerning limitations on the scope of her testimony for this deposition; is that correct? I want to make sure I understand.

MR. SKINNER: On the subject of your question there is a Court Ordered limitation and I'm trying to enforce it here. And if you're going to continue to try to peel back at that, we can go and have the Court answer that question.

The other thing about this line of questioning is like with questionable relevance to an non party like it really seems like this is in bad faith to, you know, embarrass, annoy and oppress this witness. And so that's another basis why if things continue to be this prickly we will have to

Page 77

terminate this deposition.

MR. BROWNLIE: And you are free to do that under the rules. I respect that.

BY MR. BROWNLIE:

Q. Ms Winkelman, I don't intend for it to be this adversarial. So I want to get back to my original question.

After the Sanction Order was affirmed by the Third Circuit the case was remanded for further evidentiary hearings before a three-judge panel in the Eastern District, correct?

MR. SKINNER: Same objection.

Don't answer.

BY MR. BROWNLIE:

Q. There was a finding of misconduct against your colleague, Mr. George; is that correct?

MS. MATTHIAS: Objection to form.

MR. SKINNER: Objection; relevance.

BY MR. BROWNLIE:

Q. The three-judge panel determined that he had intentionally misled Judge Goldberg; is that correct?



Page 78

MR. SKINNER: Objection; relevance.

BY MR. BROWNLIE:

Q. You can answer, ma'am.

A. Yes.

Q. He's appealing that, correct?

A. Yes.

Q. There was an Order entered against you on the sealed docket sometime in March, correct?

MR. SKINNER: Objection.

Don't answer. Again, we are talking --

MR. BROWNLIE: The docket is public. The contents of the docket is not public.

BY MR. BROWNLIE:

Q. There was an Order entered against you by Judge Beetlestone sometime in March; is that correct?

MS. MATTHIAS: Objection to form.

A. I don't know what, I don't know what you're referring to and I don't know whether it's under seal.

MR. SKINNER: Same objection.

Don't answer.

Page 79

BY MR. BROWNLIE:

Q. So the public docket reflects an Order entered against you at the end of March to which you are appealing; is that correct?

A. I don't know. I don't know whether--

Q. You don't know whether or not you are appealing a sanctions determination from the Eastern District of Pennsylvania?

A. I don't know what the Order -- I don't know what Order you're referring to. I don't know what it says.

Q. Are you appealing any Order from the sealed docket concerning your disciplinary proceedings in the Eastern District of Pennsylvania?

MR. SKINNER: Objection.

Don't answer.

MR. BROWNLIE: Again, you're directing her not to answer publicly available information?

MR. SKINNER: At this point I'm telling her not to answer because it's not relevant and because you're badgering the witness, you're harassing her about this.

Page 80

MR. BROWNLIE: That's your opinion.

BY MR. BROWNLIE:

Q. As it concerns the Concession Brief in Edward Ramirez, you filed that brief after Judge Goldberg Sanctioned Order, correct?

A. I don't remember the timing.

Q. So Judge Goldberg sanction opinion, the publicly available opinion is dated September 12, 2022. Does that sound familiar?

A. I don't --

Q. I will represent to you that September, 2022 is the date that you were sanctioned by Judge Goldberg. Does that sound familiar?

A. The dates kind of blur but I don't take issue with if that's what you are representing it says the date was.

Q. And the Concession Brief under your name was filed in August of the following year, 2023; is that correct?

A. Yes, that's the date the Ramirez brief was filed.

Q. So you had already been sanctioned for failing to provide full -- strike that.

At the time you filed the

Page 81

Concession Brief in Ramirez you had already been sanctioned for representing that you undertook a careful review of the record and had failed to do so, correct?

MS. MATTHIAS: Objection to form; misstates the record.

A. Yes, I -- based on your representation of the timing the Judge Goldberg sanctioned opinion came before the filing of the Ramirez brief.

BY MR. BROWNLIE:

Q. Did Judge Goldberg's sanction opinion change at all your approach to supervising the Concession Brief in Ramirez?

A. I think Judge Goldberg's opinion changed my approach to many things. I had never ever been accused of any unethical conduct. I took that very seriously and I am sure that my approach changed as a result of what happened.

Q. In what way?

A. I would say that I made sure that the people I was supervising were dotting every I and crossing every T. In the Wharton case Mr. George had reviewed the entire record. In this case

888-893-3767      Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

Page 86

when you were reviewing the Concession Brief?

MS. MATTHIAS: Objection to form.

A. I don't remember seeing the name jerk.

BY MR. BROWNLIE:

Q. Oh, excuse me. My apologies. I asked you to read the wrong question. The question starts on the next page, Page 116.

A. The next page is 115. So tell me where you want me to be.

Q. I would like you to be on Page 116 and the Bates number as produced by your office is 2778.

A. Okay.

Q. The question is, "Were you present when anyone came to Sarah's house?"

Do you see where I am?

A. Yes.

Q. If you could please read that question and answer. Again, my apologies.

A. Okay.

Q. And did you complete reading the answer on the next page?

A. No. So this whole page?

Q. Correct, that's the answer. And it

Page 87

concludes halfway up the next page.

A. Do you want me to keep going?

Q. Actually the sentence I'm going to point you to is in that paragraph. Feel free to continue to read it to conclusion if you would like.

A. I don't need to. I mean if I need to I will.

Q. I would like to direct your attention to the sentence that begins, "Jerk was washing his hands." It's about two-thirds of the way down that paragraph.

A. Yes.

Q. "Jerk was washing his hands in the sink and when he turned around he was shaking his hands to dry them. When he turned around I saw a big spot of blood on jerk's shirt."

Did Mr. Napiorski communicate to you that Kristine Smith had, in fact, provided a statement to the police that Mr. Ramirez did have blood on him the night of the murder?

MS. MATTHIAS: Objection to form.

A. I don't remember.

Page 88

BY MR. BROWNLIE:

Q. Were you aware of that information previously?

MS. MATTHIAS: Objection; asked and answered.

A. I don't know because I don't remember.

BY MR. BROWNLIE:

Q. So when Mr. Napiorski filed this brief under your name and made a representation to Judge DiClaudio that there was no blood on Ramirez, that was a lie?

MS. MATTHIAS: Objection to form.

A. I don't know what Mr. Napiorski was or wasn't referring to, so I don't know.

BY MR. BROWNLIE:

Q. You would agree that that's a factual inconsistency between the representations by your office and the substance of the investigation in the PPD's files?

MS. MATTHIAS: Objection to form.

A. Possibly. I don't know.

BY MR. BROWNLIE:

Q. Why do you say possibly as opposed to yes?

Page 89

A. Because you're giving me papers that I don't know what they are, I don't know who these people are, I don't know how they fit into the case. If I did know, I surely don't remember now. And you're asking me to compare that to a parenthetical in a 75-page brief. I feel like I would need to do a lot more work in order to answer your question than what I can do sitting here. I -- one word -- one thing says when there was no blood on Ramirez and another statement says there was a spot of blood on his shirt, so...

Q. And that's inconsistent you would agree?

MS. MATTHIAS: Objection to form.

A. Possibly. I mean...

BY MR. BROWNLIE:

Q. Had you been provided with Kristin Smith's statement during your conversations with Mr. Napiorski, would you have removed that language?

A. I don't know, again, because I don't, I don't have enough context.

Q. And the context that you did have was supplied by Mr. Napiorski during your discussions, correct?

888-893-3767        Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

Page 114

MS. MATTHIAS:  Objection to form.

A.  I don't know.

BY MR. BROWNLIE:

Q.  Are you aware of the matter of Commonwealth versus Jack Holmes?

A.  No.

Q.  So you don't know Detective Worrell's participation or lack of participation in any of those cases?

A.  No.  I'm just going to grab another water.

Q.  Please.

If could I direct your attention, ma'am, to Page 57 of the brief.

A.  Okay.

Q.  The paragraph that begins the "The Commonwealth agrees..."

Do you see where that is?

A.  Yes.

Q.  Could you please read that paragraph to yourself

A.  Okay.

Q.  With respect to the third conclusion here wherein you and Mr. Napiorski represent, "The

Page 115

suppressed police activity sheets, investigatory notes, internal memoranda, and Grand Jury testimony, support all four prongs of Ramirez's trial defense."

And No. 3 is "The witnesses' testimony was unreliable."

Did I read that correctly?

A.  Yes.

Q.  How did you arrive at that conclusion?

A.  I don't recall.

Q.  Is it necessary to opine on the reliability of witnesses when undertaking a materiality analysis under Brady?

A.  Yes, because you have to look at what the jury had before and what they would have had before had materials not been suppressed.

Q.  So credibility with respect to the original trial witnesses, correct?  Credibility of the original trial witnesses, correct?

A.  That's an incomplete sentence.

Q.  Under the materiality analysis that your office conducted for Mr. Ramirez's suppression claims, the credibility of the original trial witnesses was material?

Page 116

A.  It was a factor, yes.

Q.  And you ultimately arrived at the conclusion that those witnesses were unreliable, correct?

MS. MATTHIAS:  Objection to form.

A.  We -- it says what it says in the document, yes.

BY MR. BROWNLIE:

Q.  That's what it says in the Concession Brief?

A.  Yes.

Q.  So your office took a position on the credibility of the witnesses; is that correct?

MS. MATTHIAS:  Objection to form.

A.  Yes.

BY MR. BROWNLIE:

Q.  So the representation in the beginning of the Concession Brief with respect to taking a position on the credibility of the recantations is a misrepresentation?

A.  Do you mean not taking the position on the credibility of the recantations?

Q.  Correct, yes.

A.  I see where you are going that there's

Page 117

some inconsistency but I can't, sitting here today I can't tell you how we reconciled that.

Q.  So you admit that there's an inconsistency in the representations regarding witness credibility?

MS. MATTHIAS:  Objection to form.

A.  Can you point me to the --

BY MR. BROWNLIE:

Q.  To the paragraph disclaiming a credibility determination?  Is that your question, ma'am?

A.  Yes.

Q.  So that would be -- I believe it's in a footnote.  I beg your indulgence.  I don't have that readily available.

Page 12, Footnote 5.

A.  I see that and I see the inconsistency.

Q.  So your office did take a position with respect to the credibility of the original trial witnesses?

A.  Again, I would have to read this more to make sure of the context.  But I can tell you that there does appear to be an inconsistency between what you have pointed to me on Page 57 and what

888-893-3767        Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

Nancy Winkelman

Page 122

Q. No, I understand. And that's actually where I was going next, so I appreciate that.

So you did do pro bono post conviction work during your time at Schnader?

A. I believe that I worked on some federal habeas cases.

Q. Did you work on those cases with Ms. Samghui?

A. I don't remember.

Q. If we did a general docket search with you and Ms. Samghui would any cases appear?

A. Of any case that we worked on together?

Q. In the post conviction or habeas context.

A. It's possible but I don't remember.

Q. Can you say for certain that you never worked on a post conviction case with Ms. Samghui?

A. No, I can't say that.

Q. How long did you work with Ms. Samghui?

A. She wasn't at the firm for very long. She was, she was moving on. So a few years I would say.

Q. How was it that you came to learn of an opening at the Philadelphia District Attorney's

Page 123

Office? Well, that -- excuse me. That question had a premise in it that I haven't established.

Did you seek a position at the Philadelphia District Attorney's Office?

A. Yes.

Q. How did you come to learn that the position was open?

A. Well, you're still missing a few steps because I didn't know what position was open. I did seek a position. I applied -- after Mr. Krasner won the primary it caught my attention and I think after he won the general, I think it was after that that I submitted an application online to work in his Appeals Unit.

Q. What caught your attention about DA Krasner having prevailed in the primary? Again, you're glowing.

A. I'm glowing because there was a quote that it was -- somebody said it would be hilarious if he won and he did win. He's an energizing kind of person and I was interested in what he might bring to the DA's office.

Q. You had an interest in his view of criminal justice reform?

Page 124

A. Yes.

Q. What is your understanding of District Attorney's Krasner's view of criminal justice reform?

A. It's far-reaching, many aspects to it. What spoke to me was what I understood to be harsh sentencing laws in Pennsylvania. One of them has just been overturned by the Pennsylvania Supreme Court.

Q. I read that decision.

A. Five opinions read. I was interested in his views about mass incarceration and how to reduce that. I came to learn how, backward is a word that came to mind, but how punitive the Commonwealth of Pennsylvania is in its approach to sentencing and it doesn't have to be that way and it isn't that way in a lot of other parts of the country and the world.

And, in fact, in the years since Mr. Krasner has been in office and has reduced the size of the prison population and tried to address some of the problems with mass incarceration and punitive sentences, my understanding from what I read is that Philadelphia has gotten to be a safer

Page 125

place. So the idea that he had that you don't have to sacrifice public safety by extraordinary punitive measures was intriguing to me.

Q. Do you think capital punishment is too punitive?

MS. MATTHIAS: Objection; relevance.

A. My views on capital punishment are complicated.

BY MR. BROWNLIE:

Q. Have you ever worked -- your views in life imprisonment, is that too punitive?

MS. MATTHIAS: Objection; relevance.

A. It depends on the crime.

BY MR. BROWNLIE:

Q. Second degree murder?

MS. MATTHIAS: Objection; relevance.

A. Are you asking me whether I agreed with the Pennsylvania Supreme Court's decision saying that mandatory life imprisonment for a second degree murder is unconstitutional under the Pennsylvania Constitution?

888-893-3767                Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com   Nevada Registration #116F. California Firm Registration #179

LEXITAS

Page 126

Q.   Was it unconstitutional when you filed your Concession Brief in 2023?

MS. MATTHIAS:  Object to form.

A.   No.

BY MS. MATTHIAS:

Q.   So you're against life imprisonment?

MS. MATTHIAS:  Objection; relevance.

BY MR. BROWNLIE:

Q.   As a general matter you think it's too punitive?

MS. MATTHIAS:  Objection; relevance.

A.   No, I did not say that.  If I said that I misspoke.

BY MR. BROWNLIE:

Q.   So that's not your opinion?

A.   I think it's appropriate in some cases, just not mandatory for second degree in every situation, you know, where the person might have had very little involvement with it really.

Q.   When is the last time you spoke with Nilam Samghui?

A.   I don't remember but -- I don't, I don't

Page 127

remember.  I don't think I have spoken with her in at least a year, maybe more.

Q.   Was your last communication with her in the Edward Ramirez matter?

A.   I don't remember when I last communicated with her and I don't remember communicating with her about this case other than her initial -- the initial communication that we had.

Q.   Are you okay, ma'am?

A.   Mm-hmm.

Q.   Would you like a break?

A.   Well, it depends how much longer you are going to go.

Q.   I promise I'm almost there.

You testified earlier today that you see value in placing a fresh set of eyes on a developed record; is that correct?

A.   Yes.

Q.   And you testified earlier today, I have in my notes that one of the reasons that the case was reassigned to David Napiorski was so that he could get to the truth of the matter.  What did you mean by that?

Page 128

A.   I think I was speaking a little bit hyperbolically.  So I don't -- I wanted someone to do a full fresh new investigation into the law and the facts underpinning Mr. Ramirez's Petition.

Q.   Were you dissatisfied with Laurie Williamsons' conclusions with respect to the merits of Mr. Ramirez's claims?

A.   No.  I just wanted a new look at it. You know, I spoke before about how I was brought up in a culture and made my career on a culture of the value of someone who hasn't been involved, hasn't formed an opinion, hasn't been part of the sausage making, so to speak, coming in fresh and looking at things.  And that's what motivated me to assign Mr. Napiorski.

Q.   When did you become aware that the CIU had declined Mr. Ramirez's case?

MS. MATTHIAS:  Objection to form.

A.   Yesterday.

BY MR. BROWNLIE:

Q.   And how did you come into possession of that information?

A.   Either -- I spoke with both Mr. Napiorski and Ms. Ernst yesterday briefly and one

Page 129

of them told me that.  I don't -- it might have been Ms. Ernst.  I don't remember.

Q.   So you did discuss the substance of the testimony provided by either Mr. Napiorski or Ms. Ernst?

A.   They told -- one of them told me that there was an e-mail from Carrie Wood to I guess Ms. Samghui that I wasn't aware of it.  I think it was Katie Ernst I was talking to.  She wasn't either or Dave wasn't either.

Q.   So you just -- I'm sorry.

A.   I thought the CIU had never made a decision about whether to accept the case or not.

Q.   When you had your conversation with Ms. Ernst and Mr. Napiorski, they -- both of those conversations were yesterday?

A.   Yes.

Q.   Why did you read Mr. Napiorski's testimony?

A.   Why did I read it?  To help prepare for this deposition.

Q.   In what way?

A.   What kinds of areas of inquiry I might expect, what the line of questioning would be, or

888-893-3767        Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com    Nevada Registration #116F. California Firm Registration #179

LEXITAS

Nancy Winkelman

Page 134

BY MR. BROWNLIE:

Q.  I understand that, and I appreciate that.

And if Mr. Ramirez's sole basis for impeachment under Brady for these claims is the recantation, that means that your office would have taken a position with respect to the original trial witnesses' credibility, correct?

MS. MATTHIAS:  Objection to form.

A.  I'm sorry, I'm getting a little blurry here I have to tell you.

BY MR. BROWNLIE:

Q.  That's okay.  We have been going for a little while.

A.  Yes, we have been going for three hours and 13 minutes.

Q.  Yes.  We will nowhere approach the seven that we are entitled to.

The conclusion that the defense witnesses' testimony were -- excuse me, that the witnesses' testimony was unreliable is based on the conclusion that those witnesses had recanted, correct?

A.  I don't know.

Page 135

Q.  If the sole basis of evidence that Mr. Ramirez points to in support of his materiality argument is the recantations, that would mean that your office took a position with respect to the credibility of the recantations, correct?

MS. MATTHIAS:  Object to form.

A.  I don't know.

BY MR. BROWNLIE:

Q.  You don't know what?

A.  I'm having a hard time following your question.

Q.  Your office took the position that the witnesses were unreliable, correct?

A.  So --

MS. MATTHIAS:  Objection to form.

A.  We are talking on Page 57.

BY MR. BROWNLIE:

Q.  Yes, ma'am.

A.  And we are talking about the sentence that says, "supporting all four prongs of Ramirez's trial defense," and that includes the witnesses being unreliable.

Q.  Correct.

Page 136

A.  Okay.

Q.  His submission in the Post Conviction Petition was that those witnesses were unreliable because they have subsequently recanted outside of alleged police coercion.  Is that your understanding?

A.  I know there was a lot of noise about recantations.  I don't -- I think my problem here is I don't know from one page to the other who exactly we are talking about --

Q.  Right.

A.  -- and whether we are talking about the same group or not the same group.  I don't know and I can't tell that from lifting words off of a page.

Q.  So it could be inconsistent?

A.  It could be and it could not be.

MR. BROWNLIE:  Thank you.  That's all I have.

- - -

EXAMINATION

- - -

BY MS. MATTHIAS:

Q.  I just have one more question.

Page 137

The point on Page 57 I think that I wanted to ask about is like actually much simpler.  That sentence, "The suppressed police activity sheets," so it's the second sentence in that paragraph.  And then, "The suppressed police activity sheets, investigatory notes, internal memoranda, and Grand Jury testimony, support all four prongs of Ramirez's trial defense."  And then there's a colon and then there's four, a list of four items, right?

A.  Yes.

Q.  So that actually appears to just be describing the four prongs of the trial defense rather than taking a position with regard to the substance?

MS. HAYES:  Objection to form.

MR. BROWNLIE:  Objection.

A.  That's a good point, and now I see that that's probably what we meant when we wrote that.

MS. MATTHIAS:  Thanks.

MR. BROWNLIE:  We are done.  Thank you.

COURT REPORTER:  Copies, counsel?

MR. BROWNLIE:  Full and mini.

888-893-3767          Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com    Nevada Registration #116F. California Firm Registration #179

LEXITAS