**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDUARDO RAMIREZ,<br>*Plaintiff*,<br>v.<br>CITY OF PHILADELPHIA, ET AL.,<br>*Defendants*. | : | Civil Action No.: 2:24-cv-03035 |

**APPENDIX TO THE**
**MOTION TO ENFORCE SUBPOENA TO**
**THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE**


Dep. Trans., ADA Julie Nelson, 7/21/2026 .............................................................A.1

Eastern District Subpoena ...............................................................................A.68

Subpoena Rider ..............................................................................................A.71

Conferral Correspondence ................................................................................A.84

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDUARDO RAMIREZ, :

Plaintiff(s), : No. 24-3035

vs. :

CITY OF PHILADELPHIA, :
et al.,
Defendant(s). :

– – –

July 21, 2026

– – –

Deposition testimony of ADA JULIE MICHELLE NELSON, taken stenographically before ANGELA NOVAK, a Court Reporter and Notary Public of the Commonwealth of Pennsylvania taken at Marshall Dennehey, 2000 Market Street, Suite 2300, Philadelphia, Pennsylvania, commencing at 10:08 a.m.

– – –

U.S. Legal Support
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
877-479-2484

APPEARANCES:

WISEMAN SCHWARTZ
BY: JON CIOSCHI, ESQUIRE
CHRISTINA MATTHIAS, ESQUIRE (via Zoom)
718 Arch Street, 702N
Philadelphia, Pennsylvania 19106
Cioschi@wisemanschwartz.com
Matthias@wisemanschartz.com
Representing the Plaintiff(s)

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY: JOSHUA BROWNLIE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, Pennsylvania 19103
215-575-2871
Jwbrownlie@mdwcg.com
Representing the Defendant, Det. Paul Worrell



A P P E A R A N C E S: (Continued)
CITY OF PHILADELPHIA - LAW DEPARTMENT
BY: SHEA SKINNER, DEPUTY CITY SOLICITOR
1515 Arch Street
15th Floor
Philadelphia, Pennsylvania 19102
Shea.skinner@phila.gov
Representing the Defendant Philadelphia
District Attorney's Office

CITY OF PHILADELPHIA - LAW DIVISION
CIVIL RIGHTS UNIT
BY: DOROTHY HAYES, ESQUIRE
MICHAEL PESTRAK, ESQUIRE (via Zoom)
1515 Arch Street
14th Floor
Philadelphia, Pennsylvania 19102
Dorothy.hayes@phila.gov
Michael.pestrak@phila.gov
Representing the Defendant



I N D E X


| WITNESS | PAGE |
|---|---|
| ADA JULIE MICHELLE NELSON | |
| EXAMINATION BY MR. BROWNLIE | 5 |
| EXAMINATION BY MS. HAYES | 234 |
| EXAMINATION BY MR. CIOSCHI | 240 |
| FURTHER EXAMINATION BY MR. BROWNLIE | 248 |


E X H I B I T S


| ID | DESCRIPTION | PAGE |
|---|---|---|
| Nelson Exhibit 14 | Transcript of Attorney Discipline Hearing | 138 |
| Nelson Exhibit 15 | Order | 168 |
| Nelson Exhibit 16 | Order | 172 |
| Nelson Exhibit 17 | Docket | 201 |
| Nelson Exhibit 18 | Notice of Conflict | 223 |

(EXHIBITS ATTACHED HERETO)

MARKED QUESTION: PAGE 40 LINE 22




(It is stipulated by and among counsel for representative parties that all objections of any nature except as to form of the question are reserved until the time of trial.)

\- - -

ADA JULIE MICHELLE NELSON, having been first duly sworn, testified as follows:

EXAMINATION BY MR. BROWNLIE:

Q. Good morning, Ms. Nelson.
A. Good morning.
Q. My name is Joshua Brownlie and I represent Defendant, Detective Paul Worrell in the matter docketed in the Eastern District of Pennsylvania, Eduardo Ramirez versus the City of Philadelphia.
Have you ever been deposed before?
A. I have not.
Q. So I'll go over some general guidelines about how we are going to proceed this morning. If at any time you need to take a break either to confer with counsel or just take a breather for one reason or another, I'm more than happy to oblige, just let us know. The only thing that I ask is that you answer the pending question before we take a break. But other than that, I'm

Page 6

happy to have you take a break whenever you'd like.
So the stenographer here is recording everything that you are saying --
MS. MATTHIAS: I'm sorry to interrupt, but there's no sound on Zoom.
(Whereupon, a discussion was held off the record.)
BY MR. BROWNLIE:
Q. So I'll be posing questions and I'll tell you under the pretense of federal law, you are directed to answer, notwithstanding any objection that your counsel may make or any other party may make, with the exception of privileged issues. We'll take the testimony subject to the exception, and we can litigate later the validity of the asserted privilege.
There will be objections, I'm sure, by either your counsel or plaintiff's counsel. Hopefully they will give us the courtesy of asserting those objections and for the stenographer's benefit after I have completed the question so we can make sure the transcript stays clean.
Do you have any other questions about

Page 7

how we are going to proceed this morning?
A. No.
Q. Can you just state and spell your name for the record, please.
A. It's Julie Nelson, J-U-L-I-E N-E-L-S-O-N.
Q. And were you currently employed?
A. The district attorney's office in the PCRA unit.
Q. And how long have you been at the district attorney's office?
A. Since September of 2020.
Q. So I just want to get a little bit of background information.
Where did you go to undergrad?
A. Baylor University in Texas.
Q. What was your major?
A. Something called university scholars; create your own major. I studied political science, economics, and Arabic.
Q. So liberal arts education, essentially?
A. Sure.
Q. What year did you graduate?
A. I graduated undergrad in 2017.

Page 8

Q. And you went to law school next?
A. Yes.
Q. And where did you go to law school?
A. NYU.
Q. What year did you start NYU?
A. 2017.
Q. And what year did you graduate?
A. 2020.
Q. And what was your work during your time in law school? Did you work during law school?
A. No.
Q. Did you have summer internships or summer associate positions?
A. Yes.
Q. So you did work?
A. In the summers, yes.
Q. And where was your summer associate positions?
A. My 1L summer was at the U.S. Attorney's Office for the Northern District of Texas. My 2L summer was at the District Attorneys's Office here in Philadelphia. And then 3L, clinic at the Brooklyn district attorney's office -- or Kings County, rather.

Page 9

Q. So you spent your 2L summer in the Philadelphia District Attorney's Office?
A. Yes.
Q. And what year was that?
A. That would have been 2019. Yeah, 2019.
Q. So that was during Lawrence Krasner's administration?
A. Yes.
Q. How did you come to apply for a summer associate position in the Philadelphia County district attorney's office?
A. Sure. It was part of the public interest internship at NYU and I applied for that and was interviewed and came near here.
Q. Did you have an interest in practicing public interest law while you were in law school?
A. Yes.
Q. What specifically?
A. Prosecution.
Q. And why the Philadelphia District Attorney's Office?
A. It's known to be a internship where you get a lot of in-court experience through the



A.3 A.3

Page 10

municipal court unit, so that was a primary factor for me.
Q. How did you learn that?
A. Through the advisors at NYU.
Q. Who were the advisors at NYU?
A. The woman in charge of the public interest program at the time was a woman named Gail Fairman -- not Gail Fairman, Gail -- I don't remember her last name. ADA Gail something. I don't remember her last name.
Q. Was Patricia Cummings at NYU during your time there?
A. Not to my knowledge.
Q. Were you interested in the Philadelphia District Attorney's Office or Lawrence Krasner's administration?
A. I was interested in being a prosecutor.
Q. Why were you interested in being a prosecutor?
A. I care about the victims, enforcing the law, justice, all of those things. I knew I wanted to work in public interest and I knew pretty early on that I wanted to be a prosecutor.
Q. Have you done prosecutory work,

Page 11

other than post-conviction litigation?
A. Just in the internships I talked about.
Q. And what was the nature of that work?
A. So my 1L summer I had to draft motions, various things like that from a trial perspective. I was a municipal court intern in the Philadelphia District Attorney's Office and then the equivalent of that at my time at Kings County through the externship.
Q. And did you live in Philadelphia for that summer?
A. Yes.
Q. Who did you work with for your 2L summer in the Philadelphia District Attorney's Office?
A. So everyone in the municipal court unit in charge of the internship program at the time was Charles Cunningham, Angel Flores, and Jeff Lindy, and the specific ADAs I was assigned to work with, Vince -- not remembering his last name -- and Susie Buck. And I worked with various others, too, but I was specifically assigned to work with them.

Page 12

Q. And were you extended an offer of employment at the end of your 2L summer?
A. Yes.
Q. Tell me about that process.
A. Sometime in the fall I received a call, you know, that I had gotten an offer and I accepted it shortly after.
Q. Who informed you that you were receiving an offer for employment from the Philadelphia District Attorney's Office.
A. I received a voicemail from Mr. Krasner.
Q. What did he say?
A. That they were extending me an offer of employment to start with the incoming class.
Q. Did you know which unit you would be starting in?
A. No.
Q. And what were the terms of your employment?
A. So I guess I'm not sure what you mean.
Q. You are a W-2 employee?
A. Yes.
Q. So you completed your third year at

Page 13

NYU with an offer of employment with the Philadelphia District Attorney's Office?
A. The majority of it. I believe I received an offer in October. It was in the fall.
Q. Did you sit for the Pennsylvania bar exam first?
A. Yes. I mean, no, after I got -- that summer once I finished or it ended up being in the fall because of COVID.
Q. And what unit did you start in at the Philadelphia District Attorney's Office?
A. The PCRA unit.
Q. And what year was that?
A. 2020.
Q. Who was head of the PCRA unit at that time?
A. Tracey Kavanagh was the supervisor and Lori Williamson was the assistant supervisor.
Q. And you are still in that unit?
A. Yes. I'm the assistant supervisor of the unit now.
Q. What year did you become the assistant supervisor?
A. Earlier this year.
Q. When you began employment in the

Philadelphia District Attorney's Office in 2020, that would have been under DA Krasner's administration, what were your responsibilities when you first began?
A. I was a line PCRA ADA. I was assigned cases to investigate and handle. Yeah, I mean, I investigated cases, wrote answers, did hearings, everything like that.
Q. Did you draft the Commonwealth's responses to PCRA petitions?
A. Yes.
Q. What else did you do?
A. Primarily that. I mean, going to court to run PCRA lists, handling list cases, things like that. I would say that broadly encompasses the duties.
Q. You said part of your duties as a line PCRA was investigating PCRA claims?
A. Yes.
Q. What do you understand your duties as an investigator in the PCRA unit to be?
A. I began by reading all of the pleadings, viewing the records. In many cases, the homicide file. It can involve investigating and talking to witnesses, reviewing the entirety



of the DAO file, the court file, reviewing everything that there is to review for a case.
Q. So part of your duties as a line PCRA ADA was to talk to witnesses?
A. It can be, yes.
Q. What kind of training did you receive when you began in the PCRA unit in 2020?
A. We began with a general office-wide training that lasted for a couple of weeks. And then when I came to the PCRA unit, additional, you know, training sessions led by various members. We were assigned mentors and editors and things like that.
Q. That's pretty broad. So what were some of the subjects that were taught during this intensive -- is that a fair description?
A. I would say so.
Q. What were some of the subjects that were covered?
A. Timeliness of PCRA petitions, Brady claims, after-discovered evidence claims, running a PCRA list to name a few.
Q. I would like you to name as many as you can remember.
A. Ineffective assistance of counsel



claims. We talk about conducting hearings, dealing with nunc pro tunc claims. There may have been more, but those are specifically what I remember.
Q. My apologies.
The substance of the training was concerned with the tactics necessary to be a line ADA in the PCRA unit; is that correct?
A. I mean, that's part of it, but also the law and --
Q. That was my next question.
A. -- yes.
Q. Another part of it is an introduction to the substantive components of the law that you are going to be practicing?
A. Yes.
Q. What specific training did you receive with respect to investigating PCRA claims?
MR. SKINNER: Objection. Asked and answered.
MR. BROWNLIE: You can answer.
THE WITNESS: I don't know if there's a training session specifically, but it certainly comes up in the course of everything you are talking about when you are talking about an



ineffectiveness claim, you learn that oftentimes that means speaking to counsel and things like that, and then certainly you learn by having editors and supervisors as I work on the cases themselves.
BY MR. BROWNLIE:
Q. So do I understand your testimony to be that there is not specific training on how to undertake an investigation in the PCRA context, but it's more on-the-job learning?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection. Misstates prior testimony.
MR. BROWNLIE: You can answer.
THE WITNESS: I would not necessarily agree with that. No, I'm not saying there's a session that says, here's how to investigate, but through the course of everything else you certainly are taught how to investigate claims and then on-the-job training, as well.
BY MR. BROWNLIE:
Q. Just so I'm clear, during this intensive training that you received as an introduction to the district attorney's office, there is not a specific training session on how to



 A.5

conduct investigations of PCRA claims?
A. I don't recall there being one titled that, but I don't remember everything that we were trained on.
Q. I should have said at the beginning, if you don't recall, that's a fine answer, as well.
Would you say during your career at the district attorney's office did you receive more on-the-job training or formal training?
A. I would say it's combination of both.
Q. What are some examples that you have of the formal training with respect to the specific work your performed in the PCRA?
A. Well, all of the things we just discussed. Since then there are various trainings about law and things like that, for example, Brady training, timeliness training that are ongoing. I now participate in giving part of those trainings, as well.
Q. And are you required in addition to the CLE requirements of the Pennsylvania Bar Association, does the district attorney's office require continuing training for its ADAs?



A. At times there are mandatory sessions or things that we have to come to either from the office or within the unit or division as a whole.
Q. Roughly how many of those have you attended in your six years of employment there?
A. More than a dozen. I can't say for sure.
Q. So is it fair to say roughly two a year?
A. I don't know if it breaks down like that, but that can be fair.
Q. Is it less?
A. I don't know if it's two every year. Could be more in a year. I would say at least two or three a year.
Q. And what of the approximately 12 trainings that you've had since you've started, what are some of the areas that you've been trained on?
A. Pre-law. There are various trainings certainly related to supervisory duties, more HR management things. There are various panels and things. I can't think of any other specific examples.



Q. Do you have a specific panel in mind?
A. There's been panels that judges have been on before that I have attended, but I can't remember anything else specific.
Q. Have you received any training on the recent opinions from the United States or whoever deals with the Third Circuit and the Supreme Court of Pennsylvania concerning the conduct of the Philadelphia District Attorney's Office?
A. I don't know if I would say trainings. There have been meetings and discussions as it is figured out, the implementation of that, but we certainly had a meeting to be made aware of the opinion and its contents and what that means for the DA's office.
Q. We're going to talk more about that later.
But you said you are now involved in providing these trainings?
A. Sometimes, yes.
Q. What is your role in that capacity?
A. Several years ago I started helping with trainings interns. I now give trainings for



new ADAs. And, obviously, as a supervisor, an ongoing responsibility and obligation in working with people.
Q. And what -- so Lori Williamson was the assistant supervisor and Tracey Kavanagh was the supervisor of the PCRA unit when you started?
A. Correct.
Q. Was that organizational structure consistent until your ascension or was there any change in the six years that you've been at the DA's office?
A. Ms. Williamson, when she left for a different assignment, there was a period where there was no assistant supervisor and then I became the assistant supervisor.
Q. So after Tracey Kavanagh left the supervisor position, Lori Williamson became supervisor?
A. No. Ms. Kavanagh has been the supervisor in the PCRA unit my entire time in the office and remains today.
Q. Perfect. Thank you.
And when did Lori Williamson leave the PCRA unit?
A. Last fall.

Q. So fall of '25?
A. I believe so.
Q. And she's at the United States Attorney's Office now?
A. That's correct.
Q. And what's your understanding of her role there?
A. That she's an assistant district attorney detailed to the United States Attorney's Office.
Q. And as I understand it, this program is a grant program whereby city employees are sort of contracted out to the federal government; is that correct?
A. That sounds correct to me.
Q. Do you have any knowledge of that program?
A. That's the extent of my knowledge.
Q. Thank you.
When did you come to learn Lori Williamson would be leaving her role as the assistant supervisor in the PCRA unit?
A. Sometime earlier in the year of 2025.
Q. And did she tell you why?



A. Just that she was going to be working at the U.S. Attorney's Office.
Q. She didn't say why?
A. No.
Q. How did your promotion to assistant supervisor come about?
A. The assistant supervisor of the Law Division, Steve Wildberger, set up a meeting with me and asked if I -- indicated that they would like me to become assistant supervisor of the PCRA and asked if that was something that I would want to do.
Q. And you were interested in that position?
A. Yes.
Q. Did you have any discussions with District Attorney Krasner about that?
A. I personal did not, but I know they discussed it with him.
Q. When -- I'd like to talk about the Law Division a little bit more broadly.
When you were hired in 2020, who was the supervisor?
A. ADA Nancy Winkelman, and ADA Paul George was the assistant supervisor of the Law



Division.
Q. Did you work with Ms. Winkelman and Mr. George?
A. Ms. Winkelman some, Mr. George very often.
Q. Very often?
A. Yes.
Q. What was your work with Ms. Winkelman?
A. I mean, occasionally we would bring cases to her for he to weigh in on various issues in her role as supervisor.
Q. Did it concern the Commonwealth's responses to PCRA petitions?
A. It could, yes.
Q. Did it ever?
A. Yes.
Q. Did it concern your investigative efforts in responding to PCRA petitions?
MR. SKINNER: I'm going to object to the extent that you are asking for the content of privileged discussions between a supervising ADA and her subordinate with respect to how to proceed on any case.
MR. BROWNLIE: What's the privilege



you are invoking?
MR. SKINNER: To the extent that you are asking about questions between --
MR. BROWNLIE: I'm asking about the nature of her work.
MR. SKINNER: Okay.
THE WITNESS: I certainly would have told Ms. Winkelman all about my investigation into the case, yes.
BY MR. BROWNLIE:
Q. Did she ever direct your investigation at any time?
A. She may have.
Q. Did she ever direct the substance of your response to a PCRA petition?
A. We would have discussed the substance of my response. I don't know what you mean by direct.
Q. So what procedures were implemented concerning your -- ADA Winkelman's role in how you responded to a PCRA petition? Did you suggest the Commonwealth's position to her?
MR. SKINNER: Objection to the extent you are asking for privileged discussions.
MR. BROWNLIE: I'm not sure I

understand the basis of your -- are you claiming privilege?

MR. SKINNER: Yeah, I would assert privilege if you are asking, like, about what a subordinate suggested in terms of how a case proceeds to a supervisor. Those discussions would be privileged work product and --

MR. BROWNLIE: I'm not asking about specific substance of any conversations. I'm asking about general policies and practices.

MR. SKINNER: Didn't you just ask the witness if she had communicated something about those proceedings to her supervisor?

MR. BROWNLIE: Can you read back my question, Madam Court Reporter?

(Whereupon, the requested portion of the record was read.)

MR. SKINNER: So if you are asking a yes-or-no question like did a conversation happen, you can answer that. But if you are asking about the content that was discussed, then, of course, we would assert privilege and you shouldn't answer that.

THE WITNESS: I may have.

BY MR. BROWNLIE:



Q. Was it the general practice in the PCRA unit to suggest the Commonwealth's position to Ms. Winkelman?

MR. SKINNER: I would object on deliberative process grounds.

MR. CIOSCHI: I would object, as well.

MR. BROWNLIE: Notwithstanding there's no discussions about specific cases, you are asserting deliberative process privilege concerning a policy and practice of the district attorney's office?

MR. SKINNER: That's very much what that privilege concerns as distinct from attorney work products that's specific to a case.

MR. BROWNLIE: In your capacity here today, Mr. Skinner, you are represent both ADA Nelson and the district attorney's office?

MR. SKINNER: I'm representing the office and Ms. Nelson as an employee of that office.

BY MR. BROWNLIE:

Q. Ms. Nelson, are you aware of your ability to obtain independent counsel?

A. I would assume that I could do so.



Q. Let me back up a little bit.

It took some litigation to have this deposition taken; did it not?

A. It's my understanding that there was.

Q. When did you inform the district attorney that you wanted to quash the subpoena?

A. I did not inform them that I wished to quash the subpoena.

Q. When did you learn that you had been subpoenaed for a deposition?

A. I don't remember when it was, but whenever you informed them about it.

Q. So do I understand your testimony to be that you did not inform the district attorney to quash the subpoena, but they moved to quash it on its own accord under your name?

MR. SKINNER: Again, I would object to, you know, you are asking to who was said to what preceding a motion that was filed by our office. Same objection.

I wouldn't answer.

MR. CIOSCHI: I'll object, as well.

MR. BROWNLIE: And the particular objection at this juncture is that they didn't



object under her name.

BY MR. BROWNLIE:

Q. The subpoena, when did you learn that a subpoena had been directed to you?

A. Mr. Shay informed me -- or Mr. Skinner informed me. I don't remember the exact date.

Q. Do you have an objection to testifying fully and truthfully here today?

A. No.

Q. Do you understand that the attorney-client privilege to be a privilege that you hold?

A. I understand it to be a privilege that the office holds.

Q. The attorney-client privilege?

A. I'm not sure what you mean. I don't have a client.

Q. I'd like to make an offer to you, Ms. Nelson. I'm willing to suspend this deposition to provide you an opportunity to obtain independent counsel.

Have you executed a waiver in this case?

A. I don't know what that means.

Q. Have you been informed of any potential conflict between --
MR. CIOSCHI: Objection.
MR. BROWNLIE: Let me finish my question and then you can object.
BY MR. BROWNLIE:
Q. Have you been informed of any potential conflict between you and the district attorney's office concerning the nature of the district attorney's office and it's conduct in the vacatur of the murder conviction of Eduardo Ramirez?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
Don't answer. It's privileged, clearly.
MR. BROWNLIE: So, again, I'll make the offer to you. If you are happy to proceed, we will proceed, but I'm willing to suspend the deposition for purposes of providing you an opportunity to obtain independent counsel.
MR. CIOSCHI: Objection.
MR. SKINNER: Would you like to take a break, Julie?
THE WITNESS: Yes, please.



MR. BROWNLIE: That's fine.
MR. SKINNER: So off the record.
(Whereupon, a discussion was held off the record.)
THE WITNESS: I'm good to proceed.
BY MR. BROWNLIE:
Q. When you were hired at the Philadelphia District Attorney's Office, were you provided anything equivalent to an employee handbook?
A. Yes.
Q. What was the substance and the nature of the employee handbook?
A. I believe it was largely focused on human resources policies and things like that.
Q. During your ten-week intensive, were you provided training specific to post-conviction litigation?
A. Well, first, I don't know if I said ten-week intensive.
Q. You may not have. My apologies, yes.
How long was it?
A. I believe the training with the office was two weeks and the rest of the training



at PCRA was throughout -- it was COVID, so a bit unusual in that we were doing everything virtually. And I don't remember the rest of your question.
Q. And you went directly from the two-week training process into substantive work in the PCRA unit?
A. Yes.
Q. And when you first began in the PCRA unit, who did you work with mostly?
A. Tracey Kavanagh, Lori Williamson, and then, you know, certainly other ADAs who have been there longer than me would assist me on cases, edit my briefs before Tracey and Lori would look at them and things like that.
Q. And the general practice from a supervisory perspective, would you report to Ms. Williamson -- in the beginning. Would you report to Ms. Williamson directly and Ms. Kavanagh directly or was there a process?
A. Both.
MR. CIOSCHI: Objection.
MR. BROWNLIE: Both.
That was on behalf of Plaintiff's counsel.



You can answer.
THE WITNESS: Yes, both.
BY MR. BROWNLIE:
Q. And were you assigned cases from Ms. Williamson and Ms. Kavanagh?
A. Yes.
Q. And I imagine they would supervise the cases they would assign to you?
A. Yes.
Q. You testified earlier today that you were supervised in part -- or worked with, excuse me, Nancy Winkelman and Paul George; is that correct?
A. Correct.
Q. Was that always through ADA Kavanagh and ADA Williamson or did you work with them independently? Them being Winkelman and George?
A. Insofar as you mean did I directly speak to Ms. Winkelman and Mr. George myself? Yes.
Q. And did they supervise your cases independent of Ms. Kavanagh and Ms. Williamson?
MR. CIOSCHI: Objection.
THE WITNESS: I don't know what you mean by independent.

Page 34

BY MR. BROWNLIE:
Q. Was there always a process where a case that you were working on was reviewed by the supervisors in the PCRA unit in addition to the supervisors at the Law Division?
MR. CIOSCHI: Objection.
THE WITNESS: That could have been the case, yes.
BY MR. BROWNLIE:
Q. Was it the case?
A. Can you ask your question again?
Q. Is there a specific instance where you recall Winkelman and George supervising one of the cases directly?
A. They would be involved in the supervision of my cases, yes.
Q. In what capacity?
A. I should say more so Mr. George than Ms. Winkelman. Maybe the only case I worked directly on with Ms. Winkelman may have been this case. More so Mr. George. But the same answer as before, I would discuss the case with Mr. George, often Ms. Kavanagh, Ms. Williamson would be present and we would discuss the case.
Q. What's your understanding of

Page 35

Ms. Winkelman's work history prior to becoming supervisor of the Law Division?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection. Relevance.
MR. BROWNLIE: You can answer.
THE WITNESS: I know she worked in civil appellate practice.
BY MR. BROWNLIE:
Q. Do you understand her to have any criminal experience?
MR. CIOSCHI: Objection.
THE WITNESS: Not prior to the ADA's office, no.
BY MR. BROWNLIE:
Q. Could that, perhaps, be an explanation for why you worked more closely with Mr. George than Ms. Winkelman?
MR. CIOSCHI: Objection.
THE WITNESS: No, that's just the way Ms. Winkelman I believe worked more closely with the other units. Mr. George worked very closely with the PCRA unit.
BY MR. BROWNLIE:
Q. And which units did Ms. Winkelman work closely with?

Page 36

A. I can only speak to what happens in the PCRA unit.
Q. Did she work closely with the PCRA unit?
A. At times. But, as I said, often we worked more closely with Mr. George.
Q. And the Ramirez matter is the only case you can recall in which you worked with her?
A. There were other cases I discussed with her, I'm sure, but Mr. George was screened from this matter.
Q. And why was he screened?
A. I believe he had represented a witness in connection with a piece of the case or -- he had some connection to the case in such that he was screened.
Q. How did you come to learn that?
A. I believe when I was assigned the case, I was informed that Mr. George was screened from the matter.
Q. Were you informed that anyone else was screened from the matter?
A. Yes. Mr. -- or Tom Gaeta was screened from the matter or I was informed he was screened from the matter, rather.

Page 37

Q. So the district attorney's office moved to quash your subpoena and I think there was roughly three or four weeks of litigation before the Court denied the motion.
Did you review anything concerning the Ramirez matter during that time?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
MR. BROWNLIE: You can answer.
THE WITNESS: I don't know if during that period I did.
BY MR. BROWNLIE:
Q. Have you reviewed anything connected to this case at all after Mr. Ramirez's conviction was vacated?
A. Yes.
Q. When?
A. In the last few weeks.
Q. What did you review?
A. I reviewed the response filed by ADA Napiorski, the DNA report, the most recent DNA report, and I reviewed the deposition testimony of ADA Napiorski and ADA Ernst.
Q. You didn't review the testimony from Ms. Winkelman?

A. I was sent it, but I did not read it as closely, no.
Q. Who did you speak to concerning your deposition today?
MR. CIOSCHI: Objection.
THE WITNESS: I had a meeting with Mr. Skinner and Mr. Napiorski.
BY MR. BROWNLIE:
Q. You met with Mr. Napiorski concerning your deposition today notwithstanding the fact that he's a fact witness in this matter?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
MR. BROWNLIE: You can answer.
THE WITNESS: Yes, he was present at this meeting.
BY MR. BROWNLIE:
Q. What was the discussion at this meeting?
MR. SKINNER: Objection. Privilege. Don't answer.
MR. CIOSCHI: Objection.
MR. BROWNLIE: You are asserting deliberative process privilege of her conversation concerning this deposition?



MR. SKINNER: I mean, the conversation was primarily -- it was a privileged conversation.
MR. BROWNLIE: In what capacity?
MR. CIOSCHI: You can litigate this in front of the Court, y'all.
MR. BROWNLIE: I want to know what the privilege is, if it's deliberative process?
MR. SKINNER: It's attorney-client privilege, attorney work product --
MR. BROWNLIE: Mr. Napiorski represents Ms. Nelson?
MR. SKINNER: No.
MR. BROWNLIE: So then it's waived; correct?
MR. SKINNER: No.
MR. CIOSCHI: Is he the judge?
MR. SKINNER: Yeah, if you want --
MR. BROWNLIE: The basis of your objection to that question is attorney-client privilege?
MR. SKINNER: Among other things. Yes, it's the attorney-client privilege, attorney work product, yes.
BY MR. BROWNLIE:



Q. Who represents you for the purposes of this deposition, Ms. Nelson?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
MR. CIOSCHI: Josh, if you want to litigate this particular issue, bring it to the Court. You can call the Court right now.
MR. SKINNER: Don't answer. I mean --
MR. BROWNLIE: Who represents her during this deposition?
THE WITNESS: Mr. Shay is here -- I mean Mr. Skinner is here on behalf of the office. I am an employee of the office.
MR. BROWNLIE: And are you represented by Mr. Napiorski?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
MR. BROWNLIE: You can answer.
THE WITNESS: No.
BY MR. BROWNLIE:
Q. So I'll ask you again, what was the substance of your conversation during your meeting with Mr. Napiorski?
MR. CIOSCHI: Objection.



MR. SKINNER: Objection. Don't answer it.
If you want to litigate it, we can do it.
MR. CIOSCHI: Call the judge. Let's call the judge.
MR. BROWNLIE: You want to reconsider your position before we get the Court on the line?
MR. SKINNER: No.
MR. BROWNLIE: We are still on the record.
MR. SKINNER: Just to be clear, I was at the meeting, too. It's a meeting with counsel.
MR. BROWNLIE: It's waived if a third party was present.
MR. SKINNER: I don't think that's the way that it works. They are both --
MR. CIOSCHI: The Court will decide, if they are available. If they are not, they will decide it later.
MR. BROWNLIE: Fine. Then I'll recall her.
MR. CIOSCHI: Fine. Waste more

time.

MR. BROWNLIE: Jon, give it a break.

(Phone call placed.)

MR. BROWNLIE: Hi, my name is Joshua Brownlie. We have a matter before the Judge. I'm in a deposition and the parties are in disagreement about a particular assertion of privilege. Is the Court available for a conference?

UNIDENTIFIED SPEAKER: What's the case? Do you have the docket number?

MR. BROWNLIE: 24-3035.

UNIDENTIFIED SPEAKER: Ramirez versus City of Philadelphia?

MR. BROWNLIE: Yes, ma'am.

UNIDENTIFIED SPEAKER: I'm assuming Plaintiff's counsel and counsel for the Defendant are present during the deposition; correct?

MR. BROWNLIE: Yes, as well as counsel for Deponent.

UNIDENTIFIED SPEAKER: Let me just put you upon a brief hold.

MR. BROWNLIE: Thank you.

UNIDENTIFIED: I'm going to conference you in with him. Just pause for a



second.

MR. BROWNLIE: Thank you.

(Whereupon, a discussion was held off the record.)

THE COURT: Counsel, who is on the phone?

MR. BROWNLIE: Good morning, Your Honor. Joshua Brownlie for Detective Paul Worrell.

THE COURT: You are requesting the conference, Josh?

MR. BROWNLIE: I'm not -- well, at the insistence of counsel for our Deponent, ADA Nelson, and at the insistence of counsel for Plaintiff, Mr. Ramirez, we phoned the Court to resolve a privilege assertion.

MR. CIOSCHI: Your Honor, this is counsel for Mr. Ramirez, Jon Cioschi. Thank you for taking this call. We didn't insist on anything, Your Honor. Mr. Brownlie wished to ask certain questions of the Deponent. I'm not counsel for the Deponent. I can't speak to Mr. Brownlie and Mr. Skinner's dispute about this. But it wasn't getting resolved in here and Mr. Brownlie wanted to act like the Court, so we had



to call the Court to get it resolved.

MR. SKINNER: Good morning, Your Honor. If I may, this is Shea Skinner on behalf of the Deponent, ADA Julie Nelson, and we did assert a privilege objection in response to a question from Mr. Brownlie.

THE COURT: State the basis for your objection, Counsel.

MR. SKINNER: Counsel for Defendant Worrell inquired about the content of discussion at which the participants were myself for the counsel for the Deponent, Ms. Nelson, and ADA Napiorski, who also was deposed in this matter. And so I have asserted the attorney-client and work product doctrine privileges as to the content of those discussions.

THE COURT: Who is asking the questions?

MR. BROWNLIE: Your Honor, the question was posed by me. If you'd like, I can have the court reporter read it back.

THE COURT: Madam Court Reporter, can you read the question back?

(Whereupon, the requested portion of the record was read.)



MR. BROWNLIE: So, Your Honor, if I can set a factual predicate. Mr. Napiorski is an assistant district attorney at the Philadelphia District Attorney's Office. He does not represent Ms. Nelson for purposes of these proceedings or her deposition today. She met -- according to her testimony today, counsel can correct me if I misstate the record -- she testified today that prior to her deposition, she attended a meeting with Mr. Napiorski and her counsel today, Mr. Skinner, at which they discussed the Ramirez matter. In response to a question concerning substance of those communications, Mr. Skinner originally asserted attorney-client privilege. I explained to him my understanding that the privilege would have been waived considering that a third party was present during the conversations. And he now is asserting a work product privilege I understand. So that's sort of the context in which the objection has arisen.

MR. SKINNER: Your Honor, if I may --

THE COURT: Counsel, I'm going to defer ruling on the question. I'm going to ask counsel and lodge an objection to the question and

state the basis and we're going to give other counsel the opportunity to reply to the objection. If that objection is sustained, then that ends that issue. If the objection is overruled, then you are going to reconstitute the deposition for the purposes of that inquiry.

Counsel, is there anyone that has any discomfort or any objection to the ruling that I've just made?

MR. BROWNLIE: No objection, Your Honor.

MR. CIOSCHI: No objection for counsel for the Plaintiff. I don't think we have much at stake in this particular dispute, but...

MR. SKINNER: No objection.

THE COURT: So the objecting party has ten days in which to file a motion pertaining to this question.

Thanks, Counsel. Have a good day. Counsel, you are all excused.

MR. CIOSCHI: Can you mark that, please?

BY MR. BROWNLIE:

Q. When did you attend this meeting with Mr. Napiorski and Mr. Skinner?



MR. SKINNER: I'm sorry, what was the question?

MR. BROWNLIE: When.

THE WITNESS: Two weeks ago.

BY MR. BROWNLIE:

Q. How long was it?

MR. CIOSCHI: Objection.

THE WITNESS: 10 or 15 minutes.

BY MR. BROWNLIE:

Q. Who called for it?

MR. CIOSCHI: Objection.

THE WITNESS: Mr. Skinner indicated that we could meet prior to my deposition.

BY MR. BROWNLIE:

Q. Did you feel it was necessary to meet with Mr. Napiorski prior to your deposition today?

MR. CIOSCHI: Objection.

THE WITNESS: I don't know if it was necessary.

BY MR. BROWNLIE:

Q. Who else did you speak to about your deposition today, besides Mr. Napiorski and Mr. Skinner?

MR. CIOSCHI: Objection.



THE WITNESS: No one about the substance of my testimony. People know I'm being deposed, but nothing about the substance.

BY MR. BROWNLIE:

Q. Who?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. Relevance.

THE WITNESS: Ms. Kavanagh and Ms. Williamson know I'm being deposed. ADAs I'm supervising know in this matter. And then ADAs I'm supervising know I'm being deposed, but not necessarily for what, just why I would be unavailable this morning.

BY MR. BROWNLIE:

Q. When did you -- you reached out to Ms. Williamson?

MR. CIOSCHI: Objection.

THE WITNESS: Yes. I'm in communication -- contact with her.

BY MR. BROWNLIE:

Q. How did you inform Ms. Williamson that you were subpoenaed for a deposition in the Ramirez matter?

MR. CIOSCHI: Objection.

THE WITNESS: I don't recall if it



was in person or over a text, but...

BY MR. BROWNLIE:

Q. Do you see her regularly?

MR. CIOSCHI: Objection.

THE WITNESS: Every few weeks. Once a month, maybe.

BY MR. BROWNLIE:

Q. You are friendly with Ms. Williamson?

MR. CIOSCHI: Objection.

(Reporter clarification.)

THE WITNESS: Yes.

BY MR. BROWNLIE:

Q. Did you speak with Ms. Williamson before or after your meeting with Mr. Napiorski and Mr. Skinner?

MR. CIOSCHI: Objection to form and substance.

THE WITNESS: Before.

BY MR. BROWNLIE:

Q. Had you reviewed any materials before you spoke with Ms. Williamson concerning the deposition?

A. I wouldn't say I spoke with her concerning the deposition. I told her that I had

Page 50

been subpoenaed to be deposed.
Q. And her response was what?
MR. SKINNER: Objection. Relevance.
MR. CIOSCHI: Objection.
THE WITNESS: That she wasn't surprised. I don't remember exactly what she said.
BY MR. BROWNLIE:
Q. Your understanding is that she said she wasn't surprised?
A. I don't remember exactly what she said.
MR. CIOSCHI: Objection.
THE WITNESS: That would be the general impression.
BY MR. BROWNLIE:
Q. And your testimony today is you didn't discuss the substance of the Ramirez matter or your testimony at all with Ms. Williamson?
MR. CIOSCHI: Objection.
THE WITNESS: Discuss the substance of my testimony, no. A few weeks ago, Ms. Williamson asked me about what I remembered about the DNA evidence in this case. I shared that with her, but I did not speak with her about

Page 51

the substance of my testimony in this case, no.
BY MR. BROWNLIE:
Q. And what did you remember about the DNA evidence in this case?
MR. CIOSCHI: Objection.
THE WITNESS: I remembered that there was recent DNA testing on both a pipe and a fleece vest. I believe there may have been other items, but that's my focus here, that they are on two ends of the pipe. On one end of the pipe, NEIL 1 DNA was found, which matched the DNA on the vest. There's additional DNA found on both ends of the pipe that was inconclusively not able to be tied to anyone.
BY MR. BROWNLIE:
Q. And you remembered that from your work on the Ramirez matter some two years ago?
A. Well, I reread the DNA report.
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:
Q. So you did review materials --
(Multiple speakers.)
THE COURT REPORTER: Repeat your question, please.
MR. CIOSCHI: Objection.

Page 52

THE WITNESS: I reread the report.
BY MR. BROWNLIE:
Q. Prior to your conversation with Ms. Williamson?
A. Well, she asked me what I remembered. I reread the report and that refreshed my memory as to what it was.
Q. Did you read the report while you were on the phone with Ms. Williamson?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: No.
BY MR. BROWNLIE:
Q. So how was it that you communicated your understanding of the DNA evidence to ADA Williamson?
MR. CIOSCHI: Objection.
THE WITNESS: It was probably over a text message.
BY MR. BROWNLIE:
Q. So you communicated with Ms. Williamson multiple times?
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:
Q. More than one time.

Page 53

MR. CIOSCHI: Objection.
THE WITNESS: Well, if you mean there's more than one text message, sure.
BY MR. BROWNLIE:
Q. Over how many days did you communicate with Ms. Williamson --
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:
Q. -- concerning this?
A. That conversation was one day. That was not in response to me being deposed. Those were two separate conversations.
Q. Conversation number one concerned what?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I've been subpoenaed in the Ramirez matter.
BY MR. BROWNLIE:
Q. And the during the interim between conversation one and conversation two, you reviewed the materials?
A. No.
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.

BY MR. BROWNLIE:
Q. So what was the substance of conversation number two?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
THE WITNESS: Ms. Williamson said, what do you remember about the DNA in this case? I reviewed the report and I told her what I remember.
BY MR. BROWNLIE:
Q. And that question and you telling her what you remembered occurred in a single day?
MR. CIOSCHI: Objection.
THE WITNESS: Yes.
BY MR. BROWNLIE:
Q. When did you read the concession brief?
MR. CIOSCHI: Objection.
THE WITNESS: Do you mean when did I read it for the first time or when did I read it in connection with this?
BY MR. BROWNLIE:
Q. When did you read it in connection to the deposition?
MR. CIOSCHI: Objection.



THE WITNESS: Once I found out that the quashal for the subpoena had been --
BY MR. BROWNLIE:
Q. Denied?
A. -- denied.
Q. And you read the entire brief?
A. Yes.
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:
Q. Was that the first time that you read that brief?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: No.
BY MR. BROWNLIE:
Q. Had you read the concession brief before it was filed?
A. Yes.
Q. When did you come to learn that Edward Ramirez was seeking post-conviction relief?
MR. CIOSCHI: Objection.
THE WITNESS: It would have been in late 2023 or early 2024. I don't remember the exact date.
BY MR. BROWNLIE:



Q. And how did you come to learn that?
A. I was assigned to work on the matter.
Q. By who?
MR. CIOSCHI: Objection.
THE WITNESS: Either Ms. Williamson or Ms. Kavanagh. I believe it was Ms. Williamson who sent the email, but they both would have been included.
BY MR. BROWNLIE:
Q. You were assigned the Ramirez matter through email?
MR. CIOSCHI: Objection.
THE WITNESS: Yes, that's how we receive our case assignments.
MR. BROWNLIE: So we've received no such communications. So let's just do this now.
There's some issues with the DAO's production in this case because the manner in which the CIU file was transferred from Mr. Margulies (ph) to Mr. Cerone and subsequently to Plaintiffs. So, Mr. Skinner, we're going to be issuing a subpoena today to the district attorney's office for production of any and all materials -- and obviously this will be stated



more concisely in the subpoena -- concerning the Edward Ramirez matter -- criminal, prosecutorial, and post-conviction proceedings -- with the concurrent obligation of producing a privileged log for anything that's been withheld. I learned yesterday in a separate case that the DAO had withheld documents without producing a privilege log. So we will be issuing that subpoena today.
Should we direct that to your attention? I understand Attorney Gaeta was conflicted from this case?
MR. SKINNER: Yeah, to me.
MR. BROWNLIE: So we'll get that out this afternoon.
BY MR. BROWNLIE:
Q. What was your role in connection with responding to -- excuse me, strike that.
When you were assigned the case, were you responding to Mr. Ramirez's third amended petition or second amended petition?
MR. CIOSCHI: Objection.
THE WITNESS: I believe all of the filings were complete at that time, but I certainly would have reviewed everything that was filed.

BY MR. BROWNLIE:
Q. And you participated in the DAO's response to the PCRA claims through to the point of vacatur?
MR. CIOSCHI: Objection.
THE WITNESS: No, that's not accurate.
BY MR. BROWNLIE:
Q. When did your participation end?
A. I was working on investigating the case. At a certain point, I was informed that Mr. Napiorski would be drafting a response that the PCRA petition should be granted. I was, after that response had been drafted, asked to review it for any factual inaccuracies and that was the end of my involvement in the matter.
Q. So you were tasked to review the concession brief for factual inaccuracies?
A. Correct.
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:
Q. Who gave you that task?
A. Ms. Winkelman.
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:



Q. I'm going to extend my offer to you one more time, Ms. Nelson, if you would like to suspend this deposition for purposes of obtaining independent counsel.
MR. CIOSCHI: Objection. We've been over this.
MR. BROWNLIE: If you'd like to proceed, I'm happy to continue.
THE WITNESS: I'm fine.
BY MR. BROWNLIE:
Q. So you reviewed the concession brief for factual accuracy?
A. I was asked to review that brief for factual inaccuracies.
MR. CIOSCHI: Objection.
MR. SKINNER: Objection. Asked and answered.
MR. BROWNLIE: You can answer.
BY MR. BROWNLIE:
Q. Did you review the brief for factual accuracy?
A. Yes, I reviewed the brief.
Q. Did you review the brief for factual accuracy?
MR. CIOSCHI: Objection.



MR. SKINNER: Objection. Asked and answered.
THE WITNESS: I reviewed the brief. I was informed -- asked to review for factual inaccuracies. I recall both Ms. Williamson and I were -- that there may be things in the brief that we did not agree with. That's not why we were being asked to review it. It was in what was very close to its final form is what I was told.
BY MR. BROWNLIE:
Q. And we're just looking for the truth here, Ms. Williamson, so I appreciate your candor.
A. Ms. Nelson, and I am telling you the truth.
MR. CIOSCHI: Objection.
MR. BROWNLIE: Excuse me, Ms. Nelson.
BY MR. BROWNLIE:
Q. When you received the concession brief, your testimony was that it was in roughly final form.
What does that mean?
MR. CIOSCHI: Objection.
THE WITNESS: My understanding is that it had been reviewed by, I assumed,



Ms. Winkelman. I can't say soon, that it was very close to being ready to be filed.
BY MR. BROWNLIE:
Q. Did you find any factual inaccuracies in the brief?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I believe I provided a list of things to Ms. Winkelman. Ms. Williamson and Mr. Napiorski would have been on the email.
BY MR. BROWNLIE:
Q. And how was this list provided? By email?
A. Yes.
MR. CIOSCHI: Objection.
MR. BROWNLIE: Again, a document that we don't have.
BY MR. BROWNLIE:
Q. Let's back up for a second, Ms. Nelson.
When you were assigned to work on the Edward Ramirez matter, what were your responsibilities? You answered this again, but I'm going to ask you to repeat it.
A. So I was assigned to the matter.

When I was initially assigned to the matter, it was assigned to me alongside another ADA, Danielle Burkavage. She was more senior. She did not end up working on the matter. She I think very -- I don't remember when, but very soon after, transferred units. In any event, I would review everything. If -- perhaps I would be the one to do the writing. That's not how it turned out, and Ms. Burkavage would assist with the hearing if that's where this ended up. My responsibilities, like I said, involved reviewing everything that I listed earlier, which I would have done. So I reviewed the -- all of the pleadings, all of the notes of testimony, the district attorney's files, the homicide file --

Q. Sorry, just slow down.

A. Sorry.

-- the district attorney's files. The homicide file, I was not able to review because it was not available to me. And I believe I also went to try to locate the court of sessions file in this matter.

Q. When you were assigned the Ramirez matter, were you directed to investigate a particular claim that he was raising?



MR. CIOSCHI: Objection.

MR. SKINNER: Objection. Privileged.

Don't answer.

BY MR. BROWNLIE:

Q. Did you review materials for any claim raised by Mr. Ramirez other than Brady?

MR. CIOSCHI: Objection.

THE WITNESS: I reviewed all of the materials. I would have reviewed all of the notes of testimony, everything in the district attorney's files, and all of the pleadings. I certainly would have reviewed every claim that was being raised, yes.

BY MR. BROWNLIE:

Q. You said that the homicide file was not made available to you. Why not?

MR. CIOSCHI: Objection.

BY MR. BROWNLIE:

Q. Well, excuse me.

What efforts did you undertake to secure the H file?

A. I should say not that it was not made available to me, that it was not available to review. And I was aware when I was assigned -- at



some point along the way when I was assigned the case, I was informed that the homicide file was not locatable at that time.

Q. And who communicated that to you?

MR. CIOSCHI: Objection.

THE WITNESS: I don't recall.

BY MR. BROWNLIE:

Q. And was that at the initiation of your involvement in the Ramirez matter or did that come to light during your subsequent investigation?

MR. CIOSCHI: Objection.

THE WITNESS: I don't recall exactly when. I'm sure it would have been early on, because that's a step that I would take early on in the case. I don't know if the day I was assigned I was informed of that or not.

BY MR. BROWNLIE:

Q. Had you concluded your investigation by the time you were informed that ADA Napiorski would be drafting the brief?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

MR. BROWNLIE: You can answer.

THE WITNESS: I had not reached a



conclusion for myself, no.

BY MR. BROWNLIE:

Q. So if I understand your testimony today to be you were assigned the Ramirez matter alongside Mr. Napiorski -- strike that.

You were assigned the Ramirez matter along with another line ADA in the PCRA unit?

A. Correct.

Q. The other line ADA did not participate in the investigation of the PCRA claims; correct?

MR. CIOSCHI: Objection.

THE WITNESS: No. I may have had an initial conversation with her, but I don't even remember if that happened.

BY MR. BROWNLIE:

Q. You were directed to review the pleadings, the notes of testimony, the DAO's file, the H file, the court of session files for purposes of formulating the Commonwealth's response to the PCRA claims?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. Don't answer.

MR. BROWNLIE: Are you going --

MR. SKINNER: Sorry. That's a privilege objection. I apologize.

MR. BROWNLIE: Can you read back the question, Madam Court Reporter?

(Whereupon, the requested portion of the record was read.)

MR. SKINNER: I'll just withdraw the privilege objection, but object to form.

MR. CIOSCHI: Stand on my objection.

MR. BROWNLIE: You can answer.

THE WITNESS: I was assigned the case and my normal practice would be to review all of those things.

BY MR. BROWNLIE:

Q. So was the nature of your assignment to formulate the Commonwealth's response or was the nature of your assignment to fact-check Mr. Napiorski?

MR. CIOSCHI: Objection.

MR. SKINNER: Object to form and substance.

THE WITNESS: When I was initially assigned to work on the case. The idea when you are assigned a case is always that you would be ultimately responding to it. Someone from the



federal litigation unit, Mr. Napiorski, had also been assigned to the case, because it was my understanding that there was also a state habeas proceeding.

BY MR. BROWNLIE:

Q. Were you expecting to participate in the Commonwealth's response to the PCRA claims?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I didn't know what would happen.

BY MR. BROWNLIE:

Q. My question was with respect to your expectation.

A. I was expecting to be involved and work on the case, certainly.

Q. What were your expectations with respect to your involvement?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. Asked and answered.

THE WITNESS: I would review and work on the case, which is what I did.

BY MR. BROWNLIE:

Q. Without conference with other ADAs?



MR. CIOSCHI: Objection.

THE WITNESS: No. I knew I would be speaking with supervisors and presumably Mr. Napiorski as he was also assigned.

BY MR. BROWNLIE:

Q. What was Mr. Napiorski's role as you understood it at the time that the case was assigned to you?

MR. CIOSCHI: Objection.

THE WITNESS: When the case was first assigned to me, I believe I didn't immediately find out that Mr. Napiorski had been assigned. I'm sure shortly thereafter; I don't recall exactly when. Just that he had been assigned to work on the matter, as well.

BY MR. BROWNLIE:

Q. When did you come to learn of Mr. Napiorski's participation?

A. I don't recall exactly when.

Q. Were you working alongside Mr. Napiorski or was he taking lead?

MR. CIOSCHI: Objection.

THE WITNESS: I don't think either necessarily. We were both independently reviewing everything.



BY MR. BROWNLIE:

Q. And when did you come to learn that Mr. Napiorski would be drafting the brief?

MR. CIOSCHI: Objection.

THE WITNESS: When Ms. Winkelman informed me.

BY MR. BROWNLIE:

Q. Was there a conversation with respect to him drafting the brief or were you just told that he would be drafting it?

MR. CIOSCHI: Objection.

MR. BROWNLIE: You can answer.

THE WITNESS: I don't believe there was a conversation. There were meetings, but I don't believe -- I don't recall that that was discussed.

BY MR. BROWNLIE:

Q. You attended meetings during your investigative process?

MR. CIOSCHI: Objection.

THE WITNESS: Yes.

BY MR. BROWNLIE:

Q. Who attended these meetings?

MR. CIOSCHI: Objection.

THE WITNESS: I would have met with

Ms. Williamson, she and I, most likely. And that may have happened several times; I don't know. I recall at least one meeting where myself, Ms. Williamson, Mr. Napiorski, Ms. Winkelman, and, I believe, Ms. Ernst were present. There may have been an additional meeting where everyone was present. I don't recall for sure if it was one or two meetings.

BY MR. BROWNLIE:

Q. That one meeting you were speaking of, it was Lori Williamson, Nancy Winkelman, Katherine Ernst, and David Napiorski?

A. Yes. Ms. Kavanagh may have been there, but I don't know for sure.

Q. And, to your recollection, a meeting of that -- so at this meet was the supervisor of the Law Division --

Kathleen Ernst, was she supervisor or assistant supervisor of the Fed Lit unit?

MR. CIOSCHI: Objection.

THE WITNESS: I believe she was the supervisor of the federal litigation, but I could be wrong.

BY MR. BROWNLIE:

Q. The supervisor of the PCRA unit,



Ms. Williamson and -- the supervisor of the PCRA unit, you, and David Napiorski, how many times did that group of people meet?

MR. CIOSCHI: Objection.

THE WITNESS: At least once. There may have been an additional meeting. I don't recall.

BY MR. BROWNLIE:

Q. No more than two?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

MR. CIOSCHI: Josh, you present this to a jury, they are all going to fall asleep, dude. This is -- what is going on here? Relevance.

MR. BROWNLIE: Do you see a jury in here?

MR. CIOSCHI: No.

MR. BROWNLIE: When you do your examination, you can do it the way you want and when I do my examination, I'll do it the way I want.

MR. CIOSCHI: So --

MR. BROWNLIE: If you have an objection, you can assert it.



MR. CIOSCHI: Objection.

MR. BROWNLIE: Okay. You done? Are you done?

MR. CIOSCHI: I said objection; didn't I?

MR. BROWNLIE: Yeah.

MR. CIOSCHI: Feel free to continue. You done? Is it your deposition?

MR. BROWNLIE: Yeah, it is. Thank you.

MR. CIOSCHI: Go ahead, please. Be my guest.

BY MR. BROWNLIE:

Q. No more than two, ma'am?

A. I don't believe so.

Q. How many meetings did you attend with Ms. Williamson?

A. I couldn't --

MR. CIOSCHI: Objection.

THE WITNESS: -- say.

BY MR. BROWNLIE:

Q. More than two?

MR. CIOSCHI: Objection.

THE WITNESS: Very likely.

BY MR. BROWNLIE:



Q. How many times did you meet with Ms. Williamson and Mr. Napiorski?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I don't know that I ever met with just me and the two of them together if that's your question.

BY MR. BROWNLIE:

Q. That never occurred?

MR. CIOSCHI: Objection.

THE WITNESS: That particular combination of people, I don't believe so.

BY MR. BROWNLIE:

Q. This meeting with Williamson, Winkelman, Ernst, you, Napiorski, and Kavanagh --

A. And I don't -- I'm not sure if Ms. Kavanagh was there. It's possible, but I don't remember.

Q. Sure. And your testimony will be clear on that.

Was this prior to you learning that Mr. Napiorski would be drafting the concession brief?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

Page 74

(Reporter clarification.)
THE WITNESS: Yes.
BY MR. BROWNLIE:
Q. What was the purpose of that meeting?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection. Privilege. Don't answer.
MR. BROWNLIE: You have to state the privilege.
MR. SKINNER: Attorney work product and attorney-client -- I'm sorry. Attorney work product and deliberative process.
MR. BROWNLIE: Okay.
MR. CIOSCHI: I'll look up Judge Padova's number.
MR. BROWNLIE: You would be more productive that way.
MR. CIOSCHI: Was that a comment on my productivity? Wow. I think I'm being very productive.
MR. BROWNLIE: I think you are being very immature. I would suggest that you man up a little bit.
MR. CIOSCHI: Man up. I'd

Page 75

appreciate a little less gender talk.
MR. BROWNLIE: I'm sure you would.
MR. SKINNER: Let's keep it professional. I want to get out of here.
MR. BROWNLIE: Yeah. So does Ms. Nelson, so if you could relax.
MR. CIOSCHI: Judge Padova...
MR. BROWNLIE: You don't need to. I have it pulled up already.
MR. CIOSCHI: Good. I'm glad you are ready.
BY MR. BROWNLIE:
Q. This meeting that we're referencing, the larger meeting --
A. Yes.
Q. -- was a plan of action discussed at that meeting?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection. Privilege. Don't answer.
Deliberative process and work product.
MR. BROWNLIE: You understand -- I'm just going to tell you this: I'm going to move to compel the responses, and she's going to come back

Page 76

here.
MR. CIOSCHI: Oh, you know what the judge's ruling is going to be?
BY MR. BROWNLIE:
Q. Ms. Nelson, did your participation in the Ramirez investigation change after that meeting?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
MR. BROWNLIE: You can answer.
THE WITNESS: I don't know what you mean by change.
BY MR. BROWNLIE:
Q. Did the nature of your work change after that meeting?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: Again, I don't know what you mean by change. I was working on the case.
BY MR. BROWNLIE:
Q. Did the direction of your investigation change?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.

Page 77

THE WITNESS: After that meeting, I continued to work on the case and then later I was informed that Mr. Napiorski would be drafting a response. So, at that point, I knew I would not be drafting a response.
BY MR. BROWNLIE:
Q. When you say you are working on the case, you mean reviewing files, notes of testimony, all those things?
MR. CIOSCHI: Objection.
THE WITNESS: All that entails.
BY MR. BROWNLIE:
Q. Did you have an opinion with respect to the DAO's decision to concede before you had concluded your investigation?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection. Privilege.
MR. BROWNLIE: Her opinion -- her opinion is privileged?
MR. SKINNER: If you are asking about her opinion formed as an assistant district attorney, then, yes, that would be work product of the office. But if you are asking about her personal opinion about -- could you clarify the question?

Page 78

MR. BROWNLIE: Can you read the question, please?

(Whereupon, a discussion was held off the record.)

(Whereupon, the requested portion of the record was read.)

MR. BROWNLIE: I'll rephrase.

BY MR. BROWNLIE:

Q. Did you have an opinion, you personally, have an opinion about the DAO's opinion to concede relief before you had concluded your investigation?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I had not personally come to a conclusion for myself yet, no.

BY MR. BROWNLIE:

Q. Why not?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I just -- I hadn't come to a conclusion yet myself. I hadn't decided, you know, if I was asked, what my position would be -- what the answer to that question would be.

Page 79

BY MR. BROWNLIE:

Q. What were your reservations about agreeing with the position ultimately adopted by Mr. Napiorski, Ms. --

MR. SKINNER: Objection --

BY MR. BROWNLIE:

Q. -- Ms. Winkelman, and District Attorney Krasner?

MR. CIOSCHI: Objection.

THE WITNESS: I don't know that I said I had reservations. I said I had not come to a conclusion for myself yet.

BY MR. BROWNLIE:

Q. What does that mean, you hadn't come to a conclusion?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I mean that if someone had come to me and said to me, do you think we should oppose or grant this petition, I would have said I don't know yet.

BY MR. BROWNLIE:

Q. So you agreed that there were at least reasonable grounds to oppose the petition?

MR. CIOSCHI: Objection.

Page 80

MR. SKINNER: Objection. Misstates prior testimony.

THE WITNESS: I mean, I don't think that's what I said, but there are always arguments in favor of opposing and granting a petition. That's part of evaluating a case, is evaluating both of those arguments.

BY MR. BROWNLIE:

Q. And what were those arguments in this case?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. Privileged.

MR. CIOSCHI: This is very tenuously connected to relevant evidence.

BY MR. BROWNLIE:

Q. Is it your understanding that Ms. Williams shared your reservations?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection. Who is Ms. Williams?

MR. BROWNLIE: Williamson.

MR. SKINNER: Are we talking personal?

MR. BROWNLIE: I'm asking what her understanding is.

Page 81

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. Privilege. Don't answer.

MR. BROWNLIE: What's the basis of the privilege?

MR. SKINNER: If you are asking for another assistant district attorney's mental impressions --

MR. BROWNLIE: I'm asking what her understanding is of Lori Williamson's position.

MR. SKINNER: In the abstract or in --

MR. BROWNLIE: Do you have an objection?

MR. SKINNER: Yeah. I've objected on the basis of privilege.

MR. BROWNLIE: What privilege?

MR. SKINNER: Sorry. Can you rephrase the question?

BY MR. BROWNLIE:

Q. What is your understanding, Ms. Nelson, of Lori Williamson's position concerning the concession?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. I mean, privilege, yeah, if you are asking about an opinion somebody in the office had, an attorney had, about a response that had not yet been filed, then that's privileged.
MR. BROWNLIE: We're going to take ten minutes. We're going to go off the record.
(Whereupon, a recess was taken.)
MR. BROWNLIE: So we took about 15 or 20 minutes, I think, maybe a little bit longer break.
So, Mr. Skinner, let me understand what the district attorney's position is. Is it the DAO's position that you are going to deliberative process privilege concerning any question I ask about her conversations with any member of the Philadelphia District Attorney's Office?
MR. SKINNER: If you are asking about conversations between the deponent and other members of the office that were deliberative about -- yes, I mean, if privilege applies, I'm going to assert it.
MR. BROWNLIE: And that's irrespective if it's predecisional and



deliberative?
MR. SKINNER: No. I mean, obviously I'm asserting the privilege within the confines of the privilege, but, you know, there's -- like when you talk about a decision, there's a lot of decisions that go along the way to making what you might see as a larger decision. So if you are deliberating before -- yeah, anyway, the privilege is what it is, and I'm asserting it.
MR. BROWNLIE: Are you going to direct her not to answer any question I ask concerning her conversations with Lori Williamson?
MR. SKINNER: If you are asking for the content of the conversations as it relates to this case or any other, then, yes.
MR. BROWNLIE: Are you going to direct her not to answer any questions concerning the substance of her conversations with Nancy Winkelman?
MR. SKINNER: Along the same parameters, then, yes. If you are asking about the content.
MR. BROWNLIE: And I'll ask the same question with respect to Katherine Ernst.
MR. SKINNER: Yes.



MR. BROWNLIE: David Napiorski?
MR. SKINNER: It would apply, yes.
MR. BROWNLIE: Every single assistant district attorney, including DA Krasner?
MR. SKINNER: Anyone who -- yes, I mean, really in the context of here -- we're talking about internal discussions that were, at their very core, deliberative. So if you are going to ask about any of those discussions, any of those participants, yes, I will assert the privilege.
MR. BROWNLIE: And the basis of that is deliberative process?
MR. SKINNER: Among other things. Among that and the work product.
MR. BROWNLIE: Then we're going to turn to a different area of inquiry, Ms. Nelson. We're likely going to be litigating that, so there's a potential that you are going to come back to answer those questions anyway.
We've provided copies to counsel before. I don't have any today.
I'm going to hand you today, Ms. Nelson, a copy of the concession brief.
MR. CIOSCHI: Can you direct me



where?
MR. BROWNLIE: I don't have a Bates for the one that I have. I have this one, but for other exhibits.
BY MR. BROWNLIE:
Q. So what I'm handing you, Ms. Nelson, is a copy of the District Attorney's Response to Petitions for post-conviction relief, what we will be colloquially referring to as the concession brief. And the attorneys on the cover are David Napiorski, Nancy Winkelman, and District Attorney Lawrence Krasner.
You see in the upper right-hand corner that it's time-stamped marked received by the Court on August 1, 2023?
A. Correct.
Q. The brief that you reviewed prior to your deposition today, was that also time-stamped?
A. Yes, I have the copy of the one that I reviewed. It's exactly the same thing, but I'm using the copy you handed me.
Q. Okay. Thank you.
And when about did you receive a draft of this concession brief?
A. I don't recall exactly when, maybe a

couple of weeks before it was filed.
Q. Did you participate in conversations concerning its substance?
A. The draft itself, as I said, only insofar as to look for factual inaccuracies.
Q. And you did nothing more than that?
A. Well, I don't know what you mean by substance. Like leading up -- of course, we talked about the case, but I was not involved in the drafting of this, but for --
Q. Were you --
A. -- what we talked about.
Q. My apologies.
Were you involved in the formulation of the Commonwealth's arguments?
A. No.
Q. Were you involved in the Commonwealth's decision to concede relief on the Brady claim?
A. I was involved only insofar as, you know, I was present in meetings where we discussed the case, but I was not responsible for making that decision, no.
Q. And when did you first learn that the Commonwealth was going to concede relief?



A. When Ms. Winkelman informed me of that via email.
Q. She sent you an email saying that the Commonwealth was going to concede?
A. I believe so.
Q. Did you have a reaction to that?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I mean, just about how the case would be moving forward.
BY MR. BROWNLIE:
Q. Were you expecting a concession?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: It was certainly a possibility.
BY MR. BROWNLIE:
Q. Were you aware that a concession was being considered under the circumstances?
A. Well, I think a concession is always being considered. You are always deciding whether or not you are going to concede or oppose relief.
Q. And when you learned from ADA Winkelman that the District Attorney's Office would be conceding, had you had any input in that



decision?
MR. SKINNER: Objection. Privilege.
BY MR. BROWNLIE:
Q. Had you ever expressed your views concerning whether or not that decision was supported by the record?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
You can answer.
THE WITNESS: I think I may have expressed an opinion that maybe a hearing was necessary, but I don't believe I expressed -- I shouldn't say necessary -- that that was a possible course of action. I don't believe I expressed an opinion on the ultimate conclusion as to whether we would oppose or concede relief.
BY MR. BROWNLIE:
Q. And you didn't express an opinion one way or the other, whether it was appropriate or inappropriate?
A. Not that I recall.
Q. Why did you think an evidentiary hearing was necessary under the circumstances?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection. Privilege.



MR. CIOSCHI: Also misstates testimony.
MR. BROWNLIE: You are directing her not to answer?
MR. SKINNER: Correct.
Don't answer.
BY MR. BROWNLIE:
Q. The decision to concede relief had been made prior to your receipt of the email by ADA Winkelman; correct?
A. Yes. In order for her to tell me that he was drafting a brief conceding relief, the decision would have had to been made.
Q. So I'm asking for your opinion post decision.
After you learned that ADA Winkelman and the district attorney's office was going to concede relief, what was your opinion concerning that decision?
MR. SKINNER: Objection. Privilege. I mean, if you asking --
MR. BROWNLIE: What privilege?
MR. SKINNER: It's still work product. I mean, if you are asking for work product that an attorney had, like mental

impressions about the strength of the case, and it's not what's being filed and like sent to the court, then privilege has not been waived. It's still privileged.

MR. BROWNLIE: So it's work product?

MR. SKINNER: Yes. Sorry.

BY MR. BROWNLIE:

Q. How long was the editing process for you from the time that you received the draft brief until it was ultimately filed?

A. I believe it was just a day or two. It was due in court soon after we received the draft.

Q. Did you think that was adequate time to review a post-conviction record of this size for factual accuracy?

A. Well, to say I reviewed the record, I had months to review the record.

Q. Yes.

A. So I already knew everything that was in the record. You know, I was given a very limited task here.

Q. I don't think you answered my question, ma'am.

Did you feel that that was enough



time?

A. It was the amount of time I had.

Q. So you stand behind the factual representations that were made in the concession brief?

MR. SKINNER: Objection. Relevance.

MR. BROWNLIE: You can answer.

THE WITNESS: I did not file this brief. My name is not on this brief.

BY MR. BROWNLIE:

Q. You reviewed it for factual accuracy; correct?

A. That was what I asked to do, correct.

Q. Do you stand behind your contributions to this concession brief?

MR. SKINNER: Objection. Relevance.

MR. BROWNLIE: You can answer.

THE WITNESS: Do I stand behind the recommendations I made? Sure. Is that not to say there are other things? I don't know. I am not the one who filed this brief. I didn't write this. I didn't draft this. My name is not on this.

BY MR. BROWNLIE:



Q. What was the process that you undertook to determine whether or not the factual representations in the concession brief were true and supported by the record?

MR. SKINNER: Objection. Asked and answered.

THE WITNESS: I think perhaps, when I'm being asked to review for factual accuracies, what I'm looking -- what I understood myself being asked to do is if, you know, the testimony said ten people testified and only eight people testified, that's something -- whether or not -- I was not asked whether or not I agreed with the arguments, if I agreed with what was in the brief. So, again, what I was asked to do, it was quite limited.

BY MR. BROWNLIE:

Q. So this brief, if you can turn to the Table of Contents, ma'am, there is a section of the brief, Factual Background and Procedural History that begins on page 4 and goes all way to 45, perhaps 46.

Was your review confined to that section of the brief?

A. I read the whole brief.



Q. I didn't ask if you read the whole brief; I asked if your review for factual accuracy was confined to the section labeled Factual Background and Procedural History?

A. No, I was asked to read the whole brief.

Q. So you checked the whole brief for factual accuracy?

A. Again, factual accuracy in a very narrow sense.

Q. What are you looking for when you are trying to determine whether or not a fact is accurate? Whether or not it is supported by the record?

A. Again, if someone's testimony is that the sky is blue and the brief says that they testified that the sky is green, I'm going to point that out as a factual inaccuracy.

Q. Or whether there was blood or wasn't blood on the Petitioner?

A. Perhaps, but I wasn't asked if all of the details, all of the facts made its way into its brief.

Q. Well, I didn't ask if all of the facts made their way into the brief. What I asked

Page 94

you was whether or not your task was to determine whether the representations made in this brief were true?

A. I don't think that's -- it depends on what you're talking about. I was not asked --

Q. It's a very simple question, ma'am. A fact is either true or it's not. So I don't understand the hedging.

So when I ask you what was your task, were you trying to determine whether a factual representation was supported by the record and true or whether or not a representation made by the drafter was inaccurate and not supported by the record?

MR. CIOSCHI: Objection to form.

THE WITNESS: I don't understand the difference between the two options you just said.

BY MR. BROWNLIE:

Q. You don't understand the difference between a true and a false fact?

MR. SKINNER: Objection.

THE WITNESS: I certainly understand the difference between something that's true and false. I don't understand your question.

MR. SKINNER: Perhaps could you

Page 95

rephrase, Counsel?

MR. BROWNLIE: Sure.

BY MR. BROWNLIE:

Q. If there is a factual misrepresentation in this brief, you would have been aware of it considering your knowledge of the record?

A. It's possible I could have missed something, sure. I mean, it's possible I missed something. I would have pointed out the things I was aware of. I don't recall what those things were or were not.

Q. But you did memorialize those things in an email to Nancy Winkelman?

A. Yes, and Mr. Napiorski and I believe Ms. Williamson would have been on the email chain.

Q. Were you concerned with the number of misrepresentations that you discovered?

MR. SKINNER: Objection. Privilege. Work product.

Don't answer, sorry.

BY MR. BROWNLIE:

Q. Roughly how many misrepresentations did you discover in the brief drafted by David Napiorski, Katherine Ernst, and Nancy Winkelman?

Page 96

A. Well, first of all, I don't think I characterized anything as a misrepresentation. I don't remember how many things I pointed out. Both Ms. Williamson and I provided a list of things that we both noticed.

Q. Was it a single list or was it two separate lists; one by you and one by Ms. Williamson?

A. Two separate lists.

Q. Did you review Ms. Williamson's list before it was sent -- excuse me, I'm assuming a fact.

Did Lori Williamson send her list to Ms. Winkelman, as well?

A. Yes.

Q. Were you covered on that email?

A. Yes.

Q. And you had an opportunity to review Ms. Williamson's list?

A. I reviewed her list and then, in fact, sent my list after and deliberately didn't duplicate anything she had in there to be expedient.

Q. So there was a list of misrepresentations --

Page 97

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

BY MR. BROWNLIE:

Q. What was the list composed of?

A. I don't recall specifically what it was composed of.

Q. I'm not asking for specifics.

Was it factual inaccuracies? Were they lies? Were they misstatements of the record? Were they --

MR. SKINNER: Objection.

BY MR. BROWNLIE:

Q. -- facts not supported by the record? What exactly were you listing out for Ms. Winkelman?

MR. SKINNER: I would object and, you know, I would object based on privilege, too, to the extent that you are inquiring like what the content of this piece of attorney work product says.

So don't answer.

MR. CIOSCHI: I'll object on form grounds.

BY MR. BROWNLIE:

Q. What was the ultimate basis upon

Page 98

which the District Attorney's Office conceded relief?
A. It was on a Brady claim.
Q. How many?
A. Well, I mean, there's certainly like a cumulative analysis that goes into this. I believe there was several documents. It's my understanding the brief also talks about the cumulative effect of those documents.
Q. I apologize. That was not a good question.
How many documents were allegedly withheld?
A. I would have to rereview to know the exact number.
Q. Okay. And that's fine.
What is your understanding -- did you conduct your investigation with Mr. Napiorski or alongside him? In other words, did you review these together?
A. No. I would say we both -- I would actually say we both independently conducted an investigation.
Q. So you are not aware of the extent or scope of Mr. Napiorski's review of the

Page 99

underlying case?
A. I cannot speak to what he did or didn't do, no.
Q. So you would have no reason to question whether or not Mr. Napiorski's review of the record was thorough?
MR. CIOSCHI: Objection to form.
BY MR. BROWNLIE:
Q. You don't couldn't tell one way or the other?
MR. CIOSCHI: Objection to form.
THE WITNESS: Yeah, I don't know what his investigation was.
BY MR. BROWNLIE:
Q. There were missing files in this case, were there not?
A. Correct.
Q. What was missing?
A. Well, the homicide file and then there was a district attorney -- I believe there was one box that also cannot be located.
Q. Can you please turn to page 55 of the brief, ma'am.
A. I'm there.
Q. Footnote 27.

Page 100

A. Yes.
Q. Can you read that to yourself, please.
A. Okay.
Q. And you didn't draft that?
A. No.
Q. Did you edit that at all during your review as assigned by Ms. Winkelman?
A. I read it. I don't remember whether or not that's something I provided a note on.
Q. Do you recall generally that in addition to the missing DAO boxes that the original trial counsel for Mr. Ramirez was also missing files?
A. I may have been informed of that. I did not speak to Mr. McMahon, so I believe I knew that, but I don't know for sure.
Q. And I believe you testified earlier that you were aware that the H file was also missing?
A. Correct.
Q. So in the context of circumstances that the district attorney's office is missing files, the original trial counsel for Mr. Ramirez is missing files, and the H file cannot be

Page 101

located, do you have a opinion personally one way or the other whether or not it is appropriate to concede that certain evidence has not been produced?
MR. CIOSCHI: Objection to form.
MR. SKINNER: Objection. Relevance.
THE WITNESS: You can only review the claims based on the evidence in the record that you have to review. And we have the question of suppression, you know, you can't just -- you can only review what exists and what we have access to.
BY MR. BROWNLIE:
Q. Are you more reserved to concede relief on a Brady claim without access to the full universe of evidence?
MR. CIOSCHI: Objection. Form.
MR. SKINNER: Objection. Relevance.
THE WITNESS: We have to answer these claims based on the universe of what we have. There's nothing I can do to go back in time and find a box. So we have to answer these claims based on the records before us.
BY MR. BROWNLIE:
Q. Correct. If there's missing files,

there's a possibility that the evidence that was allegedly suppressed is in those missing files; correct?
A. Certainly.
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:
Q. So when you say that you have to respond on a petition based on the record that you have, you have to respond to the petition, but the district attorney does not have to concede relief --
A. No, but --
MR. CIOSCHI: Objection to form.
BY MR. BROWNLIE:
Q. -- correct?
A. That's correct.
MR. BROWNLIE: I'm going to cut to the chase here with respect to the individual documents that the district attorney conceded or suppressed and I'm just going to ask your knowledge about whether or not Detective Worrell possessed any of them.
To your knowledge, based off of your records and your participation in the



post-conviction litigation, do you have any knowledge about whether or not Detective Worrell personally possessed the activity sheet dated February 21st of 1995?
A. I can't know that.
Q. Same question with respect to the activity sheet dated February 22, 1995?
A. I can't know that.
Q. The activity sheet dated February 23, 1995?
A. I can't know that.
Q. The activity sheet dated March 1, 1995?
A. Same answer.
Q. The activity sheet dated March 2, 1995?
A. I don't know.
Q. The activity sheet dated May 16, 1995?
A. I don't know.
Q. Handwritten notes concerning TA Dennis and Nathaniel Rodriguez?
A. Without knowing the author of the note, no, I can't know that.
Q. Do you recall ever knowing the



author of the note?
A. I don't recall if that's something I knew or not.
Q. The document Form 75328 concerning the Office of the Medical Examiner Investigator Suplee concerning findings of profuse bleeding by the decedent?
A. Whether or not Detective Worrell had that, no, I can't know that.
Q. The ATF Operational Plan?
A. I don't know.
Q. The grand jury transcripts concerning Detective Hoffner's testimony on September 19, 1995?
A. Well, presumably he wouldn't have access to grand jury testimony, but I can't know.
Q. The district attorney's office memorandum dated July 14, 1995, from ADA Fairman to Deputy of Investigations Connor?
A. I don't know.
Q. And the stipulations drafted by Patricia Cummings in the Commonwealth versus Veasy matter concerning alleged misconduct against my client?
A. I don't know.



Q. So my understanding is you have no information about whether or not Detective Worrel at any time had access or possession to these documents?
MR. CIOSCHI: Objection to form.
THE WITNESS: No, I can't know that.
BY MR. BROWNLIE:
Q. Thank you.
Can I ask you to turn to page 2, ma'am?
And if you wouldn't mind reading, please, the paragraph beginning "After careful review of the record..."
A. Okay.
Q. You'll see, ma'am, the sentence about two-thirds of the way down, it begins, "if the jury"...
A. Yes.
Q. I'll read for the record, "If the jury had been told of additional evidence supporting Ramirez's arguments, from evidence of a bloody struggle (when there was no blood on Ramirez) to evidence of alternative suspects to evidence that would have impeached the credibility of key prosecution witnesses, there exists a

Page 106

reasonable probability that the result of the trial would have been different."

I'm going to hand you what's been previously marked as Defense Exhibit 2. I'm going to ask you to read this statement to yourself.

MR. BROWNLIE: Copies for counsel.

MR. CIOSCHI: Thank you, Josh.

THE WITNESS: Okay.

BY MR. BROWNLIE:

Q. Can I ask you to turn to page -- it's 287 at the Bates stamp, but the number above that is 120.

A. You only handed me 2 -- oh, I don't have 287.

Q. I'm sorry, 2782. My apologies.

A. Okay.

Q. And the third question down -- for the record, it says: "Showed PPN 77028, Edward Ramirez.

Answer: Yeah, that's Jerk."

Do you understand that to be Kristine Smith identifying Edward Ramirez as Jerk?

A. Yes.

Q. Had you read this statement prior to today?

Page 107

A. I have no -- I recall some -- I don't recall specifically, but if it was in the file, I would have read it.

Q. What information do you recall from this statement?

A. I mean, I recall the descriptions of what happened at the party and things like that.

Q. In the context of the concession brief, there is a representation here to ultimately Judge DiClaudio, that there was no blood on Ramirez; correct?

A. I see that.

Q. And in this statement by Kristine Smith, if you turn, ma'am, to 117 or 2779.

A. Yes.

Q. About three-quarters of the way down in the middle of the sentence it begins, "and when he..."?

A. Yes.

Q. And Kristine Smith is informing the detectives "and when he turned around he was shaking his hands to dry them, and when he turned around, I saw a big spot of blood on Jerk's shirt."

A. Yes.

Page 108

Q. Did I read that correctly?

A. Yes.

Q. Did you come across that factual misrepresentation in your review of the concession brief?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: Again, I don't specifically recall what I did and did not note. I have a vague memory that I did note something about blood on a boot in my response to the factual inaccuracies. I don't recall whether or not I mentioned this. And I also can't recall whether or not this testimony was introduced at trial, which is certainly, you know, something, you know, a part of how we review the claims is what was introduced at trial.

BY MR. BROWNLIE:

Q. Do you understand a Brady materiality analysis to be constrained solely to the presentation of evidence at trial?

A. Not solely, but insofar as you are determining whether there's a reasonable probability of a different outcome, you have to consider what evidence the jury heard. If there's

Page 109

a confession that the jury never heard, you know, that's very different. So I don't recall whether or not this was introduced at trial --

Q. And a cumulative --

A. -- or she testified at trial, I should say.

Q. And a cumulative error analysis also incorporates evidence that the jury did not hear?

MR. SKINNER: Was there a question?

MR. BROWNLIE: That was a question.

MR. CIOSCHI: Objection.

THE WITNESS: Insofar as you are asking whether or not there would be a different outcome at the trial that happened, you consider the evidence that was introduced at trial. But, certainly, when I'm evaluating the case as a whole, I am evaluating all of the evidence.

BY MR. BROWNLIE:

Q. And that's from a legal perspective, correct, under the substantive standards of the Brady analysis?

MR. CIOSCHI: Objection.

THE WITNESS: Yes.

BY MR. BROWNLIE:

Q. Attorneys have common ethical duties

not to misrepresent facts to courts; correct?
A. Correct.
Q. So when the district attorney's office made a representation to Judge DiClaudio in its concession brief that there was no blood on Ramirez, that was, at the very least, a violation of an attorney's ethical responsibilities?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I don't think that's for me to opine on that. If that is what happened, then sure.
BY MR. BROWNLIE:
Q. Would you have put it in the brief?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I mean, I don't know if I would have phrased it like this because I certainly -- I believe I pointed out about the drops of blood on the boot at the very least, and, again, I may have pointed this out. So I can't say that I would have phrased it like this, but I didn't write this brief, and, again, I'm not the one who filed this brief.
BY MR. BROWNLIE:



Q. And I will summarize for you that the testimony concerning the boot was with respect to another suspect, not with respect to Mr. Ramirez. Counsel can correct me if I'm wrong on that, but that's my understanding of the record.
A. I would have known that then, what my knowledge is now.
Q. So with respect to the assertion to Judge DiClaudio that there was no blood on Ramirez, that was a factual assertion that was not supported by the record?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I think there are two things to think about here, whether or not there was evidence at trial of that in the record. So I don't think it's for me to opine on what is and is not, as you put it, a misrepresentation.
BY MR. BROWNLIE:
Q. You are a licensed attorney in the Commonwealth of Pennsylvania?
A. Yes.
Q. And you don't think telling a court that there was no blood on a person is a



misrepresentation when you have a statement from a third-party witness that says that they saw a big spot of blood on him the night of the murder?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: It is possibly a misrepresentation.
MR. BROWNLIE: Thank you.
BY MR. BROWNLIE:
Q. There are allegations in this case of police coersion.
You would agree?
A. I believe that was one of the claims, yes.
Q. But that was not the ultimate claim upon which the District Attorney conceded relief?
A. Yes.
Q. What efforts did you undertake to investigate the claims of coercion?
A. I guess I would need you to be more specific about like what pieces of the claim you are talking about and things.
Q. Did you, during your time investigating the Ramirez case, ever follow up on any allegation of coersion of a third-party



witness?
MR. CIOSCHI: Objection.
THE WITNESS: If you mean by follow up, did I speak to the witness? No.
BY MR. BROWNLIE:
Q. Did you do anything to either corroborate or invalidate the claims of coercion?
MR. CIOSCHI: Object to form.
THE WITNESS: No.
BY MR. BROWNLIE:
Q. Are allegations of coersion material in the Brady context?
A. That's a very general question. It could be.
Q. Were they material in this case?
A. I mean, I would --
MR. SKINNER: Yeah, I'm going to object. To the extent that you are asking about her professional opinion, that is not something that was represented by the office if the brief, like if it's a work product opinion she has about the strength of the case or whatever. You are asking her about that -- sorry, objection.
Don't answer.
MR. BROWNLIE: Can you read that

back, please?

(Whereupon, the requested portion of the record was read.)

BY MR. BROWNLIE:

Q. Were the allegations of coercion material to your analysis in this case?

A. An allegation of coercion would not form my basis of a concession until I had spoken to that witness or there had been a hearing. So those allegations for me personally did not carry any weight.

Q. Because you as a reasonable, prudent, and diligent attorney would follow up on those allegations of coercion to investigate whether or not they were truthful; correct?

A. I mean, I cannot opine whether or not they are truthful until I investigate or speak with the witness or whatever the case may be.

Q. So you would follow up with them?

A. If that was going to form the basis for relief in a case, you know, sure, yes -- or I want to be clear. I don't necessarily -- maybe there would be a hearing. It's not that I would necessarily speak to them like on my own. Follow up can mean different things.



Q. Correct. But have you ever put a witness up in the PCRA context without first having to interview them first?

A. I have not put a witness of my own up. Have I crossed-examined defense witnesses without speaking to them? Certainly.

Q. So would you undertake that same level of diligence in investigating allegations of coercion if you were going to use it as persuasive argument in a concession brief?

MR. CIOSCHI: Objection to form.

THE WITNESS: Insofar as I could not opine on whether or not the allegation is to be believed. Whether or not that is discussed in the brief, I guess is difficult to say. It would depend on the context.

BY MR. BROWNLIE:

Q. Would you as a licensed professional not include allegations of coercion in a brief that you had not vetted?

MR. CIOSCHI: Objection to form.

MR. SKINNER: Objection.

THE WITNESS: I think -- could you rephrase that? There's like a double negative and I'm a little confused.



BY MR. BROWNLIE:

Q. Sure. You personally would include allegations of coercion in a brief whether for context or merit on a PCRA claim only if you vetted those allegations?

A. Well, I might include the fact that they had happened, but whether or not they are to be believed, I can't say.

Q. And how do you make that differentiation in a filing before the court?

MR. SKINNER: Objection.

THE WITNESS: I mean, if I personally was writing, it would say the petitioner or the defendant alleges or the witness alleges or states, something to that effect.

BY MR. BROWNLIE:

Q. What's your understanding of the relationship between the law department and the Conviction Integrity Unit?

A. Do you mean the Law Division and the Conviction Integrity Unit?

Q. Yes, excuse me, division.

A. I mean, they are both units within the office. I don't know the relationship between them.



Q. Are you sharing information concerning cases that you are reviewing?

A. At times, cases are transferred between the units. You may share information about the procedural status about the case. Typically speaking, the Conviction Integrity Unit does not, as a matter of practice, necessarily share the details of their investigation if they transfer a case back to the law division or the PCRA unit.

Q. Do you know why that is?

A. I can't speak to that.

Q. Have you ever been told why the CIU does not disclose its investigative finding to a coordinate department in the District Attorney's Office?

MR. CIOSCHI: Objection to form --

MR. SKINNER: Objection.

MR. CIOSCHI: -- and also assumes facts not in evidence.

THE WITNESS: No.

BY MR. BROWNLIE:

Q. Do you think it would be beneficial to have a more robust record in the district attorney's office to fully inform yourself before

Page 118

responding to post-conviction claims?
MR. CIOSCHI: Objection to form.
THE WITNESS: As an attorney, I'm always going to do an independent investigation myself. So I can't say whether it would be beneficial without knowing what they would be telling me.
BY MR. BROWNLIE:
Q. And you can't know what they would be telling you without access to the information; correct?
MR. CIOSCHI: Objection to form.
MR. SKINNER: Objection to form.
THE WITNESS: Correct.
BY MR. BROWNLIE:
Q. Can you turn to page 15 of the brief. And footnote 6, could you read that, please?
A. I've read it.
Q. This was an instance in which the Conviction Integrity Unit shared information with the law unit; correct?
A. You mean in reference to the footnote?
Q. In reference to the Veasy

Page 119

stipulations?
A. Well, I believe they filed something publicly.
Q. How did you become aware of the Veasy stipulations?
A. I may have been aware of it before this case. It's a case that I'm aware of what has happened in the case and have reviewed the filings by the Conviction Integrity Unit before.
Q. For what purposes?
A. Well, very often there are claims raised in relation to the stipulations in that case. So in connection to, you know, both this petition and others. I don't recall whether or not this was the first time I would have reviewed it or I have in previous cases.
Q. So is it your testimony today that you referred to the Veasy stipulations in other cases concerning -- strike that.
What specifically in the Veasy stipulations are you looking to when you are referencing them for other cases?
A. Well, it would depend on what the case is and what the claim is and what the arguments being made by the petitioner or

Page 120

defendant are about the case.
Q. Because Willie Veasy stipulations are relevant in every single PCRA case that comes to the District Attorney's Office.
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: No, that's --
MR. CIOSCHI: Argumentative.
THE WITNESS: I didn't say that. It's possible there have been other cases that cite to this have been raised. I don't recall for sure.
BY MR. BROWNLIE:
Q. How many times have you read these stipulations?
A. I can't say.
Q. Did you read them prior to your involvement in the Ramirez matter?
A. I have no independent recollection, but I'm sure I would have.
Q. This, what I'm handing you, ma'am, is previously marked as Defense Exhibit 10.
MR. BROWNLIE: Does everyone have a copy?
MR. CIOSCHI: Yeah, I got one, Josh.

Page 121

Thank you.
BY MR. BROWNLIE:
Q. If you could, ma'am, turn to page 7 and read to yourself paragraphs 46 through 57.
A. Okay.
Q. And you've read this before?
A. I'm sure I have.
Q. What is this section?
A. Well, the document as a whole is joint stipulations of fact filed in the Veasy matter.
Q. And it's signed by Assistant District Attorney Patricia Cummings; correct?
A. Yes, alongside what I would assume are attorneys for Mr. Veasy.
Q. Have you used stipulations in your own work?
A. I believe so.
Q. In what context?
A. In the context of hearings very often you stipulate to facts. I believe there may be one resolution of a PCRA case in which I used -- involved stipulations, but primarily in the hearing context.
Q. And have you participated in a

Page 122

concession outside of the Edward Ramirez matter -- other than, excuse me.
A. If by concession you mean recommending that a court grant PCRA relief, then, yes.
Q. Which cases?
A. The cases named Mark Young; Garnet Smith; Andrea Harvey and Russell Williams, whom are co-defendants; Tira Kornegay, I believe is spelled, K-O-R-N-E-G-A-Y.
Q. Thank you.
A. There may be a few others, but off the top of my head -- I don't believe that's a complete list, but I would have to check my records if I'm missing any.
Q. Could you estimate how many more? Less than five?
A. Less than five more.
Q. So that's about one PCRA concession a year.
Is that a fair representation?
A. I mean, if the timeline works out that way, but sure.
Q. Are these in chronological order, to the best of your knowledge?

Page 123

A. No.
Q. What was your first concession?
A. I believe the first case I worked on the Tira Kornegay matter and I was working with Mr. George on that case. It has been reassigned to me from another ADA. I believe that would be the first one.
Q. And the Harvey and Williams matter. Are those the co-defendants cases?
A. Yes.
Q. Did Mr. George also supervise those cases?
A. Yes.
Q. And the Garnet Smith?
A. Yes.
Q. And the Mark Young?
A. Yes, he would have been involved. He wasn't the only one involved, but, yes.
Q. And those were concessions by the District Attorney's PCRA unit, not the Federal Litigation Unit?
A. Correct.
Q. Do you have a general opinion -- well, strike that.
With respect to the stipulations in

Page 124

Veasy --
A. I'd like to add one more thing.
Q. Sure.
A. By concessions meaning PCRA relief is granted, each of those cases resulted in an immediate plea to lesser charges or different charges.
Q. In all of those cases, did the defendant leave prison on time-served sentences?
A. Many, I don't know if all.
Q. The majority?
A. Sure.
Q. Did you use stipulations in those cases?
A. I believe the only one stipulations was used in was Garnet Smith at the request of the judge.
Q. And which judge was that?
A. Judge Jennifer Schultz.
Q. And those were factual stipulations?
A. Yes.
Q. I only ask because earlier on you had noted that at some point or another you had stipulated to -- I don't know if it was conclusions of law or law?

Page 125

A. I don't believe I noted that and I would not stipulate to a conclusion. I can't do that.
Q. Right. Okay. Did you review the Veasy stipulations as part of your fact-checking the concession brief in the Ramirez matter?
A. I don't know if I would say in connection. I have no independent memory of when I did, but I'm certain I would have read this and I had likely already read it prior to being assigned to this matter.
Q. Have you worked on any other cases where there were allegations against my client, Detective Worrell?
A. I don't believe so.
Q. So why would --
A. It's possible, but I...
Q. So why would you have read the Veasy stipulations prior to their citation in the Ramirez concession brief?
A. Because Detective Worrell is not the only detective mentioned in these.
Q. What other cases have you reviewed concerning allegations against Detective Martin Devlin?

Page 126

MR. SKINNER: Objection.
THE WITNESS: I don't know specifically.
BY MR. BROWNLIE:
Q. More than one?
A. It's difficult for me to say because cases I'm assigned to versus now being a supervisor various claims are discussed with me. So certainly they have come up in cases, but I don't know specifically what cases or how many.
Q. So are you still citing these stipulations in the Commonwealth's response to PCRA petitions?
A. I guess I don't know what you mean by citing. Very often these are proffered by the defense as evidence of misconduct on the part of the detectives. And how they are spoken about in the response would depend on the case.
Q. Have you ever opposed the representations made in these stipulations?
A. I don't know anything about the underlying facts in this case.
Q. That's where we're going.
These are, in fact, not stipulations when they are cited as evidence in support of a

Page 127

post-conviction petition in any case other than the Veasy litigation; correct?
A. Yes.
Q. So when a petitioner appends these stipulations to their petition, the district attorney's office should be treating them as they would any other documentary evidence cited in support of a post-conviction claim?
MR. CIOSCHI: Objection to form.
THE WITNESS: And I don't know what you mean by should be treating them. What role or weight these play on a case is very case dependent. It's -- I believe these are part of a Brady/Giglio disclosure packet. I don't know for sure, but I suspect that's true. So I guess I don't know what you mean by should it be treated. They are stipulations of fact.
BY MR. BROWNLIE:
Q. In the Veasy matter?
A. In the Veasy matter. I don't know whether or not a judge later then said I find these facts to be, you know -- I would have to rereview the record and things like that.
Q. So if you were provided these stipulations in support of a post-conviction

Page 128

petition, you would have an ethical obligation to vet the accuracy of the representations made within them?
MR. CIOSCHI: Objection to form.
BY MR. BROWNLIE:
Q. Because they are not stipulations in any other case other than the Veasy litigation?
MR. CIOSCHI: Objection to form. Objection also to substance.
MR. SKINNER: Objection.
THE WITNESS: I don't know about the facts. All I know is that this is something that someone filed and it's cited to very often by PCRA petitioners.
BY MR. BROWNLIE:
Q. So when these stipulations were cited in the Ramirez matter at Footnote 6, and I'll read for the record: "The Commonwealth has previously stipulated that the detective who took Ramirez's statement, Detective Paul Worrell, engaged in a pattern and practice of eliciting false statements from witnesses dating back to at least 1992." And then there's a citation to the Willie Veasy docket and to the joint stipulations, paragraphs 46 through 57, and the footnote

Page 129

concludes: "The court there granted Veasy relief."
When you read these stipulations, did you undertake an independent investigation as to whether the representations made at paragraphs 46 through 57 were true?
A. No. That would have not been in the gambit of what I was working on in this case.
Q. I'm not sure I understand your answer.
A. No, I did not do that.
Q. What do you know about the Anthony Wright case, the criminal prosecution and the post-conviction proceeding?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
THE WITNESS: I don't recall necessarily anything off the top of my head. It's a name that is familiar to me. It's obviously discussed in what we just read, but I have no personal involvement in that.
BY MR. BROWNLIE:
Q. You are aware that your office prosecuted Martin Devlin for his involvement in the Anthony Wright prosecution?

A. I know he was prosecuted. That sounds correct to me. Again, I have no involvement in that.
Q. And you are aware that Martin Devlin was acquitted on all charges, including the allegation that he had coerced a confession from Anthony Wright?
A. I don't know what the charges were, but I do know that he was acquitted.
Q. So the only time that that allegation was put to a fact finder, they actually found in favor of the detective and not Anthony Wright?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I don't know if it's been put to a fact finder in another --
MR. BROWNLIE: I'll tell you it hasn't been.
THE WITNESS -- context or not.
MR. CIOSCHI: Objection.
THE WITNESS: I don't know.
BY MR. BROWNLIE:
Q. What do you know about the matter of Commonwealth versus Tonez?



A. Can you spell that?
Q. Yes, it's T-O-N-E-Z.
A. That's not familiar to me.
Q. And you didn't undertake an investigation as to Detective Worrell's alleged involvement in the Carl Tonez matter?
A. No.
Q. What do you know about the matter of Commonwealth versus Jack Jones?
A. It's a name that's familiar to me. I may have read pleadings with it. I don't -- I have no involvement in that and I don't recall that sitting here today.
Q. And your review of the pleadings in that case was not in connection with the Ramirez matter?
A. I don't recall. I just know it's familiar to me.
Q. And the Shaurn Thomas matter?
A. Again, a name that's familiar to me. I may have reviewed pleading. I don't know in connection with what and I don't have any independent memory of what is in those pleadings.
Q. And you are aware that the district attorney's office conceded relief in the Shaurn



Thomas matter and then he murdered another person --
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
BY MR. BROWNLIE:
Q. -- after he got out of prison?
A. I believe that's something -- I believe, so I know that, yes.
Q. So I understand your testimony to be today that you did not independently investigate any allegations Detective Worrell cited in the Veasy stipulations; is that correct?
A. That's correct.
Q. Have you ever heard the name Brian O'Leary?
A. I don't believe so.
Q. Not in connection with any PCRA claims or?
A. It's possible. I would need more context.
Q. He's a very famous author of post-conviction affidavits.
MR. CIOSCHI: Objection. Josh, please.
THE WITNESS: No, that doesn't sound



familiar to me.
BY MR. BROWNLIE:
Q. Did you have any conversations with Mark Gilsen in connection with your investigation into the Ramirez matter?
A. I know Mr. Napiorski reached out to him. I believe Mr. Gilsen responded via email and that was shown to me, but I -- it -- Mr. Napiorski was the one who was asked or would be the one to speak with Mr. Gilsen, so I did not.
(Soto voce conversation.)
MR. BROWNLIE: And, just for the record, I asked my paralegal if he recalled seeing that email and he said no.
BY MR. BROWNLIE:
Q. Did you talk to any of the participants in the underlying prosecution, be they third-party witnesses, attorneys, investigators, anyone?
A. No.
Q. Was your review strictly documentary?
A. At the time my work in the case concluded, yes.
Q. Would you -- strike that.

I'm going to transition to a different area. Ms. Nelson, would you like a break?
A. I'm fine.
MR. BROWNLIE: Counsel?
MR. CIOSCHI: No.
Let's go off the record for just a moment.
(Whereupon, a discussion was held off the record.)
THE WITNESS: If we're back on the record, given what was discussed, I would like to clarify that the email I was referring to is the email between Mr. Napiorski and Mr. Gilsen.
MR. BROWNLIE: Okay. Thank you.
BY MR. BROWNLIE:
Q. What's your understanding of the procedure, practice, process, whatever, of how the district attorney ultimately comes to a decision about how his office will respond to post-conviction claims?
MR. SKINNER: I'll just object, again, to the extent for privileged discussions, the content, but if you can answer without revealing any --



MR. BROWNLIE: I'm asking about policies and practices.
THE WITNESS: It's a very broad question. Like our practices are to investigate the claims, review everything there is to review and come to a conclusion. And whom is involved in that decision, depends on the case.
BY MR. BROWNLIE:
Q. Is the collusion the result of collaboration amongst supervisors and assistant supervisors and line ADAs in a particular unit?
A. I can only speak to what happens in the PCRA unit, but nothing is filed in the PCRA unit without either a supervisor or what we would call now a team leader having reviewed it.
Q. And does the supervisor and the assistant supervisor of the Law Division also review it before it's filed?
A. Not every --
MR. CIOSCHI: Objection. Form.
THE WITNESS: -- filing, no.
BY MR. BROWNLIE:
Q. What's your understanding of the Sentencing Review Committee?
A. It's a committee that meets to



discuss cases for various purposes, sometimes cases where relief has already been granted by a judge, perhaps over our objection and we are deciding what to do. Deciding cases as to what our position will be. It serves various functions.
Q. Have you ever attended an SRC meeting?
A. Yes.
Q. Have you attended an SRC meeting in connection with your work on the Ramirez matter?
A. I don't believe it ever was presented to the Sentencing Review Committee. I certainly was not present at a meeting in which I it was.
Q. I will tell you that Nancy Winkelman and Katherine Ernst both testified that it was presented to the SRC no less than twice.
A. Okay. That may be true. I wasn't there.
Q. Were you aware that it had been put before the SRC?
A. I was aware that it was discussed with the DA. Whether or not that was at a formal SRC meeting or not, I don't know. Perhaps I



assumed that it was independent of the SRC. But I knew the DA had been involved in conversations about the case.
Q. And I think you testified earlier that you worked closely with Mr. George or more closely with Mr. George than Ms. Winkelman?
MR. CIOSCHI: Objection to form.
THE WITNESS: Yeah. By "more closely," he was just involved in our cases more, yes.
BY MR. BROWNLIE:
Q. Did he ever, as part of his preparation of documents for the SRC review, elicit your opinion on a case?
MR. CIOSCHI: Objection. Assumes facts not in evidence.
MR. SKINNER: Yeah, objection.
THE WITNESS: I mean, certainly part of the SRC process might result in me giving my opinion on the case. I don't know if Paul is necessarily the one who solicited it, but that could have happened, sure.
MR. BROWNLIE: I'm going to mark this next exhibit -- I think we're on 12.
MS. HAYES: We're on 14.

Page 138

(Nelson Exhibit 14, Transcript of Attorney Discipline Hearing, was marked for identification.)

BY MR. BROWNLIE:

Q. These are transcripts from an evidentiary hearing in the Wharton matter.

Are you familiar with the Wharton matter in the Eastern District of Pennsylvania in the Third Circuit, Ms. Nelson?

A. I'm generally familiar. I have never reviewed these transcripts, but, yes.

Q. Sure. And what's your understanding of the Wharton matter?

A. It's a matter that involved federal habeas. I don't know whether or not there were also PCRA elements to it. It involved the death penalty. I know it was a case handled by our office, I believe Mr. George and Ms. Winkelman, perhaps other attorneys, as well. Everything I know about the matter would be just what I have read in the news, so to speak.

Q. And what do you know to be the result of those proceedings?

A. Well, I don't know if you are asking me the result of those proceedings or if you are

Page 139

asking a different question about Mr. George and Ms. Winkelman.

Q. I'm asking the proceedings.

A. The Wharton matter --

Q. I'm not hedging, Ms. Nelson.

A. No, but I just want to answer your question. I believe the Wharton matter -- I don't recall -- I don't believe the death penalty was overturned. That, I don't know. And I believe there may still be ongoing litigation, whether federal habeas or PCRA. In fact, I do believe he has a pending PCRA. At one point I was asked to keep an eye on what was happening with that PCRA. I'm no longer doing that and I cannot speak to that, but I believe his matters are ongoing.

Q. Do you understand that the habeas matter was -- that Judge Goldberg rejected a concession from Ms. Winkelman and Mr. George in that matter?

A. Yes. As to the capital nature of the case.

Q. And you referenced earlier on litigation concerning Mr. George and Ms. Winkelman.

What were you referring to?

Page 140

A. Mr. George and Ms. Winkelman have faced disciplinary sanctions, as I understand it, in connection to that matter by the federal courts.

Q. How did you come to learn that?

A. I came to learn of that concerning Mr. George. There was a meeting announcing that news would be breaking that he had been disbarred federally. And then I believe I learned about Ms. Winkelman just in the press.

Q. So you learned that Mr. George had been disbarred and that there would be a press release about it?

A. Not that there would be a press release about it, but that there was going to be information coming out that that had happened. I don't know if there was a press release about it or not.

Q. You understand that his disciplinary proceedings were filed under seal?

A. That's my understanding.

Q. And that there was an allegedly inadvertent disclosure of the order disbarring him and the report of recommendation to that effect when Mr. Rudovsky filed his concise summary in the

Page 141

case in the Third Circuit?

MR. CIOSCHI: Objection to form.

MR. SKINNER: Objection.

MR. CIOSCHI: Sorry, I'm lost.

THE WITNESS: I knew that there was an inadvertent disclosure. I didn't know why or --

BY MR. BROWNLIE:

Q. But you didn't -- I apologize.

A. I don't think it's fair to say I had advanced notice of it. I think at that point when we were being told it must have -- the disclosure must have already been made.

BY MR. BROWNLIE:

Q. So not that press release was forthcoming, but that news had come out that Mr. George had been disbarred for lying to Judge Goldberg?

A. That he would be disbarred, yes.

Q. As part of the public record -- now public record, are transcripts from evidentiary hearings that the Eastern District convened after the Third Circuit affirmed Judge Goldberg's Rule 11 sanctions?

Do you believe that to be the general

Page 142

process?
A. I'm not sure of the federal terminology, but, sure, that sounds correct.
Q. And Mr. George testified. And I want to ask you some practices questions concerning the substance of his testimony. If you could, ma'am, turn to page 10.
A. Okay.
Q. And I'm going to ask you to read line 11 through 21.
A. Okay.
Q. Is it your understanding that notwithstanding the fact that there were separate units in the Law Division that there would be collaboration between the departments on a single case?
MR. CIOSCHI: Object to form. I'm sorry.
MR. SKINNER: Yeah.
THE WITNESS: I mean, there could be collaboration, sure. It would depend on the circumstances.
BY MR. BROWNLIE:
Q. For instance, in the Ramirez matter, he had pending PCRA claims. He filed a federal

Page 143

habeas petition. The petition -- the federal litigation was stayed for purposes of state exhaustion.
Under those circumstances, there could be collaboration between the Federal Litigation Unit and the PCRA unit; correct?
A. Certainly so and clearly there was here.
Q. Right. In the Ramirez matter; correct?
A. Yes.
Q. If I could ask you to turn to page 13. I'm going to ask you to read from line 13 to 16 of the next page.
A. Okay.
Q. Is Mr. George's testimony here consistent with your understanding of the Sentencing Review Committee and the capital case review committee?
A. I was never involved in a capital case review committee. I can't speak to that at all.
Q. Is it your understanding -- well, let me just ask: Are there two separate committees or is the sentencing committee the

Page 144

capital case review committee?
A. I can't speak to that. I believe at some point there was something called capital something or another. That was before my time in the office nor have I ever encountered a case in which that --
Q. Do you --
A. -- came up.
Q. Sorry. You trail off and I interject. My apologies.
Do you have any knowledge of the SRC ever discussing a capital case?
A. I'm sure it's possible. And there are many ways a capital case can come out. A case that was formerly capital, a case that was still capital. So I'm certain I may have discussed cases that were formerly capital cases, but are no longer for whatever reason.
Q. And if you could read, please, from 17 to 12 of the next page.
A. Of what page?
Q. Page 14, line 17; page 15, line 12.
A. Until what line?
Q. 12.
A. Okay.

Page 145

Q. And you've testified today that you've participated in SRC meetings; correct?
A. Yes.
Q. Are these titled positions still members of the SRC?
A. They are individuals who frequently would be at the SRC, yes, not these particular individuals.
Q. Correct, but the titles?
A. Yes.
Q. And in response -- the question on page 15 beginning line 7 says: "And were you and Ms. Winkelman on the Committee, as well?" And Mr. George testifies: "Ms. Winkelman was on the Committee and I was on the Committee as well as someone who had prepared reports for the Committee to familiarize them with the cases so that discussion could occur."
You would agree that Mr. George is talking about a general practice in that context?
A. It seems so. It seems as though he is referring to the capital case, but insofar as, you know, the same would be applicable to the Sentencing Review Committee, yes.
Q. Right. And you read testimony from

Page 146

these transcripts that says that the same committee was called the Sentencing Review Committee from page 14, line 8?
A. That's what I read. I can't speak to the evolution of that.
Q. These reports that were produced and distributed at the SRC meetings, according to this testimony, were prepared by Mr. George.
Have you ever reviewed such a report?
MR. CIOSCHI: I don't think I ever read that here, so I don't think that characterizes it accurately.
MR. BROWNLIE: You can answer.
THE WITNESS: Well, it says that someone would prepare reports, so have I ever reviewed a report that was prepared to present to the SRC committee? Yes, I prepared them myself. Whether or not I reviewed a report Mr. George prepared, I don't believe so.
BY MR. BROWNLIE:
Q. And if you could read, ma'am, line 13, page 15 to page 16, line 15.
MR. CIOSCHI: Josh, what line are you reading?
MR. BROWNLIE: 15.

Page 147

THE WITNESS: Okay. I read it.
BY MR. BROWNLIE:
Q. So this is Mr. George testifying that he did, in fact, prepare materials for the SRC?
MR. CIOSCHI: Objection. Mischaracterizes the document.
THE WITNESS: I think he's talking specifically about capital cases. I think the terminology may be a little mixed here. I think there was this capital review of cases and then the Sentencing Review Committee as I have been to, it is something different. But, yes, he prepared things in connection in these capital cases, it sounds like.
BY MR. BROWNLIE:
Q. And you yourself have prepared materials for distribution at SRC meetings?
A. Yes, but not the capital piece of it, no.
Q. And is that generally the process by which the members of the SRC are apprised of the case is through pre-meeting dispensation of memos prepared by attorneys familiar with the case?
A. Certainly, whoever is assigned to

Page 148

the case typically would prepare memorandum to present and go to the meeting and also present the case and answer any questions and so on.
Q. Is that a general practice?
A. Yes. That's generally how those committee meetings work.
Q. Again, documents we were not provided.
So are you aware of any such document for the Ramirez matter?
A. I can't say how the meetings with DA Krasner came about because I was not a part of them.
Q. Did you read any of the filings in connection with the litigation of the motion to quash your subpoena?
A. I read the judge's order denying the quashal. I do not believe I read the motion to quash itself.
Q. And you didn't read my opposition to the motion?
A. I did not read that.
MR. CIOSCHI: Josh, are we at a point where we can take a brief comfort break?
MR. BROWNLIE: Yeah, sure.

Page 149

(Whereupon, a discussion was held off the record.)
(Whereupon, a lunch recess was taken.)
BY MR. BROWNLIE:
Q. So you testified earlier today, Ms. Nelson, that you and Lori Williamson both sent emails to ADA Winkelman with issues concerning the concession brief; correct?
MR. CIOSCHI: Objection. Mischaracterizes.
MR. SKINNER: Objection.
THE WITNESS: I won't say issues, but we both sent -- I'll call it notes.
BY MR. BROWNLIE:
Q. Notes. And did those notes concern the accuracy of the facts in the brief?
MR. SKINNER: Objection.
THE WITNESS: Yes. That's what we were asked to review for factual accuracy. It was told to us that it was understood that there may be things that we disagreed with in the brief. That's not what we were to review the brief for.
BY MR. BROWNLIE:
Q. And Ms. Winkelman was aware that you

Page 150

disagreed with some of the positions that they were taking in the concession brief?
MR. CIOSCHI: Objection. Misstates prior testimony.
THE WITNESS: I don't know that I expressed that. I know -- I think she's aware it was a possibility because, like I said before, I had not come to a conclusion for myself yet.
BY MR. BROWNLIE:
Q. But you were directed not to review the substance of the arguments contained within the brief?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I don't know that I was directed not to review it, but, again, that was not what I was asked to do. I was not the one who authored the brief and I was not the one who made the arguments.
BY MR. BROWNLIE:
Q. So the scope of your review of the concession brief was very narrow and it concerned only the factual inaccuracies?
A. That's what I understood myself being asked to do.

Page 151

Q. Would you have done more?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: What do you mean by more? In regards to what?
BY MR. BROWNLIE:
Q. Well -- strike that.
The edits that you sent to ADA Winkelman, did they make their way into the final brief that you've read in preparation for this deposition?
MR. SKINNER: Objection.
THE WITNESS: I can't say for sure. I would have to do a line-for-line comparison. I just don't recall.
BY MR. BROWNLIE:
Q. Nothing stands out to you today?
A. I just don't recall. Again, I would have to compare it line for line to know.
MR. BROWNLIE: Mr. Skinner, we've obviously informed you of our intent to serve a subpoena this afternoon and I just want to make a specific reference to those two emails to ADA Winkelman from Ms. Williamson and Ms. Nelson.
BY MR. BROWNLIE:

Page 152

Q. Did you ever participate in any conversations with counsel for Mr. Ramirez during your investigation?
A. I don't believe so. I handed a -- at least one court listing, possibly two, so I'm sure I would have had a logistical conversation with Mr. Wiseman there, but beyond that, I personally did not, no.
Q. Are you aware of any conversations between the DAO and counsel for Mr. Ramirez before his conviction had been vacated?
A. I mean, I knew that Mr. Wiseman and counsel would have communicated with the Conviction Integrity Unit, but the fact that that happened beyond that, I have no knowledge.
Q. And you didn't participate in any of those meetings?
A. No. I was not involved with the case at all until the Conviction Integrity Unit transferred it back to PCRA.
Q. And what was your understanding of the reason that the case was transferred from CIU back to the Law Division?
MR. SKINNER: Objection.
THE WITNESS: I don't believe I was

Page 153

told a reason.
BY MR. BROWNLIE:
Q. And you did not review the CIU's files in connection with your own investigation into the Ramirez matter?
A. Those were not made available to me.
Q. You are still currently employed by the district attorney's office?
A. Correct.
Q. And you are the assistant supervisor of the PCRA unit?
A. Correct.
Q. Is ADA Winkelman still employed by the district attorney's office?
A. She is.
Q. And what's her role?
A. She works in the Law Division. I don't know what she does day to day. I don't know.
Q. Are you friendly with her?
A. Say hi --
MR. SKINNER: Objection.
You can answer.
THE WITNESS: I say hi in the hallways and things certainly. I don't speak with

her often.
BY MR. BROWNLIE:
Q. And ADA Ernst, is she still employed by the district attorney's office?
A. She is.
Q. And what's her role?
A. I believe she's now the chief of training for the Law Division is her title.
(Reporter clarification.)
BY MR. BROWNLIE:
Q. Do you work with her in connection with some of the training that you spoke about earlier today, development for internal?
A. She's given some of those trainings, like the Brady training, for example. I have not yet -- I worked with her in organizing trainings. There's now a committee, I think, that's doing that that I'm not a part of.
Q. Are you aware of work that ADA Ernst is performing outside of her role as chief of training?
A. Within --
MR. SKINNER: Objection.
You can answer.
THE WITNESS: Within the DAO?



MR. BROWNLIE: Correct.
THE WITNESS: Yes. She's, I believe, an appeals ADA now in the Appellate Unit, I should say.
BY MR. BROWNLIE:
Q. Does she have cross titles?
A. I mean, she's an ADA. I know she's handling appeals and things like that. That's the most I can speak to about, you know, what she's doing.
Q. Would you know why she filed an appearance on behalf of the district attorney's office in the Dennis Johnson matter?
A. I have no reason to know why that happened.
Q. But you would agree that's not in connection with appellate work?
MR. SKINNER: Objection.
THE WITNESS: Well, appellate federal work -- I mean, I can't --
BY MR. BROWNLIE:
Q. It's post-conviction work?
A. Yes.
Q. But it's not appellate work in the traditional sense; correct?



A. It --
Q. Collateral review?
A. Sure, if that's the distinction you want to use, yes.
Q. When did Nancy Winkelman step down as supervisor of the Law Division?
A. I believe it was winter of last year, maybe the beginning of January of last year, but I could be wrong.
Q. And last year being '25?
A. That's correct.
Q. And did she step down?
MR. SKINNER: Objection. Relevance.
THE WITNESS: Do you mean, is she still the supervisor? No, she's not.
BY MR. BROWNLIE:
Q. Was she demoted or did she willing leave the position, to your knowledge?
A. To my knowledge, she willingly left the position.
Q. Yeah, that's what I was asking.
And, to your knowledge, ADA Ernst also willingly left her position as supervisor in the Federal Litigation Unit?
MR. SKINNER: Objection. Relevance.



You can answer.
THE WITNESS: Well, she left her role of the supervisor of the Federal Litigation Unit to become the supervisor of the Law Division and then my understanding for personal reasons stepped down as the supervisor of the Law Division.
BY MR. BROWNLIE:
Q. Did she serve as the supervisor of the Law Division immediately after ADA Winkelman stepped down?
A. Yes.
Q. And how long was her tenure, that being ADA Ernst?
A. From whenever Ms. Winkelman stepped down to a few months, so maybe a little over a year.
Q. And who served as assistant supervisor of the Law Division during that time?
A. While Katie was the supervisor?
Q. Uh-huh.
A. ADA Napiorski and ADA Wildberger also an assistant supervisor, but I don't recall if that was when Dave became supervisor. I think it was before, but I could be wrong on the timing.

Page 158

Q. As it's currently constituted, who is supervisor of the Law Division?
A. Mr. Napiorski.
Q. And who is the assistant?
A. There is no assistant right now.
Q. When was that title discontinued, so to say?
A. Mr. Wildberger stepped down from his role as assistant supervisor yesterday.
Q. And Mr. Napiorski has not?
A. No.
Q. Who is current supervisor of the Federal Litigation Unit?
A. Peter Andrews -- Andrew.
Q. And does he have an assistant?
A. I don't believe so.
Q. And I believe you testified that Tracey Kavanagh is currently supervisor of the PCRA unit?
A. Yes.
Q. And you are the assistant?
A. Yes.
Q. Thank you for clarifying that.
To your knowledge, has ADA Wildberger left the district attorney's office or just

Page 159

stepped down from his supervisory role?
MR. CIOSCHI: Objection. Relevance.
MR. SKINNER: Objection.
THE WITNESS: He hasn't left the district attorney's office as far as I know.
BY MR. BROWNLIE:
Q. To your knowledge?
A. Yes.
Q. When you were assigned the Ramirez matter, did you ever come to learn of the professional relationships between Mr. Ramirez's counsel and certain ADAs in the office?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I knew that Ms. Ernst had previously worked -- I don't know if it was with Mr. Wiseman or at his firm, but that was the extent of what I knew.
BY MR. BROWNLIE:
Q. When did you learn that?
A. I think I may have known that when Katie came to the office. I think that was something I was aware of.
Q. So Paul George and Thomas Gaeta -- what is Mr. Gaeta's current position in the

Page 160

Philadelphia District Attorney's Office?
A. He's currently supervisor of the Civil Litigation Unit.
Q. Is there an assistant supervisor for that unit?
A. I don't believe so.
Q. And Mr. George, is he still employed by the DAO?
A. He is not.
Q. He retired, I believe; correct?
A. Correct.
Q. Do you know roughly when his retirement was?
A. December 2025, I believe.
Q. So you're aware that Paul George and Thomas Gaeta both had involvement in the Eddie Ramirez matter before the PCRA petition was filed?
A. Correct.
Q. Were you aware that Nilam Sanghvi of the Philadelphia Innocence Project, who represented Mr. Ramirez, had been hired by Nancy Winkelman while the two were in private practice at Schnader?
MR. CIOSCHI: Objection.
THE WITNESS: No, I did not know

Page 161

that.
BY MR. BROWNLIE:
Q. Are you aware that the Ramirez matter came to the attention of ADA Winkelman through a phone call by Nilam Sanghvi?
A. I knew it came to her attention. I did not know how.
Q. I think you testified earlier that you were aware that Katherine Ernst was employed by Wiseman Schwartz and operated under the supervision of Michael Wiseman doing PCRA and habeas work before she was employed by the DAO and during the time that Wiseman represented Mr. Ramirez?
MR. CIOSCHI: Objection. Form and substance.
THE WITNESS: I knew she had worked with Mr. Wiseman. I didn't know the particulars of that. I believe I knew it was right before she came to the district attorney's office, but I know that know. I believe I knew that then.
BY MR. BROWNLIE:
Q. You would have been aware at the time that Michael Wiseman represented Eddie Ramirez because his name was on the

Page 162

post-conviction petition?
A. Certainly.
Q. So by my count that's at least four assistant district attorneys with prior connections to either Mr. Ramirez or his counsel at the time that the concession brief was drafted immediately before the vacatur was granted?
MR. CIOSCHI: Objection.
THE WITNESS: Yes.
BY MR. BROWNLIE:
Q. And the screening protocol referenced in Footnote 1 of the concession brief, are you familiar with the process?
A. Can I review the --
Q. Please do, yes. Page 1, Footnote 1.
A. Yes.
Q. And what, generally, is that protocol?
A. Generally anytime someone has a connection to the case such, for example, previously represented someone involved in the case, they are screened from the case, meaning you don't discuss the case with them, they have no involvement in the case and that's what happened here. At one point in time there was someone in

Page 163

the District Attorney's Office named Richard Glazer that dealt with a lot of these -- dealt with conflict things. He left the office and I don't recall at what point it was in relation with this case.
Q. Sure. And when you say "dealt with," what do you mean by that?
A. Meaning questions or things surrounding conflicts, he would be the person that would bring that to -- address that to.
Q. And the protocol was only effective insofar as the individual ADA or prospective ADA brought the matter to Mr. Glazer's attention?
A. Well, it wouldn't necessarily have to be brought to his attention to be effectuated. Certainly, if I saw someone that needed to be screened, I would never speak to them regardless of whether Mr. Glazer knew or didn't know about it, but...
Q. And when you are vetting ADAs for potential screening, what are you looking for?
A. I don't know about the word vetting, but...
Q. Sure.
A. I mean, here it's very obvious why

Page 164

Mr. Gaeta and Mr. George can't be involved in the case. I suppose there may be other questions that require different analysis, but here their prior connection to the case makes it clear they can't be involved in the case.
Q. How is that protocol enforced?
MR. SKINNER: Objection. Relevance.
THE WITNESS: I mean, just an ADA who is assigned to the case is responsible for not speaking to them about that and certainly presumably they also they bear some obligation not to speak about it.
BY MR. BROWNLIE:
Q. Is there a technical process for walling off a screened ADA from access to the files?
A. Not that I -- well, as to the physical files, sometimes stickers will be placed on the box saying so-and-so is screened from this. As to the virtual files, I don't know, I've never been screened from a matter.
Q. So as I understand it, there is no process in the Philadelphia District Attorney's Office by which attorneys who are screened from a case are precluded or unable to access electronic

Page 165

or physical files --
MR. CIOSCHI: Objection.
BY MR. BROWNLIE:
Q. -- other than a sticker?
MR. SKINNER: Objection.
MR. CIOSCHI: That's not her testimony.
THE WITNESS: Well, there's no way -- a physical file -- most of our files are physical boxes and files. I don't know how you bar someone from accessing that knowing that they can't look at the file. I don't know about the digital files. I've never heard of that, but it's possible. I don't know the answer to that.
BY MR. BROWNLIE:
Q. And you can lock boxes up?
A. No. I don't know what you mean by lock a box up.
Q. Can you place a box concerning a case subject to screening in a locked room to prevent access to that box by an ADA who has been screened?
A. The boxes either typically remain in the ADAs who are assigned to the case's office. We also have a file room where ADAs have dedicated

Page 166

shelves. I assume the room to that -- maybe that door can be locked. I don't know.

Q. There's no general practice of segregating files of cases where ADAs have been screened?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: The practice is is the ADA who is working on the case has the file, not the person who is screened from the case.

BY MR. BROWNLIE:

Q. So do I understand your answer to be no?

A. My answer is what my answer is. I...

(Reporter clarification.)

MR. SKINNER: Objection. Form objection.

MR. CIOSCHI: Objection.

BY MR. BROWNLIE:

Q. You testified earlier today concerning the Wharton matter.

Has the district attorney's office implemented any practices or policies to prevent the kind of misconduct for which ADA Winkelman and

Page 167

ADA Paul George were sanctioned?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection.

THE WITNESS: I mean, the practices and policies are that we investigate cases and our duty of candor. So I don't -- if your question is have there been new policies in response to that, I guess the answer would be no.

BY MR. BROWNLIE:

Q. Was there any internal response to the sanctions opinion meant to educate assistant district attorneys on their duty of candor?

MR. SKINNER: Privilege objection on deliberative process. I mean, if you are asking about internal decisions about how do we move forward as a result of what is -- I think that goes to deliberative process privilege. I mean, if you could rephrase.

BY MR. BROWNLIE:

Q. Are you aware of any response from the district attorney's office internally to the Wharton litigation and the sanctions imposed there meant as an effort to prevent that type of misconduct from happening again?

A. Following learning about what

Page 168

happened with Paul, I recall that ADA Ernst reiterated to the entire division that our job was to investigate cases, we had duty of candor, and that's what we were there to do.

Q. Is it your understanding to this day that ADA Winkelman and ADA George maintain that they did nothing wrong in the Worrell litigation?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I don't have any knowledge of what they said in their filings or anything like that.

MR. BROWNLIE: I'm going to mark this as D-15, Defense Exhibit 15.

(Nelson Exhibit 15, Order, was marked for identification.)

BY MR. BROWNLIE:

Q. And what I've just handed you, Ms. Nelson, is a copy of the Order and the report and recommendation -- excuse me. Let me rephrase.

What I've handed you is a copy of the Report and Recommendation recommending to the Eastern District of Pennsylvania that Paul George be disbarred from that court as a result of his misconduct in the Wharton matter.

Page 169

Have you reviewed this R&R?

A. No.

Q. Have you discussed this R&R or anything concerning the Wharton matter internally?

MR. SKINNER: Objection to form.

THE WITNESS: Just the facts of, you know, what had happened and that Paul had been disbarred, but beyond that, no.

BY MR. BROWNLIE:

Q. If I can ask you to turn to page 23, ma'am?

A. Okay.

Q. And I'll just ask you to read that last paragraph. It ends at the bottom of the next page.

MR. CIOSCHI: What page?

MR. BROWNLIE: 23 to 24.

THE WITNESS: Okay.

BY MR. BROWNLIE:

Q. And I'll read for purposes of the record: "We find" -- and just for clarity, this is a Report and Recommendation signed by the Honorable Paul S. Diamond, the Honorable Gerald J. Pappert, and the Honorable John N. Gallagher as a result of disciplinary proceeding conducted after

Page 170

the Third Circuit's affirmance in court.

The opinion states: "We nonetheless find that George's misrepresentations were intentional; they were certainly at least knowing under the objective standard. He was aware of the Third Circuit's mandate to look for the kind of mitigation and anti-mitigation evidence that would have been presented, and he knew that the CCRC reviewed mitigation evidence but no anti-mitigation evidence just as he had set it up to do. Then, purportedly on his own knowledge, he asserted that Wharton's claim was meritorious based on his and CCRC's careful review of the facts and law, but he knew that he never conducted a reasonably diligent inquiry into the anti-mitigation evidence specifically required by the Third Circuit. Finally, when the Attorney General revealed Wharton's escape attempts, he didn't reconvene the committee to discuss it. Combined, these facts make clear that George intended to mislead the Court in order to achieve his policy goal, which undermined the integrity of the adjudicative process by allowing the tribunal to be misled by false statements of law or fact."

Did I read that correctly, ma'am?

Page 171

A. Yes.

Q. And I understand your testimony today that there's been no response, other than an admonition from ADA Katherine Ernst in response to these findings of intentional misconduct against Paul George?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I mean, I can't speak to what happened. I don't know else happened in the office. What I know is what I stated.

BY MR. BROWNLIE:

Q. And Paul George was not fired from the Philadelphia District Attorney's Office; he retired?

A. That's my understanding, yes.

Q. And Nancy Winkelman also participated in the District Attorney's response to the Wharton litigation; correct?

MR. CIOSCHI: Objection. Assuming facts not in evidence. Also implies somebody we just talked about participated.

BY MR. BROWNLIE:

Q. Are you aware that Nancy Winkelman was involved in the Wharton litigation?

Page 172

A. I know she had some involvement. I don't know the extent of that involvement.

MR. BROWNLIE: I'm going to mark this Defense Exhibit 16.

(Nelson Exhibit 16, Order, was marked for identification.)

BY MR. BROWNLIE:

Q. What I've handed you, ma'am, is a copy of the Report and Recommendation drafted by the same judicial panel of the Eastern District of Pennsylvania recommending that Nancy Winkelman be suspended for three years from practicing in that court as a result of her misconduct in connection with the Wharton matter. And appended to the top of the R&R is the Order signed by Chief Judge Wendy Beetlestone imposing such a sanction.

Now, Nancy Winkelman was involved in drafting the Commonwealth's concession brief in the Ramirez matter; correct?

A. Yes.

Q. And what's your understanding of her participation in that process?

A. I know she certainly would have edited the responses drafted by Mr. Napiorski, but that's the extent of what I can say. I was not

Page 173

involved in the process.

Q. And I think you testified today that you read the deposition testimony in this case, the civil action, of Mr. Napiorski and Ms. Ernst?

A. Yes, I received the deposition from Ms. Winkelman. I did not have time to get to it.

Q. Did you speak to Ms. Ernst about her deposition?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I mean, prior to even knowing I would be deposed, I remember her telling me she had been deposed the day that it happened, but beyond that, no.

BY MR. BROWNLIE:

Q. Did you speak -- well, we know you spoke with David Napiorski.

Did you discuss the -- strike that.

Did you discuss with David Napiorski the substance of his deposition testimony and/or your anticipated deposition today?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. Privileged. I mean...

MR. BROWNLIE: Privileged?

MR. SKINNER: Yeah, if we are talking about the conversation we had earlier, like discussion that Julie had with counsel to prepare for this, then...

MR. BROWNLIE: I'm asking her at all.

MR. SKINNER: Okay. Well, sorry. Can you restate the question, please?

BY MR. BROWNLIE:

Q. Did you, prior to your deposition today, discuss the substance of David Napiorski's deposition and/or your anticipated testimony today?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection. But it's a form objection.

THE WITNESS: I did not discuss the substance of his testimony. As to the substance of my testimony, I refreshed Mr. Napiorski on what my role in the case was, but not him telling me what I should or should not say, nothing like that.

BY MR. BROWNLIE:

Q. Did Mr. Napiorski attempt to direct your testimony today?



MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: No.

BY MR. BROWNLIE:

Q. And did you at all discuss with Ms. Winkelman her testimony in this case and/or your deposition today?

A. No.

Q. This Report and Recommendation that I've handed you that we've marked Defense Exhibit 16 concerns Nancy Winkelman's participation in the DAO's misconduct in the Wharton matter.

Was there any internal response to Ms. Winkelman's suspension in an effort to ensure that the type of misconduct that she committed in Wharton was not committed by any other ADA in the Philadelphia District Attorney's Office?

MR. SKINNER: Objection to form.

You can answer.

THE WITNESS: There's been no discussions about this. It's only in recent weeks that we even learned that this had happened.

BY MR. BROWNLIE:

Q. So you were not aware that Ms. Winkelman had been suspended for three years



as of October 2025?

A. Well, I believe it was sealed until recently.

Q. Correct.

A. So I only learned of it when it became unsealed.

Q. And the district attorney's office has not implemented any policies or practices with respect to ensuring that the type of misconduct she committed and was sanctioned for did not reoccur?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I don't know if it's fair to stay there's no polices to ensure that things like this doesn't happen. I suppose if your question is has there been a policy change in recent weeks? No.

MR. BROWNLIE: I'm going to ask you, Ms. Nelson, to read the first two paragraphs of the R&R.

THE WITNESS: Okay.

BY MR. BROWNLIE:

Q. I'll read for purposes of the record the second paragraph: "After multiple hearings



and extensive briefing, we find that Nancy Winkelman knowingly made misrepresentations to effectuate a policy of vacating all death sentences on appeal, at PCRA, or on federal habeas review. We do not credit her testimony that there is no such policy. We further find that she was willfully blind to, and complicit in, George's misrepresentations to Judge Goldberg. As with George, we emphasize that we are not recommending the imposition of discipline because Winkelman opposes the death penalty. As the Third Circuit ruled in upholding Judge Goldberg's imposition of sanctions: While the DAO may oppose the death penalty, it may not further that position by slanting the facts and the law. We base our decision on Winkelman's knowing role in misleading Judge Goldberg and her false testimony before us."

Did I read that correctly, ma'am?

A. Yes.

Q. And Judge Goldberg sanctioned -- imposed Rule 11 sanctions against ADA George and ADA Winkelman before the concession brief was filed in the Ramirez matter.

Are you aware of that?

A. I would --

MR. CIOSCHI: Object to form.
THE WITNESS: -- have to look at the dates. I don't know what the timeline was. I certainly know that I was not aware of that until the matter had concluded.
BY MR. BROWNLIE:
Q. The matter being the sanctions litigation?
A. Sorry, the Ramirez matter concluded. I was not aware of the sanctions as it concerns Ms. Winkelman and Mr. George until after Ramirez.
Q. And the record will speak for itself, but I will represent to you that it was at least six to seven months before the concession brief was filed in the Ramirez matter that ADA Winkelman had been sanctioned for misleading the Court.
And you were not made aware of her misconduct at the time that she was supervising the drafting of the concession brief in Ramirez?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: Well, it's my understanding all of it was under seal, so I didn't know.



MR. BROWNLIE: No, Judge Goldberg's Rule 11 was not under seal. That was filed of record.
THE WITNESS: I can't speak to that, but, no, I did not know that.
BY MR. BROWNLIE:
Q. That's my question. You were not made aware that ADA Winkelman was sanctioned for misleading courts to secure post-conviction relief; correct?
MR. CIOSCHI: Objection to form and to substance.
THE WITNESS: I mean, I would say the opinion speaks for itself as to what she was sanctioned to. I'm not going to characterize that.
MR. BROWNLIE: Sure.
THE WITNESS: But, no, I did not become aware of that until recently.
BY MR. BROWNLIE:
Q. Would that have changed your approach in the investigative process and your review of the concession brief in this case if you had known that the supervisor had been sanctioned for filing concession briefs based on



misrepresentations?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
THE WITNESS: No, I review the record the same in every case, regardless of what it is and who was involved in the case.
BY MR. BROWNLIE:
Q. And I think your testimony earlier today was that ADA Winkelman directed you what to do with respect to the concession brief; is that correct?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: She said for what purpose she was sending it to Ms. Williamson and I to look at, the brief, yes.
BY MR. BROWNLIE:
Q. So she tasked you with a specific task?
A. Sure, yes.
Q. Did she communicate to you that she did not want you to go beyond that task?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
THE WITNESS: Like I said, she



stated that -- to review for factual -- I don't know if she said accuracy or inaccuracy -- that she understood that there may be things that either Ms. Williamson and I disagreed with, and that's not the purpose she was asking -- I'm paraphrasing. I don't know exactly the words, but...
BY MR. BROWNLIE:
Q. So she was aware that you and ADA Williamson disagreed with the position they were taking in the concession brief?
MR. CIOSCHI: Objection. That's not her testimony.
MR. SKINNER: Objection.
THE WITNESS: I don't know what Ms. Winkelman was aware of in terms of my thoughts on the case. And I can't speak to what she was aware of as it concerns Ms. Williamson.
MR. BROWNLIE: Fair enough.
THE WITNESS: I suppose she thought it was a possibility.
BY MR. BROWNLIE:
Q. If I can direct your attention to page 3 of the R&R, Ms. Nelson. The last sentence of the first paragraph, if you could read that to

yourself.
A. Okay.
Q. And this is a factual finding by the Court. And, again, the opinion speaks for itself where the Court writes: "Like the other Committee members" -- I understand the Committee to be the CCRC -- "Winkelman knew only what was in the memorandum presented to the CCRC that George prepared for each case."
Did I read that correctly?
A. Did you say page 3?
Q. Yes. The pagination at the bottom of the R&R.
MR. CIOSCHI: Yeah, it doesn't match the top. It's page 4.
MR. BROWNLIE: Page 4 by the PACER stamp, page 3 at the bottom.
THE WITNESS: And which --
MR. BROWNLIE: Yeah, the last sentence of the first paragraph.
THE WITNESS: Sorry. I think I'm just missing something. I'm not on the right page.
MR. SKINNER: This first paragraph. It is page 3, but...



THE WITNESS: Sorry.
MR. BROWNLIE: No problem. We're together?
THE WITNESS: I'm there.
BY MR. BROWNLIE:
Q. The last sentence reads: "Like the other Committee members, Winkelman knew only what was in the memorandum presented to the CCRC that George prepared for each case."
Did I read that correctly?
A. Yes, I see that.
Q. And that's further evidence corroborating that documents would be prepared in advance of CCRC and SRC meetings?
MR. CIOSCHI: Objection. It does not say anything about SRC meetings.
THE WITNESS: Yeah, I was never involved in any CCRC meetings or processes. That's what that reads to me, but I have no personal knowledge as to that.
BY MR. BROWNLIE:
Q. And you read testimony earlier today by Paul George that the CCRC was also known as the SRC?
MR. SKINNER: Objection.



MR. CIOSCHI: Objection. Mischaracterization.
MR. BROWNLIE: The record speaks for itself.
THE WITNESS: I would say his testimony speaks for itself. My understanding is that perhaps there was some evolution in that. I don't know what terminology was used before I came to the office.
BY MR. BROWNLIE:
Q. And today as it's currently constituted, do you understand there to be two separate committees, a CCRC and an SRC or solely an SRC?
A. I'm not sure. I've not encountered a case such that, you know, the types of review that the Capital Review Committee would have been doing. I can't answer that.
Q. So as an assistant supervisor in the Philadelphia District Attorney's Office, you do not know whether a committee exists for purposes of reviewing capital cases as opposed to other cases?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.



THE WITNESS: To my knowledge, there is not a separate committee.
BY MR. BROWNLIE:
Q. That's my question.
So there is one committee for which these type of documents are prepared.
And it is sometimes referred to as the CCRC and sometimes referred to as the SRC?
A. In my tenure at the DA's office, it's never been referred to as the CCRC.
Q. Only the SRC?
A. Yes.
Q. Thank you.
Again, page 6 of the R&R, again, we're going by the pagination at the bottom. The beginning of the last paragraph: "Winkelman testified that" -- I'm sorry. Are you with me?
A. Yes.
Q. "Winkelman testified that until George presented Wharton to the CCRC, she did not know what he had determined. The six-page memo George distributed to the Committee was never disclosed to Judge Goldberg or the Third Circuit."
Did I read that correctly?
A. Yes.

Q. And the bottom of that paragraph: "Winkelman told us that she remembered nothing about the CCRC meeting at which Wharton was considered except George's failure to present anti-mitigation evidence and the CCRC's decision. We do not credit that testimony."

Do you understand that to be a finding by the panel that Ms. Winkelman is not truthful with respect to the substance of her memory concerning those meetings?

MR. SKINNER: Objection.

THE WITNESS: I never read this, but I will say the opinion -- the findings speak for themselves. I won't characterize them myself.

BY MR. BROWNLIE:

Q. What is the District Attorney's Office's general position with respect to participation by the Office of the Attorney General?

MR. SKINNER: Objection.

MR. CIOSCHI: Oh, objection.

THE WITNESS: I don't know if there's one.

BY MR. BROWNLIE:

Q. Have you ever participated in a case



in which amicus support was sought by the Commonwealth's Attorney General's Office?

MR. CIOSCHI: Objection to form.

THE WITNESS: I don't believe so, no.

BY MR. BROWNLIE:

Q. Have you participated in conversations concerning the OAG's participation in other cases that you were not personally involved, but aware of?

MR. SKINNER: Objection.

I mean, to the extent that it's a privilege, don't answer.

THE WITNESS: I'm aware that that happened. I don't know if I've been involved in conversations about it.

BY MR. BROWNLIE:

Q. Is there a general policy with respect to the OAG'S participation in post-conviction cases?

A. Not to my knowledge, no.

Q. If I can direct your attention to page 9, Ms. Nelson. And if I could ask you to read that first paragraph.

MR. CIOSCHI: Are we on 9 of --



MR. BROWNLIE: The pagination at the bottom is what I'm referring to, D16.

MR. CIOSCHI: Which sentence, Josh?

MR. BROWNLIE: The paragraph that begins "Dissatisfied with these submissions... "

MR. CIOSCHI: The whole paragraph?

MR. BROWNLIE: The whole paragraph.

THE WITNESS: I'd like to add something to my last answer.

MR. BROWNLIE: Sure.

THE WITNESS: Which is just that obviously in the light of the Lavar Brown decision, there's ongoing conversations.

MR. BROWNLIE: Yeah, we're going to talk about that.

THE WITNESS: But no general policy as to their involvement, no.

MR. BROWNLIE: Thank you.

THE WITNESS: Which part? Sorry, can you read?

MR. BROWNLIE: The paragraph that begins "Dissatisfied with these submissions..."

THE WITNESS: Okay.

BY MR. BROWNLIE:

Q. And I'll read for the record:



"Dissatisfied with these submissions, Judge Goldberg asked the OAG to participate as an amicus. The OAG found considerable anti-mitigation evidence -- including Wharton's violent attempted escape in 1986 -- simply by reviewing his prison record, something the CCRC never did.

After the OAG submitted its brief describing the anti-mitigation evidence the DAO had failed to disclose, Judge Goldberg held hearings on the matter, permitting the OAG to participate. Entering her appearance, Winkelman herself authored and signed a vigorous eight-page objection to the OAG's participation as a full-fledged adversarial party. Winkelman repeated that the DAO decided to concede after a thorough review by the CCRC. Winkelman protested the OAG's in-depth factual investigation, and its highly aggressive partisan stance. Winkelman thus argued that Judge Goldberg had impermissibly insisted on conducting an adversarial proceeding, yet in upholding Judge Goldberg's eventual denial of habeas relief, the Third Circuit upheld the propriety of the OAG's participation precisely because the adversarial process broke down after

the DAO's about-face?"
Did I read that correctly?
A. Yes.
Q. Has the Philadelphia District Attorney Office's implemented a practice with respect -- strike that.
Do you yourself, Ms. Nelson, see value in the adversarial process?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: Of course.
BY MR. BROWNLIE:
Q. What are the values?
A. I mean, for the facts to be heard and for a judge to make a decision.
Q. That's all?
A. I mean, there's several values, but that's like the big overarching value to it, certainly.
Q. Do you think that the adversarial process works as a check against knowing misrepresentations made to tribunals?
A. It certainly can, yes.
Q. And does?
A. Yes.



Q. If you could turn to page 13, ma'am.
A. Okay.
Q. And the sentence that begins underneath the block quote, it begins: "Winkelman misrepresented..." And I'll read for purposes of the record.
"Winkelman misrepresented to Judge Goldberg she did not and could not have had an objectively reasonable belief that her misstatements were true. She also failed to conduct a reasonably diligent inquiry as to the basis of those misstatements and failed to inform herself about the facts of the case. Winkelman thus violated Rules 3.3 and 3.1, which imposed on her a duty of candor and a duty to present to the Court only assertions that have a basis in law and fact."
Did I read that correctly?
A. Yes.
Q. And with respect to her direction to you to vet the concession -- I'll say vet; you please correct my characterization of the assignment -- to vet the concession brief for factual accuracy, she herself did not undertake that exercise in the Ramirez matter?



MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I'll let my testimony speak for itself. I can't speak for what Ms. Winkelman --
BY MR. BROWNLIE:
Q. I'm asking for your awareness of what she did.
A. My awareness of what she did is what she asked me to do. That's all I can speak to.
Q. So the single email sending you the draft of the concession brief and asking you to fact-check it is the extent of your knowledge of her participation in this case?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: That's not what I said.
MR. CIOSCHI: Misstates the record.
THE WITNESS: It's my understanding she also edited the response as authored by Mr. Napiorski. Obviously she was present at the meeting that we discussed. That's the extent of my knowledge.
BY MR. BROWNLIE:



Q. Yeah. And I'll represent to you that in her deposition she testified that she didn't review a single document, other than the concession brief.
I'm asking is that consistent with your understanding or you have no knowledge of that?
A. Only she can speak to what she did or didn't do.
Q. If I can ask you to turn to page 15, ma'am. And the last paragraph beginning "Winkelman stood by her misrepresentations..."
A. Okay.
Q. And I'll read for the record: "Winkelman stood by her misrepresentations, either authoring, adopting, editing, or otherwise reiterating false statements about the CCRC's consideration of Wharton. She defended the propriety of both the Notice of Concession and the Joint Proposed Order urging Judge Goldberg to grant habeas relief upon a careful and independent review of the parties' submissions and all prior proceedings, even though she knew that the CCRC had not conducted a review."
Did I read that correctly?

Page 194

A. Yes.
Q. And have you ever discussed Ms. Winkelman's sanctions litigation with her?
MR. SKINNER: Objection.
THE WITNESS: No.
BY MR. BROWNLIE:
Q. And you were not made aware that she had, in fact, been suspended from the Eastern District until the suspension was made public?
A. Yes. I became aware sometime in the last month or two I think it was.
Q. Were you made aware by the DAO or did you come to learn about that on your own accord?
A. My own accord.
Q. Was there ever an announcement from the district attorney's office that Paul George had been disbarred as a result of misconduct and that Nancy Winkelman has been suspended as a result of misconduct?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: There was no announcement as to Ms. Winkelman. There was an announcement to the Law Division as it concerned

Page 195

Mr. George, but not to the office as a whole.
BY MR. BROWNLIE:
Q. And you are familiar with the Pennsylvania Supreme Court's decision in Lavar Brown, both decisions?
A. What do you mean by both decisions?
Q. What is your understanding of your office's litigation concerning the Lavar Brown matter?
MR. SKINNER: Objection.
THE WITNESS: Generally speaking, it was a PCRA that was filed that I believe was conceded by the office. It was appealed. There were certain things about intervention by the OAG and the victim's family. Recently the Pennsylvania Supreme Court authored an opinion concerning that matter and remanded it for further proceedings.
MR. CIOSCHI: Josh, can we take a quick comfort break?
MR. BROWNLIE: Sure. Off the record.
(Whereupon, a discussion was held off the record.)
BY MR. BROWNLIE:

Page 196

Q. Ms. Nelson, before we took the comfort break, I was asking you about your understanding of the Pennsylvania Supreme Court's decision in Commonwealth versus Lavar Brown.
A. Yes.
Q. Do you understand that the Supreme Court of Pennsylvania issued two decisions in that case?
A. That sounds correct to me. I mean, I'm most recently familiar, obviously, with the most recent decision.
Q. As part of your work -- and you've been in the PCRA unit of the Philadelphia District Attorney's Office for about six years now?
A. Correct.
Q. When the first Lavar Brown decision was decided in 2018, did the Philadelphia District Attorney's Office implement a training protocol with respect to the Supreme Court's direction as to how concession briefs operate in the PCRA context?
MR. SKINNER: Objection.
THE WITNESS: Well, I didn't work in the office in 2018.
BY MR. BROWNLIE:

Page 197

Q. But you worked in the office after that decision; correct?
A. I don't know the date of -- you said in 2018. I didn't work at the office in 2018.
Q. Have you ever received training on the Pennsylvania Supreme Court's decision -- let me rephrase.
Have you ever received training on the Pennsylvania Supreme Court's 2018 decision in Commonwealth versus Lavar Brown?
A. Explicit training, no. But if it was in 2018, that would have been the state of the law at the time I entered the office.
Q. Do you understand the Pennsylvania Supreme Court's decision to be confined to the year 2018?
A. (No verbal response.)
Q. You filed concession briefs as part of your role in the PCRA unit; correct? I think you testified today that it was less than ten, but more than five?
A. First, I don't think I said it was limited to 2018, but, yes, I filed concession briefs.
Q. Are you aware of how that decision

Page 198

constrains your office's ability to file and use concession briefs?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I would review that.

BY MR. BROWNLIE:

Q. So I think the answer to my question is, no, you did not receive any explicit training on how Commonwealth versus Lavar Brown, the 2018 decision from the Pennsylvania Supreme Court, confines your office's ability to use concession briefs; is that correct?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I don't know if that's exactly what I said. I don't know if we received training explicitly in connection with that opinion. And I haven't reviewed that opinion in some time. I don't recall exactly what that opinion says.

BY MR. BROWNLIE:

Q. Have you ever read it?

A. I believe I have, yes.

Q. And what do you understand that decision to hold?

Page 199

MR. SKINNER: Objection.

THE WITNESS: Again, I haven't reviewed it in some time. And now having read the more recent decision, I would not want to conflate the two.

BY MR. BROWNLIE:

Q. The concessions that you participated in, have you ever filed a concession, Ms. Nelson, under your own name?

A. What do you mean filed a concession? Have I filed briefs in cases --

Q. Have you ever filed a brief in a PCRA case in which you agreed to relief?

A. Yes. But like I stated, all of the cases in which I have recommended the Court concede relief were conditioned on an immediate guilty plea. So it would be different than what happened in this case.

Q. And you distinguished this case from those other cases because Mr. Ramirez's charges were nolle prossed --

A. Yes, he didn't plead guilty.

Q. -- or dismissed?

(Reporter clarification.)

BY MR. BROWNLIE:

Page 200

Q. Why does that distinction matter in the context of your office's use of concession briefs?

A. I don't know that it necessarily does matter, but I think it's important for you to understand what I've been involved in.

Q. What cases have you been involved in in which you have appended your name to a concession brief?

MR. CIOSCHI: Objection. Asked and answered.

MR. SKINNER: Objection. Asked and answered.

THE WITNESS: Those listed earlier, and, then additionally, again, I said there may be a few names that I had forgotten off the top of my head.

BY MR. BROWNLIE:

Q. So all of the cases that you listed prior to today were cases in which you personally filed the concession brief?

A. Not necessarily. I don't know if the concession briefs were filed in all those cases. But in those cases where concession briefs were filed, my name would have been appended to

Page 201

it, yes. There may have been some cases where I orally agreed to that.

Q. Do you recall referencing the 2018 decision in Lavar Brown before filing those concessions?

MR. SKINNER: Objection.

THE WITNESS: Explicitly, no.

MR. BROWNLIE: I'm going to mark this as Defense Exhibit 17.

(Nelson Exhibit 17, Docket, was marked for identification.)

BY MR. BROWNLIE:

Q. Ms. Nelson, what I've handed you is a copy of the docket in Commonwealth versus Lavar Brown that's been the subject of the Pennsylvania Supreme Court's recent decision. I'm going to ask you to turn to page 7. And you've read Philadelphia County criminal dockets before I'm sure; correct?

A. All the time. Not this one, but, yes.

Q. So you know where the pagination is.

The attorney entered on behalf of the Philadelphia County district attorney's office is Thomas Charles Gaeta; is that correct?

A. Yes.
Q. And when an attorney enters their appearance on behalf of the Philadelphia District Attorney's Office, they are participating in the litigation in the shoes of the District Attorney; correct?
A. Sure. I should clarify, though, that it's not necessarily common practice for an individual attorney to enter their appearance in any given PCRAs. I don't know if I've actually ever formally entered my appearance, but that doesn't mean I'm not the one handling the case for the district attorney's office, which is just to say sometimes there's not a specific name there.
Q. Do you find it unusual that Mr. Gaeta entered his appearance in the Lavar Brown matter?
A. Not unusual. I don't know what his practice is.
Q. It's not a practice that you are familiar with?
MR. SKINNER: Objection. You are misstating the document.
MR. BROWNLIE: You can answer.
THE WITNESS: I'm not familiar with



his personal practices to whether he enters his individual appearance, no.
BY MR. BROWNLIE:
Q. Have you ever entered your own personal appearance in a PCRA matter?
A. No.
Q. I'm going to ask you to turn to page 20 of the docket, ma'am.
A. Okay.
Q. And you'll see at sequence -- it's the sixth entry down. It's a filing on June 23, 2020 of a Post-Conviction Relief Act petition.
Did I read that correctly?
A. Yes.
Q. And if you could turn the page, please, ma'am, to 21 and it's the penultimate entry, Commonwealth's Response to PCRA filed by Thomas Charles Gaeta, April 5th of 2022.
Did I read that correctly?
A. Yes.
Q. So do I read that to understand that Mr. Gaeta filed the Philadelphia District Attorney's answer to Mr. Brown's PCRA petition?
A. Assuming the docket is correct, yes.
Q. And if you could turn to page 24,



ma'am, please. The third entry is a memorandum of law on September 9, 2022 filed by Mr. Gaeta. Two more lines down there's a letter brief filed on September 23, 2022 by Mr. Gaeta. And there's another memorandum of law filed by him on November 11, 2022 at the penultimate entry on page 24.
Did I read that correctly?
A. Correct.
Q. And if you turn to page 26, ma'am, the third docket entry, May 5, 2023, there's an order entered by Judge Bronson, I believe, granting the PCRA petition vacating Mr. Brown's sentence and a ordering a new trial. That's dated May 5, 2023.
Did I read that correctly?
A. Correct.
Q. So according to these docket entries, Mr. Gaeta conducted the litigation giving rise to the order granting PCRA relief on behalf of the Philadelphia District Attorney's Office; is that correct?
A. I mean, I can say he filed things. Whether or not he handled everything or there were other people involved, this docket doesn't reflect



that.
Q. Right. And did you have occasion to read the Pennsylvania Supreme Court's most recent decision in Commonwealth versus Brown?
A. Yes.
Q. And what's your understanding of the ultimate decision?
A. The ultimate decision is that any time the Commonwealth or, rather, the Philadelphia District Attorney's Office concedes PCRA relief that the Court is required to notify the Pennsylvania Attorney General to give them an opportunity to intervene.
Q. And what's your understanding -- what gave rise to the necessity of that practice?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection. I'm just not --
MR. BROWNLIE: You can answer.
MR. CIOSCHI: -- sure what we're doing here.
MR. BROWNLIE: It's okay.
THE WITNESS: The Justices' reasoning is in their opinion. I can't say --
MR. BROWNLIE: I'm asking for what

your understanding is, ma'am.

MR. SKINNER: Objection. Relevance. And, you know, it's an opinion which speaks for itself.

MR. BROWNLIE: You can answer.

MR. CIOSCHI: Objection, as well.

THE WITNESS: I don't know that my opinion is that that's necessary. Your question assumes that.

BY MR. BROWNLIE:

Q. Is your opinion that it is unnecessary for the OAG to be notified any time the Philadelphia District Attorney's Office concedes relief in a post-conviction case?

A. I don't have an opinion universally. I know that the opinion now requires and that's how these cases will proceed going forward.

Q. And what has been the internal response to the most recent decision in Brown?

MR. SKINNER: Objection. It's pretty vague.

MR. BROWNLIE: Sorry. I didn't hear that.

MR. SKINNER: Vague.

THE WITNESS: I would say the



response is ongoing. This is a pretty recent decision.

BY MR. BROWNLIE:

Q. As assistant supervisor of a unit in the Law Department that conducts post-conviction litigation, are you involved in the implementation and development of policies in response to this opinion?

A. I've been --

MR. SKINNER: Objection.

You can answer.

THE WITNESS: I've been involved in some conversations about it. It's my understanding there may have been conversations also that don't involve me. But, yes, I have been involved in some litigations.

BY MR. BROWNLIE:

Q. Has the decision at all impacted the way that you handle PCRA litigation?

A. Do I personally? No. I investigate my cases top to bottom the same as I ever would. This will change, you know, that we have undertaken ourselves to notify Attorney General of cases, even though that is not necessarily what opinion requires.



Q. Are you aware that Katherine Ernst entered her appearance and conducted the appellate litigation in Lavar Brown?

A. Yes, I did know that.

Q. And, in fact, according to the opinion, she and Mr. Gaeta are the only two ADAs from your office that participated on behalf of the Philadelphia District Attorney's Office.

Is that your understanding?

A. I don't recall that specific part of the opinion. And I don't know whether or not other attorneys participated or not.

Q. How did you come to learn that Ms. Ernst was involved?

A. I just remember it being discussed around the office. I remember her talking about preparing for the argument.

Q. And do you understand that the Justices to conclude the manner in which the Philadelphia District Attorney's Office was using concessions gave rise to the need for OAG intervention and post-conviction litigation?

MR. SKINNER: Objection.

THE WITNESS: I think I would let the Justices' opinions speak for themselves.



BY MR. BROWNLIE:

Q. I'm asking what your understanding is, ma'am.

A. My understanding is that opinion requires the Court to notify the Attorney General and give them the ability to intervene any time the Philadelphia District Attorney's Office concedes relief in a PCRA.

Q. And why is that?

MR. SKINNER: Objection.

THE WITNESS: Their reasons are detailed in the opinion. I --

BY MR. BROWNLIE:

Q. I'm not asking what their reasons are. I'm asking what your understanding is. Do you understand the distinction between those two questions?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection.

THE WITNESS: I do.

BY MR. BROWNLIE:

Q. So what's your understanding?

A. My understanding is they reviewed the concession in this case. They found issues with it and implemented this policy.

Q. What issues do you understand the Justices to have taken with the concession brief filed by Mr. Gaeta?

MR. SKINNER: Objection.

THE WITNESS: I know there's a discussion of very specific factual things. And I've not reviewed the factual record in this case beyond what's in this opinion.

BY MR. BROWNLIE:

Q. The opinion is pretty thorough, you would agree?

A. It's certainly very long, yes.

Q. I'll read for purposes of the record from Majority Opinion. The Court writes: "We conclude this concession was not reliable. More specifically, we find the DAO conceded relief, although none was warranted, based on the existing record; violated its duty of candor to the PCRA Court; withheld material evidence from the Court, opposed efforts by amici to gain access to this evidence; submitted a false stipulation of fact; misstated facts in its pleading; failed to conduct a reasonable investigation; and opposed the required evidentiary hearing. The predictable result was the erroneous grant of a new trial."



Do you understand the opinion to be based upon those circumstances?

MR. SKINNER: Objection.

THE WITNESS: I understand that that's what the opinion says, yes.

BY MR. BROWNLIE:

Q. We talked earlier about the 2018 decision in Lavar Brown. And is it your testimony today that you do not recollect what that holding of that decision is as the assistant supervisor of the PCRA unit?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection.

THE WITNESS: I can't say whether or not I'm familiar, but I can't say what the holding of that case is, no, sitting here today. I have not reviewed that opinion.

BY MR. BROWNLIE:

Q. So the Pennsylvania Supreme Court summarizes its holding of that decision by saying: "The PCRA requires judicial merits review favorable to the Petitioner before any relief may be granted. A concession of the error by the Commonwealth does not constitute a judicial ruling in the Petitioner's favor and, thus, is



insufficient for any grant of relief under the PCRA."

Does that refresh your recollection?

A. I mean, whether coming from that opinion, I don't know, but I certainly understand that just because the Commonwealth says relief can be granted, it doesn't mean relief is automatically granted. A judge has to make that decision.

Q. And in this case, you have reservations about some of the representations that were made in the Ramirez concession brief?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection. Josh, come on.

THE WITNESS: I don't believe that's what I testified to. I said I had not come to a conclusion myself as to what -- you asked me what position I would take on the case. I had not reached a decision.

BY MR. BROWNLIE:

Q. "Part of the Court's findings in that case was that four months after Brown raised his Brady claim, the DAO filed a selective papers-only review, confessed error, and agreed to a new



trial. What's more, the DAO confidently declared this case to be a stark example of what can go wrong when prosecutors cut corners and shrink their ethical and constitutional duties in order to obtain and defend convictions of defendants they believe are guilty. Yet the DAO itself cut corners and shirked its duties in conducting its post-conviction investigation. Although the paperwork alone did not come close to presenting a clear basis for relief, the DAO nonetheless restricted its review to the inscrutable documentary evidence. This was neither reasonable nor adequate to ensure the PCRA Court was not mislead."

Do you recall reading that section of this opinion?

MR. CIOSCHI: Which opinion are you talking?

MR. BROWNLIE: The 2016 [sic] decision.

For purposes of the record, the cite is -- I don't know have the Atlantic Reporter. The Docket Number 32 EN, 2023.

MR. CIOSCHI: Is it the 2026 decision?

MR. BROWNLIE: Correct.
THE WITNESS: I mean, I read the entire 2026 decision. I don't have a specific memory of those words, but I certainly know I read the entire opinion.
BY MR. BROWNLIE:
Q. And this process that the Court is describing here about a selective papers-only review is the same process that gave rise to the vacatur in this case, is it not?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: I don't know what process -- I have no intimate knowledge of the underlying filings in this case. If your question is if there was a hearing in this case, the answer is obviously, no.
BY MR. BROWNLIE:
Q. And Mr. Napiorski opposed the holding of an evidentiary hearing on the PCRA claims.
Is that your understanding?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
(Reporter clarification.)



THE WITNESS: I don't know I would say he opposed it. Perhaps he didn't think it was necessary, but I don't know if that's the same as saying he opposed one.
BY MR. BROWNLIE:
Q. If I represented to you that Judge DiClaudio thought that a hearing was necessary and the district attorney's office said that it was not, would you consider that to be an opposition?
A. I think saying it's opposed to having a hearing because the final point of this brief I think is something to the effect of in the alternative the Commonwealth doesn't oppose a hearing. But perhaps he argued it wasn't necessary to have one, but I don't know how we're using the word opposition in your questions.
Q. You don't understand what the word opposition means?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
MR. SKINNER: It's argumentative.
MR. CIOSCHI: Josh.
THE WITNESS: You are saying he opposed it saying that he didn't think it was necessary. If that means opposing it, then, yes.



BY MR. BROWNLIE:
Q. Thank you.
Did you do anything other than review documentary evidence during your work on the Ramirez PCRA petition?
MR. CIOSCHI: Objection. Asked and answered about 20 times.
THE WITNESS: I did not speak to any witnesses, no.
BY MR. BROWNLIE:
Q. Did you do anything other than review papers?
A. No. I reviewed the entirety of the papers.
Q. Are you aware of anyone else having done anything other than review only the documentary evidence in this case?
A. Well, I know that Mr. Napiorski had the email exchange we discussed earlier with Mr. Gilsen and it's my understanding that he had an oral conversation with Mr. McMahon.
Q. Do you have any personal knowledge about the number of concessions filed by the Philadelphia District Attorney's Office?
A. No.



Q. And do you recall that the Justices explained -- page 131 -- "The DAO does not acknowledge any problem or need to reform its practices."
Are you aware of the Court's conclusion in that respect?
A. I mean, yes. Like I said, I read the entire opinion.
Q. And, in your opinion, are there practices that were implemented in this particular case that could have been improved now considering and having the benefit of the Pennsylvania Supreme Court's decision in Brown?
MR. SKINNER: Objection. And privilege. Yeah, I think that's attorney work product.
MR. BROWNLIE: Excuse me?
MR. SKINNER: I mean, her impression is about the strength of the case.
MR. BROWNLIE: No, it's not. The question was concerning policies and practices.
MR. SKINNER: Can you repeat the beginning of the question?
BY MR. BROWNLIE:
Q. Do you think that there are

practices in the Philadelphia District Attorney's Office that should be revised in light of the Pennsylvania Supreme Court's decision in Brown?
MR. SKINNER. Objection. Relevance.
MR. BROWNLIE: You can answer.
THE WITNESS: I believe that every case before Brown or since Brown should be reviewed in the same way, reviewing everything with thoroughness, and that's how I undertake my practice and that's what I understand myself being asked to do in every case I'm assigned to.
BY MR. BROWNLIE:
Q. And sometimes that means interviewing witnesses?
A. It can.
Q. Or speaking to trial counsel?
A. It can, yes.
Q. Or speaking to the prosecutor that conducted the initial prosecution?
A. It certainly happens, yes.
Q. Speaking to the police?
A. It can, yes.
Q. How many times have you spoken to police during your six years at the Philadelphia District Attorney's Office?



MR. CIOSCHI: Objection. Form.
MR. SKINNER: Objection.
BY MR. BROWNLIE:
Q. In the context of responding to a post-conviction petition?
A. I don't know an exact number, several.
Q. And generally when you reach out to police to conduct a reasonable investigation, what are you usually contacting them for?
A. It really depends on the case. I mean, I can give an example, sometimes just the recollection of the case, if they are going to need to be called as a rebuttal witness, what they remember about the case. It's very case-dependent, what you would talk to them about.
Q. Do you think it would be prudent to confer with police in the context of a post-conviction petition alleging coercion by that officer?
A. You know, it certainly would depend on what the question we're trying to answer is. If we're talking about specifically what happened in a certain case, perhaps. If we're talking about whether or not a finding of prior misconduct



would create a Brady violation, there's not always a need to speak to that officer from a legal perspective of that question. So, again, it's very case-dependent.
Q. Did you think it was specific to reach out to the officers in this case for purposes of responding to the allegations of coercion that were ultimately adopted in advance of the concession brief?
MR. CIOSCHI: Object to form. And I think the question is --
MR. BROWNLIE: You can answer it.
MR. CIOSCHI: -- confoundedly worded.
THE WITNESS: Can you repeat your question?
BY MR. BROWNLIE:
Q. Do you think that it would have been prudent to interview the police officers against whom allegations of coercion were made in formulating a conclusion about whether or not relief was appropriate in this case?
MR. SKINNER: Objection. Privileged. Work product.
THE WITNESS: No.



BY MR. BROWNLIE:
Q. Now, the Pennsylvania Supreme Court in its 2026 decision did not limit its review solely to the Lavar Brown case; is that correct?
A. That's correct.
Q. And, in fact, it cited, I believe, five or six other cases, including Wharton, in which DA Krasner's office misrepresented facts to the courts for purposes of securing post-conviction relief; is that correct?
A. There are other cases discussed in that opinion, yes.
Q. Do you think the Pennsylvania Supreme Court got it right in its 2026 decision?
MR. SKINNER: Objection.
THE WITNESS: I don't have an opinion on that. All I know is how it affects how I do my job now and I will continue to do my job like I did before and now with this new added element of that.
BY MR. BROWNLIE:
Q. Are you aware of the Dennis Johnson matter currently pending before Judge Diamond?
A. I'm aware it's pending, yes.
Q. What's your knowledge of that case?

Page 222

MR. SKINNER: Objection. Relevance.
THE WITNESS: My knowledge would just be what I read in the public press. I have no knowledge beyond that. I'm not involved in that matter within the office.
BY MR. BROWNLIE:
Q. Were you present during the hearing on Friday?
A. I was not.
Q. And, to your knowledge, ADA Katherine Ernst and ADA David Napiorski were involved in that matter?
A. That's correct.
Q. And what's your understanding of their involvement in that matter?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
MR. BROWNLIE: You can answer.
THE WITNESS: What I know is that they filed a brief along with other supervisors earlier this summer withdrawing a brief that had been filed previously by the district attorney's office. I believe ADA Ernst and ADA Wildberger filed a motion regarding a conflict. And it's my understanding there was an additional filing

Page 223

regarding that yesterday, which I have read.
(Reporter clarification.)
BY MR. BROWNLIE:
Q. You have read what?
A. The document that was filed by Ms. Ernst and Mr. Wildberger yesterday.
Q. And why did you read that?
A. In my personal time because I was interested in what it said.
Q. When did you come to learn that that document had been filed?
A. Last night.
Q. Through acquaintances?
A. Yes.
Q. Who told you the document had been filed?
MR. CIOSCHI: Objection.
MR. SKINNER: Objection.
THE WITNESS: Someone sent me an Inquirer article.
MR. BROWNLIE: So I'm going to mark this as Defense Exhibit 18.
(Nelson Exhibit 18, Notice of Conflict, was marked for identification.)
(Whereupon, a discussion was held

Page 224

off the record.)
(Whereupon, a recess was taken.)
BY MR. BROWNLIE:
Q. So you did have an opportunity to read the Notice of Conflict filed by Katherine Ernst, I believe it was yesterday; right?
A. Yes.
Q. Why were you interested in reading those?
MR. SKINNER: Objection.
THE WITNESS: Because it's something that's going on in the office.
BY MR. BROWNLIE:
Q. Do you understand it to implicate potential misconduct by your office in the Dennis Johnson matter?
MR. SKINNER: Objection.
THE WITNESS: I mean, I would, you know, think what ADAs Wildberger and Ernst say speak for itself. I supposed it's a possible implication, but I don't have any knowledge beyond what I'm reading.
BY MR. BROWNLIE:
Q. And is your understanding that Judge Diamond held an evidentiary hearing on Friday for

Page 225

purposes of what actually happened in that case concerning the concession brief filed in that matter?
A. I know that a hearing was held, yes.
Q. And that the basis for that hearing was that your own office represented to Judge Diamond that it's own brief contained factual misrepresentation?
A. I believe --
MR. CIOSCHI: Objection.
THE WITNESS: -- so, yes.
BY MR. BROWNLIE:
Q. Having reviewed the Notice of Conflict filed by Katherine Ernst and Steve Wildberger, what do you understand their conflict to be?
MR. SKINNER: Objection.
THE WITNESS: I mean, I don't know if I can speak to what I understand their conflict to be because I haven't been involved in all of this. I understand them to be saying that they feel they have a conflict given the process and what has happened in this case.
BY MR. BROWNLIE:
Q. And read for purposes of the record,

Page 226

ma'am. This is the first paragraph on the first page: "On the day the Commonwealth filed its Motion to Withdraw Response, June 5, 2026, ADAs Wildberger and Ernst, along with Law Division Supervisor David Napiorski and Federal Litigation Supervisor Peter Andrews, requested to District Attorney Lawrence Krasner ("DA Krasner") that the case be referred to the Office of Attorney General ("OAG"). In a series of meetings thereafter, ADAs Wildberger and Ernst and others repeatedly implored DA Krasner to refer the case to the OAG."

What's your understanding about DA Krasner's position concerning the participation of OAG in post-conviction litigation as assistant supervisor of the PCRA unit?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection.

THE WITNESS: I have not spoken with DA Krasner myself or been involved in any conversations with him myself. You know, I certainly have seen a video he posted to Instagram and, you know, that's the extent of what I can say about his position on it.

BY MR. BROWNLIE:

Q. Which video are you referring to?

Page 227

A. He posted a video, I believe, on his Instagram -- I don't know if it's DAO's Instagram -- where he spoke about the Lavar Brown decision.

Q. Shortly after the opinion was published?

A. Yes.

Q. The first full paragraph on the second page of the sentence begins: "In short, ADAs Wildberger and Ernst, (1) understand that DA Krasner had received litigation advice from ADA Matthew Stiegler about this case, advice DA Krasner then suggested to ADAs Wildberger and Ernst and others." And there's a footnote. "And (2) received instruction from DA Krasner to litigate the case in a matter to protect the office, which they view as incompatible with their ethical obligations and the interests of the Commonwealth."

Is there a culture in the Philadelphia District Attorney's Office that litigation must be undertaken for the purposes of protecting the goals of DA Krasner's administration?

MR. SKINNER: Objection.

Page 228

MR. CIOSCHI: Objection.

THE WITNESS: No. Certainly the goal is that the administration effect policies, but there's no practice. You know, again, my job in any given case is to review the case, like I said, top to bottom is the simplest way I know how to say that and handle each case individually in that way.

BY MR. BROWNLIE:

Q. And pursuant to your own ethical obligations, you are required to oppose relief if you believe that the facts and the record do not support it, irrespective of what the administration may later claim in front of a court?

A. Yes.

Q. And you understand your own ethical obligation to report that misconduct to the bar association?

A. If I -- yes, if I encountered misconduct, I would have an obligation to report that, yes.

Q. The penultimate paragraph on page 2 reads: "At a meeting on June 25, 2026 where ADA Wildberger and others once again requested that

Page 229

the case be referred to the OAG, DA Krasner stated that there would be consequences for anyone who notified the court of the conflict issues."

Did I read that correctly?

A. Yes.

Q. Do you understand that assertion by Ms. Ernst and Mr. Wildberger to be reflective of any general customs or practices in the Philadelphia District Attorney's Office?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection.

THE WITNESS: Would you clarify the question?

BY MR. BROWNLIE:

Q. Yes. So what I'm getting is a culture within the unit itself.

So with respect to post-conviction concessions, such as the ones in Ramirez, Brown, Wharton, Johnson, is there a culture in the Philadelphia District Attorney's Office that once a concession is made, that irrespective of misrepresentations contained within the brief, that the office should hold the line?

MR. SKINNER: Objection.

THE WITNESS: No.

Page 230

BY MR. BROWNLIE:
Q. Have you personally participated in any other case in which -- excuse me. Let me clarify.
Have you participated in any other PCRA litigation -- strike that.
Have you participated in any post-conviction litigation in which a concession brief was filed and later found to contain factual misrepresentations or inaccuracies?
A. No.
Q. Earlier on we discussed -- I have one more area, then I'll be finished.
Earlier on we discussed the use of the office's stipulations. Do you currently -- and I think I asked you this before, but I'm going to ask you one more time in the context of this inquiry. You currently use stipulations in your response to post-conviction petitions?
A. I don't know what you mean by "currently use in response." Stipulations can mean a variety of different things. Do I stipulate to things in the context of a hearing? Might I stipulate that a certain day of testimony happened on this particular date? Of course.

Page 231

Q. Sure.
A. So if that's your question, then, yes, I use stipulations in that way.
Q. Are there limits to the DAO's ability to use stipulations?
MR. SKINNER: Objection to form.
MR. CIOSCHI: Objection, as well, on form.
THE WITNESS: Sure. There are certain things that can't be stipulated to that a judge has to make a finding on, yeah.
BY MR. BROWNLIE:
Q. Such as what?
A. Well, conclusions of law, for one.
Q. Any other factual determinations outside the purview of the Philadelphia District Attorney Office's ability to stipulate?
A. There could be. I'm sure that's possible. I don't know.
Q. As the assistant supervisor of the PCRA, you are unaware of any doctrinal limitation on the office's ability to use stipulations in a factual context?
MR. SKINNER: Objection.
THE WITNESS: I don't know what you

Page 232

mean by "doctrinal limitation."
BY MR. BROWNLIE:
Q. Are you familiar with the Pennsylvania Supreme Court's decision in Commonwealth versus Perrin?
A. The case name is familiar to me. I don't know whether I've read it.
Q. In which the Court found or held that the district attorney's office could not stipulate to the credibility of witnesses?
A. Sure. Because that's a legal conclusion.
Q. Is it?
A. In my view -- yes, for a judge to decide if it's practical or not.
Q. Are you aware of a specific decision?
A. I don't know if I'm aware of that specific decision. I'm aware that -- I can't -- certainly you could not contest the credibility of a witness. That happens all the time for an expert or something like that, you know.
Q. Or a post-conviction affiant who claims to have been coerced?
A. I've never stipulated to the

Page 233

credibility of a witness in that way.
Q. Do you consider non-opposition to an assertion of coercion to be a de facto stipulation?
MR. SKINNER: Objection.
THE WITNESS: No. If there's an allegation of coercion, that doesn't form the basis for relief if the case is being resolved on a separate claim. There's no need to address the credibility of that.
BY MR. BROWNLIE:
Q. And, in fact, there's no need to address the coercion at all?
A. I don't know what you mean by "address the coercion at all."
Q. If the coercion is not a basis for post-conviction relief, then there's no reason it should be included in a concession brief; correct?
A. Well --
MR. SKINNER: Objection.
THE WITNESS: -- for the sake of completeness that there's an allegation of that, it may come up in a brief, certainly.
BY MR. BROWNLIE:
Q. And completeness would include

factual matters that weigh against a finding of coercion; correct? So both sides of the story?
A. Sure, yes.
Q. And if you do not present the opposite side of an allegation of coercion by interviewing police officers, then you have not presented a full and complete factual record; correct?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
THE WITNESS: Well, you can't present anything like that in a filing. That would require a hearing.
BY MR. BROWNLIE:
Q. Correct, which your office opposed in this case?
MR. SKINNER: Objection.
MR. CIOSCHI: Objection.
THE WITNESS: What I would say, the brief filed by ADA Napiorski says that in order to resolve these Brady claims, a hearing is not necessary. So insofar that's an opposition, sure.
MS. HAYES: I have just a few questions. Josh hit on most topics.
EXAMINATION BY MS. HAYES:



Q. We talked a lot about this email that you sent to Nancy Winkelman in your factual review --
A. Sure.
Q. -- of the concession brief. You mentioned that you can't remember whether your notes were incorporated into the brief; right?
A. (No verbal response.)
Q. Do you remember or know whether Lori Williamson's notes were incorporated into the brief?
MR. SKINNER: Objection.
THE WITNESS: Again, it would require me to do a one-for-one comparison.
MS. HAYES: Understood.
THE WITNESS: I can say I never reviewed the brief again. We sent those notes and then the brief was filed. I read it again for myself once it was filed, but I never reviewed the brief again. That was the only time.
BY MS. HAYES:
Q. Did you and Mr. Napiorski work together on this case?
A. Like I said, we were both conducting our own independent review of the case.



There's -- you have to read things for yourself. Obviously, we were involved in at least that one meeting together. He and I may have spoken, the two of us about the case, as well. So in that sense, perhaps we worked together, but we were conducting our own independent reviews. The only way I can know what a statement says is by reading the statement myself.
Q. Would you say that you were investigating facts alongside him? Would that be a fair characterization or no?
A. I mean, we have been investigating the same thing, I suspect. But we were both -- yeah, I don't know that we were necessarily investigating different things, but there were things that he was asked to do, such as speaking to Mr. Gilsen and Mr. McMahon that I was not asked to do. That was the role that he would take in that case or he would take that task.
Q. Independent review of the facts, but you would get together and talk about the case with him. Fair?
A. Sure.
Q. Could you give me a brief overview of how the PCRA unit is notified that a PCRA



petition is filed and how it gets assigned?
A. Sure. So when a PCRA is filed there is an automatic court notice that would go to a general PCRA inbox. Typically, the matter is not assigned until a judge has ordered or directed the Commonwealth to take some action, whether it be to file a response or a hearing. Sometimes matters are assigned for other reasons, if there's a complicated discovery issue or something like that, but most often it's assigned once a judge has ordered the Commonwealth to take action, irrespective of when a petition has been filed, both from a practical standpoint and because very often petitions are filed, but the defense has not completed its pleadings yet, so it would be premature to file something if there's going to be amendments or supplements.
Q. All right. So at what point does, let's say, the supervisor of the PCRA unit do that assignment?
A. Once the person who has handled court that day where the judge has ordered the Commonwealth answer to be filed, for example, we're emailed about that and notified about that and then the assignment process begins.

Page 238

Q. So the supervisor gets from that line ADA whatever PCRAs have been filed and then they assign it out; is that correct?
A. Not necessarily what's been filed, but, again, what has been ordered to have Commonwealth action taken on it.
Q. Understood. Thank you for that.
Was it unusual for two different units in this case, the Federal Litigation Unit and PCRA, to be assigned to the same case?
A. So I was told that the idea was that perhaps they would try to be more collaboration between units, PCRA and federal habeas, whenever both -- the case was in both postures. This is the only case I worked on personally where that happened, but I don't know if that happened in other instances.
Q. So as far as it being unusual, you just haven't experienced cases like this that have that posture?
A. I've had cases with that posture where the habeas opinion may have been stayed. This was the first case -- or, rather, only case I have worked on where both someone from federal litigation and myself were assigned to it. It was

Page 239

my understanding that that was a goal that was perhaps going to be tried in the Unit.
Q. But those previous cases, those would only be with the PCRA unit?
A. Or perhaps with the Federal Litigation Unit. I mean, you know...
Q. Understood. But just one unit instead of together?
A. Well, someone could still be assigned -- could in theory still be assigned to the federal habeas petition, regardless of whether or not someone is assigned to the PCRA, whether or not they're needing to do work on the case often can depend on the posture in federal court.
Q. But the Ramirez case is the first time that you have seen someone from the Federal Litigation Unit file a response to a PCRA?
A. No, certainly people at the Federal Litigation Unit are at times assigned PCRAs perhaps because they had the habeas case, maybe from just a resources perspective. So, no, that itself is not unusual, no.
Q. Understood. Last thing. So the training that you talked about, the training that was specific for PCRA.

Page 240

A. Sure.
Q. Are you aware Federal Litigation has their own training? Are you all trained together? How does that work?
A. I believe when I was going through the training, there were probably some division-wide trainings and then I'm certain there were also federal litigation trainings specific to the nuances of federal habeas versus the nuances of PCRA, but I, obviously, wasn't present for any of those.
MS. HAYES: That's all I have. Thank you.
MR. CIOSCHI: Hi, ADA Nelson.
THE WITNESS: Hi.
MR. CIOSCHI: I think I only have one or two questions. I'll try to be very brief.
THE WITNESS: Okay.
EXAMINATION BY MR. CIOSCHI:
Q. We've talked a lot of about D1, the --
A. The filing?
Q. -- filing in the Ramirez matter?
A. Yes.
Q. In that filing, did the

Page 241

Commonwealth, to your recollection, stipulate to the credibility or reliability of any witnesses?
A. I don't believe so.
Q. In fact, on page 12, note 5, did the Commonwealth's response expressly note that the Commonwealth takes no position on the reliability or credibility of the recantations and/or allegations of police misconduct in this matter?
A. Yes, that's correct.
Q. ADA Nelson, there's been some discussion about cases where you personally have signed briefs conceding relief --
A. Yes.
Q. -- in post-conviction matters?
How many cases, PCRA cases, are you assigned currently?
A. Currently, I would say it's narrowing some since I've become a supervisor, I probably have 30 to 40 active cases of my own in addition to all the cases I'm supervising.
Q. Understood. Before you were a supervisor, when you were a line ADA in the PCRA unit, how many cases were you assigned at any given time?
A. Probably be --

MR. BROWNLIE: Objection to form.
THE WITNESS: -- upwards of 50.
BY MR. CIOSCHI:
Q. And those are all PCRA cases or cases where petitions were brought under Pennsylvania's Post-Conviction Relief Act?
A. Correct. In various stages of their litigation.
Q. And over the course of your time at the DA's office, you've only been assigned to the PCRA unit; is that correct?
A. Correct.
Q. So your work has either been responding to PCRA petitions or supervising their response --
A. Correct.
Q. -- to PCRA petitions?
A. Correct.
Q. About how many PCRA petitions have you responded to?
MR. BROWNLIE: Objection to form.
THE WITNESS: Where I filed a personal response, more than a hundred. It may be way more than that. It's hard to say.
BY MR. CIOSCHI:



Q. Right. The years kind of blend together; don't they?
A. Yes.
Q. And sometimes the cases do, too; right?
A. Yes.
Q. So at least 100 cases you filed PCRA responses?
A. I think that's fair or I should say I've been assigned to work on 100 cases. Most of those often result in filings of some sort.
Q. Right. Because sometimes you are not ordered to file a response by the Court; is that correct?
A. That's correct.
Q. So probably most of the 100 you worked on, you filed some form of response?
A. More often than not, either a substantive response or a response saying that we don't oppose a hearing or something like that.
Q. So either a motion to dismiss the petition, an answer to the petition, or some type of answer that indicates you may not oppose further evidentiary development?
A. That's correct.



Q. And when you don't oppose for evidentiary development, are you telling the Court that a hearing is not necessary?
A. Sorry. Can you say that one more time?
Q. Sure. There's a little double negative there.
When you file a response in a PCRA case saying the Commonwealth does not oppose an evidentiary hearing, what are you trying to communicate to the Court whether an evidentiary hearing might be needed?
A. Yes. It's the Commonwealth position to use the language of the statute that there's a material issue of fact that the Court has to resolve in order to be able to resolve the legal conclusion. Very often, that's dealing with the credibility of a witness, but it can be other things, as well.
Q. So if the Commonwealth opposes an evidentiary hearing, what kind of language do you use to respond to a PCRA petition requesting one?
MR. BROWNLIE: Objection to the form.
THE WITNESS: Sure. So if we are



opposing a hearing or, rather, saying that a hearing is not necessary, it's that we believe on the existence of the record that there's enough evidence, you know, for the Court to resolve it. So it may be the case that -- you know, in a case for Brady analysis, we would argue that there's no reasonable probability of a different outcome because of the Brady material.
BY MR. CIOSCHI:
Q. You've reviewed D1 today and in preparation for today?
A. Correct.
Q. That's the Commonwealth's response to Mr. Ramirez's PCRA petition?
A. Yes.
Q. Filed August 1, 2023?
A. Correct.
Q. Where in that response does the Commonwealth make clear that it opposed an evidentiary hearing in this matter?
MR. BROWNLIE: Objection to the form. Misstates prior testimony and the record.
THE WITNESS: Well, I don't know that it does, because I believe if you looked at the table of contents you would see that in the

Page 246

alternative the Commonwealth does not oppose a hearing on the Brady claims.
BY MR. CIOSCHI:
Q. Can you turn to page 73 and 74?
A. I'm there.
Q. Can you just briefly review the bottom of 73 from the bold heading C to the top of 74 --
A. Yes.
Q. -- just to where the section ends?
A. Yes, I'm done reviewing.
Q. Did the Commonwealth in this filing oppose an evidentiary hearing in this matter?
A. No, it intimated to the Court that if the Court believed additional factual development was necessary, it would proceed as such.
Q. So you filed in your personal capacity as a PCRA line ADA and potentially, as well, in your supervisory capacity handling individual cases about a hundred responses to PCRA petitions?
A. Yes, at least.
Q. And you've signed briefs conceding relief in approximately five?

Page 247

A. I would say between five and 12, somewhere in there, conceding ultimately the grant of a new trial. For the sake of completeness, I should add I filed several additional briefs agreeing that nunc pro tunc reinstatement of either direct appeal rights or post-sentence motions should be granted. But as to like the ultimate grant of a new trial, a much more limited number.
Q. So approximately five?
A. Yeah, five to ten, I would say.
Q. So that would be five to ten concessions of relief filed under your name, in part, to a new trial out of about 100 PCRA --
A. Correct.
Q. -- responses you filed?
So that's between 5 and 10 percent of all of your cases?
A. Yes.
Q. Would you say that's based on your general knowledge of the Law Division or particularly, I should say the PCRA unit -- strike that.
Would you say, based on your knowledge and practice of PCRA unit, that's pretty

Page 248

consistent with standard practice, that rate of concession versus opposition?
A. I would say the vast majority of positions taken in cases are opposite to relief.
MR. CIOSCHI: Thank you. No further questions.
Oh, and so let me just follow up on that briefly.
BY MR. CIOSCHI:
Q. That means you are telling the Court that despite the claims that the petitioner has made asking for a new trial based on alleged constitutional legal violations, they are not entitled to a new trial?
THE WITNESS: Correct.
MR. CIOSCHI: Nothing further.
MR. BROWNLIE: I have some redirect.
FURTHER EXAMINATION BY MR. BROWNLIE:
Q. The questions that Ms. Hayes posed to you with respect to Fed Lit ADAs handling PCRA petitions, I believe you testified that it was your understanding that if they handled the federal habeas litigation that they would handle the subsequent state court filings for purposes of exhaustion?

Page 249

A. Not that they always would, but that -- it's a possibility.
Q. Have you ever participated in a case where a line ADA, who had opposed relief for more than 20 years, was removed from a post-conviction case and replaced by a Fed Lit attorney with no knowledge of the case whatsoever?
MR. SKINNER: Objection. Misstates prior testimony.
MR. CIOSCHI: Objection.
THE WITNESS: I mean, I don't know if you are asking a question about this case as it concerns Ms. Williamson and Mr. Napiorski. I don't know that I would see Ms. Williamson -- I mean, Ms. Williamson was still involved in the case, but, you know, I was assigned as a line ADA and Mr. Napiorski was assigned as a line ADA.
BY MR. BROWNLIE:
Q. And is it your understanding that Lori Williamson litigated post-conviction proceedings on behalf of the DAO for between 15 and 20 years after the conviction?
A. I know she had handled at least some of the prior PCRAs. Whether or not she handled them all and whether or not she was the only one

Page 250

to handle them, I don't recall sitting here now, but I certainly know that, yes, she had handled or at least been involved in a prior PCRA and a hearing previously.

Q. So you would agree that Ms. Williamson possessed a more superior knowledge of the record, given her extensive participation in post-conviction litigation than did ADA Winkelman, Ernst, and Napiorski?

MR. SKINNER: Objection.

MR. CIOSCHI: Objection.

THE WITNESS: Well, she certainly had previously reviewed the record. I can only speak for myself where I would have come to a point where I knew everything that Lori knew about the case, but I guess she had existing knowledge in that she had worked on the case before.

BY MR. BROWNLIE:

Q. And the case was reassigned from her to Mr. Napiorski?

MR. CIOSCHI: Objection.

MR. SKINNER: Objection.

THE WITNESS: I don't know that it's a fair characterization to say it was reassigned. At the time, Ms. Williamson was not personally

Page 251

handling a ton of cases of her own, given her role as a supervisor. She was still involved in the case --

BY MR. BROWNLIE:

Q. Did -- my apologies.

A. Like she and PCRA assigned the case to me. Either she or Tracey, like I said, I don't know who which sent the email. But they assigned the case to me, understanding that I would, of course, work with them as I did all of my cases with my supervisors.

BY MR. BROWNLIE:

Q. And you are unaware of the fact that ADA Winkelman testified in this case that she thought having someone other than Lori Williamson on the Ramirez matter was a good thing?

A. I mean, if that's what she testified to, then that must be what she believed.

Q. You were asked about certain portions of this brief and whether or not the Commonwealth made an opposition or expressed an opposition to the holding of an evidentiary hearing on Mr. Ramirez's claims?

A. Yes.

Q. Are you aware Judge DiClaudio called

Page 252

for oral argument on these proceedings?

A. I recall that there were in-court proceedings. It's not surprising to me; he often asked for argument on cases.

Q. Would it be surprising to you to know that at that hearing, Judge DiClaudio expressed a desire to hold an evidentiary hearing and Mr. Napiorski, despite what the concession brief says, told the Court that that was not necessary?

MR. CIOSCHI: Wait, objection.

BY MR. BROWNLIE:

Q. Are you aware of that?

MR. CIOSCHI: Misstates the record.

THE WITNESS: Yeah, I don't know. I know there were listings of this case, some of which I was at, not in connection with this case, but because I just am in that courtroom frequently. I don't recall whether I knew that at the time or not.

BY MR. BROWNLIE:

Q. So notwithstanding the representations in the concession brief, there were other opportunities at which ADAs appeared before the Court representing the Commonwealth's

Page 253

position with respect to evidentiary hearings and whether one should be had?

A. I mean, what I can say, there were listings on the case. I only appeared at listings on behalf of the Commonwealth prior to the filing of the brief. What happened at the subsequent listings -- whether or not I knew at the time because I just happened to be there, I don't remember.

MR. CIOSCHI: Just briefly, I have a little request for production for that transcript that you seem to have that I don't have.

MR. BROWNLIE: You've got everything that we have, so you might want to read it again.

MR. CIOSCHI: I don't have it.

MR. BROWNLIE: Is that an objection?

MR. CIOSCHI: No, it's a request for production on the record.

MR. BROWNLIE: It's on the record. What do you want me to say to that? Do you want me to pull it out of my back pocket?

MR. CIOSCHI: I'd like you to acknowledge that it's a legitimate request for production on the record.

MR. BROWNLIE: Acknowledged.

MR. CIOSCHI: Great. Thanks. No further editorialization needed, Mr. Brownlie.

MR. BROWNLIE: Thank you.

BY MR. BROWNLIE:

Q. Did Lori Williamson ever express an opinion to you about whether or not she should be more involved in the drafting of the concession brief?

MR. SKINNER: Objection.

BY MR. BROWNLIE:

Q. After the decision to concede had been made?

MR. SKINNER: I'm sorry. Can you repeat the question?

BY MR. BROWNLIE:

Q. Did Lori Williamson ever express an opinion to you about whether or not she should be more involved in the Commonwealth's response to Mr. Ramirez's PCRA petition?

MR. SKINNER: Yeah, objection. Privilege.

BY MR. BROWNLIE:

Q. So consistent with the on-record request for production, the hearing on the PCRA petition conducted on November 2, 2023, page 19:



"THE COURT: Like, should I hear he didn't give me a candy bar? I sat there for two hours? Like what kind of coercion? Did he threaten him? Did he beat him? Did he -- like, should I hear from them at least on what the alleged coercion was? Because if the coercion isn't that significant -- like, hey, he kept us there for two hours and, you know, after two hours, I wanted to tell them.

MR. NAPIORSKI: Right.

THE COURT: Like, should I hear from them before I undo a conviction?

MR. NAPIORSKI: I don't -- I -- because this is a Brady claim, I don't think it's necessary."

So is that the Court expressing a desire to hear from the witnesses that your office cited in the concession brief and Mr. Napiorski expressing that he did not think that that was necessary?

MR. SKINNER: Objection.

THE WITNESS: I mean, it sounds like the judge said should I hear from them and Mr. Napiorski said he doesn't think it's necessary. Yeah, speaks for itself.



MR. CIOSCHI: What Bates number is that, Josh, from the production?

MR. BROWNLIE: I'll get it to you afterwards.

MR. CIOSCHI: Exactly. It hasn't been produced to us.

MR. BROWNLIE: You mean the records of the proceedings that concerned your client?

MR. CIOSCHI: Just because they concern my client --

MR. BROWNLIE: I don't need a lesson in discovery practices from you.

MR. CIOSCHI: Okay. Wow. Impressive.

BY MR. BROWNLIE:

Q. Would you have liked to have heard from the witnesses alleging coercion?

MR. SKINNER: Objection.

THE WITNESS: If that had formed part of the basis of relief, I certainty would have needed to hear from them. But, you know, if there's a basis for relief independent of that claim, whether or not I would like to have heard from them, I think is not terribly relevant.

BY MR. BROWNLIE:



Q. Do you think it would have provided a more accurate context for the Court when reviewing the Brady claims considering that those allegations were submitted in conjunction with the Commonwealth's opposition -- concession to the Brady claims?

MR. SKINNER: Objection.

THE WITNESS: Well, those are separate claims. It certainly can be the case that, you know, a Brady claim standing alone irrespective of whatever other claims are in the petition, you know, is itself, you know, legally requires relief. It's not uncommon in a concession case for there to be one claim that sort of rules the day, so to speak, and then, you know, additional litigation on other claims, therefore, is not necessary.

BY MR. BROWNLIE:

Q. But this is an instance in which the Court is asking for more factual information and Mr. Napiorski is saying that that factual information is not necessary?

MR. SKINNER: Objection.

THE WITNESS: I take him to be saying that the factual -- I can't speak for

Page 258

Mr. Napiorski, but I suppose I take him to be saying that that factual information is not necessary to resolve the Brady claims about the documents or the activity sheets, not that that factual information is not necessary to resolve a claim of coercion. Certainly, if it was coming down to the recantations or allegations of coercion, you know, a court would necessarily have to hear from those witnesses.

BY MR. BROWNLIE:

Q. And so there's been testimony in this case from some of your colleagues that the coercion allegations were included in the brief for context and foundation.

Do you think it would have been beneficial to allow the Court to vet the accuracy and reliability in that context in deciding the Brady claims?

MR. SKINNER: Objection. I think I'm going to stop this. We are going to stop this now because we're really going back into --

MR. BROWNLIE: Going to stop this on what grounds?

MR. SKINNER: I'm going to object on attorney work product, privilege. I mean, are we

Page 259

going back and asking like impressions about strength of the case at this point? Like, we've walked from the general to, you know -- anyway, privileged objection.

Don't answer.

MR. BROWNLIE: Can you read back my question, please.

(Whereupon, the requested portion of the record was read.)

MR. SKINNER: I stand on the privilege objection.

MR. BROWNLIE: So that's all I have.

So we'll get the subpoena out to your office today courtesy of you.

You are going to accept service?

MR. SKINNER: Yes.

MR. BROWNLIE: There will be subsequent litigation concerning the assertions of privilege with respect to all four ADAs. We will likely be filing an omnibus motion and asking to recall all four of them.

MR. SKINNER: Okay.

MR. BROWNLIE: And we will check our production records for the transcripts that we referenced during today's hearing.

Page 260

MR. CIOSCHI: I don't think we got any production from you guys.

MR. BROWNLIE: I'll mark those as -- what number are we up to?

THE COURT REPORTER: 19.

MS. HAYES: Wait, I think they were already marked. One second.

MR. BROWNLIE: I think they were marked during Mr. Napiorski's deposition, to be quite frank.

MR. CIOSCHI: I don't think so.

MR. BROWNLIE: You might check the deposition transcripts and get back to me.

MR. CIOSCHI: How about you just produce them, Josh?

MR. BROWNLIE: Why don't you check to see if you have them.

I think you are correct.

MS. HAYES: I want to say it's Exhibit D8. I need to look at what I have.

MR. BROWNLIE: We'll supply a copy in any event --

MR. CIOSCHI: Thank you for the courtesy.

MR. BROWNLIE: -- but I'm fairly

Page 261

certainly that they were marked at ADA Napiorski's deposition, so you do have them.

MR. CIOSCHI: Okay.

MR. BROWNLIE: Anything else for the record?

MS. HAYES: No.

MR. BROWNLIE: Ms. Nelson, I appreciate your patience.

THE WITNESS: Thank you.

MR. BROWNLIE: This case involves a lot of heightened interest and I appreciate your candor.

THE COURT REPORTER: Can I please have orders before we go off of the record?

MR. BROWNLIE: I'll take a copy, full and mini.

MR. CIOSCHI: Full and mini.

MR. SKINNER: We'll do full and mini, as well.

THE COURT REPORTER: Thank you.

(Witness excused.)

(Deposition concluded at 4:21 p.m.)

C E R T I F I C A T E

I, ANGELA NOVAK, a Court Reporter and Notary Public of the Commonwealth of Pennsylvania and the State of New Jersey, do hereby certify that prior to the commencement of the examination, ADA JULIE MICHELLE NELSON, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date herein before set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.



_______________________________________

Notary Public of the Commonwealth of Pennsylvania

My Commission expires August 11, 2028

Dated:  July 30, 2026



INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.



E R R A T A   S H E E T

WITNESS'S NAME ________________________________

DATE OF DEPOSITION ______________________________

CASE NAME _______________________________________

PAGE   LINE CORRECTION

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________



ACKNOWLEDGEMENT OF DEPONENT

I, ____________, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

DATE: ___________________

________________________




A.67

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | | |
|---|---|---|
| Eduardo Ramirez<br>*Plaintiff*<br>v.<br>City of Philadelphia, et. al.<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Civil Action No. 24-cv-3035 |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Office of the District Attorney, Curtosy of Shae Skinner, Esq.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: SEE ATTACHED SUBPOENA RIDER.

| Place: Marshall Dennehey P.C.<br>2000 Market St, Suite 2300, Philadelphia, PA 19103<br>ATTN: John Gonzales, Esq. & Joshua Brownlie, Esq. | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time:<br>30 DAYS AFTER SERVICE OF THIS SUBPOENA. |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/23/2026

*CLERK OF COURT*

_______________________ OR [signature]

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Detective Paul Worrell, who issues or requests this subpoena, are:

Joshua Brownlie, Esq. - 2000 Market St., Suite 2300, Philadelphia, PA 19103 - JWBrownlie@mdwcg.com - 215-575-2816

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 24-cv-3035

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________

on *(date)* ____________ .

❐ I served the subpoena by delivering a copy to the named person as follows: ______________

______________________________________________________________

______________________________ on *(date)* ____________ ; or

❐ I returned the subpoena unexecuted because: ______________________________

______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).



A.70

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDUARDO RAMIREZ,<br>*Plaintiff*,<br>v.<br>CITY OF PHILADELPHIA, ET AL.,<br>*Defendants*. | Civil Action No.: 2:24-cv-03035 |

**RIDER TO SUBPOENA DUCES TECUM**

Pursuant to Federal Rule of Civil Procedure 45, you are commanded to produce the following documents and electronically stored information at the date, time, and location specified in the accompanying subpoena.

**DEFINITIONS**

"**You**," "**Your**," or "**Recipient**" means the individual or entity to whom this subpoena is directed, including all attorneys, law firms, partners, associates, counsel, employees, agents, investigators, consultants, paralegals, legal assistants, contractors, representatives, or any other persons acting or purporting to act on their behalf, or within their possession, custody, or control.

"**Document**" or "**Documents**" shall have the broadest meaning permitted under applicable law, including Rule 34(a) of the Federal Rules of Civil Procedure, and includes every original, draft, non-identical copy, electronically stored information, writing, recording, photograph, image, chart, graph, data compilation, or other tangible thing from which information can be obtained, whether maintained in paper, electronic, digital, cloud-based, or any other form.

"**Electronically Stored Information**" or "**ESI**" shall have the broadest meaning permitted under Rule 34(a) of the Federal Rules of Civil Procedure and includes, without limitation, emails, text messages, instant messages, messaging application communications, social media

communications, direct messages, voicemail, calendars, electronic notes, databases, metadata, spreadsheets, word-processing files, presentations, digital photographs, audio recordings, video recordings, computer files, cloud-based files, backup media, and all other electronically stored data, regardless of the storage medium.

Unless otherwise agreed, ESI shall be produced in native format or in a reasonably usable form, including associated metadata (*e.g.*, date created, date modified, author, recipients).

"**Communication**" means every manner or means of transmitting or exchanging information, whether oral, written, electronic, recorded, or otherwise memorialized, including correspondence, letters, emails, text messages, instant messages, messaging application communications, social media communications, memoranda, notes of conversations, telephone records, voicemail messages, audio recordings, video recordings, and all attachments or enclosures thereto.

"**Matter**" or "**Underlying Matter**" means all matters relating to Plaintiff Eduardo Ramirez (DOB: November 10, 1976), including, without limitation, the investigation, arrest, prosecution, conviction, direct appeal, post-sentence proceedings, collateral proceedings, proceedings under Pennsylvania's Post Conviction Relief Act ("PCRA"), state and federal habeas corpus proceedings, innocence claims, Conviction Integrity Unit review, Federal Litigation Unit review, Civil Litigation Unit review, Law Division review, appellate review, DNA or other forensic testing or analysis, evidentiary review, vacatur of Plaintiff's conviction, entry of the nolle prosequi, any investigation or evaluation concerning Plaintiff's actual innocence or alleged wrongful conviction claims, any communications or decisions concerning the foregoing, and all claims, defenses, investigations, discovery, motions, proceedings, appeals, and litigation arising out of or relating to *Ramirez v. City of Philadelphia, et al.*, No. 2:24-cv-03035 (E.D. Pa.), including all matters relating

to Philadelphia County Court of Common Pleas Docket No. CP-51-CR-0903912-1996, and any related criminal, civil, administrative, or appellate proceeding arising from or relating to those events.

"**Philadelphia District Attorney's Office**," "**DAO**," or "**District Attorney's Office**" means the Philadelphia District Attorney's Office, including all of its divisions, bureaus, units, offices, departments, task forces, and components, as well as all current and former elected District Attorneys, First Assistant District Attorneys, Assistant District Attorneys, special prosecutors, detectives, investigators, law clerks, paralegals, legal assistants, interns, administrative personnel, records custodians, employees, agents, representatives, consultants, contractors, and any other persons acting or purporting to act on its behalf.

"**Witness**" means any individual identified in the Schedule of Witnesses attached to this Rider, or any person reasonably understood to be acting on behalf of or in conjunction with such individual with respect to the subject matter of this litigation.

"**Relating To**" or "**Concerning**" shall be construed broadly to mean constituting, referring to, reflecting, evidencing, memorializing, discussing, describing, identifying, mentioning, supporting, contradicting, transmitting, receiving, responding to, commenting upon, summarizing, analyzing, or otherwise pertaining in any way, directly or indirectly, to the identified subject matter.

"**Including**" means "including, but not limited to."

**DOCUMENT REQUEST NO. 1**

Produce the complete file maintained by the Philadelphia District Attorney's Office relating to Plaintiff Eduardo Ramirez and the Ramirez Matter, including all Documents and ESI, whether maintained in paper or electronic form, concerning the investigation, prosecution, post-conviction proceedings, collateral proceedings, innocence review, vacatur of Mr. Ramirez's conviction, entry of the nolle prosequi, and the claims and defenses asserted in this litigation.

This request includes, without limitation, all Documents and ESI maintained by, created by, received by, transmitted to or from, reviewed by, relied upon by, or otherwise within the possession, custody, or control of the Philadelphia District Attorney's Office, including, but not limited to:

a) the Conviction Integrity Unit;

b) the Law Division, including its Federal Litigation Unit, Civil Litigation Unit, PCRA Unit, and Appeals Unit;

c) every other division, bureau, unit, section, office, task force, committee, or working group of the Philadelphia District Attorney's Office;

d) every Assistant District Attorney, investigator, detective, law clerk, paralegal, legal assistant, analyst, consultant, employee, contractor, intern, volunteer, or agent acting on behalf of the Philadelphia District Attorney's Office;

e) every shared drive, document management system, evidence management system, litigation database, case management system, cloud repository, email account, messaging platform, archive, backup, server, mobile device, electronic repository, or other physical or electronic location where responsive Documents or ESI may exist;

f) every draft, revision, redline, tracked-change version, handwritten annotation, margin note, comment, version history, metadata, audit trail, and prior version of any responsive Document or ESI;

g) all handwritten notes, interview notes, investigator notes, legal pads, meeting notes, calendars, Outlook entries, Teams meetings, Zoom meetings, telephone logs, call histories, voicemail, audio recordings, video recordings, photographs, presentations, chronologies,

timelines, memoranda, reports, analyses, recommendations, factual summaries, legal research, and internal working papers;

h) every Document or ESI relating to the identification, location, preservation, collection, review, analysis, authentication, testing, chain of custody, transfer, storage, or destruction of evidence relating to the Ramirez Matter; and

i) every Document or ESI sufficient to identify the existence or location of any responsive Document, ESI, custodian, repository, or source of information.

**DOCUMENT REQUEST NO. 2**

Produce every Communication relating to Plaintiff Eduardo Ramirez or the Ramirez Matter that is within the possession, custody, or control of the Philadelphia District Attorney's Office, including, without limitation, Communications:

a) among employees, attorneys, investigators, or representatives of the Philadelphia District Attorney's Office;

b) between the Conviction Integrity Unit and any other division, bureau, unit, or employee of the Philadelphia District Attorney's Office;

c) between the Law Division, including its Federal Litigation Unit, Civil Litigation Unit, PCRA Unit, and Appeals Unit, and any other division, bureau, unit, or employee of the Philadelphia District Attorney's Office;

d) between the Conviction Integrity Unit and the Law Division;

e) between the Philadelphia District Attorney's Office and Plaintiff Eduardo Ramirez or anyone acting on his behalf;

f) between the Philadelphia District Attorney's Office and any attorney representing Plaintiff;

g) between the Philadelphia District Attorney's Office and the Innocence Project of Pennsylvania and the Federal Defenders Association, including any investigator, detective, clerk, paralegal, assistant, analyst, consultant, employee, contractor, intern, volunteer, or agent acting on behalf of thereof;

h) between the Philadelphia District Attorney's Office and any law enforcement agency, governmental agency, prosecutorial agency, forensic laboratory, expert, consultant, contractor, or investigator;

i) between the Philadelphia District Attorney's Office and any Witness;

j) concerning the investigation, prosecution, post-conviction proceedings, innocence review, DNA testing, evidentiary review, vacatur proceedings, the decision to enter a nolle prosequi, this litigation, or any issue relating to the Ramirez Matter;

k) maintained in any email system, Microsoft Teams, Slack, Signal, WhatsApp, iMessage, text messaging platform, instant messaging application, collaboration platform, cloud-based messaging service, or other electronic communications system;

l) including all attachments, enclosures, embedded files, hyperlinks, metadata, read receipts, delivery confirmations, calendar invitations, meeting agendas, attendee lists, handwritten notes memorializing oral communications, and any draft or revised versions thereof.

**DOCUMENT REQUEST NO. 3**

Produce every Document and ESI reflecting, referring to, discussing, analyzing, evaluating, recommending, approving, memorializing, or otherwise relating to the factual basis, evidentiary basis, legal basis, reasoning, deliberations, recommendations, conclusions, or decision-making process that resulted in:

a) the Conviction Integrity Unit's review of the Ramirez Matter;

b) any recommendation or determination concerning Plaintiff's conviction;

c) any recommendation or determination concerning Plaintiff's innocence;

d) any recommendation or determination to support vacatur of Plaintiff's conviction;

e) any recommendation or determination not to pursue further prosecution;

f) the decision to enter a nolle prosequi;

g) any position taken by the Philadelphia District Attorney's Office in any PCRA, habeas, appellate, or civil proceeding relating to the Ramirez Matter.

This request expressly includes every draft, memorandum, chronology, factual summary, recommendation, legal analysis, investigative report, interview summary, note, comment, revision, and Communication relating thereto.

**PRIVILEGE LOG**

Pursuant to Federal Rules of Civil Procedure 26(b)(5)(A) and 45(e)(2)(A), if the Philadelphia District Attorney's Office withholds or redacts any responsive Document or ESI, in whole or in part, on the basis of the attorney-client privilege, work-product doctrine, deliberative process privilege, or any other asserted privilege, immunity, or protection, the Philadelphia District Attorney's Office shall expressly make the claim and contemporaneously produce a privilege log sufficient to enable the parties to assess the applicability of the asserted privilege, immunity, or protection.

For each withheld or redacted Document or ESI, the privilege log shall identify:

a) the date of the Document or Communication;

b) the author(s), creator(s), or sender(s);

c) every recipient, including all copied and blind-copied recipients;

d) the type of Document or ESI (*e.g.*, email, memorandum, handwritten notes, draft memorandum, text message, meeting notes, presentation, report);

e) the custodian from whose files the Document or ESI was collected;

f) the Bates number(s) of any redacted version produced, if applicable;

g) a description of the subject matter sufficient to permit evaluation of the asserted privilege;

h) the specific privilege, immunity, or protection asserted;

i) the factual basis supporting the assertion of privilege, immunity, or protection, including, where applicable, the identities and capacities of all persons participating in the Communication; and

j) whether the Document or ESI has been withheld in its entirety or produced in redacted form.

If only a portion of a responsive Document or ESI is withheld on the basis of privilege, immunity, or protection, the Philadelphia District Attorney's Office shall produce the non-privileged portions of the Document or ESI with the privileged material redacted, and each redaction shall be separately identified in the accompanying privilege log.

No Document or ESI shall be withheld or redacted based upon a generalized or categorical assertion of privilege. Each withheld or redacted Document or ESI shall be identified individually.

## FORM OF PRODUCTION

All Documents and ESI shall be produced in the form in which they are ordinarily maintained or in a reasonably usable form that preserves the original information, organization, functionality, searchability, and metadata of the responsive Documents and ESI.

All responsive ESI shall be produced in native format. If the Philadelphia District Attorney's Office contends that native production of any responsive ESI is not feasible, it shall identify each such Document or category of Documents, state with specificity the reasons native production cannot be accomplished, and produce the ESI in the most complete and reasonably usable form available while preserving all available metadata.

Each responsive electronic Document shall be produced together with all associated metadata maintained in the ordinary course of business, including:

a) custodian;

b) file name;

c) original file path or storage location;

d) document title;

e) author or creator;

f) date created;

g) date last modified;

h) date last accessed;

i) sender;

j) recipients, including copied and blind-copied recipients;

k) subject line;

l) parent-child relationships, including all attachments and embedded files;

m) document type;

n) hash value or other unique identifier, if maintained;

o) Bates number(s), if assigned; and

p) all other metadata maintained in the ordinary course of business that may assist in identifying, authenticating, searching, reviewing, or understanding the responsive Document or ESI.

Emails and other electronic Communications shall be produced together with all attachments, embedded documents, hyperlinks maintained as part of the Communication, calendar invitations, meeting responses, read receipts, delivery receipts, routing information, and complete parent-child family relationships. Attachments shall not be separated from their parent Communications.

Spreadsheets, databases, presentations, audio recordings, video recordings, photographs, electronic calendars, Microsoft Teams data, messaging-platform communications, and any other electronically stored files whose functionality, formulas, revision history, comments, tracked changes, or metadata would be lost through image conversion shall be produced in native format.

The production shall include all drafts, prior versions, tracked changes, comments, annotations, revision histories, audit logs, version histories, embedded information, hidden text, and metadata associated with responsive Documents and ESI.

Documents maintained only in paper form shall be produced in searchable PDF format with optical character recognition ("OCR") text, together with all available attachments and enclosures, and shall be Bates numbered.

Responsive Documents and ESI shall be produced as maintained in the ordinary course of business and shall not be altered, reformatted, compressed, deduplicated in a manner that obscures custodial information, or otherwise manipulated so as to impair their evidentiary value or usability.

Documents shall not be stripped of metadata, attachments, embedded objects, or document-family relationships.

If any responsive Document or ESI cannot be produced in its original format, has been altered, is encrypted, password protected, corrupted, lost, destroyed, or otherwise unavailable, the Philadelphia District Attorney's Office shall identify the affected Document or ESI, describe the nature of the information, state the reason for the inability to produce it in its original form, identify the custodian, specify the date and circumstances giving rise to its unavailability, and produce the Document or ESI in the most complete and reasonably usable form available.

The Philadelphia District Attorney's Office shall produce all responsive Documents and ESI within its possession, custody, or control, regardless of whether such Documents or ESI are maintained by the Conviction Integrity Unit, the Law Division (including the Federal Litigation Unit, Civil Litigation Unit, PCRA Unit, or Appeals Unit), any other division, bureau, office, employee, investigator, contractor, consultant, or agent of the Philadelphia District Attorney's Office, or in any physical or electronic repository under its possession, custody, or control, including email systems, document management systems, litigation databases, case management systems, cloud repositories, shared drives, mobile devices, archived media, backup systems, or other storage locations.

The Philadelphia District Attorney's Office shall identify each custodian and repository searched in responding to this subpoena and shall preserve the parent-child relationships of all responsive Documents and ESI throughout the production process.

**SCHEDULE OF WITNESSES**

| Witness | Time Period |
|---|---|
| Mary Emanuel | January 1, 2015 through Present |
| Luis Rivera | January 1, 2015 through Present |
| Sarah Hurd | January 1, 2015 through Present |
| David Wadsworth | January 1, 2015 through Present |
| Joseph McDevitt | January 1, 2015 through Present |
| Jay Darnell Jr. | January 1, 2015 through Present |
| Thomas Dennis | January 1, 2015 through Present |
| Shirley Rivera | January 1, 2015 through Present |
| William Weihe | January 1, 2015 through Present |
| Melanie Forman | January 1, 2015 through Present |
| Peter Gozzi | January 1, 2015 through Present |
| Samuel Emanuel | January 1, 2015 through Present |
| Brook Williams | January 1, 2015 through Present |
| Jeannine Maio | January 1, 2015 through Present |
| Catherine & Gerald Maio | January 1, 2015 through Present |
| Billie Joe Blood | January 1, 2015 through Present |
| Maureen Suarez | January 1, 2015 through Present |
| Sabrina Suarez | January 1, 2015 through Present |
| Kristine Smith | January 1, 2015 through Present |
| Corey Wadkins | January 1, 2015 through Present |
| Nathaniel Rodriguez | January 1, 2015 through Present |
| Mark Scott Sedley, Esq. | January 1, 2015 through Present |

| | |
|---|---|
| Ronald Rowan | January 1, 2015 through Present |
| Kenneth Oberholzer | January 1, 2015 through Present |
| Patrick Oberholzer | January 1, 2015 through Present |
| Steve Boyd | January 1, 2015 through Present |
| Detective Walter Hoffner | January 1, 2015 through Present |
| Brian O'Leary, Esq. | January 1, 2015 through Present |
| Michael Wiseman, Esq. | January 1, 2015 through Present |
| Alan Tauber, Esq. | January 1, 2015 through Present |
| Christina Matthias, Esq. | January 1, 2015 through Present |
| Jon Cioschi, Esq. | January 1, 2015 through Present |
| Nilam Sangvhi, Esq. | January 1, 2015 through Present |
| Theodore Tanski, Esq. | January 1, 2015 through Present |
| Hon. Arianna Freeman | January 1, 2015 through Present |
| Leigh Skipper, Esq. | January 1, 2015 through Present |
| Brett Sweitzer, Esq. | January 1, 2015 through Present |
| Andrew Reed Childers, Esq. | January 1, 2015 through Present |
| Susan Lin, Esq. | January 1, 2015 through Present |

| | |
|---|---|
| **From:** | Brownlie, Joshua W. |
| **Sent:** | Friday, September 25, 2026 9:03 AM |
| **To:** | Michelle Paznokas |
| **Cc:** | Shea Skinner; Jennie Doran; Gonzales, John P.; Carmelite, Donald L.; Hubbert, Coryn D. |
| **Subject:** | RE: Ramirez v. City of Philadelphia |
| **Attachments:** | Ramirez v. City of Phila. - 7.23.26 Subpoena to Phila. District Attorney's Office(303165706.1).pdf; (77) Ramirez - Stipulation and Order that DA will withdraw(302531081.1).pdf |

Shelly:

I understand that you are newly assigned to the matter, but we cannot agree to another three-week delay.

The subpoena was served on July 23rd. On the eve of the thirty-day compliance deadline, the DAO requested additional time. We accommodated that request and agreed to a four-week extension, moving the deadline to September 18th. That extended deadline has now passed without the required production, without communication from your office, and with no explanation for the failure to comply.

We appreciate that Shea has been unexpectedly unavailable at the end of the four-week extension and that Mr. Gaeta is screened from this matter. Neither circumstance, however, affects the Civil Litigation Unit's ability or obligation to comply with a subpoena directed to the DAO. Nor does the internal reassignment of this matter justify further delay, particularly where the DAO requested and received four additional weeks to complete its production.

The subpoena was necessitated by deficiencies in the DAO's first production. In fact, it was only through the depositions of former ADAs that we learned additional responsive materials existed and were withheld by the DAO without service of a privilege log. The subpoena was intended to address those deficiencies, and the DAO has now had more than two months—and an agreed extension—to comply.

We have our own discovery deadline to meet and cannot continue delaying this discovery. Please provide the partial production and privilege log, if any, immediately and confirm when the balance will be produced. We are not agreeing to an additional three weeks. If the DAO cannot complete its production promptly, we will proceed with a motion to compel and advise the Court of the history outlined above.

Thanks.

MARSHALL DENNEHEY

**Joshua W. Brownlie**
*Attorney at Law*
2000 Market Street, Suite 2300, Philadelphia, PA 19103
Direct: (215) 575-2816 | Main: (215) 575-2600 | Fax: (215) 575-0856
bio | e-mail | website

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to JWBrownlie@MDWCG.com, or by telephone at (215) 575-2816 and then delete the message and its attachments from your computer.

**From:** Michelle Paznokas <Michelle.Paznokas@phila.gov>
**Sent:** Thursday, September 24, 2026 4:49 PM
**To:** Brownlie, Joshua W. <JWBrownlie@MDWCG.com>
**Cc:** Shea Skinner <Shea.Skinner@Phila.gov>; Jennie Doran <Jennie.Doran@Phila.gov>
**Subject:** Re: Ramirez v. City of Philadelphia

**WARNING: This email originated outside Marshall Dennehey. BE CAUTIOUS before clicking any link or attachment.**

Good afternoon, Josh -

As Shea indicated below, he has been unexpectedly out of the office. As you also likely know, Tom Gaeta is screened from the case, which is why we haven't been able to answer your past few emails.

I'm newly assigned to this matter and will need a little more time to get up to speed. We should be able to provide a partial production within the next week. We can likely respond to whatever else is outstanding within 2 to 3 weeks.

Have a great evening.

Best,
Shelly

**Michelle Paznokas** *(she/her)*
Assistant District Attorney | Law Division
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107

---

**From:** Shea Skinner <Shea.Skinner@Phila.gov>
**Sent:** Thursday, 24 September 2026 11:07:39
**To:** Brownlie, Joshua W. <jwbrownlie@mdwcg.com>
**Cc:** Steven Nelson <Steven.Nelson@phila.gov>; Jennifer Huege <Jennifer.Huege@phila.gov>; Jennie Doran <Jennie.Doran@Phila.gov>; David Napiorski <David.Napiorski@Phila.gov>; IAMir@MDWCG.com <IAMir@MDWCG.com>; Gonzales, John P. <jpgonzales@mdwcg.com>
**Subject:** Fw: Ramirez v. City of Philadelphia

Greetings Josh,

I've been out of the office for some time and am just returning today. My understanding is that this matter has been reassigned to a different DAO attorney moving forward. I'm forwarding this email to members of our Civil Litigation unit for any additional follow up.

Appreciatively,

**Shea Skinner**

Assistant District Attorney

Appeals Unit

Philadelphia District Attorney's Office

215-686-7644

*he/him*

---

**From:** Brownlie, Joshua W. <JWBrownlie@MDWCG.com>
**Sent:** Tuesday, September 22, 2026 8:21 AM
**To:** Shea Skinner <Shea.Skinner@Phila.gov>
**Cc:** Gonzales, John P. <jpgonzales@mdwcg.com>; Mir, Ilsa A. <IAMir@MDWCG.com>
**Subject:** FW: Ramirez v. City of Philadelphia

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

---

Shea:

I am following up again regarding the DAO's outstanding production. Pursuant to the parties' stipulated extension, the production was due Friday, September 18th. We followed up yesterday morning after that deadline passed and have received neither the production nor a response regarding its status.

Please provide the production today or, at minimum, advise us today when we can expect to receive it. If there is an issue preventing compliance with the stipulated deadline, we need to know what that issue is and when it will be resolved.

We will otherwise move to compel without a response.


**Joshua W. Brownlie**
*Attorney at Law*
2000 Market Street, Suite 2300, Philadelphia, PA 19103
Direct: (215) 575-2816 | Main: (215) 575-2600 | Fax: (215) 575-0856
bio | e-mail | website



This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to JWBrownlie@MDWCG.com, or by telephone at (215) 575-2816 and then delete the message and its attachments from your computer.


---

**From:** Brownlie, Joshua W.
**Sent:** Monday, September 21, 2026 9:01 AM
**To:** Shea Skinner <shea.skinner@phila.gov>
**Cc:** Gonzales, John P. <JPGonzales@MDWCG.com>
**Subject:** Ramirez v. City of Philadelphia
**Importance:** High

Shea:

Pursuant to the parties' stipulated extension, the DAO's production was due Friday, September 18, 2026. We have not yet received the production or any update from your office regarding its status.

Please let us know when we can expect the DAO's production.

Thanks.

**Joshua W. Brownlie**
*Attorney at Law*
2000 Market Street, Suite 2300, Philadelphia, PA 19103
Direct: (215) 575-2816 | Main: (215) 575-2600 | Fax: (215) 575-0856
bio | e-mail | website

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to JWBrownlie@MDWCG.com, or by telephone at (215) 575-2816 and then delete the message and its attachments from your computer.